UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| | ) |
| | )   No.   1:20-cv-03000 |
| MARIAM DAVITASHVILI, ADAM BENSIMON, | ) |
| and MIA SAPIENZA, individually and on behalf of | ) |
| all others similarly situated, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )   **CLASS ACTION COMPLAINT** |
| | ) |
| GRUBHUB INC. (a/d/b/a SEAMLESS), | ) |
| DOORDASH INC., POSTMATES INC., and | )   **Jury Trial Demanded** |
| UBER TECHNOLOGIES, INC., in its own right and | ) |
| as parent of wholly owned subsidiary UBER EATS, | ) |
| | ) |
| Defendants. | )   **FILED VIA ECF** |

_____

Plaintiffs Mariam Davitashvili, Adam Bensimon, and Mia Sapienza (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by the undersigned attorneys, allege as follows for this Class Action Complaint against Defendants Grubhub Inc. (also doing business as Seamless) ("Grubhub"), DoorDash Inc. ("DoorDash"), Postmates Inc. ("Postmates"), and Uber Technologies, Inc. ("Uber"), in its own right and as parent of wholly owned subsidiary Uber Eats ("Uber Eats"). These allegations are made on information and belief, and pursuant to investigation by Plaintiffs' counsel.

## NATURE OF THE CASE

1.      Defendants Grubhub, Uber and/or Uber Eats, Postmates, and DoorDash own and operate software platforms (the "Delivery Apps") that digitally connect restaurants to consumers who want meal takeout or meal delivery.[1]  By providing consumers with a list of restaurants in their apps, Defendants promote themselves to restaurants as more than just an electronic transaction platform, but also a marketing service.

2.      Defendants obtained their monopoly power over both meal delivery consumers and restaurants in the relevant Geographic Submarkets[2] by being first to market Online Meal Ordering Platforms in the various submarkets.  Because of the Delivery Apps' market control in the respective markets, consumers and restaurants have little choice but to do business with them.  For example, in New York City Geographic Submarket, Grubhub has a whopping 66% marketshare of the Meal Delivery Market.[3]

3.      Defendants' monopoly power in a Meal Delivery Market is reflected by their fees, which range from 13.5%–40% of revenues, even though the average restaurant's profits range from 3%–9% of revenues.  Defendants' fees are shocking when one considers how little value Defendants provide to restaurants and consumers.  In contrast to platforms like American Express—which earns its 3.5% fees by offering consumers special products, experiences, benefits, exclusive membership services, and loyalty programs—Defendants merely offer a list of local restaurants that can easily be found on Google or Yelp for free.  As TechCrunch put it in

---

[1]  Hereinafter, "meal delivery" and "meal takeout" will be collectively referred to as "meal delivery."

[2]  This term as used herein is defined below.

[3]  This term as used herein is defined below.

a March 16, 2020 article, "the primary differentiation between delivery apps today is not based on innovations that meaningfully impact user experience, but instead comes down to a handful of restaurant brands with which the various apps are in a land grab to create exclusive delivery relationships."[4]

4.      Unable to compete on anything that "meaningfully impact[s] user experience," each Defendant instead uses its monopoly power in the meal delivery market to prevent competition and limit consumer choice.  Specifically, Defendants use their market power to impose unlawful price restraints in their merchant contracts, which have the design and effect of restricting price competition from competitors in order to maintain the Delivery Apps' market share.

5.      In their form contracts with restaurants, Defendants include clauses requiring uniform prices for restaurants' menu items throughout all purchase platforms (the "No Price Competition Clause" or "NPCC").  The NPCCs prevent restaurants from charging different prices to meal delivery customers than they charge to dine-in customers for the same menu items.  The purpose and effect of the No Price Competition Clause is to act as an unlawful price restraint that prevents restaurants from gaining marketshare and increased profitability per consumer by offering lower prices to consumers.  The NPCCs target and harm not only restaurants, but also two distinct classes of consumers: (1) consumers who purchase directly from restaurants in the Meal Delivery Market; and (2) consumers who buy their meals in the separate and distinct restaurant Dine-In Market.[5]  Both restaurants and consumers would benefit absent Defendants' unlawful restraints,

_____

[4]  *See* https://techcrunch.com/2020/03/16/the-hidden-cost-of-food-delivery/.  All URL links cited herein are current as of April 10, 2020.

[5]  This term as used herein is defined below.

6. The rise of the four Defendants has come at great cost to American society. Defendants offer restaurants a devil's choice: in exchange for permission to participate in Defendants' Meal Delivery monopolies, restaurants must charge supra-competitive prices to consumers who do not buy their meals through the Delivery Apps,[6] ultimately driving those consumers to Defendants' platforms. Unable to offer consumers the increased choice of paying better prices to dine-in, restaurants have seen precious dine-in customers slip away year after year.

7. Defendants' NPCCs work by forcing Direct and Dine-In consumers to shoulder Defendants' exorbitant economic rents. While both meals sold through Defendants' platforms and directly from the restaurant share the same costs and overhead, meals sold through the Delivery Apps are more expensive, because of Defendants' high fees. Restaurants must calibrate their prices to the more costly meals served through the Delivery Apps in order to not lose money on those sales. Defendants' unlawful NPCCs then force restaurants to also charge those higher prices to Dine-In and Direct Consumers, even though the cost of those consumers' meals are lower as they do not include Defendants' exorbitant fees.

8. Absent Defendants' unlawful restraints, restaurants could offer consumers lower prices for direct sales, because direct consumers are more profitable. This is particularly true of Dine-In consumers, who purchase drinks and additional items, tip staff, and generate good will. Restaurants cannot offer Plaintiffs and the class this lower cost option, because the Delivery Apps' No Price Competition Clauses prevent them from doing so.

---

[6] These include consumers who purchase their delivery meals directly from the restaurant via the restaurant's website or app, or via telephone ("Direct" consumers); as well as consumers who Dine-In.

9.      If consumers were offered discounts for Direct sales, they would buy most of their Delivery Meals directly.  Since consumers have a limited number of restaurants available to them that are within their delivery range, cuisine preference, and price preference, consumers rarely discover new restaurants when they order food delivery.  Instead, once a consumer discovers that they like, for example, the famous khachapuri at Cheeseboat restaurant, they are likely to reorder that item again and again.  Even a small discount reflecting the decreased cost of Direct sales would drive direct purchases because of the substantial savings to those consumers over time, creating benefits to both the restaurant and the consumer.

10.      Unable to compete on the basis of price due to Defendants' unlawful restraints, restaurants have seen their precious Dine-In market cannibalized by Defendants' Delivery Apps. Plaintiffs bring this claim for relief on behalf of all Americans who would still to enjoy a nice dinner out with their family before Defendants make that impossible.

**PARTIES**

**A.    Plaintiffs**

11.      Mariam Davitashvili resides in New York State.  Ms. Davitasvhili is a consumer who purchased Dine-In and Direct meals in New York City restaurants that are contracted with the Delivery Apps.

12.      Adam Bensimon resides in New York State.  Mr. Bensimon is a consumer who purchased Dine-In and Direct meals in restaurants in New York, NY, Boston, MA, New Orleans, LA, Philadelphia, PA, and Portland, ME that are contracted with the Delivery Apps.

13.      Mia Sapienza resides in New York State.  Ms. Sapienza is a consumer who purchased Dine-In and Direct meals in restaurants in New York, NY, Boston, MA, Los Angeles, CA, Philadelphia, PA, and Washington DC that are contracted with the Delivery Apps.

