**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIAM DAVITASHVILI, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03000 (LAK) |
| v. | **ECF Case** |
| GRUBHUB INC., *et al.*, | **Electronically filed** |
| Defendants. | |

**JOINT MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO**
**DISMISS PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

COMPLAINT ALLEGATIONS ............................................................................... 3

    A.    Defendants' Meal-Ordering Platforms, Their Value to Both Consumers and Restaurants, and the Vigorous Competition They Face .................................. 3

    B.    The Alleged Markets and Market Shares .............................................................. 5

    C.    The Challenged Contractual Provisions and Plaintiffs' Causes of Action ............ 6

LEGAL STANDARD ............................................................................................... 8

ARGUMENT ............................................................................................................ 8

I.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE COGNIZABLE ANTICOMPETITIVE EFFECTS IN THE "DIRECT" MARKETS (COUNT I AGAINST ALL DEFENDANTS) ............................................................. 10

    A.    Purported Harm in the "Direct" Markets Cannot Sustain a Claim Against Defendants Absent Harm in the Purported Platform Market ................................ 10

    B.    Plaintiffs Fail to Allege Actual Anticompetitive Effects in the "Direct" Markets .................................................................................................................. 12

    C.    Plaintiffs Fail to Allege Anticompetitive Effects Indirectly in the "Direct" Markets .................................................................................................................. 14

II.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS IN THE PURPORTED PLATFORM MARKET (COUNT II AGAINST GRUBHUB AND UBER EATS) ............................................. 16

    A.    Plaintiffs Fail to Allege Actual Anticompetitive Effects in the Purported Platform Market ................................................................................................... 16

        1.    *Plaintiffs Do Not Plausibly Allege That Consumers Pay Supracompetitive Prices* ......................................................................... 17

        2.    *Plaintiffs Do Not Plausibly Allege That Restaurant Commissions on Grubhub or Uber Eats Are Above a Competitive Level* ..................... 18

    B.    Plaintiffs Fail to Indirectly Allege Anticompetitive Effects in the Purported Platform Market ................................................................................................... 19

        1.    *Plaintiffs Do Not Allege Facts Suggesting That Grubhub or Uber Eats Possesses Sufficient Market Share in Any Purported Geographic Market* .................................................................................. 19

2. *Plaintiffs Do Not Allege Facts Suggesting That Grubhub or Uber Eats Can Control Prices or Exclude Competition* ................................... 21

**III.   PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE RELEVANT PRODUCT OR GEOGRAPHIC MARKET (COUNTS I AND II)** ................................... **23**

    A.   Plaintiffs Fail to Allege a Plausible Product Market ............................................ 24

    B.   Plaintiffs Fail to Allege a Plausible National Platform Market ........................... 26

**IV.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED (COUNTS III AND IV)** ............................................................................. **27**

**CONCLUSION** ............................................................................................ **29**

**TABLE OF AUTHORITIES**

*In re Aluminum Warehousing Antitrust Litigation*,
No. 13-md-2481 (KBF), 2014 WL 4743425 (E.D. Pa. Sept. 15, 2014) ...........................28

*Apotex Corp. v. Hospira Healthcare India Private Ltd.*,
No. 18-cv-4903(JMF), 2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ....................................20

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937 (2009)...................................................................................8

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011)....................................................................................9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007).........................................................................8, 14

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013)........................................................................19, 24

*Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates*,
996 F.2d 537 (2d Cir. 1993).................................................................................................15

*Chapman v. N.Y. State Division for Youth*,
546 F.3d 230 (2d Cir. 2008).................................................................................................24

*Chufen Chen v. Dunkin' Brands, Inc.*,
No. 17-CV-3808 (CBA) (RER), 2018 WL 9346682 (E.D.N.Y. Sept. 17, 2018).............28

*Cinema Village Cinemart, Inc. v. Regal Entertainment Group*,
No. 15-cv-05488 (RJS), 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) .........................29

*Concord Associates, L.P. v. Entertainment Properties Trust*,
817 F.3d 46 (2d Cir. 2016)........................................................................... *passim*

*Contant v. Bank of America Corp.*,
No. 17 Civ. 3139 (LGS), 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018) ........................29

*Data Servers, Inc. v. International Business Machines Corp.*,
262 F. Supp. 2d 50 (S.D.N.Y. 2003)...................................................................................20

*Dozier v. Deutsche Bank Tr. Co. Americas*,
No. 09 Civ. 9865 (LMM), 2011 WL 4058100 (S.D.N.Y. Sept. 1, 2011).........................23

*E & L Consulting, Ltd. v. Doman Industries Ltd.*,
472 F.3d 23 (2d Cir. 2006)....................................................................................................9

*Eastern Food Services, Inc. v. Pontifical Catholic University Services Ass'n*,
357 F.3d 1 (1st Cir. 2004)....................................................................................................10

iv

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...........................................................................11, 15

*Heerwagen v. Clear Channel Communications*,
    435 F.3d 219 (2d Cir. 2006)......................................................................................27

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019)........................................................................................28

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ...................................................................................27

*K.M.B. Warehouse Distrs., Inc. v. Walker Manufacturing Co.*,
    61 F.3d 123 (2d Cir. 1995).....................................................................................9, 14

*Michael E. Jones M.D., P.C. v. UnitedHealth Group, Inc.*,
    No. 19-CV-7972 (VEC), 2020 WL 4895675 (S.D.N.Y. Aug. 19, 2020) .........................14

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) .................................................................................. *passim*

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,
    485 F. Supp. 2d 387 (S.D.N.Y. 2007).......................................................................15

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)......................................................................................24

*Spinelli v. National Football League*,
    903 F.3d 185 (2d Cir. 2018)..........................................................................10, 11, 12

*Stubhub, Inc. v. Golden State Warriors, LLC*,
    No. C 15-1436 MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015).........................24, 25

*In re SunEdison, Inc. Securities Litigation*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018).......................................................................13

*In re Tamoxifen Citrate Antitrust Litigation*,
    277 F. Supp. 2d 121 (E.D.N.Y. 2003) .......................................................................28

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir.2008).......................................................................................27

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)..............................................................................20, 21, 22

*United States v. American Express Co.*,
    838 F.3d 179 (2d Cir. 2016)......................................................................................26

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)............................................................................................10

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)..............................................................................................17

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007).............................................................................13

Defendants Grubhub Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber Eats"), and Postmates Inc. ("Postmates") respectfully submit this memorandum of law in support of their joint motion to dismiss Plaintiffs' Amended Consolidated Class Action Complaint ("Complaint" or "Compl.").[1]

## PRELIMINARY STATEMENT

"Over the past decade, as smart phones have become ubiquitous, the popularity of [meal-ordering] platforms has skyrocketed."  Compl. ¶ 2.  As evidenced by the ever-increasing volume of transactions on meal-ordering platforms, these marketplaces have enhanced the ways restaurants can serve consumers.

Not long ago, consumers who wanted food delivered were limited to restaurants that provided their own delivery services, and had to search for those restaurants (as well as restaurants offering takeout) individually.  Now, through meal-ordering platforms, consumers can access a large network of local restaurant options; search for and compare menus, prices, and reviews; place and pay for an order; and receive delivery via independent couriers.  Similarly, restaurants can now sign up with one or multiple meal-ordering platforms to reach new diners; serve existing customers who prefer to order and pay for food using the platforms; and provide delivery without investing in a delivery fleet.  Consistent with the growing demand among restaurants and consumers for meal-ordering platforms, Plaintiffs identify several new platforms that have launched in recent years.  And in recent months, meal-ordering platforms have served quarantined consumers and offered restaurants an alternative means of reaching consumers.