B.       **Defendants**

**DoorDash**

14.       Defendant DoorDash Inc. ("DoorDash") is located at 901 Market St., Suite 600,

San Francisco, California.  DoorDash describes itself as "enabl[ing] delivery in areas where it

was not available" and "empower[ing] small business owners to offer delivery in an affordable

and convenient way" "by enabling restaurant food delivery."  DoorDash states that it has

partnered with more than 300,000 restaurants in more than 4,000 cities in the U.S. and Canada.

In addition to countless local partner restaurants, national partners include McDonald's, and

Wendy's.

15.       DoorDash boasts that it has the top Delivery App market share in North America,

with 80% consumer reach.  According to a Nov. 13, 2019 report by Bloomberg, DoorDash

comprises 35% of consumer spending in the food delivery category in the U.S.[7]  DoorDash does

not regularly publicly disclose its financials; however, a December 4, 2019 report from The

Information estimated its net revenue for that year at $900 million to $1 billion.[8]  On February

27, 2020, DoorDash announced it had confidentially submitted a draft registration statement with

the U.S. Securities and Exchange Commission ("SEC") concerning a proposed initial public

offering.[9]  On April 4, 2020, The Economist reported DoorDash's valuation at $13 billion.[10]

---

[7]  *See* https://www.bloomberg.com/news/articles/2019-11-13/doordash-picks-up-another-100-million-at-nearly-13-billion-valuation

[8]  *See* https://www.theinformation.com/articles/with-public-debut-looming-doordash-projected-450m-2019-loss

[9]  *See* https://www.prnewswire.com/news-releases/doordash-announces-confidential-submission-of-draft-registration-statement-for-proposed-initial-public-offering-301012714.html

[10]  *See* https://www.economist.com/briefing/2020/04/04/technology-startups-are-headed-for-a-fall

16.     DoorDash takes a "commission" from restaurants for processing orders that ranges from 10%–25%.[11]

**Grubhub**

17.     Defendant Grubhub Inc. (a/d/b/a Seamless) ("Grubhub") is located at 111 W. Washington St., Suite 2100, Chicago, Illinois.  Grubhub describes itself as an online and mobile food-ordering and delivery marketplace.  Grubhub states that it has partnered with more than155,000 restaurants in over 3,200 U.S. cities and London. The Grubhub portfolio of brands includes Grubhub, Seamless, LevelUp, AllMenus and MenuPages.

18.     Grubhub's power in U.S. markets is growing exponentially.  As reported in Grubhub's press release, dated February 5, 2020, it was able to double its restaurant selection in the fourth quarter of 2019 over the prior quarter.  In 2019, Grubhub reported revenues of $1.3 billion, a 30% increase over year prior.[12]

19.     Grubhub takes a "marketing commission" from restaurants for processing orders that ranges from 13.5%–40%.

**Postmates**

20.     Defendant Postmates Inc. ("Postmates") is located at 201 3rd St., Floor 2, San Francisco, California.  Postmates describes itself as "transforming the way goods move around cities by enabling anyone to have anything delivered on-demand," a mission that it seeks to fulfill through its "revolutionary Urban Logistics platform connect[ing] customers with local couriers who can deliver anything from any store or restaurant in minutes [and] empower[ing] business through our API [application program interface] to offer delivery."  Postmates states

---

[11] *See* https://appinstitute.com/doordash-commission/

[12] *See* https://investors.grubhub.com/investors/press-releases/press-release-details/2020/Grubhub-Reports-Fourth-Quarter-And-Full-Year-2019-Results/default.aspx

that it has partnered with more than 75,000 restaurants in more than 4,200 cities in the U.S.  In addition to countless local partner restaurants, national partners include Popeyes.

21.     Postmates claims that it is able to reach 80% of U.S. households, and is "#1 In Guest Spend."  According to <u>Second Measure</u>, Postmates is the fourth-largest Delivery App (after DoorDash, Grubhub, and Uber Eats), earning 10 percent of U.S. meal delivery consumer spending in February 2020.[13]  Postmates does not regularly publicly disclose its financials; however, a May 22, 2019 report from <u>The Information</u> estimated its net revenue for the prior year at $400 million.[14]  Postmates was expected to go public in late 2019, but has yet to do so.  A November 19, 2019 report from <u>Barron's</u> put its valuation at $2.4 billion.[15]

22.     Postmates takes a "commission" from restaurants for processing orders that ranges from 15%–30%.[16]

**Uber Eats**

23.     Defendant Uber Eats ("Uber Eats") is a wholly owned subsidiary of Defendant Uber Technologies, Inc. ("Uber"), and is located at 1455 Market St., 4th Floor, San Francisco, California.  Uber describes Uber Eats as "benefiting . . . consumers [by] provid[ing r]estaurants with an instant mobile presence and efficient delivery capability."  Uber reports that Uber Eats has partnered with more than 100,000 restaurants in 6,000 cities internationally.  In addition to countless local partner restaurants, national partners include Starbucks.

---

[13]  *See* https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/

[14]  *See* https://www.theinformation.com/articles/what-uber-tells-us-about-a-postmates-ipo

[15]  *See* https://www.barrons.com/articles/food-delivery-grubhub-doordash-and-uber-eats-51573859107

[16]  *See* https://appinstitute.com/postmates-commission/

24.     According to <u>Second Measure</u>, Uber Eats is the fourth-largest Delivery App (after DoorDash and Grubhub), earning 20 percent of U.S. meal delivery consumer spending in February 2020.[17]  In January 2020, Uber reported that Uber Eats' net revenues in 2019 were $1.38 billion, an 82% increase over year prior.[18]

25.     Uber Eats takes a "fee" from restaurants for processing their orders that ranges from 20%–30%.[19]

**JURISDICTION**

26.     This Court has subject matter jurisdiction based on 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

27.     Venue is proper in this judicial district under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c), because Defendants transact business within this district and the interstate trade and commerce described in this complaint is carried out, in substantial part, in this district. Venue is particularly appropriate in this district because New York City consumers have been particularly victimized by Defendants' conspiracy.

**BACKGROUND**

**A.  Restaurant Economics**

28.     Restaurants in the United States operate in a challenging economic environment where even successful restaurants experience slim, and diminishing profit margins.  As recently as two decades ago, average restaurant profit margins were much higher.  For example, in

---

[17] *See* https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/

[18] *See* https://s23.q4cdn.com/407969754/files/doc_financials/2019/ar/Uber-Technologies-Inc-2019-Annual-Report.pdf

[19] *See* https://appinstitute.com/uber-eats-commission/

Philadelphia, Pennsylvania, restaurant profit margins had been a robust 15%–20%, according to a July 25, 2018 article by <u>Philadelphia</u> magazine; today, profit margins in Philadelphia have shrunk to 4%–7%.[20]

29.     The Restaurant Industry Operations Report published by The National Restaurant Association and Deloitte & Touche LLP, reports that average pre-tax profit margins for restaurants in the United States range from 2%–6% (2% for Full Service and 6% for Limited Service restaurants).[21]

30.     Restaurants may broadly be categorized into four categories: full service, fast food/quick service, food trucks, and catering, with the first three competing in the food delivery market.  Full service restaurants generally experience profits margins[22] of 3%–5%, while quick service restaurants and food trucks have average margins of 6%–9%.