Notwithstanding this vibrant marketplace competition, Plaintiffs claim that three

---

[1] The Complaint is attached as Exhibit 1 to the accompanying Declaration of Steven C. Sunshine dated October 19, 2020 ("Sunshine Decl.").

platforms (Grubhub, Uber Eats, and Postmates)—but not the largest platform (DoorDash)—have violated the antitrust laws by preventing restaurants from charging higher menu prices to consumers who use their platforms.  Non-discrimination provisions ("NDPs") in Defendants' standard contracts allegedly prohibit restaurants from charging platform consumers higher menu prices than they charge consumers who order directly from the restaurants for dining in, takeout, or delivery.  Grubhub and Uber Eats also allegedly include "inter-platform NDPs" in their standard contracts that prohibit restaurants from charging consumers using Grubhub's and Uber Eats' platforms more than they charge consumers who use other meal-ordering platforms.

Plaintiffs assert that Defendants' NDPs somehow cause increased prices even though Plaintiffs acknowledge that restaurants remain free to lower their prices and that restaurants (and consumers) remain free to use the purported industry-leading platform, DoorDash, which is not alleged to include NDPs in its contracts.  Counts I and III assert antitrust claims against all Defendants based on the NDPs in each Defendant's standard restaurant contracts; Counts II and IV assert antitrust claims against Grubhub and Uber Eats based on their inter-platform NDPs.

After multiple attempts, Plaintiffs' pleading is still fundamentally defective and cannot be cured.  Plaintiffs have twisted their claims of competitive effects and artificially segmented their proposed markets beyond plausibility.

Specifically, Count I should be dismissed because, according to Plaintiffs, Defendants *do not compete* in the "dine-in" and "direct takeout and delivery" markets in which the NDPs allegedly cause competitive harm, and because in any event, Plaintiffs fail to plausibly allege any anticompetitive effects in those purported markets.  Count II fails to state a claim because Plaintiffs do not plausibly allege that Grubhub's and Uber Eats' inter-platform NDPs caused anticompetitive effects in the purported platform-only market.

Counts I and II also fail because Plaintiffs' purportedly separate product markets are implausible, as Plaintiffs concede that meals ordered directly from restaurants compete with the same meals ordered via platforms.  Moreover, the purported national geographic market is not supported by factual allegations.

Finally, Plaintiffs' state law claims (Counts III and IV) fail for the same reasons as the federal claims.

## COMPLAINT ALLEGATIONS[2]

### A.   Defendants' Meal-Ordering Platforms, Their Value to Both Consumers and Restaurants, and the Vigorous Competition They Face

Defendants operate online meal-ordering platforms that enable consumers to search for and order delivery or takeout from nearby restaurants.  Compl. ¶¶ 26-27, 37-39, 50.  They "are two-sided platforms, acting as an intermediary to connect restaurants and consumers to the benefit of both." *Id.* ¶ 36.[3]  They display the restaurants from which users can order takeout or delivery and enable users to compare those restaurants' menu offerings and order and pay for meals from the convenience of their own computer or mobile device.  *Id.* ¶ 50.  They also coordinate meal delivery and provide restaurants that do not have their own meal delivery personnel with access to Defendants' networks of delivery drivers.  *Id.* ¶ 27.

Among other things, meal-ordering platforms give restaurants significant marketing exposure by connecting them—and allowing them to easily advertise their menu offerings—to the consumers who use the platforms.  *Id.* ¶¶ 2, 85-86, 93.  For consumers, meal-ordering

---

[2] Defendants accept the allegations as true only for purposes of this Motion to Dismiss.

[3] While Plaintiffs allege that Defendants operate two-sided platforms, meal-ordering platforms actually operate on at least *three* different sides because in addition to competing for customers and restaurants, they also compete for delivery drivers when delivery is requested.  *See, e.g.*, Compl. ¶ 39.

platforms provide easy comparison shopping for local takeout and delivery options and the convenience of ordering and paying for delivery or takeout without the need to contact restaurants directly.  *Id.* ¶ 50.  And because consumers want to use platforms with a wide selection of restaurants and restaurants want to make their food available to the largest possible number of consumers, meal-ordering platforms allegedly "exhibit indirect network effects, in that the value that they offer to one side of the platform is a function of the extent of the use of the other side."  *Id.* ¶¶ 66-67.

Plaintiffs acknowledge that Defendants' platforms face significant competition.  *Id.* ¶¶ 29, 65.  In addition to one another, Defendants compete for transactions with numerous other meal-ordering platforms, including DoorDash (which Plaintiffs allege is the largest meal-ordering platform), Foodetective, Slice, and Waitr.  *Id.* ¶¶ 31, 110; *see also id.* ¶ 137 ("SiteJabber, a website that allows consumers to rate businesses," highlights almost 100 different "Food Delivery sites" for ordering online).  They also compete with individual restaurants' or franchises' online ordering options (*e.g.*, Domino's Pizza's online ordering platform).  *Id.* ¶¶ 25, 28-30.  And Plaintiffs further allege that meal-ordering platforms compete with restaurants' in-restaurant dining options and takeout and delivery orders that restaurants receive over the phone.  *Id.* ¶ 89 (platforms "have cannibalized restaurants' existing business by redirecting orders that used to flow to restaurants directly"); *id.* ¶ 152 (platforms have "cannibalized sales from . . . the Dine-In Market"); *see also id.* ¶¶ 92-93.

For each transaction that occurs over their respective platforms, Defendants and other meal-ordering platforms charge restaurants a commission.  According to Plaintiffs, Defendants' commissions range "between 15% and 30% depending on the service being offered (*e.g.*, takeout, delivery orders that the restaurant delivers, or delivery orders that the platform

delivers)." *Id.* ¶ 109.  Other meal-ordering platforms that have smaller consumer networks

charge restaurants "between 15% and 25%." *Id.* ¶ 110.  Plaintiffs acknowledge that

commissions vary depending on the services (like delivery) that restaurants choose to procure

from Defendants.  *See id.* ¶ 42 (restaurants may choose to pay a lower commission by

"provid[ing] their own delivery").

Plaintiffs recognize that substantial majorities of both consumers and restaurants use

multiple meal-ordering platforms: "approximately" 80% of Postmates customers, 60% of Uber

Eats customers, and over 50% of Grubhub customers.  *Id.* ¶ 86.  And Plaintiffs allege that

restaurants list their menus on multiple platforms to reach the most potential customers—*i.e.*, "to

access consumers that use different Restaurant Platforms."  *Id.* ¶ 85.

### B.   The Alleged Markets and Market Shares

Plaintiffs allege three purported product markets: (i) a "Restaurant Platform Market" in

which meal-ordering platforms "compete with each other in the product market for takeout and

delivery," *id.* ¶ 29; (ii) a "Direct Takeout and Delivery Market" where "restaurants also sell

meals directly to consumers for takeout and delivery" via restaurant websites or over the phone,

*id.* ¶ 30; and (iii) a "Dine-In Market" where consumers order a meal directly from a restaurant to

"eat the meal at that restaurant," *id*.  Plaintiffs contend that the purported platform market is

distinct from the two purported "direct" product markets, notwithstanding that Plaintiffs

acknowledge "there is some cross-elasticity" between these purported markets.  *Id.* ¶ 148; *see*

*also id.* ¶ 54 ("If a hypothetical Restaurant Platform monopolist increased prices, some

consumers would switch to ordering in the [direct markets] . . . .").