31.     While costs vary, restaurant industry experts state that almost two-thirds of restaurant operational costs are in overhead for such items as rent, employee costs, and utilities.[23] The graphic on the following page from Lightspeed, a point-of-sale company,[24] illustrates this:

---

[20] *See* https://www.phillymag.com/foobooz/2018/07/25/restaurant-profit-margins-philly/

[21] *See* https://www.rrgconsulting.com/ten-restaurant-financial-red-flags.html

[22] *See* https://upserve.com/restaurant-insider/profit-margins/

[23] *See* https://www.restaurantowner.com/public/Restaurant-Rules-of-Thumb-Industry-Averages-Standards.cfm

[24] *See* https://lightspeedhq.com/blog/complete-guide-to-restaurant-profit-margins/



32.     The Dine-In Market is essential for restaurant economic health, as described by restaurant industry consultant Rewards Network:

> Restaurant In On-premise dining sales are the bread and butter of most restaurants, and it's important for restaurants to ensure that their dine-in business remains a strong income source, even as delivery orders soar.

> Dine-in visits tend to account for the most positive guest experiences because the restaurant is able to provide the highest level of service, food, and atmosphere.  Unlike delivery or takeout orders, owners and managers are able to address any negative issues that arise during a customer's meal in real time.  Not only that, it's easier to boost margins through upsells when patrons dine in, especially when it comes to alcohol sales.[25]

## B.  Market Descriptions

### The Meal Delivery Market

33.     Meal delivery markets are distinct two-sided markets defined by geographic area, where one side is comprised of restaurants that sell meals and beverages to be delivered to the other side, consumers who ordered those items.

---

[25]   *See* https://www.rewardsnetwork.com/blog/dine-in-delivery-takeout/

34.     The relevant meal delivery markets for the purposes of this action are New York City, Los Angeles, Chicago, Dallas-Fort Worth, Houston, Washington DC, Miami, Philadelphia, Atlanta, Boston, Phoenix, San Francisco, or any other Geographic Submarket (the "Geographic Submarkets") where Defendants unlawfully exert their market power, as described herein (the "Meal Delivery Markets").

**Online Meal Ordering Platforms**

35.     Beginning in the early 2000s, Online Meal Ordering Platforms ("OMOP") began to gain popularity due to the advent of smartphones and the increased convenience offered by online ordering.  OMOPs are two-sided transactional platforms that allow restaurants and consumers to engage in online transactions to facilitate meal and beverage delivery.

36.     Beginning in the early 2010s, the OMOPs began to overtake more and more of the nationwide meal delivery market, replacing ordering by telephone.  On July 14, 2015, Quartz reported that "Online food delivery ordering is about to overtake phone ordering in the US," observing:

> In the year ended May 2010, approximately 1.39 billion phone delivery orders were placed in the US, according to market research firm NPD.  By May 2015, that number had dropped to about 1.02 billion.  In the same period, online orders more than doubled from approximately 403 million to nearly 904 million.

> GrubHub launched its services in 2004, and has benefitted from both the early start and the change in ordering preferences.  Seamless, which began offering consumers online ordering in 2005, merged with GrubHub in 2013, and the company now includes MenuPages and allmenus as well.  But while GrubHub had a "first mover advantage," according to a report from Cowen and Company, startups are eating away at it—despite its massive network of more than 30,000 restaurants—because consumers are increasingly looking for higher quality food options.

> Services like UberEATS, Caviar, Postmates, and DoorDash are providing delivery services for restaurants that don't have their own, upgrading customers' dinner

choices from the typical pizza, sushi and Chinese food to include more artisanal, freshly prepared, and lovingly packed meal options.[26]

37.     Since their inception, the OMOPs have been highly concentrated in any given geographic market with the two largest competitors controlling the majority of market share nationwide, as illustrated by the following graph from a March 24, 2020 report by Second Measure[27]:



38.     In the early years of the OMOP market, Defendants did not compete on the basis of price, but instead saw the new OMOP market as a gold rush where each attempted to sign up the best available restaurants.  This was a logical strategy as there was no reason to engage in

---

[26] *See* https://qz.com/452609/online-food-delivery-ordering-is-about-to-overtake-phone-ordering-in-the-us/

[27] *See* https://secondmeasure.com/datapoints/food-delivery-services-grubhub-uber-eats-doordash-postmates/.  Defendants' market share is actually higher than represented by the graph. Second Measure notes: "Purchases made through LevelUp, which Grubhub acquired in late 2018, are not included in our analysis.  Neither are college student meal plan purchases made through Grubhub subsidiary Tapingo."

price competition when they could simultaneously increase profits and market share simply by signing up restaurants that did not use an OMOP.

39.     Unconstrained by competition, Defendants have experienced explosive growth.

As <u>Second Measure</u> observed in its March 24, 2020 report:

> Although coronavirus-related sales spikes weren't yet detected in February, sales across the industry did increase 28 percent year-over-year.   And DoorDash's growth continues to stand out.  The company saw an unparalleled 85 percent year-over-year jump in February.

40.     While Defendants continue growth in new markets, they have already carved

America's largest cities, according to <u>Second Measure</u>:



41.     Importantly, Defendants do not share market power equally in each Geographic Submarket.  Instead, most markets are dominated by one or two of the Defendants.  The monopolists in each Geographic Submarket enjoy naturally high barriers to entry from each other because, as transactional two-sided markets, Defendants enjoy very powerful network

effects.  Network effects occur when the value of a market is increased by the additional users in that market.  In the case of OMOPs, the more consumers they have, the more restaurants they can lure, thus enabling them to lure more consumers, and so on.

42.     These barriers to entry protect Defendants from each other.  For example, DoorDash, while the largest OMOP in the United States, has only 15% market share in New York City.  This is because in New York City, both consumers and restaurants know they will benefit from the enhanced network effects of a large network like that of Grubhub (including Seamless), and there is little benefit to using DoorDash which has both substantially fewer consumers and restaurants in New York City.  The costs of building brand and building a network in New York City would thus be relatively high to DoorDash.

43.     However, one group of competitors is not subject to these barriers to entry—the restaurants themselves.  With numerous cheaper OMOP out-of-box solutions available, the restaurants are horizontal competitors with Defendants for the food delivery business.  The restaurants can offer a nearly identical product as Defendants with the same transactional functionality, the same user ease, and results in the same delicious meal for the consumer.

44.     Unlike other two-sided transactional marketplaces, whatever marketing benefit gained by both the consumer and the restaurant when they use the Defendants' platform for the first time is lost.  For the second transaction between them, and every one thereafter, neither the restaurants nor consumers gain anything special from using Defendants' platforms to effectuate their transaction.  The limited geography of OMOP markets means, by definition, consumers will become familiar with the restaurant offerings both within their pallet and delivery range.

45.     The OMOP market generated over $94 billion in revenues in 2019.  The OMOP market was projected to have a revenue volume of almost $130 billion by 2023 even before the Covid-19 crises. [28]

**Direct Sales Market**

46.     The Direct Sales Market includes all sales made directly from a restaurant, including Dine-In, or delivery or takeout orders made over the phone, through the restaurant's app or website.

47.     In order to sell meals directly, numerous out-of-box solutions are available to restaurants to create high quality apps and websites.  For example, AppInstitute offers restaurants the option to have their own digital ordering technology for as low as $44/month.

48.     Toast, which is used by tens of thousands of restaurants worldwide, boasts that it can save restaurants a whopping 13% of their revenues as compared to using Grubhub, and offers loyalty programs.[29]  Similarly, competitor AppInstitute offers options as inexpensive as $66/month, a restaurant may have its own ordering website and app.[30]  ChowNow enables online orders, commission free, for as low as $99/month.[31]

49.     Recently, and in just a matter of months, a startup OMOP called Project Quarantine—a reference to the Covid-19 quarantine—has captured 2,500 restaurant partners. Project Quarantine's secret is that it provides all of the functionality that Defendants do, but for free.