Plaintiffs allege both a nationwide platform market, *id.* ¶ 95, and at least twelve

metropolitan areas that constitute purported local submarkets, *id.* ¶ 99.  Plaintiffs claim that some

competition among meal-ordering platforms is "local" because "a consumer in one metropolitan

area is highly unlikely to order food through a Restaurant Platform from a restaurant in a far-away metropolitan area, and because both Restaurant Platforms' and restaurants' delivery ranges are limited." *Id.* ¶ 98.  Nevertheless, Plaintiffs also assert that there is a nationwide platform market because meal-ordering platforms "compete nationwide to build a national network of consumers to offer restaurants, and a national network of restaurants to offer consumers." *Id.* ¶ 95.  Unlike the purported platform market, Plaintiffs claim that the two purported direct markets are only "local," not nationwide. *Id.* ¶ 99.

Plaintiffs also claim that the purported platform market is "dominated by just four firms: DoorDash, Grubhub, Uber [Eats], and Postmates." *Id.* ¶ 31.  DoorDash—which Plaintiffs originally sued but dismissed in their latest pleading—is, according to Plaintiffs, the largest meal-ordering platform, with a 37% "national share of the market." *Id.* ¶ 33.  Plaintiffs allege that Defendants' shares of the purported nationwide platform market are 31% for Grubhub, 20% for Uber Eats, and 10% for Postmates. *Id.*

In addition to alleging nationwide platform market shares, the Complaint also includes a chart that purports to show, based on one month of data, Defendants' market shares in the alleged local submarkets. *See id.* ¶ 34.  Plaintiffs assert that Defendants "split their dominance regionally," but do not specify which Defendants are dominant in which regions. *Id.*  Notably, Plaintiffs now omit a chart that they included in their original complaint, which alleged that DoorDash possesses the largest or second largest share of sales in 10 of the 12 purported local submarkets. *See* Class Action Complaint, Sunshine Decl. Ex. 2, at ¶ 40.

### C.   The Challenged Contractual Provisions and Plaintiffs' Causes of Action

Plaintiffs allege that Defendants each have NDPs in their standard agreements with restaurants.  Specifically, each Defendant's NDP allegedly requires that a restaurant's pricing on that Defendant's platform be no higher than the price the restaurant offers for delivery and

takeout orders made directly to the restaurant or for in-person dining.  Compl. ¶¶ 56-61.

Grubhub's and Uber Eats' standard agreements also allegedly contain inter-platform NDPs,

which prohibit restaurants in their networks from offering lower menu prices on other meal-

ordering platforms.  *Id.* ¶¶ 59-61.  Plaintiffs allege that DoorDash does not include NDPs in its

standard agreements with restaurants.  *Id.* ¶ 62.

Named Plaintiffs are eight individuals, all of whom reside in the New York City

metropolitan area.  *Id.* ¶¶ 10-17.  They each "ordered meals for takeout, delivery, and dine-in

directly from restaurants that sell" through at least one of the Defendants' platforms.  *Id.* ¶¶ 10-

17.  Plaintiff Drewey admits that he has not used any of Defendants platforms, *id.* ¶ 17, and four

of the other Plaintiffs allege that they also "placed orders for takeout, delivery, and dine-in . . .

indirectly from such restaurants" through DoorDash and/or Caviar—two platforms Plaintiffs did

not name in this action, *id.* ¶¶ 14-16.

Plaintiffs seek to represent three nationwide classes: (1) a "Direct Takeout and Delivery

Class" comprised of "all persons or entities in the United States who have purchased goods, for

takeout from or delivery by the restaurant, directly from a restaurant subject to any Defendant's

[NDPs]," *id.* ¶ 173; (2) a "Dine-In Class" comprised of "all persons or entities in the United

States who have purchased goods, for dining in the restaurant, from a restaurant subject to any

Defendant's [NDPs]," *id.* ¶ 174; and (3) a "Restaurant Platform Class" comprised of "all persons

or entities in the United States who have purchased goods, through a non-Defendant Restaurant

Platform, from a restaurant subject to Grubhub's or Uber [Eats' inter-platform NDPs]," *id.* ¶ 175.

Plaintiffs claim that Defendants' NDPs constitute "vertical agreements with restaurants in

restraint of trade" or commerce, *id.* ¶¶ 191, 200, 208, that violate Section 1 of the Sherman Act

and its "state analogues," *id.* ¶ 1.  *See also id.* ¶ 214.  Counts I and III assert that Defendants

possess market power in the purported nationwide and local platform markets, as well as in the

purported local direct markets in which Defendants do not compete, *id.* ¶¶ 189, 207, and that the

NDPs have produced "substantial anticompetitive effects" in the alleged direct markets.  *Id.*

¶¶ 192, 208.  Counts II and IV assert that Grubhub's and Uber Eats' inter-platform NDPs have

harmed competition in all alleged geographic markets of the purported platform market.  *Id.*

¶¶ 201, 213.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citation omitted).  "A

claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged,' meaning that

there is 'more than a sheer possibility that a defendant acted unlawfully.'"  *Concord Assocs., L.P.

v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (citation omitted).  Mere "labels and

conclusions [or] a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965 (2007).

## ARGUMENT

As Plaintiffs implicitly concede, their Sherman Act Section 1 claims challenging the

separate, vertical agreements between each Defendant and the restaurants that use their platforms

are subject to the rule of reason.  *See, e.g.*, Compl. ¶¶ 192, 201 (alleging the NDPs "constitute

unreasonable restraints of trade" because they purportedly "produce[] substantial anticompetitive

effects"); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) [hereinafter *Amex*]

("[N]early every . . . vertical restraint . . . should be assessed under the rule of reason.").

Under the rule of reason, a plaintiff "has the initial burden to prove that the challenged

restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 138 S. Ct. at 2284. Plaintiffs can make this threshold showing of anticompetitive effects "directly or indirectly." *Id.* Direct evidence of anticompetitive effects must demonstrate "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market," *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (citation omitted), including by "reduc[ing] output, increas[ing] prices or decreas[ing] quality." *Amex*, 138 S. Ct. at 2284. Where a plaintiff is unable to allege actual detrimental effects to competition, it must allege anticompetitive effects indirectly by "'at least establish[ing] that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide," *plus* some "other grounds to believe that the defendant's behavior will harm competition market-wide." *K.M.B. Warehouse Distrs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (citation omitted).

In addition to plausibly alleging that a challenged restraint has caused cognizable anticompetitive effects, the plaintiff must "allege a relevant geographic and product market in which trade was unreasonably restrained." *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011); *see also Concord Assocs.*, 817 F.3d at 53 ("[W]ithout a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." (citation omitted)).

Each of Plaintiffs' claims should be dismissed because they fail to plausibly allege that the challenged NDPs have caused anticompetitive effects in any relevant market. Plaintiffs' claims also should be dismissed because the facts they allege do not support a platform-only product market *or* a nationwide geographic market.