---

[28] *See* https://www.qsrmagazine.com/technology/fighting-share-166-billion-delivery-app-market

[29] *See* https://pos.toasttab.com/about

[30] *See* https://appinstitute.com/pricing/

[31] *See* https://get.chownow.com/pricing

**Dine-In Market**

50.     Like the Meal Delivery Market, the market for in-restaurant dining is comprised of numerous geographically distinct submarkets in cities and towns across the United States (the "Dine-in Market").

51.     Defendants acknowledge that the Dine-in Market is a distinct market from the Meal Delivery Market.  For example, in its October 29, 2019 letter to shareholders, Grubhub implied that restaurant overhead, an obvious component of the economics of the Dine-in Market, is not part of the Meal Delivery Market: "Restaurants profit because their incremental sales from Grubhub orders are greater than the incremental cost of food and demand generation fee paid to Grubhub."

52.     Similarly, in an interview with MarketWatch published on March 23, 2020, Grubhub CEO Matt Maloney responded to a question thusly:

> [MarketWatch]: Can restaurants survive on deliveries alone?
>
> Maloney: Not in the long-term.  The industry isn't large enough for all restaurants to survive just on delivery, but they can survive for a matter of weeks potentially.  It's definitely not a long-term solution to bridge across restaurants.[32]

53.     Echoing GrubHub's comments, Uber boasts in its 2019 annual report that Uber Eats "generates incremental demand and improves margins for [r]estaurants by enabling them to serve more consumers without increasing their existing front-of-house expenses."  And DoorDash's webpage targeting potential restaurant partners promises: "Your restaurant will be

---

[32]  *See* https://www.marketwatch.com/story/restaurants-wont-be-able-to-survive-on-delivery-only-says-grubhub-ceo-matt-maloney-2020-03-21 (the "March 23, 2020 Maloney Interview").

Case 1:20-cv-03000-LAK   Document 1   Filed 04/13/20   Page 18 of 41

seen by millennials, parents, and even companies who need catering – all without the costs of a dine-in experience."[33]

54.      Most recently, the Covid-19 pandemic has annihilated the Dine-in Market, as the quarantines advocated by local, state, and federal government officials categorically precludes participation in the Dine-in Market.  In the next three months, 5 to 7 million servers, cooks, dishwashers, managers and others in the meal and beverage industry are expected to be laid off according to the National Restaurant Association.  The industry as a whole is expected to take a $225 billion loss over that time.[34]

<u>Defendants' Restraints Have Contributed To The Demise of American Restaurant Culture</u>

55.      Defendants' Delivery Apps have been cannibalizing the Dine-in Market since their inception.  As <u>The Atlantic</u> observed on August 2, 2019:

> But another turn is coming: In 2020, more than half of restaurant spending is projected to be "off premise"—not inside a restaurant.  In other words, spending on deliveries, drive-throughs, and takeaway meals will soon overtake dining inside restaurants, for the first time on record.  According to the investment group Cowen and Company, off-premise spending will account for as much as 80 percent of the industry's growth in the next five years.

56.      On November 9, 2019, research group NPD observed, "since 2014 [] total visits to restaurants have declined more than 700 million visits."[35]

**The Delivery Labor Market**

57.      In order to maintain their monopoly over the Meal Delivery Market, in certain Geographic Submarkets the Delivery Apps also sought to monopolize the labor market for

---

[33]  *See* https://get.doordash.com

[34]  *See* March 23, 2020 Maloney Interview.

[35]  *See* https://www.npd.com/wps/portal/npd/us/news/press-releases/2019/when-it-comes-to-eating-patterns-in-america-the-more-things-appear-to-stay-the-same-the-more-they-change/

delivery persons, as delivery persons are an essential component of the Meal Delivery Market. Defendants mostly do business in complex urban environments like New York City, Los Angeles, Chicago, and Miami. Experienced delivery personnel, who know the local streets, apartments, doormen, and customs are vastly more efficient than inexperienced personnel, regardless of their knowledge of the city.

58.     In its October 28, 2019 letter to shareholders, Grubhub admitted that it had not entered the Delivery Labor Market because it expected to profit from it, but instead because it expected to increase restaurant participation as they became more reliant on the platform:

> In 2015, we added delivery capabilities to enable restaurants that didn't have delivery to join our platform. We did this as a means to an end - we knew it would be valuable to have those restaurants on the platform. But, we didn't then, and still don't believe now, that a company can generate significant profits on just the logistics component of the business. It is a commodity and there are significant variable costs that are hard to leverage even with technology and scale. Extremely large delivery/logistics companies can generate slim margins, but only because of the hub and spoke efficiencies they gain at substantial scale. The point-to-point nature of our business mostly eliminates that aspect of operating leverage.
>
> A common fallacy in this business is that an avalanche of volume, food or otherwise, will drive logistics costs down materially. Bottom line is that you need to pay someone enough money to drive to the restaurant, pick up food and drive it to a diner. That takes time and drivers need to be appropriately paid for their time or they will find another opportunity. At some point, delivery drones and robots may reduce the cost of fulfillment, but it will be a long time before the capital costs and ongoing operating expenses are less than the cost of paying someone for 30-45 minutes of their time. <u>Delivery/logistics is valuable to us because it increases potential restaurant inventory and order volume, not because it improves per order economics.</u>[36] (Emphasis added).

59.     Similarly, Uber bragged in its 2019 annual report that Uber Eats allows Uber to co-opt local labor markets by enticing gig workers who do not already, or do not have the vehicles necessary to, offer services to consumers on Uber's original ride-hailing app:

---

[36] *See* https://s2.q4cdn.com/772508021/files/doc_financials/2019/q3/October-2019-Shareholder-Letter.pdf

[Uber] Eats not only leverages, but also increases, the supply of Drivers on our network.   For exampled [Uber] Eats enables Rides Drivers to increase their utilization and earnings by accessing additional demand for trips during non-peak Rides times.  [Uber] Eats also expands the pool of Drivers by enabling people who are not Rides drivers or who do not have access to Rides-qualified vehicles to deliver meals on our platform."

60.     In many cities, the Delivery Apps monopolized the market for delivery workers and required that a restaurant use their digital platform in order to participate in the Delivery Labor Market.

**C. Defendants' Products**

61.     Defendants' products are largely commodified, with little to offer users other than those on the other side of the network.  An analysis of the Online Ordering Platform Marketplace demonstrates that Defendants do not maintain their monopoly power because of any special technology, or because consumers somehow prefer their products or customer service.

62.     On June 12, 2019, NPD reported that it had surveyed consumers who used OMOPs to ask why they enjoyed the platform.  NPD found:

Although convenience is understandably the top reason consumers choose digital ordering, other top reasons include: no waiting; the ability to order, pay, and have it ready; ordering at my "own" pace; and earning rewards/feeling valued.   In addition to these reasons, since mobile apps represent 60 percent of digital orders, users of leading restaurant brand apps are also drawn to other motivations, like saving money, customizing orders, ordering on the way, and earning rewards.

63.     Of the top five reasons consumers listed for using OMOP products, none of them are access to a variety of restaurants through a single platform—the only advantage Defendants purport to offer consumers.  After all, users can get this data for free from Google, Yelp, Tripadvisor, and countless other services.