I.      **PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE COGNIZABLE ANTICOMPETITIVE EFFECTS IN THE "DIRECT" MARKETS (COUNT I AGAINST ALL DEFENDANTS)**

In Count I, Plaintiffs challenge each Defendant's alleged requirement that a restaurant's pricing on its platform be no higher than the restaurant offers directly to consumers in the purported direct markets (*i.e.*, "Dine-In" and "Direct Take-Out and Delivery").  Because Plaintiffs fail to plausibly allege that the NDPs have caused anticompetitive effects in any relevant market, Count I should be dismissed.

A.      **Purported Harm in the "Direct" Markets Cannot Sustain a Claim Against Defendants Absent Harm in the Purported Platform Market**

To cause anticompetitive effects cognizable under the Sherman Act, a challenged restraint must harm competition in a market in which defendants compete.  *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (relevant market is market in which "defendant conspirators have 'market power'" and plaintiff "must demonstrate that *within the relevant market*, the defendants' actions have had substantial adverse effects on competition, such as increases in price, or decreases in output or quality" (emphasis added)).  Accordingly, there can be no cognizable anticompetitive effects resulting from a challenged restraint that does not harm competition in a market in which defendants compete.  *See, e.g.*, *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1, 5 (1st Cir. 2004) ("Virtually always, anti-competitive effects under the rule of reason require that the arrangement or action in question create or enhance market power . . . .") (citing Areeda & Hovenkamp, *Antitrust Law* ¶ 501 (2d ed. 2002)).

In *Spinelli v. National Football League*, the Second Circuit recently reiterated the need to allege that challenged conduct harmed competition in the relevant market.  *Spinelli* concerned an alleged agreement among all NFL teams to "pool[] and collectively licens[e] their intellectual

10

property."  903 F.3d 185, 211 (2d Cir. 2018).  This agreement occurred in a purported "market for commercial licensing of [NFL]-related stock photography," in which NFL teams compete against one another to license their intellectual property for commercial photographs.  *Id.* (alteration in original).  Plaintiffs alleged the agreement "substantially reduced the output of stock photography for NFL events," *id.* at 212—*i.e.*, a different market than the one in which the teams competed.  The court held that this allegation of harm "say[s] nothing about the market for licenses for such photographs" because fewer photographs does not necessarily entail fewer commercial licenses sold by NFL teams.  *Id.*  The court affirmed dismissal of the antitrust claim because the alleged competitive harm did not occur "in the relevant market" in which NFL teams competed, and thus could not constitute a cognizable anticompetitive effect.  *Id.; see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 999 (9th Cir. 2020) (increased prices to Qualcomm's customers did not constitute "'anticompetitive harm' in the antitrust sense" because they did not result from or cause reduced competition between Qualcomm and its competitors in the modem chip market).

Plaintiffs do not allege that the NDPs cause harm in a market in which Defendants compete.  According to Plaintiffs, the NDPs have "reduced price competition *in the [direct] markets* by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants."  Compl. ¶ 193 (emphasis added).  Because Defendants operate meal-ordering platforms that Plaintiffs allege compete in the purported platform market, not the alleged direct markets, *see, e.g., id.* ¶¶ 46, 151, harm to competition in the direct markets cannot sustain Count I without any competitive harm in the platform market.  However, Plaintiffs do not allege that the NDPs harm competition *among meal-ordering platforms*.  That alone warrants dismissal of Count I.

**B.      Plaintiffs Fail to Allege Actual Anticompetitive Effects in the "Direct" Markets**

Plaintiffs also fail to plausibly suggest that Defendants' NDPs have caused actual anticompetitive effects in the purported direct channels.  At the pleading stage, conclusory allegations that prices have increased or output has decreased "will not suffice to state anticompetitive effect."  *Spinelli*, 903 F.3d at 212 (finding insufficient a "conclusory allegation that prices have increased" in the relevant market).  Bare allegations that a challenged restraint harmed individual consumers or competitors are likewise insufficient to suggest market-wide anticompetitive effects.  *See id.* ("The identification of two copyright lawsuits, in one state, however, does not suffice to permit a plausible inference that Defendants' alleged anticompetitive behavior increased prices in the market for commercial licenses for NFL photographs 'as a whole.'" (citation omitted)).  Plaintiffs offer only such conclusory assertions, and therefore Count I must be dismissed.

Plaintiffs allege that the NDPs have caused anticompetitive effects in the direct markets, Compl. ¶ 192, by "prohibiting restaurants from offering lower prices to consumers who order directly from restaurants."  *Id.* ¶ 93.  However, even as characterized in the Complaint, restaurants are just as free to *lower* their menu prices on Defendants' platforms to match a lower dine-in or delivery price offered by competing restaurants as they are to raise dine-in and delivery prices to match a higher menu price on Defendants' platforms.  *See id*. ¶¶ 55-61.  And if the NDPs were disfavored by restaurants, restaurants could shift their business to other platforms, including Doordash, which allegedly does not include NDPs in its contracts with restaurants.  *See id.* ¶ 62.

Plaintiffs also offer no factual allegations of market-wide competitive harm in the purported direct markets.  Rather, Plaintiffs cite a single restaurant association survey to allege

that restaurants that use Grubhub in New York are considering raising menu prices or have

raised menu prices by some unspecified amount at some unidentified point in time.  *Id.* ¶ 144.

But this survey found that 62% of such restaurants had *not* raised their menu prices.[4]  And based

on Plaintiffs' allegation that only 63% of restaurants in New York are on Grubhub, *id.* ¶ 82, at

most, this study shows that less than a quarter of restaurants in New York have increased prices.

Even if accurate, these statistics are insufficient to plausibly allege that Grubhub's NDPs have

caused increased prices *market-wide* in the direct channels of the purported New York

geographic submarket, much less across *all* the geographic markets Plaintiffs allege.  *See Wellnx*

*Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F. Supp. 2d 270, 293-94 (S.D.N.Y. 2007)

(agreement between defendant and publisher did "not plausibly harm competition market-wide"

when "[t]he remaining 60% of the advertising market is free to compete with [the publisher] by

offering better services to advertising consumers").  In any event, Plaintiffs do not—and could

not—allege that those increased prices for a minority of New York restaurants are above the

competitive level.  And these allegations cannot support any claim against either Uber Eats or

Postmates because they do not concern any alleged effects of either of those Defendants' NDPs.

Plaintiffs' "anecdotes" are similarly insufficient.  For example, that a restaurant in

Milwaukee (which is not an alleged geographic submarket) purportedly raised prices at some

point says nothing about whether prices increased market-wide in Milwaukee, much less in the

purported geographic submarkets specified in the Complaint.  *See* Compl. ¶ 145.  Likewise, that

---

[4] *See* NYC Hospitality Alliance, "Grubhub/Seamless Survey" (Feb. 2020), *available at*
https://thenycalliance.org/assets/documents/informationitems/jYlTV.pdf.  The Court may
consider this article "as part of the motion to dismiss" because Plaintiffs have cited it as support
for their allegations.  *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 487 n.7
(S.D.N.Y. 2018) (articles cited in complaint are incorporated by reference and "properly
considered as part of the motion to dismiss").

a restaurant owner in San Francisco (in which, by Plaintiffs' own admission, no Defendant has more than a 16% share of the purported platform market) said he "would" raise prices in 2015, does not suggest that the restaurant owner did in fact raise prices, never mind whether any other restaurant in San Francisco raised its price. *See id.* Moreover, Plaintiffs do not allege that any restaurants they reference contracted with any Defendant, so these "anecdotes" do not even show that any individual restaurant raised prices *as a result of* Defendants' NDPs. *See id.* Thus, Plaintiffs fail to allege facts that "raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965.