64.     Defendants' products are panned on consumer online review sites.  For example, Grubhub has 1.19/5 stars with 2,343 reviews on sitejabber.com, making it the 94th ranked

platform in the "Food Delivery" category, out of 101.[37]  Doordash fares no better with 1.14/5 stars on 214 reviews, ranking 99th among food delivery sites.  Postmates 1.18/5 stars on 451 reviews, ranking 96th.  Uber Eats was the best of Defendants with a still pitiful 1.86 stars on 14 reviews as of the authorship of this complaint.  Consumer reviewers on sitejabber don't have a prejudice against food delivery companies in general.  For example, competitor Goldbelly received 4.77 stars with a whopping 7,102 reviews, and Freshly received a 2019 Customer Choice Award with 4.19 stars on 1,827 reviews.  Forty-Nine of the 101 competitors received more than 4 stars, and both Dominoes and Papa John's received 3.5 stars or greater.

65.     On independent review site Trustpilot, Grubhub received a score of 2 out of 5 with 8,124 reviews.  Postmates received a score of 1.1 out of 5 with 1275 reviews.  Doordash has a score of 1.2 of 5 with 3,128 reviews.  Uber Eats has a score of 1.1 out of 5 stars with 10,615 reviews.

66.     Defendants' technology is no better.  As one pundit observed in an article titled "Why Restaurants Hate GrubHub Seamless," in March 2016[38]:

**The technology stinks**

Seamless and GrubHub were founded in 1999 and 2004, respectively, and yet they still haven't found a way to integrate their current technology into restaurant point-of-sale systems—or even into a single tablet.  (Then again, why would the company want to free up space for a competitor's tablet?)  Corporate orders are directed to what used to be the Seamless tablet and personal orders—which there are generally many more of—to the inferior GrubHub tablet.  Restaurants have to monitor the tablets for orders, and then manually integrate them into their systems.  Moreover, Seamless does not give restaurants the ability to change their own listings.  Instead, they have to call or email if they want to add or remove an item, update prices, and so on.

---

[37]  *See* https://www.sitejabber.com/categories/food-delivery

[38]  *See* https://tribecacitizen.com/2016/03/01/why-restaurants-hate-grubhub-seamless/

In other words, Seamless has one job—to take the order and run the card.  And as
you'll see below, it does a terrible job of it.

**Grubhub, Doordash, and Postmates Do Not Offer Traditional Loyalty Programs**

67.     Loyalty programs have been a fixture in the restaurant business, and for two-sided

platforms like Mastercard and Visa, for decades.  Grubhub did not begin offering loyalty

programs until September 4, 2019, according to a press release it issued on that date.[39]

Meanwhile Doordash offered its first loyalty program in Aug. 8, 2018, called DashPass.

However, unlike loyalty programs like American Express, DashPass did not offer any special

rewards or benefits.  Instead, according to an August 2018 post on DoorDash's blog announcing

DashPass,[40] DoorDash offered a simple economic bargain to high-frequency users to specific

partners, "like Wendy's, The Cheesecake Factory, California Pizza Kitchen, White Castle, and

many more," whereby they could purchase a pass for $9.99 per month, and pay zero dollar

delivery fees on orders of $15 or more, but only from certain restaurants.  DoorDash was merely

offering a discount that high-frequency users could use to save money in exchange for

committing to make purchases on the platform.

68.     Postmates and Uber Eats, which have consistently held third and fourth in market

share, were forced to offer loyalty programs earlier.  Uber Eats offered a loyalty program on

November 2018 that focused on its giant ride-share program, but included points for Uber Eats

purchases.  Postmates offered a premium upgrade called Postmates Unlimited since March 31,

2016 in order to entice and lock-in high frequency users to its ecosystem.

---

[39] *See* https://media.grubhub.com/media/press-releases/press-release-details/2019/Grubhub-
Features-Hundreds-Of-Millions-Of-Dollars-In-Free-Food-With-The-Launch-Of-
Perks/default.aspx

[40] *See* https://blog.doordash.com/introducing-unlimited-free-delivery-with-dashpass-
subscription-2dbde0e7210

69.     Numerous OMOP alternatives offer loyalty programs.  For example, the OMOP Delivery.com offers a robust loyalty program.  For every $1 spent, Delivery.com awards 20 reward points, which customers can redeem for prizes like an iPad mini.  Consumers can even use their points to donate to charities like (Red), Rise Against Hunger, or New York City's own City Harvest.

**Defendants' Platforms Do Not Experience Consumer Loyalty**

70.     The illusion that Defendants provide a special value to restaurants because they offer a special group of consumers was shattered last fall, when Grubhub announced that Grubhub does not actually experience consumer loyalty.  Instead, Grubhub admitted that consumers are increasingly indifferent to the value Defendants' individual platforms offer, instead preferring to simply choose the local restaurants they like, irrespective of which platform it is offered on.

71.     As Grubhub admitted in the letter to shareholders accompanying its third-quarter 2019 earnings report (as reported by MarketWatch):

> "For years, we saw in our data that a Grubhub diner was extremely loyal to our platform," the letter said.  "However, our newer diners are increasingly coming to us already having ordered on a competing online platform, and our existing diners are increasingly ordering from multiple platforms.  We find this 'sharing' to be greatest among our newest diners, in our newest markets, but believe it is happening to some degree throughout our diner base."[41]

72.     As a direct result of this revelation, and the resulting lowered earnings guidance, Grubhub's stock plummeted almost 43%.[42]

---

[41]  *See* https://www.marketwatch.com/story/grubhub-stock-tanks-after-earnings-show-disappointing-sales-forecast-2019-10-28?mod=article_inline

[42]   As of the writing of this complaint, Grubhub has been profiteering off of the Covid-19 crises for a month, and still its stock is almost 25% lower than its peak in October 2019.

73.     The market for consumer food delivery is mostly a repeat customer business in which people order the same menu items, from a limited number of restaurants, within a limited geographical range, as illustrated by this graphic from Second Measure:



**Meal Delivery - U.S. Customer Overlap**

How many customers also used a competitor in the fourth quarter of 2019?

|  | Grubhub | DoorDash | Uber Eats | Postmates | Waitr |
|---|---|---|---|---|---|
| Grubhub | — | 27% | 15% | 10% | 1% |
| DoorDash | 21% | — | 17% | 10% | 2% |
| Uber Eats | 20% | 28% | — | 12% | 1% |
| Postmates | 25% | 33% | 23% | — | 1% |
| Waitr | 11% | 28% | 11% | 6% | — |

Second Measure

74.     The Delivery Apps have acknowledged that they do not offer restaurants access to an exclusive market of clientele.  As Grubhub admitted in its letter to shareholders dated October 28, 2019:

> [W] e believe online diners are becoming more promiscuous.  For years, we saw in our data that a Grubhub diner was extremely loyal to our platform.  However, our newer diners are increasingly coming to us already having ordered on a competing online platform, and our existing diners are increasingly ordering from multiple platforms.  We find this "sharing" to be greatest among our newest diners, in our newest markets, but believe it is happening to some degree throughout our diner base.

**The Delivery Apps Place Economic Pressure on Slim Margins**

75.     The Delivery Apps force restaurants to charge higher prices for their Meal Delivery items, because of Defendants' massive fees.  As explained by developer ChowNow, which provides low cost OMOP products to restaurants for Direct sales:

24

Across the country, third-party food delivery apps have become a part of everyday life.   But beyond their marketing-fueled facade of convenience and instant gratification, they're killing the restaurants we love.