### C.    Plaintiffs Fail to Allege Anticompetitive Effects Indirectly in the "Direct" Markets

Plaintiffs' allegations of competitive harm in these purported markets through indirect evidence are also insufficient. To allege anticompetitive effects indirectly, plaintiffs must state facts indicating that defendants possess market power in the purportedly harmed market, along with some reason to believe the challenged restraint creates or maintains that market power. *K.M.B. Warehouse*, 61 F.3d at 129; *see also Amex*, 138 S. Ct. at 2285 n.7 ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power . . . ."). Market power is "the ability to raise price significantly above the competitive level without losing all of one's business." *K.M.B. Warehouse*, 61 F.3d at 129 (citation omitted). "Market power may be shown by evidence of 'specific conduct indicating the defendant's power to control prices or exclude competition,'" and "market share may be used as a proxy for market power." *Id.* (citations omitted).

Plaintiffs cannot allege harm to competition in the purported direct markets through indirect evidence because Defendants do not compete—and thus do not set any restaurant's prices, have *no* market share, and have *no* market power—in those markets. *See Michael E.*

14

*Jones M.D., P.C. v. UnitedHealth Grp., Inc.*, No. 19-CV-7972 (VEC), 2020 WL 4895675, at *8 n.11 (S.D.N.Y. Aug. 19, 2020) ("[I]t is axiomatic that a firm cannot monopolize a market in which it does not compete." (internal citation and quotation marks omitted)); *see also Cap. Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 547 (2d Cir. 1993) ("[W]ith such a *de minimis* market share [of 1.15%], appellees lack the power to injure competition . . . .").

Nevertheless, Plaintiffs contend that Defendants possess market power in the purported direct markets, Compl. ¶ 189, because the purportedly "supracompetitive Restaurant Commission Rates that Defendants charge" to use their platforms coupled with the NDPs allegedly enable Defendants "to control, or at minimum substantially affect, the prices charged by restaurants." *Id.* ¶ 124. But even if Defendants could influence, "substantially affect," or "control" restaurants' pricing in the direct channels based on the fees they charge restaurants to use their platforms in the purported platform market, such an ability would not provide Defendants with market power in the direct channels in which they do not compete. *See Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2007) (market power does not "encompass[] 'influence' by a non-competitor over the relevant market"); *see also Qualcomm*, 969 F.3d at 985 (Qualcomm "does not 'compete'—in the antitrust sense—against OEMs" even though it is a "major player [and can raise prices] in the broader cellular technology market" because it licenses and sells chips to OEMs).

In any event, Plaintiffs' factual allegations contradict the conclusory assertion that Defendants "control" restaurants' direct prices. Rather, restaurants set their own menu prices regardless of whether they agree to the NDPs. *See, e.g.*, Compl. ¶ 42 ("Restaurant List Prices" are chosen by the restaurant). Moreover, a significant portion of restaurants—more than half—

15

serve customers only through direct means (dine-in, takeout, and/or delivery), and thus are not subject to Defendants' NDPs at all.  It is implausible—as a matter of law—that prices in the dine-in market as a whole could be controlled  by provisions affecting less than half of the market participants.[5]

Finally, even if market power in the purported platform market could convert to market power in the purported direct markets—which it cannot—Plaintiffs' allegations demonstrate that Defendants do not possess such market power.  *See infra* section II.B. & note 8 (discussing Defendants' lack of market power).

## II.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS IN THE PURPORTED PLATFORM MARKET (COUNT II AGAINST GRUBHUB AND UBER EATS)

In Count II, Plaintiffs challenge Grubhub's and Uber Eats' inter-platform NDPs, which require that a restaurant's pricing on their platforms be no higher than the restaurant offers on other platforms.  But Plaintiffs have not alleged facts plausibly suggesting that these provisions cause anticompetitive effects in the purported platform market.

### A.   Plaintiffs Fail to Allege Actual Anticompetitive Effects in the Purported Platform Market

Plaintiffs contend that Grubhub's and Uber Eats' inter-platform NDPs "prevent[] competing platforms from offering lower Restaurant List Prices to consumers."  Compl. ¶ 132. According to Plaintiffs, without the inter-platform NDPs, competing platforms would "attract consumers by offering restaurants lower Restaurant Commission Rates to induce those

---

[5] Plaintiffs allege that over 40% of restaurants offer only dine-in or direct takeout services, and thus by definition do not contract with Defendants' platforms.  Compl. ¶ 81.  More than 20% of the remaining restaurants use only their own proprietary delivery services.  *Id.* ¶ 80.  As a result, Plaintiffs allege that less than half of restaurants contract with *any* third-party delivery provider. The proportion of restaurants that contract with Defendants is in fact much lower, due to the presence of DoorDash and the many other options for delivery providers beyond the three Defendants.  *See id.* ¶¶ 33, 110.

restaurants to provide lower Restaurant List Prices." *Id.* ¶ 128.  Plaintiffs thus allege both that consumers would pay less when using other platforms and that Grubhub's and Uber Eats' restaurant commission rates are currently at supracompetitive levels.  *See id.* ¶¶ 130-32.  The Complaint fails to allege facts to plausibly support either of these assertions.

1.     *Plaintiffs Do Not Plausibly Allege That Consumers Pay Supracompetitive Prices*

Plaintiffs fail to plausibly allege that any consumers paid supracompetitive prices for meals ordered on platforms other than Grubhub and Uber Eats.  They do not allege even a single instance of a restaurant raising its menu prices on a platform other than Grubhub and Uber Eats because that restaurant also sells and advertises through Grubhub or Uber Eats.

Indeed, the Complaint undermines Plaintiffs' conclusory assertion that *menu* prices are supracompetitive on Grubhub and Uber Eats.  It alleges that *total* prices are marked up on those platforms by 25 to 91%, *id.* ¶116, and that consumers pay up to 40% more through the platforms than when they order directly from restaurants, *id.* ¶ 117.  But those "higher prices" include commissions and fees in the total "markup," *id.* ¶¶ 41-44, some of which would not have applied if the restaurants had chosen to engage their own delivery personnel.  *Id.* ¶¶ 42, 45.  Moreover, the increase in orders over Grubhub's and Uber Eats' platforms, *see id.* ¶¶ 77-78, demonstrates that consumers value—and are willing to pay for—the services they provide.  Plaintiffs thus have failed to allege facts showing that the combined or net "price" charged to both consumers and restaurants on the multi-sided meal-ordering platforms would have been lower absent the NDPs.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 59 (2d Cir. 2019) (in evaluating rule of reason claim concerning two-sided transaction platforms, courts must consider the "combined," "net prices" charged to users on both sides of the platform).

Even if Plaintiffs had plausibly alleged that menu prices increased market-wide, they fail

17

to plausibly allege causation.  After all, Plaintiffs fully admit that DoorDash does not use NDPs

and, according to Plaintiffs' allegations, DoorDash alone comprises a larger percentage of the

purported platform-only market than either Grubhub or Uber Eats.  Further, the Complaint

explains why restaurants would raise menu prices on platforms independent of the inter-platform

NDPs.  Plaintiffs assert that the proportion of restaurants' sales from delivery and takeout orders

has increased and that consumers who order delivery and takeout "are less likely to ask for menu

items that carry higher margins—including soda and alcoholic drinks."  Compl. ¶ 91.  That

demand shift—and accompanying inability of restaurants to subsidize menu costs with alcohol

and soda sales—strongly suggests that restaurants have an incentive entirely unrelated to the

NDPs to increase menu prices on meal-ordering platforms.  Accordingly, Plaintiffs' own

allegations are fatal to their conclusory assertion that Grubhub's and Uber Eats' inter-platform

NDPs caused menu prices to increase.