Lured-in with signup deals and hooked with the promise of sales boosts, restaurants are discovering that life inside the web of big tech is unsavory at best.   With commissions as high as 40% on every order — on top of a delivery fee and service charge — these apps are forcing restaurants to sacrifice a large slice of their already razor-thin profit margin.

The average restaurant only nets a 6% profit.1 If a restaurant only keeps 60 cents of a $10 sandwich, an added commission of 40% whittles their margins down to nothing.   In many cases, restaurants lose money on these orders.

And as third-party food delivery apps gain popularity among diners, restaurants are seeing sharp spikes in the kind of delivery orders that hurt them the most.   This is simply not sustainable.   With nearly 11,000 independent restaurants closing in the U.S. in 2017 our very own communities are at stake.[43]

**Absent Defendants' Unlawful Restraints, Restaurants Could Offer Consumers More Choice**

76.     Absent Defendants' unlawful restraints, participants in the Dine-in restaurant market could offer better priced choices to customers in order to draw them into more profitable transactions for both parties.   Restaurant consumers are price-sensitive, and the high prices drive them away.   As industry publication Restaurant Dive wrote on January 14, 2019:

It's a tricky environment for restaurants as they contend with rising labor and tightening margins.   Food costs alone are up 0.4%, the most since May 2014.   But by taking these pricing increases, restaurants also are making it harder for consumers to dine out.   The core consumer price increase is up just 0.2%.   With such a widening gap between costs and consumer index, many consumers will no doubt reduce their restaurant visit frequency, particularly as grocery costs rise at a slower pace.

This trajectory has already presented itself as a concern for restaurants, as The NPD Group data revealed that U.S. consumers are already eating out less often.   The

---

[43] *See* https://get.chownow.com/order-better/

average American consumer has 1,473 eating occasions on a per capita basis annually, down 3.8% compared to 2008.[44]

77. There are a limited number of restaurants within the range, pallet, and budget of any given consumer. For this reason, most consumers' concentrate their business for restaurant-prepared meals as repeat orders from a relatively limited number of restaurants.

78. The Delivery Apps have facilitated the Food Delivery Market's cannibalization of the Dine-In Market as a higher and higher percentage of restaurants' sales go through Defendants' platforms. As one pundit observed:

> One concern for restaurant operators is that introducing delivery will lead to significant declines in dine-in sales. This is troubling as most third-party platforms charge expensive delivery fees meaning the restaurant cannot raise its prices.
>
> Studies conducted specifically for the Food on Demand conference suggest that a sizable portion of people choosing delivery do so in place of cooking at home. This would mean an overall expansion in the consumer foodservice industry as opposed to complete substitution between dine-in and delivery. Still, a significant portion of delivery customers are choosing delivery in place of dining in or takeout.[45]

79. Independent restaurants have been hit particularly hard by Defendants' conduct. NPD reports: "The U.S. restaurant count reached 647,288 in fall of 2017, a two percent decrease in units from a year ago, based on a recent restaurant census conducted by The NPD Group, a leading global information company. The primary source of the decline in U.S. restaurant units was a three percent drop in independent restaurant units."[46]

---

[44] *See* https://www.tagexbrands.com/post/2019/02/01/highest-increase-in-restaurant-prices-in-7-years

[45] *See* https://blog.euromonitor.com/the-future-of-food-is-delivery/

[46] *See* https://www.npd.com/wps/portal/npd/us/news/press-releases/2018/total-us-restaurant-count-at-647288-a-drop-from-last-year-due-to-decline-in-independent-restaurant-units-reports-npd/

**D.      Unlawful Restraints**

80.      Since Defendants do not offer any special services or rewards, they maintain their market power in the Meal Delivery Market by the use of unlawful price restraints.

81.      Grubhub's standard restaurant agreement includes the following provision under Sec. 3.a.: "The item pricing must be at least as favorable to the consumer as that which is available for Restaurant's standard menu or offered to any 3rd party service."  The purpose and effect of this provision is to both prevent horizontal price competition between Grubhub, other OMOPs, and Direct purchases from the restaurant.  The purpose and effect of the provision is also to fix the restaurant's prices used in the Dine-In Market, where Grubhub does not have monopoly power, to the prices used in the Food Delivery Market, where Grubhub holds monopoly power.  By restricting restaurants from competing for market share in the Dine-In Market on the basis of menu item price, Grubhub restricted consumer choice and caused prices to be higher in the Dine-In Market.

82.      Postmates' standard Partner Agreement Terms and Conditions between Postmates and restaurants includes the following provision under paragraph 4: "Pricing shall be consistent with Merchant's in-store pricing."  The purpose and effect of this provision was to fix the price of the restaurant's prices used in the Dine-In Market, where Postmates does not enjoy monopoly power, to the prices used in the Meal Delivery Market, where Postmates enjoys monopoly power.  By restricting restaurants from competing for market share in the Dine-In Market on the basis of menu item price, Postmates restricted consumer choice and caused prices to be higher in the Dine-In Market than they would be at competitive levels.

83.      Doordash's Merchant Agreement includes the following provision under Sec. 3.b.i.: "**Merchant Core Responsibilities.** Merchant will, in a timely manner:  Provide DoorDash

with the Merchant's in-store or take-out menu, including the price of each item on such menu."
(bold text original).  The purpose and effect of this provision is to both prevent horizontal price
competition between DoorDash, other OMOPs, and Direct purchases from the restaurant.  The
purpose and effect of the provision is also to fix the restaurant's prices used in the Dine-In
Market, where DoorDash does not have monopoly power, to the prices used in the Food
Delivery Market, where DoorDash holds monopoly power.  By restricting restaurants from
competing for market share in the Dine-In Market on the basis of menu item price, DoorDash
restricted consumer choice and caused prices to be higher in the Dine-In Market that they would
be at competitive levels.

84.     Uber Eats' Merchant Terms and Conditions states the following under Sec. 5.4,
titled "Pricing":

> Notwithstanding anything to the contrary in this Section 5, Merchant may not make
> any Item available to Customers through the Eats App at a price that is higher than
> the price that Merchant charges in-store for similar Items.  Merchant agrees that
> you will not make an Item available under this Agreement at a price higher than the
> amount Merchant is charging for similar Items through any comparable platform
> for food delivery services.

85.     The purpose and effect of this provision is to both prevent horizontal price
competition between Uber Eats, other OMOP, and Direct purchases from the restaurant.  The
purpose and effect of the provision is also to fix the restaurant's prices used in the Dine-In
Market, where Uber Eats does not have monopoly power, to the prices used in the Food Delivery
Market, where Uber Eats holds monopoly power.  By restricting restaurants from competing for
market share in the Dine-In Market, Uber Eats restricted customer choice and raised prices above
competitive levels.

**No Price Competition Clauses Unlawfully Perpetuate Monopoly Power**

86.     No Price Competition Clauses have effectively shielded Defendants' market share for at least the past five years.  This is because two-way transactional markets,[47] like Defendants', gain all of their value from volume of participation of both consumers and restaurants, and therefore experience a network effect.  A network effect is where a product gains value the more users adapt it.  In this case new users prefer platforms with more restaurants and restaurants prefer platforms with more users.