> 2.  *Plaintiffs Do Not Plausibly Allege That Restaurant Commissions on Grubhub or Uber Eats Are Above a Competitive Level*

Plaintiffs also fail to plausibly allege that Grubhub's and Uber Eats' commissions are

"supracompetitive" vis-à-vis other platforms or that "the price of [platform] transactions was

higher than the price one would expect to find in a competitive market."  *Amex*, 138 S. Ct. at

2288.  Specifically, Plaintiffs do not allege that Grubhub's and Uber Eats' restaurant

commissions are any higher than the other two national platforms—DoorDash and Postmates—

which allegedly do not include inter-platform NDPs in their contracts with restaurants.  And

Plaintiffs allege that Grubhub's and Uber Eats' rates are about the same as smaller platforms

Waitr and Delivery.com, which offer restaurants a substantially narrower consumer reach.

Compl. ¶ 110 ("Waitr charges between 15% and 25%, and Delivery.com charges 15%.").

Plaintiffs also do not plausibly allege that Grubhub's or Uber Eats' commissions are

supracompetitive given the value to restaurants that Plaintiffs recognize the platforms provide, including marketing, delivery drivers, and consumer reach.  *See, e.g.*, *id.* ¶ 27 (platforms "enable consumers to search for participating restaurants in a particular locality and order food for takeout or delivery" and "deliver food for participating restaurants that do not want to provide delivery themselves").  While Plaintiffs point to an increase in restaurant commissions over time, they allege no facts to suggest that such increases reflect anything other than the enhanced value Grubhub and Uber Eats provide to restaurants, particularly in the form of expanded consumer networks.  Indeed, an increase in restaurant commissions does not suggest anticompetitive conduct or prices higher than "one would expect to find in a competitive market" because Plaintiffs have alleged that output has expanded over Grubhub's and Uber Eats' platforms at the same time their rates have allegedly increased.  *See id.* ¶ 2; *Amex*, 138 S. Ct. at 2288 ("Where . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." (alteration in original) (citation omitted)).

### B.    Plaintiffs Fail to Indirectly Allege Anticompetitive Effects in the Purported Platform Market

According to the Complaint, Grubhub and Uber Eats compete in a market limited to transaction platforms that connect restaurants and consumers.  *See* Compl. ¶ 36.  But the Complaint does not plausibly allege that either Grubhub or Uber Eats possesses market power in the purported national or local platform-only markets.

#### 1.    Plaintiffs Do Not Allege Facts Suggesting That Grubhub or Uber Eats Possesses Sufficient Market Share in Any Purported Geographic Market

Courts sometimes use market share as a proxy for market power, *see supra* section I.C., but "have rejected . . . market shares between 30 percent and 40 percent as inadequate to demonstrate market power."  *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013) (alteration in original) (citation omitted).  They have also

19

held that shares below 50 percent "rarely" are evidence of market power.  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998); *accord Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power." (citation omitted)).  In addition, high market shares can indicate market power only if they are sustained over a period of time.  *See Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-cv-4903(JMF), 2020 WL 58247, at *6 (S.D.N.Y. Jan. 6, 2020) (dismissing Sherman Act claim for lack of market power where "the most that Apotex alleges is that Hospira controlled 56.68% of the cefepime market for the month of August 2016").

Plaintiffs' sole purported evidence of market shares—a chart that summarizes estimated shares *as of November 2019* in twelve different cities, *see* Compl. ¶ 34, along with a nationwide market share estimate, *see id.* ¶ 33—is insufficient to suggest market power for two independent reasons.  *First*, the chart does not allege the type of durable market power sufficient to state a Sherman Act claim; instead, it contains a snapshot of market shares at only one moment in time. *See Apotex Corp.*, 2020 WL 58247, at *6.  Tellingly, the Complaint does not allege that market shares are consistent over time.  Nor could Plaintiffs allege such facts, as the shares of Grubhub and Uber Eats—as well as Postmates and DoorDash—have fluctuated significantly over time even in a purported platform-only market.[6]

*Second*, even if these estimates accurately depicted long-term market shares in a relevant

---

[6] *See* Molla, Rani, "Grubhub Sale Rumors Highlight the State of the Struggling Food-Delivery Industry," Vox (Jan. 9, 2020) (chart showing changing market shares over time), *available at* https://www.vox.com/recode/2020/1/9/21058674/grubhub-sale-food-delivery-struggling-industry.  Plaintiffs cite this article for their market share estimates, *see* Compl. ¶ 34, but omit a chart from the article that shows changing market share over time.  Nevertheless, the Court may consider the chart in its entirety because Plaintiffs have incorporated the Vox article by reference.  *See supra* note 4.

market—which Defendants do not concede—Plaintiffs do not allege that either Grubhub or Uber Eats has more than a 50% share of sales in 11 of the 13 purported geographic markets (and in the other two, neither has more than a 70% share of sales).  *See* Compl. ¶ 34.  That is below the level at which courts would typically infer market power.  *See Tops Mkts.*, 142 F.3d at 99.

Plaintiffs cannot rectify the above deficiencies by relying on the legally-irrelevant metric of percentage of consumers on each Defendant's platform.  *See, e.g.*, Compl. ¶¶ 81-83, 101-02, 104.  The number of users on either side of a two-sided transaction platform is not a relevant measure of market share because transaction platforms "'suppl[y] only one product'— transactions."  *Amex*, 138 S. Ct. at 2286 n.8; *see also id.* at 2280 ("The key feature of transaction platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other.").  And Plaintiffs' own allegations demonstrate that having a large number of restaurants or consumers on a meal-ordering platform does not necessarily lead to a correspondingly large number or volume of transactions on that platform.  *See, e.g.*, Compl. ¶¶ 34, 82-83 (in Los Angeles, 95% of restaurants are on Grubhub, which has a 19% share of transactions in a Los Angeles submarket); *id.* ¶¶ 34, 82 (in San Francisco, 91% of restaurants are on Grubhub and 93% are on Uber Eats, which respectively have 16% and 13% share of transactions in a San Francisco submarket).

> **2.**     *Plaintiffs Do Not Allege Facts Suggesting That Grubhub or Uber Eats Can Control Prices or Exclude Competition*

To show market power, in addition to alleging that Grubhub or Uber Eats possessed large market shares, Plaintiffs would also have to assert facts suggesting high barriers to entry or expansion in the relevant markets.  *See* Areeda, *Antitrust Law* ¶ 501 (4th ed., 2020 cum. supp.) ("For antitrust purposes, therefore, market power is the abilities (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by

new entry or expansion."); *see also Tops Mkts.*, 142 F.3d at 99 (although defendant possessed more than 70 percent market share, the court could not infer market power because "marketplace realities" such as low barriers to entry defeated any assertion of market power).  Plaintiffs have failed to assert any such facts.