87.     Because Defendants' raced to have their platform in numerous distinct geographic markets, their monopoly power is distributed unevenly.  Only one or two Defendants have majority control of any one Geographic Submarket.  Without the ability to ensure they could gain market share through price competition, new competitors have been effectively disincentivized from spending the substantial cost of customer acquisition, including providing computer terminals and training.  Moreover, the marketing costs of brand development from scratch in a Geographic Submarket are high.

**E.  Monopoly Power**

**Market Control**

88.     The Delivery Apps' market power is evidenced not only in their percent of market control in the Meal Delivery Geographic Submarkets, but also in their extraordinary economic rents in comparison to the service they are offering, and the effect their pricing restraints have had on the market—rendering restaurant menu item prices almost completely uniform.  Finally,

---

[47] "Two-way" (or "two-sided") transactional markets are characterized by the presence of two types of participants with nonaligned interests—generally, merchants or advertisers and consumers.

the deleterious effects their exertion of market power has had in contributing to the decline of the related Dine-In Market demonstrates Defendants' monopoly power.

**Pricing Uniformity**

89.     Defendants' attempts to unlawfully obtain and use monopoly power resulted in a total uniformity of pricing.  On March 16, 2020, TechCrunch reported sampling analyses of restaurant menu pricing around the country to see how restaurants' menu prices varied across platforms.  The publication found a near-complete uniformity of pricing: for all cities it sampled other than San Francisco and Los Angeles, pricing variation was less than 1.77%.[48]

**Outsized Economic Rents**

90.     Defendants' outsized economic rents may be demonstrated by both their revenues in comparison to the objective value of the products they are providing and by a transactional comparison of their revenues as compared to their restaurant partners' revenues, who are doing all of the work and taking all of the risk.

91.     As Project Quarantine has demonstrated, the Delivery Apps' service may be replicated by a free database linking to restaurants' digital direct purchase portals.  The 3.5% transactional merchant fee charged by American Express for its extensive cardholder services must serve as the outer-limits of reasonable economic rents.  In 2019, American Express gave 40% of its transactional merchant fees back to its consumers in the form of member rewards.  While Grubhub spends almost 24% of revenue on marketing, American Express spends a little over 16% of revenue on marketing, and Visa spends just over 5%.[49]

---

[48]  *See* https://techcrunch.com/2020/03/16/the-hidden-cost-of-food-delivery/

[49]  *See* Grubhub 2019 Annual Report on Form 10-K; American Express 2019 Annual Report on Form 10-K; Visa 2019 Annual Report on Form 10-K.

92.     The Delivery Apps do not process financial transactions between consumers and restaurants.  Instead, they rely on third-parties, like American Express, to process the payment transactions in exchange for an additional fee charged to the restaurant.

a.   As Grubhub explains in its 2019 annual report:[50]

The Company generates revenues primarily when diners place an order on its Platform.  Restaurant partners pay a commission, typically a percentage of the transaction, on orders that are processed through the Company's Platform.   Most of the restaurant partners on the Company's Platform can choose their level of commission rate, at or above the base rate a restaurant partner can choose to pay a higher rate, which affects its prominence and exposure to diners on the Platform. Additionally, restaurant partners that use the Company's delivery services pay an additional commission on the transaction for the use of those services.  The Company also recognizes as revenue any fees charged directly to the diner.

For most orders, diners use a credit card to pay the Company for their meal when the order is placed.  For these transactions, the Company collects the total amount of the diner's order net of payment processing fees from the payment processor and remits the net proceeds to the restaurant less commission and other fees. The Company generally accumulates funds and remits the net proceeds to the restaurant partners on at least a monthly basis. The Company also deducts commissions for other transactions that go through its platform, such as cash transactions for restaurants partners, from the aggregate proceeds received. Additionally, the Company provides consolidated invoicing for its corporate and campus program customers generally on a monthly basis.

b.   Uber's 2019 annual report[51] explains:

The Company relies on a limited number of third parties to provide payment processing services ("payment service providers") to collect amounts due from end-users.  Payment service providers are financial institutions or credit card

---

[50]   *See* Grubhub 2019 Annual Report on Form 10-K, p. 3.

[51]   *See* Uber 2019 Annual Report on Form 10-K, p. 99.

companies that the Company believes are of high credit quality. None of the Company's Drivers and Restaurants or Freight Customers accounted for 10% or more of revenue for the years ended December 31, 2017, 2018 and 2019.

c.   On its website,[52] Doordash explains to restaurants:

**Payment Processing.**

Payment processing services for Merchants on the DoorDash Marketplace and PickUp are provided by Stripe and are subject to the Stripe Connected Account Agreement, which includes the Stripe Services Agreement.   By agreeing to these Terms, Merchant agrees to be bound by the Stripe Connected Account Agreement and the Stripe Services Agreement, as the same may be modified by Stripe from time to time.   As a condition of DoorDash enabling payment processing services through Stripe, Merchant agrees to provide DoorDash accurate and complete information about Merchant's representative and its business, and Merchant authorizes DoorDash to share it and transaction information related to Merchant's use of the payment processing services provided by Stripe.   Stripe has been audited by a PCI-certified auditor and is certified to PCI Service Provider Level 1.[53]

## F.   Anticompetitive Effects

93.   Defendants' anticompetitive conduct has enabled each Defendant to: (a) prevent and limit competition in the Meal Delivery Market; (b) prevent and limit competition in the Direct Purchase Market; (c) prevent and limit competition in the Dine-In Market.

94.   During the Class Period, class members purchased meals from restaurants that were subject to Defendants' NPCCs.   As a result of Defendants' illegal conduct, these consumers were compelled to pay artificially inflated prices for their meals.

---

[52]   *See* https://help.doordash.com/merchants/s/terms-of-service-us?language=en_US)

[53]   Stripe explains that "'Payment Method' means a type of payment method that Stripe accepts as part of the Payment Processing Services, such as credit card, debit card, and ACH."   *See* https://stripe.com/legal

## CLASS ACTION ALLEGATIONS

95.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and

(b)(3) of the Federal Rules of Civil Procedure, as representative of two Classes defined as

follows:

(i)    All persons or entities in the United States who, from April 14, 2016 until
the anticompetitive effects of Defendants' unlawful conduct ceases,
purchased meals directly from any restaurant that was contemporaneously
contracted with the Delivery Apps (the "Direct Class").

Excluded from the Direct Class are Defendants, and their officers, directors,
management, employees, subsidiaries, and affiliates, and all federal
governmental entities, as well as purchases made in the Dine-In Market.

(ii)   All persons or entities in the United States who purchased Dine-In meals
from any restaurant that was contracted with the Delivery Apps at any time
from April 14, 2016 until the anticompetitive effects of Defendants'
unlawful conduct cease (the "Dine-In Class").

Excluded from the Dine-In Class are Defendants, and their officers,
directors, management, employees, subsidiaries, and affiliates, and all
federal governmental entities.

96.    But for Defendants' anticompetitive actions, Direct and Dine-In consumers would

have been offered lower menu prices on their Direct and Dine-In purchases.

97.    As a result of Defendants' unlawful price restraints, Direct and Dine-In

class members paid supra competitive prices for their Direct and Dine-In purchases.

98.    Members of the Classes are so numerous that joinder is impracticable.

Plaintiffs believe the Class numbers in the tens of millions.  Further, the Classes are

readily identifiable from receipts obtained during the subject purchases.

99.    Plaintiffs' claims are typical of those of each of the Class members.

Plaintiffs and Class members were damaged by the same wrongful conduct of

Defendants, *i.e.,* as a direct and proximate result of Defendants' wrongful conduct, they

paid artificially inflated prices for their Direct and Dine-In Meals and were deprived of the benefits of lower prices reflecting restaurants' increased profitability for those purchases.