Rather, the Complaint suggests significant ongoing competition among Grubhub, Uber Eats, and other platforms.  In addition to fluctuating market shares, the Complaint cites numerous meal-ordering platforms that compete with Grubhub and Uber Eats, including Postmates, DoorDash, Caviar, Foodetective, Slice, Fare, Waitr, and Delivery.com.  *See* Compl. ¶¶ 15, 31, 110.  It further explains that DoorDash, Postmates, Uber Eats, and other startups have been "racing to capitalize" on the expanding meal delivery marketplace, *id.* ¶ 70, and that the platforms continue to compete to attract consumers through "exclusive deal[s]" with sought-after national chains like McDonald's, *id.* ¶ 72, and packages waiving monthly service fees.  *Id.* ¶ 74. Indeed, the Complaint highlights that the platforms even compete on the NDPs themselves: Plaintiffs describe the alleged absence of such provisions in DoorDash's contracts as a "key 'differentiator'" that allegedly attracts restaurants to that platform.  *Id.* ¶¶ 62-63.

Such competition is necessary because of the significant overlap of restaurants and customers across the platforms, with most restaurants "sell[ing] through multiple Restaurant Platforms," *id.* ¶ 85, and, as Plaintiffs allege, more than half of all Grubhub users, 60% of all Uber Eats users, and 80% of all Postmates users ordering through more than one platform.  *Id.* ¶ 86.  Thus, in any purported geographic submarket—even one in which Grubhub or Uber Eats has an alleged share over 50%—Plaintiffs have not asserted facts to suggest that barriers to entry

or expansion provide the purported market leader with market power.[7]

Plaintiffs also cannot rely on their unsupported allegations that Defendants charge supracompetitive fees to restaurants.  *See supra* section II.A.2.  Plaintiffs' allegations about supracompetitive fees to consumers are similarly insufficient because they merely label these fees as "supracompetitive" and "egregious," Compl. ¶ 116, without considering the costs associated with and value provided by the platforms to consumers or comparing their prices to competitors that purportedly do not have market power.[8]

Accordingly, Plaintiffs have not plausibly alleged—either directly or indirectly—that the inter-platform NDPs have caused anticompetitive effects, and Count II should be dismissed.

## III.   PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE RELEVANT PRODUCT OR GEOGRAPHIC MARKET (COUNTS I AND II)

With respect to the purported platform market referenced in Counts I and II, Plaintiffs also fail to "assert[] sufficient facts to allege plausibly the existence of both a product and geographic market."  *Concord Assocs.*, 817 F.3d at 53.  A product market must "bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis

---

[7] In an earlier complaint, Plaintiffs alleged that "newer diners are increasingly ordering from multiple platforms."  Class Action Complaint, Sunshine Decl. Ex. 2, at ¶ 74; *see also id.* ¶ 70 ("[C]onsumers are increasingly indifferent to the value Defendants' individual platforms offer, instead preferring to simply choose the local restaurants they like, irrespective of which platform it is offered on.").  Plaintiffs now attempt to walk back their prior allegations.  *See* Compl. ¶¶ 51, 73 (contending that Defendants discourage multihoming and "consumers who become familiar with platforms are unlikely to switch to any other service").  However, the facts Plaintiffs allege in the operative Complaint demonstrate that consumers "multi-home," *see id.* ¶ 86, and this Court may disregard any allegations to the contrary because they contradict factual allegations in both the operative and original complaints.  *See, e.g.*, *Dozier v. Deutsche Bank Tr. Co. Americas*, No. 09 Civ. 9865 (LMM), 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011) (holding that a "court need not accept as true allegations that conflict with a plaintiff's prior allegations").

[8] For similar reasons that apply to Grubhub and Uber Eats, Postmates also does not have market power in any purported geographic platform-only market.  As with Grubhub and Uber Eats, Postmates' low alleged market shares, *see* Compl. ¶ 34, and the significant competition among restaurant platforms render implausible Plaintiffs' conclusory assertions of market power.

of the interchangeability of use or the cross-elasticity of demand, and it must be plausible."

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) (citation omitted).

Because "[p]roducts will be considered to be reasonably interchangeable if consumers treat them

as 'acceptable substitutes,'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002), a

claim should be dismissed where the alleged product market omits "obvious potential

substitute[s]."  *Bookhouse of Stuyvesant Plaza*, 985 F. Supp. 2d at 621.  In addition, "[c]ourts

generally measure a market's geographic scope, the 'area of effective competition,' by

determining the areas in which the seller operates and where consumers can turn, as a practical

matter, for supply of the relevant product."  *Concord Assocs.*, 817 F.3d at 53 (citation omitted).

### A.     Plaintiffs Fail to Allege a Plausible Product Market

Plaintiffs' alleged platform market is implausible and impermissibly underinclusive

because it omits delivery, takeout, and dine-in orders placed directly with restaurants.  Plaintiffs

purport to justify separate product markets based on how meals reach consumers because meal-

ordering platforms "offer services that restaurants do not offer"—*e.g.*, a rating system and

mobile applications—and are "sticky" such that consumers familiar with a platform are

purportedly unlikely to switch.  Compl. ¶¶ 48-51.  These sparse allegations fail to plausibly

suggest that ordering from a restaurant (or a restaurant receiving an order) is not a substitute for

ordering the same meal from a restaurant (or a restaurant receiving an order) via Defendants'

platforms.

Courts have not hesitated to reject similar efforts to define separate markets based on how

the same product reached the consumer.  For example, in *Bookhouse of Stuyvesant Plaza*, the

district court dismissed a claim that implausibly alleged separate product markets for print books

and e-books, because "print books are an obvious potential substitute for e-books."  985 F. Supp.

2d at 621.  Likewise, the court in *Stubhub, Inc. v. Golden State Warriors, LLC* dismissed

Sherman Act claims based on implausibly alleged separate primary and resale markets for Golden State Warriors tickets because Warriors tickets "are used for the purpose of obtaining entry to a Warriors game" regardless of whether they are purchased directly from the team at the box office or on a resale platform like Stubhub.com. No. C 15-1436 MMC, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015).

Plaintiffs' own allegations highlight the substantial competition and interchangeability between and among orders placed on platforms and direct delivery, takeout, and dine-in meals. Throughout the complaint, Plaintiffs allege that restaurants compete with Defendants' platforms by accepting takeout and delivery orders over the phone or through their own websites, *see* Compl. ¶ 89 ("Restaurant Platforms have cannibalized restaurants' existing business by redirecting orders that used to flow to restaurants directly to instead flow through Restaurant Platforms."), and that the platforms have also "cannibalized sales from . . . the Dine-In Market." *Id.* ¶ 152; *see also id.* ¶ 92 (citing reports that "43% of consumers who ordered food for delivery say it replaced a meal at a restaurant" and that "total visits to restaurants have declined more than 700 million visits"); *id.* ¶ 93 (citing restaurant owner statement that "existing customers—*those who used to eat at the restaurant*—have started using Seamless instead").

Plaintiffs even acknowledge the cross-elasticity between these markets, alleging that "[i]f a hypothetical Restaurant Platform monopolist increased prices, some consumers would switch to ordering in the Direct Takeout and Delivery Market or the Dine-In Market" and "it would not necessarily be profitable for a hypothetical Restaurant Platform monopolist to increase prices to more than 5% above competitive levels." *Id.* ¶ 54; *see also id.* ¶ 148 ("[R]estaurants would be motivated to encourage consumers to buy directly from them. . . . by charging lower prices" and "[b]ecause there is *some* cross-elasticity between these markets, this strategy would likely be

successful.").[9]  Plaintiffs' claim that there is "*some* cross-elasticity [of demand] between these [purported] markets," *id.* —presumably, just enough cross-elasticity to imbue Defendants' NDPs with an anticompetitive purpose, but not enough to combine the markets into one for purposes of assessing market power—is plain economic and legal gamesmanship.