100.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, the interests of the Class members.

101.    Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation.

102.    Questions of law and fact common to the Class members predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

103.    Questions of law and fact common to the Class include, but are not limited to:

(a)     whether each Defendant conspired to willfully maintain and/or enhance its own monopoly power over the relevant Meal Delivery Markets in the various Geographic Submarkets;

(b)     whether each Defendant sought to create an unlawful monopoly over the relevant Meal Delivery Markets in the various Geographic Submarkets;

(c)     whether each Defendant suppressed competition to their Delivery Apps for meal purchases from competing Direct and Dine-In offerings.

(d)     whether each Defendant imposed its NPCC to prevent price competition and consumer choice;

(e)     whether each Defendant possessed market power or monopoly power over the Meal Delivery Market in relevant Geographic Submarkets;

(f)     whether each Defendant's above-described conduct has substantially affected interstate and intrastate commerce;

(g)     whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.,* overcharges) to Plaintiffs and the Class members and if so, the appropriate measure of damages.

104.    Class action treatment is the superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

105.    Plaintiffs know of no special difficulty that could be encountered in this action that would preclude its maintenance as a class action.

106.    Certification of the Class is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

107.    Defendants' wrongful actions are generally applicable to Class members as a whole, for which Plaintiffs seek, inter alia, damages and equitable remedies.

108.    Absent a class action, Defendants would retain the benefits of their wrongdoing despite their serious violations of the law and infliction of harm on Plaintiffs and Class members.

## CLAIMS FOR RELIEF

### COUNT I:

### Monopolization in Violation of Section 2 of the Sherman Act

109.    Plaintiffs repeat and incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

110.    At all times throughout the class period, Defendants each possessed monopoly power in various Geographic Submarkets in the Meal Delivery Market.

111.    Defendants have each willfully maintained, and unless restrained by the Court will continue to willfully maintain, its monopoly power by anticompetitive and unreasonably exclusionary conduct.  Specifically, each Defendant used its monopoly power to force restaurants to agree to Defendant's unlawful NPCCs that had the purpose and effect of fixing prices.  Absent the restaurant's unwilling participation in Defendants' violations, Defendants would refuse to deal with them.  Each Defendant has acted with an intent to illegally maintain its own monopoly power over the Meal Delivery Market in various Geographic Submarkets, and their illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

112.     At all material times, Defendants' Delivery Apps transacted consumers'
restaurant purchases in a continuous and uninterrupted flow of commerce across state and
national lines and throughout the United States.

113.     The relevant product markets are the markets for prepared meals and related items
as sold through the Food Delivery Market and the Dine-In Market.

114.     Because of the different customer experiences and different presentation of those
meals (e.g. plating, atmosphere, the meal having been recently cooked), meals purchased in the
Dine-In Market are not reasonably interchangeable with meals purchased through the Meal
Delivery Market.  At all relevant times Defendants maintained monopoly power over the Meal
Delivery Market.

115.     The relevant geographic market is the United States and its territories.

116.     But for Defendants' unlawful actions, Plaintiffs and class members would have
benefitted from price competition from the restaurant in the form of lower prices for Direct and
Dine-In purchases during the class period.

117.     Plaintiffs and the Class are entitled to recover treble damages for their injuries
under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT II:

## Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act

118.     Plaintiffs repeat and incorporates by reference the allegations in the preceding
paragraphs as if fully set forth herein.

119.     At all times throughout the class period, Defendants each possessed monopoly
power in various Geographic Submarkets in the Meal Delivery Market.

120.     Each Defendant used its monopoly power to force restaurants to agree to Defendants' unlawful NPCCs that had the purpose and effect of fixing prices above competitive levels for purchases in the Direct and Dine-In Markets.  Absent the restaurant's participation in Defendants' violations, Defendants' would refuse to deal with them.  Each Defendant intentionally illegally fixed prices in the various Geographic Submarkets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

121.     At all relevant times, Defendants' Delivery Apps transacted consumers' restaurant purchases in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

122.     The relevant product markets are the markets for prepared meals and related items as sold through the Food Delivery Market and the Dine-In Market.

123.     Because of the different customer experiences and different presentation of those meals (e.g. plating, atmosphere, the meal having been recently cooked), meals purchased in the Dine-In Market are not reasonably interchangeable with meals purchased through the Meal Delivery Market.  At all relevant times Defendants' maintained monopoly power over the Meal Delivery Market.

124.     The relevant geographic market is the United States and its territories, as subdivided into the relevant Geographic Submarkets.

125.     During the Class Period, but for Defendants' unlawful actions, Plaintiffs and class members would have benefitted in the form of lower prices as a result of price competition from the restaurant.

126.     Plaintiffs and the Class are entitled to recover treble damages for their injuries under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## COUNT III:

## Price Fixing and Restraint of Trade in Violation of Sec. 1 of the Sherman Act

127.    Plaintiffs repeats and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

128.    At all times throughout the class period, Defendants each possessed monopoly power in various Geographic Submarkets in the Meal Delivery Market.

129.    Each Defendant used their monopoly power to force restaurants to agree to Defendants' unlawful NPCCs.  Defendants' NPCCs had the purpose and effect of restraining trade and fixing prices in the Meal Delivery and Dine-In Markets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

130.    At all relevant times, Defendants' Delivery Apps transacted consumers' restaurant purchases in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

131.    The relevant product markets are the markets for prepared meals and related items as sold through the Food Delivery Market and the Dine-In Market.

132.    Because of the different customer experiences and different presentation of those meals (e.g. plating, atmosphere, the meal having been recently cooked), meals purchased in the Dine-In Market are not reasonably interchangeable with meals purchased through the Meal Delivery Market.  At all relevant times Defendants' maintained monopoly power over the Meal Delivery Market.

133.    The relevant geographic market is the United States and its territories and the Geographic Submarkets thereof.

134.    But for Defendants' unlawful actions during the Class Period, Plaintiffs and class members would have benefitted from price competition from the restaurant, creating lower price options for Direct and Dine-In purchases.

135.    Plaintiffs and the Class are entitled to recover treble damages for their injuries under Section 4 of the Clayton Act, 15 U.S.C. § 15.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of all issues so triable in the complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that:

(a)        The acts alleged herein be adjudged and decreed to be unlawful as willful acts of monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act;

(b)        The acts alleged herein be adjudged and decreed to be unlawful and willful acts of price fixing and restraint of trade in violation of Section 1 of the Sherman Act;

(c)        Plaintiffs and the Class be awarded three-fold the damages determined to have been sustained, and that judgment be entered against Defendants in favor of Plaintiffs and the Class;

(d)        Plaintiffs and the Class recover its costs of suit, including reasonable attorneys' fees as provided by law; and

(e)        Plaintiffs and the Class be granted such other, further, and different relief

as the nature of the case may require or as may be determined to be just,

equitable, and proper by this Court.

Dated:      New York, New York
            April 13, 2020

                                        Respectfully submitted,

                                        **FRANK LLP**

                                        By:    _/s/ Gregory A. Frank_____
                                        Gregory A. Frank (GF0531)
                                        Marvin L. Frank (MF1436)
                                        Asher Hawkins (AH2333)
                                        370 Lexington Avenue, Suite 1706
                                        New York, New York 10017
                                        Tel: (212) 682-1853
                                        Fax: (212) 682-1892
                                        info@frankllp.com