Accordingly, due to the competition between Defendants' platforms and restaurants' direct sales that the Complaint repeatedly acknowledges, Plaintiffs fail to plausibly allege separate platform and direct markets.  This failure requires dismissal of Counts I and II.

### B.   Plaintiffs Fail to Allege a Plausible National Platform Market

Plaintiffs' factual allegations also contradict their proposed national platform-only market.  As Plaintiffs allege, "a consumer in one metropolitan area is highly unlikely to order food through a Restaurant Platform from a restaurant in a far-away metropolitan area, because both Restaurant Platforms' and restaurants' delivery ranges are limited."  *Id.* ¶ 98.  Plaintiffs thus concede that meal-ordering platforms compete for transactions on a local basis, and that they do not compete for transactions based on the number of "far-away" restaurants they can offer consumers.  *Id.*  Indeed, according to Plaintiffs, Defendants' shares of transactions vary substantially in different metropolitan areas, *see id.* ¶ 34, thereby demonstrating the regional character of competition among meal-ordering platforms.

Nevertheless, Plaintiffs insist a national market exists because the platforms "compete nationwide to build a national network of consumers to offer restaurants, and a national network of restaurants to offer consumers."  *Id.* ¶ 95.  To support this assertion, Plaintiffs allege that the

---

[9] Thus, *by their own admission*, Plaintiffs' contrived markets fail the "hypothetical monopolist test," which asks if "a hypothetical monopolist acting within the proposed market 'would be "substantially constrain[ed]" from increasing prices by the ability of customers to switch to other producers.'"  *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016) (citation omitted), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

platforms operate in the same way for consumers regardless of where consumers are located, *id.* ¶ 96, and that the platforms "compete for important partnerships with national restaurant chains," *id.* ¶ 97. But, as Plaintiffs acknowledge, Defendants compete for transactions based on the number of restaurants they can offer to a consumer—and the number of consumers they can offer to a restaurant—located in or near a specific place. *See id.* ¶ 98. Accordingly, that Defendants' platforms purportedly operate in the same manner nationwide or enter into contracts with some nationwide chains does not mean that they compete for transactions in a national geographic market. *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228, 230 (2d Cir. 2006) ("Local markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally"; no national market definition was possible when "there is little cross-elasticity of demand for live rock concert tickets between geographic areas"), *overruled on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) ("The ability of national promoters to coordinate cross-country tours [or advertise nationally] does not change the fact that they provide services and compete for business on a local basis.").

The implausibility of Plaintiffs' "national" platform-only market alone warrants dismissal of Counts I and II.

## IV.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED (COUNTS III AND IV)

In Counts III and IV, these eight New York Plaintiffs bring claims under the antitrust laws of 32 different states and the District of Columbia based on the same conduct that they allege violates the Sherman Act. *See* Compl. ¶¶ 209-216. It is well-settled that if Plaintiffs fail to state a Sherman Act claim for the conduct they challenge in this case, they cannot state a

derivative state antitrust claim.  *See, e.g.*, *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 69 (2d Cir. 2019) (dismissing Donnelly Act claim where plaintiffs failed to adequately plead a federal claim); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing seventeen state antitrust claims "since Plaintiffs fail[ed] to state a claim under the Sherman Act, and since the state antitrust law claims are based on the same allegations"), *aff'd*, 466 F.3d 187 (2d Cir. 2006); *see also In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4743425, at *1 (E.D. Pa. Sept. 15, 2014) (dismissing twenty-nine state law consumer protection, unfair competition, and unfair trade practices claims based on same deficient allegations underlying Sherman Act and Clayton Act claims), *aff'd*, 833 F.3d 151 (2d Cir. 2016).  On this basis alone, Plaintiffs' failure to state a claim in Count I requires dismissal of the copycat state law claims in Count III; and Plaintiffs' failure to state a claim in Count II requires dismissal of the matching state law claims in Count IV.

In addition, Plaintiffs' pleading is completely devoid of any allegations concerning *26 of the jurisdictions* under whose laws they purport to sue and, most relevant here, Plaintiffs do not allege where they made any purchase.  Instead, each state law claim is made "with respect to purchases in" that state with no supporting allegations of any Plaintiff having made any purchase in any particular state.  Compl. ¶¶ 209, 214.  Dismissal of the Sherman Act claims thus requires dismissal of each state law claim on this basis as well because Plaintiffs have not sufficiently alleged that they can bring a claim in their individual capacities for violation of any of the state laws listed in Counts III and IV.  *See Chufen Chen v. Dunkin' Brands, Inc.*, No. 17-CV-3808 (CBA) (RER), 2018 WL 9346682, at *8 (E.D.N.Y. Sept. 17, 2018) ("Because the Court dismisses the individual claims of each of the named plaintiffs, the Court lacks jurisdiction over the state-law class claims of the unnamed putative class members." (collecting cases)), *aff'd*, 954

F.3d 492 (2d Cir. 2020); *Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139 (LGS), 2018 WL

1353290, at *8 (S.D.N.Y. Mar. 15, 2018) (dismissing state antitrust and consumer protection

claims for not satisfying due process requirements "because the Complaint fails to allege any

nexus between those states and the parties and events in this case, apart from a plaintiff's

domicile").

<u>**CONCLUSION**</u>

The Complaint should be dismissed in its entirety with prejudice because Plaintiffs fail to

allege facts plausibly suggesting competitive harm or even a plausible relevant market. *See*

*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, No. 15-cv-05488 (RJS), 2016 WL 5719790, at

*8 (S.D.N.Y. Sept. 29, 2016) (denying leave to file a second amended complaint when

"[n]otwithstanding the opportunity to file amended pleadings, [plaintiff] still relies on vague and

conclusory allegations that are inadequate to sustain its asserted causes of action"), *aff'd*, 708 F.

App'x 29 (2d Cir. 2017).  And amendment would be futile because Plaintiffs' own allegations

demonstrate that no Defendant possesses market power and that, in any event, the largest

platform, DoorDash, does not use the challenged NDPs.  *See Concord Assocs.*, 817 F.3d at 55

(denying leave to file a second amended complaint when amendment to proposed market

definition would be "futile").

Dated: Washington, DC
     October 19, 2020

Respectfully submitted,

/s/ *Steven C. Sunshine*
Steven C. Sunshine
SKADDEN, ARPS, SLATE,
  MEAGHER, & FLOM, LLP
1400 New York Avenue N.W.
Washington, D.C. 20005
steve.sunshine@skadden.com

Karen M. Lent
Evan Kreiner
SKADDEN, ARPS, SLATE,
  MEAGHER, & FLOM, LLP
One Manhattan West
New York, NY 10001
karen.lent@skadden.com
evan.kreiner@skadden.com

*Counsel for Defendant Postmates Inc.*

/s/ *Derek Ludwin* (*with permission*)
Derek Ludwin
Stacey K. Grigsby
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001
dludwin@cov.com
sgrigsby@cov.com

Andrew A. Ruffino
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
aruffino@cov.com

*Counsel for Defendant Uber
Technologies, Inc.*

/s/ *David J. Lender (with permission)*
David J. Lender
Eric S. Hochstadt
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
david.lender@weil.com
eric.hochstadt@weil.com

*Counsel for Defendant Grubhub Inc.*