**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARIAM DAVITASHVILI, ADAM BEN-
SIMON, MIA SAPIENZA, PHILIP ELI-
ADES, JONATHAN SWABY, JOHN BOISI,
NATHAN OBEY, and MALIK DREWEY,
individually and on behalf of all others simi-
larly situated,

      Plaintiffs,

v.

GRUBHUB INC., UBER TECHNOLOGIES,
INC., and POSTMATES INC.,

      Defendants.

Civ. No. 1:20-cv-03000-LAK

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

I.     THE RELEVANT MARKETS.......................................................................... 3

II.    DEFENDANTS' ANTICOMPETITIVE CONDUCT ......................................... 4

       A.    Defendants Impose Supracompetitive Pricing in the Relevant Markets. .................... 4

       B.    Defendants Maintain and Cause Supracompetitive Pricing in the Relevant
             Markets Through Vertical Agreements That Fix Uniform and Minimum Prices. ....... 6

       C.    Grubhub and Uber Further Fix Prices and Preclude Competition in the Relevant
             Markets Through Their Particular Vertical Agreements. ............................................ 7

ARGUMENT ........................................................................................................... 8

I.     PLAINTIFFS PLAUSIBLY ALLEGE THE RELEVANT MARKETS............................. 8

       A.    Defendants' Argument for the Scope of the Product Markets Necessarily
             Fails Under the Controlling Precedent.......................................................................... 8

       B.    Plaintiffs Plausibly Allege the Relevant Product Markets.......................................... 9

             1.    Restaurant Platforms Offer Services That Restaurants Do Not Offer. ............. 10

             2.    Low Cross-Elasticity Exists Between the Markets at Issue............................... 11

             3.    Plaintiffs Account for the *Cellophane* Fallacy in Making Their Allegations,
                   Which Defendants Fail to Do in Their Motion................................................... 13

       C.    Plaintiffs Plausibly Allege the Relevant Geographic Markets. ................................. 14

II.    PLAINTIFFS PLAUSIBLY ALLEGE AND MAY SEEK REDRESS FOR THEIR
       INJURY IN THE DIRECT MARKETS................................................................ 16

       A.    The Direct Classes Have Suffered Injury Inextricably Intertwined with the
             Injury That Defendants Sought to Inflict in the Restaurant Platform Market. .......... 16

       B.    Plaintiffs Allege Anticompetitive Effects in the Direct Markets Because the
             NPCCs Cause Supracompetitive Pricing in Those Markets. ..................................... 19

III.   PLAINTIFFS PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS IN THE
       RESTAURANT PLATFORM MARKET ............................................................. 24

A.    Plaintiffs Plausibly Allege Anticompetitive Effects Directly. .................................... 24

    1.    Plaintiffs Plausibly Allege Increased Consumer Prices. .................................... 25

    2.    Plaintiffs Plausibly Allege Increased Restaurant Prices. ................................... 27

B.    Plaintiffs Plausibly Allege Anticompetitive Effects Indirectly. ................................. 29

    1.    Plaintiffs Allege that Grubhub and Uber Have the Ability to Adversely Affect Competition in the Restaurant Platform Market. .................................... 29

    2.    Plaintiffs Allege Grubhub's and Uber's Market Shares. ................................... 30

    3.    Plaintiffs Allege Other Evidence of Grubhub's and Uber's Market Power. ..... 32

IV.    PLAINTIFFS ADEQUATELY ALLEGE THEIR CLAIMS UNDER STATE LAW ....... 33

CONCLUSION ..................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   306 F. Supp. 3d 610 (S.D.N.Y. 2018) ................................................................. 10

*Allen v. Dairy Farmers of Am., Inc.*,
   748 F. Supp. 2d 323 (D. Vt. 2010) ..................................................................... 29

*Allen v. Dairy Mktg. Servs., LLC*,
   2013 WL 6909953 (D. Vt. Dec. 31, 2013) .......................................................... 12

*Apotex Corp. v. Hospira Healthcare India Private Ltd.*,
   2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ............................................................ 31

*Babyage.com, Inc. v. Toys R Us, Inc.*,
   558 F. Supp. 2d 575 (E.D. Pa. 2008) ............................................................ 21, 25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................. 8

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982) .................................................................................. 3, 16, 18

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2012) ............................................................ 10, 31

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
   996 F.2d 537 (2d Cir. 1993) ............................................................................... 19

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
   403 F. Supp. 3d 191 (S.D.N.Y. 2019) ................................................................ 19

*Commercial Data Servers, Inc. v. IBM*,
   262 F. Supp. 2d 50 (S.D.N.Y. 2003) .................................................................. 31

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ............................................................................................ 31

*Darush v. Revision LP*,
   2013 WL 1749539 (C.D. Cal. Apr. 10, 2013) ..................................................... 33

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018) ................................................................ 19

*Discovery Fin. Servs., Inc. v. Visa U.S.A., Inc.*,
   2005 WL 8178488 (S.D.N.Y. Nov. 10, 2005) ..................................................... 10

*DSM Desotech Inc. v. 3D Sys. Corp.*,
 2009 WL 174989 (N.D. Ill. Jan. 26, 2009) ........................................................... 30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992) ................................................................................... 8, 12, 31

*F&M Schaefer Corp. v. C. Schmidt & Sons, Inc.*,
 597 F.2d 814 (2d Cir. 1979) .............................................................................. 25

*FTC v. AbbVie Inc.*,
 976 F.3d 327 (3d Cir. 2020) .............................................................................. 19

*FTC v. Indiana Fed'n of Dentists*,
 476 U.S. 447 (1986) ........................................................................................ 29

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
 386 F.3d 485 (2d Cir. 2004) .............................................................................. 13

*Gordon v. Amadeus IT Grp., S.A.*,
 194 F. Supp. 3d 236 (S.D.N.Y. 2016) .................................................................. 22

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
 806 F.3d 162 (3d Cir. 2015) .............................................................................. 18

*Heerwagen v. Clear Channel Commc'ns*,
 435 F.3d 219 (2d Cir. 2006) .......................................................................... 14, 15

*In re Aggrenox Antitrust Litig.*,
 199 F. Supp. 3d 662 (D. Conn. 2016) ............................................................... 13, 32

*In re Aluminum Warehousing Antitrust Litig.*,
 833 F.3d 151 (2d Cir. 2016) ........................................................................... 16, 18

*In re Commodity Exch., Inc.*,
 213 F. Supp. 3d 631 (S.D.N.Y. 2016) .................................................................. 27

*In re Crude Oil Commodity Futures Litig.*,
 913 F. Supp. 2d 41 (S.D.N.Y. 2012) ................................................................... 11

*In re Disposable Contact Lens Antitrust Litig.*,
 215 F. Supp. 3d 1272 (M.D. Fla. 2016) ............................................................... 24

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
 383 F. Supp. 3d 187 (S.D.N.Y. 2019) .................................................................. 12

*In re London Silver Fixing Ltd., Antitrust Litig.*,
 213 F. Supp. 3d 530 (S.D.N.Y. 2016) .................................................................... 9

iv

*In re London Silver Fixing, Ltd. Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ................................................. 27

*In re Nexium Antitrust Litig.*,
    968 F. Supp. 2d 367 (D. Mass. 2013) ................................................. 26

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    562 F. Supp. 2d 392 (E.D.N.Y. 2008) ............................................. 31, 32

*In re Restasis Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020) .......................................................... 23

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) ............................................ 16, 18

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    897 F.3d 88 (2d Cir. 2018).............................................................. 34

*Laumann v. NHL*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ........................................... 19, 25

*Leegin Creative Leather Products v. PSKS*,
    551 U.S. 877 (2007).............................................................. passim

*Mazda v. Carfax, Inc.*,
    2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) .................................... 23, 29

*Meredith Corp. v. SESAC LLC*,
    1 F. Supp. 3d 180 (S.D.N.Y. 2014) ................................................... 19

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ................................................ 12

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)........................................................................ 32

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................. 12, 13, 14, 15

*O'Brien v. Leegin Creative Leather Prods., Inc.*,
    277 P.3d 1062 (Kan. 2012) .............................................................. 33

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)............................................................ 2, 19, 28

*Prime Int'l Trading, Ltd. v. BP PLC*,
    784 F. App'x 4 (2d Cir. 2019) ......................................................... 17

v

*R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*,
  462 F.3d 690 (7th Cir. 2006) (Easterbrook, J.) ........................................ 30

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................... 33

*SC Innovations, Inc. v. Uber Tech., Inc.*,
  2020 WL 2097611 (N.D. Cal. May 1, 2020) ........................................... 32

*SC Innovations, Inc. v. Uber Techs., Inc.*,
  434 F. Supp. 3d 782 (N.D. Cal. 2020) ..................................................... 12

*Sentry Data Health Sys., Inc. v. CVS Health*,
  379 F. Supp. 3d 1320 (S.D. Fla. 2019) ...................................... 14, 15, 16

*Spinelli v. NFL*,
  903 F.3d 185 (2d Cir. 2018) ..................................................................... 18

*Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*,
  2006 WL 1766434 (D. Mass. June 28, 2016) ........................................... 26

*Stubhub, Inc. v. Golden State Warriors, LLC*,
  2015 WL 6755594 (N.D. Cal. Nov. 5, 2015), ........................................... 10

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ....................................................................................... 9

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .............................................................. passim

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ................................................................. 30, 32

*Toys R Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ............................................................. 23, 26

*TSI Prods., Inc. v. Armor AII/STP Prods. Co.*,
  2019 WL 4600310 (D. Conn. Sept. 23, 2019) ........................... 9, 10, 11, 24

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016) ............................................... 29, 30, 32, 33

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ..................................................................... 20

*United States v. Blue Cross Blue Shield of Mich.*,
  809 F. Supp. 2d 665 (E.D. Mich. 2011) ................................................... 22

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
  248 F. Supp. 3d 720 (W.D.N.C. 2017) .................................................................. 33

*United States v. Eastman Kodak Co.*,
  63 F.3d 95 (2d Cir. 1995) ....................................................................................... 13

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ...................................................................................... 8, 14, 15

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974) ............................................................................................... 14

*United States v. Visa USA, Inc.*,
  344 F.3d 229 (2d Cir. 2003) ............................................................................ passim

*US Airways, Inc. v. Sabre Holdings Corp.*,
  105 F. Supp. 3d 265 (S.D.N.Y. 2015) ............................................................. 21, 33

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ............................................................................. passim

*Wacker v. JP Morgan Chase & Co.*,
  678 F. App'x 27 (2d Cir. 2017) ............................................................................... 8

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007) .................................................................... 24

## Other Authorities

4E *Commercial Litigation in N.Y. State Courts* § 124:22 (5th ed. Oct. 2020 update) ................. 33

Andre Boik & Kenneth Corts, *The Effects of Platform Most-Favored-Nation Clauses on
  Competition and Entry*, 59 J. L. & Econ. 105 (2016) ............................................ 28

Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*,
  127 Yale L.J. 2176 (2018) ...................................................................................... 25

Plaintiffs, Mariam Davitashvili, Adam Bensimon, Mia Sapienza, Philip Eliades, Jonathan Swaby, John Boisi, Nathan Obey, and Malik Drewey, individually and on behalf of all others similarly situated, respectfully submit this Memorandum of Law in opposition to Defendants' motion to dismiss.

## **INTRODUCTION**

This action concerns the unlawful agreements that each Defendant uses to fix uniform and minimum prices across the channels that the country's restaurants use to sell their food. Defendants operate "Restaurant Platforms," online marketplaces that enable consumers to search for restaurants in a locality and order food for takeout or delivery from them. Seeking to reduce competition, both from other Restaurant Platforms and from restaurants, Defendants have entered into contracts with restaurants that preclude restaurants from offering lower prices through their direct sales channels or through other Restaurant Platforms (like Doordash), with the purpose and effect of fixing uniform and minimum prices across these channels.

Defendants' use of these No Price Competition Clauses ("NPCCs") to fix prices has caused consumers in three product markets to suffer anticompetitive harm, primarily through higher prices. Consumers in the "Restaurant Platform Market" pay higher prices, for example, because absent the NPCCs, restaurants would offer lower prices through competing Restaurant Platforms that impose lower commissions on restaurants, reflected in consumer prices. In both the "Direct Takeout and Delivery Market" (in which consumers order meals directly from restaurants) and the "Dine-in Market" (in which consumers order meals at restaurants for dine-in service), consumers pay higher prices because, absent the NPCCs, restaurants would offer lower prices in these "Direct Markets," where they are not required to pay commissions to Restaurant Platforms. If the restaurants were free to offer consumers lower prices for direct orders, then restaurants would sell more outside of Restaurant Platforms, and Defendants' ability to impose supracompetitive commission

rates would decrease. Each Defendant thus utilizes the NPCCs as a "fulcrum" to reduce any competition from restaurants.

In moving to dismiss Plaintiffs' claims, Defendants ignore controlling law and improperly disregard Plaintiffs' allegations. Defendants' arguments fail for three main reasons.

*First*, on a threshold issue that Defendants address only briefly and secondarily, Plaintiffs plausibly allege the relevant markets. Restaurant Platforms are two-sided, and as the Supreme Court has held: "Only other two-sided platforms can compete with a two-sided platform for transactions." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018). Restaurant Platforms thus do not compete with restaurants in the same market. At the same time, as is common between product markets, Defendants *would* stand to lose *some* sales to restaurants if restaurants could lower their prices—which the NPCCs preclude.

*Second*, in disputing the plausibility of the anticompetitive effects that Plaintiffs allege, Defendants mischaracterize the NPCCs and thus fail to address the controlling precedent, under which Plaintiffs' claims are well-founded. The NPCCs are not "non-discrimination provisions"; they are vertical price-fixing agreements between retailers (Defendants' platforms) and manufacturers (restaurants). The NPCCs are the precise type of vertical restraint that concerns the Supreme Court most, *see Leegin Creative Leather Products v. PSKS*, 551 U.S. 877 (2007), because they fix uniform and minimum prices, a retailer (the platform) imposes them on manufacturers (the restaurants), manufacturers cannot economically avoid using the retailer, they prevent other retailers from charging lower prices, and they bind a large share of manufacturers.

*Third*, in arguing that Plaintiffs' claims based on harm in the Direct Markets must fail because Defendants "do not compete" in these markets, Defendants fail even to address the controlling precedent holding otherwise. Under *Blue Shield of Virginia v. McCready*, 457 U.S. 465

(1982), as the Second Circuit has recognized, a plaintiff may bring a claim based on anticompetitive effects in one market that are "inextricably intertwined" with the anticompetitive effects the defendant sought to inflict in a separate market in which the defendant competes. Plaintiffs allege in detail how the Defendants have sought to use the NPCCs to reduce competition in the Restaurant Platform Market and in doing so have caused anticompetitive effects and harmed consumers in the Direct Markets. In addition, although Plaintiffs here plausibly allege such anticompetitive effects, *McCready* holds that the plaintiff need not even show that the defendant *succeeded* in imposing anticompetitive effects in the market in which it competes.

## **FACTUAL BACKGROUND**

### I.     **THE RELEVANT MARKETS**

Defendants operate Restaurant Platforms through which consumers may search for participating restaurants in a locality and order food for takeout or delivery, through the platform, from those restaurants. Amended Complaint ("AC") ¶ 27. Restaurant Platforms compete for such transactions in the Restaurant Platform Market. *Id.* ¶¶ 29, 46. The Restaurant Platforms compete locally for listings from restaurants and orders from consumers. *Id.* ¶¶ 98–99. The "Local Markets" here are New York, Chicago, Los Angeles, San Francisco, Miami, Phoenix, Dallas, Washington, D.C., Boston, Philadelphia, Houston, and Atlanta. *Id.* ¶ 99. As measured by sales to consumers, Grubhub has 67% of the market in New York City and over 40% of the market in Boston and Philadelphia; Uber has over 40% of the market in Miami and Atlanta; and Postmates has 37% of the market in Los Angeles. *Id.* ¶ 34. The Restaurant Platforms also compete nationally. *Id.* ¶¶ 95–97. The national Restaurant Platform Market is highly concentrated: the largest four firms, including Defendants, control 98% of the national Restaurant Platform Market. *Id.* ¶¶ 31–32.

In the Direct Takeout and Delivery Market, consumers order meals directly from restaurants for takeout or delivery; and in the Dine-in Market, consumers order meals at restaurants for

dine-in service. *Id.* ¶ 30. These Direct Markets are separate from the Restaurant Platform Market because Restaurant Platforms offer services that restaurants do not, including functionality that enables consumers to search for restaurants in their area, review restaurants, select restaurants based on their preferences and other consumer reviews, and place orders through mobile apps and websites. *Id.* ¶¶ 48–50. In addition, these platforms are especially popular with a distinct group of consumers with distinct preferences—young professionals living in major cities. *Id.* ¶ 52. Industry analysts and commentators identify the Restaurant Platform Market as a stand-alone market, characterizing it as an oligopoly and calling for antitrust scrutiny. *Id.* ¶ 53.

## II.   DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A.   <u>Defendants Impose Supracompetitive Pricing in the Relevant Markets.</u>

With thin profit margins—typically between zero and 15%—restaurants need a significant number of sales to cover their costs. *Id.* ¶ 75. Over the past decade, those sales have increasingly come through Restaurant Platforms. *Id.* ¶¶ 2, 77. Restaurants have to work with these platforms, especially Defendants', which are each used by tens of millions of consumers, because refusing to do so would foreclose a restaurant from a large segment of potential consumers. *Id.* ¶¶ 78–79, 104. Indeed, because many consumers use only a single platform, restaurants typically sell through multiple platforms to access a sufficient number of consumers. *Id.* ¶¶ 85–88, 126.

Defendants exploit their market power by imposing supracompetitive commissions on restaurants. Each time a consumer orders through a Restaurant Platform, that platform charges the restaurant a commission (the "Restaurant Commission"), usually a percentage (the "Restaurant Commission Rate") of the total price of the order. *Id.* ¶ 41. With 80% of online delivery orders now placed through Restaurant Platforms, "Defendants' Restaurant Commission Rates today are approximately 30%," triple what they were in 2004 and almost double what they were in 2015. *Id.* ¶¶ 109, 112–13, 115, 118. These rates, which are (and are perceived as) "unreasonable," *id.* ¶ 115,

vastly exceed those charged by Defendants' smaller competitors like Foodetective, Slice, Fare, Waitr, and Delivery.com, and enable Defendants to make profit margins as high as 80% per order. *Id.* ¶¶ 110, 112–13, 120–21.

These exorbitant Restaurant Commission Rates dwarf restaurants' profit margins, *id.* ¶¶ 75, 142–43, forcing restaurants to increase the price that they charge on Defendants' platforms (the "Restaurant List Prices"), *id.* ¶¶ 142–44, 146. In 2019 alone, for example, 64% of restaurants in New York raised or considered raising their prices to offset Grubhub's fees. *Id.* ¶ 144. Restaurants throughout the country have similarly raised prices in response to Defendants' rates. *Id.* ¶ 145. On top of these inflated Restaurant List Prices, for some transactions, Defendants charge commissions to consumers that are, as the *New York Times* has characterized them, "downright egregious." *Id.* ¶¶ 43–44, 116–17.

Consumers and restaurants cannot readily switch to alternatives. The Restaurant Platform Market has high barriers to entry, because Restaurant Platforms exhibit indirect network effects, "in that the value that they offer to one side of the platform is a function of the extent of the use of the other side of the platform." *Id.* ¶ 66. It is thus difficult and expensive for smaller platforms to attract the additional restaurants or consumers needed to gain even a foothold in the market. *Id.* ¶¶ 66–69, 105. At the same time, Defendants' platforms are—as recognized by *Yale Law Journal* and McKinsey—"sticky," meaning that once a consumer becomes familiar with a particular platform, he or she is resistant to switching to a competing service. *Id.* ¶¶ 87, 106–07. Accordingly, even a Restaurant Platform offering better services, technology, and prices would face substantial barriers to becoming a leading market participant and viable alternative for consumers and restaurants.

B.     <u>Defendants Maintain and Cause Supracompetitive Pricing in the Relevant Markets Through Vertical Agreements That Fix Uniform and Minimum Prices.</u>

In order to protect their supracompetitive rates, Defendants restrict price competition by imposing NPCCs in their contracts with restaurants. Under the NPCCs, each Defendant prohibits any restaurant that sells through its platform from selling goods at a lower price directly to consumers. *Id.* ¶¶ 55–61. The NPCCs thus artificially interfere with a restaurant's incentive to offer lower prices to such a consumer. By maintaining lower prices in the Direct Markets, restaurants could divert *some* of their sales from the lower-margin Restaurant Platform Market to the higher-margin Direct Markets. *Id.* ¶ 148. That is, although the Restaurant Platform Market and Direct Markets are distinct, there is some cross-elasticity between them, such that some consumers would switch in response to price changes. *Id.* ¶ 154. This cross-elasticity is higher than it otherwise would be because Defendants are *already* charging supracompetitive prices. *Id.* The NPCCs have the purpose and effect, however, of preventing restaurants from undercutting Defendants on price, and therefore enable Defendants to continue charging supracompetitive rates, earning exorbitant profit margins, without losing sales to the Direct Markets. *Id.* ¶ 148.

Consumers pay the price. Restaurants on Defendants' platforms must increase their prices on the platforms to offset Defendants' Restaurant Commissions, and—by design—Defendants' NPCCs force restaurants to charge those same inflated prices in the Direct Markets. *Id.* ¶ 147. Absent the NPCCs, a restaurant that sells through Defendants' platforms could increase its prices on those platforms, while maintaining lower prices in the Direct Markets. *Id.* ¶¶ 142, 149. Or such a restaurant could decrease its prices in the Direct Markets, to persuade consumers to purchase directly from the restaurant. *Id.* ¶ 148. The NPCCs *prohibit* these results. *Id.* ¶¶ 147, 149. As a consequence, consumers in the Direct Markets pay higher prices than they otherwise would.

These supracompetitive prices are market-wide. Approximately 77% of restaurants in the United States that offer delivery do so through Grubhub, and more than a quarter do so through Uber and Postmates. *Id.* ¶ 81. At least 50% of *all* restaurants in each Local Market sell through Grubhub; the same is true in seven Local Markets for Uber, and in three Local Markets for Postmates. *Id.* ¶¶ 82–84. With the NPCCs binding such a high percentage of restaurants, they artificially inflate prices throughout the Direct Markets. *Id.* ¶¶ 157–62.

C.   Grubhub and Uber Further Fix Prices and Preclude Competition in the Relevant Markets Through Their Particular Vertical Agreements.

Grubhub and Uber go even further than Postmates and also prohibit restaurants that sell through their platforms from charging lower prices *anywhere*, including on competing platforms. *Id.* ¶¶ 59–61. The Restaurant List Price for a restaurant that sells through Grubhub or Uber is *the* lowest price the restaurant is permitted to charge for its goods. *Id.* The implications of this artificial restriction are significant because, as explained above, restaurants typically need to sell through multiple platforms to generate sufficient revenue to cover their costs. *Id.* ¶ 126.

Grubhub and Uber's NPCCs thus have the purpose and effect of fixing the end-prices that consumers pay in the Restaurant Platform Market. *Id.* ¶¶ 125, 132. This is because these NPCCs *contractually prohibit* Restaurant Platforms from competing on Restaurant List Prices; and the Restaurant List Price is a key—and, in some cases, the only—component of prices that consumers pay. *Id.* ¶¶ 81–82, 125. Where Grubhub's or Uber's NPCCs bind most restaurants in a given Local Market, *id.* ¶¶ 82–84, for example, those NPCCs create artificially high prices, reduce competition, and artificially increase barriers to entry by precluding both existing platforms and prospective new platforms from attracting restaurants and consumers by competing on price or quality with Grubhub's and Uber's platforms, *id.* ¶¶ 130, 135–36. For this reason, large Restaurant Platforms charge near-uniform Restaurant Commission Rates. *Id.* ¶ 130.

Grubhub's and Uber's NPCCs also further enable Grubhub and Uber to profitably increase Restaurant Commission Rates. *Id.* ¶¶ 131–33. Absent the NPCCs, for example, if Grubhub charged supracompetitive Restaurant Commission Rates, then restaurants would pass that cost on to consumers using Gruhub, and consumers would switch to a Restaurant Platform that offered lower Restaurant List Prices. *Id.* But the NPCCs prevent competing Restaurant Platforms from undercutting Grubhub (or Uber) on Restaurant List Prices, and therefore remove a powerful disincentive for Grubhub (or Uber) to increase its Restaurant Commission Rates. *Id.* Restaurant Commission Rates therefore have increased significantly in recent years. *Id.* ¶¶ 112–15.

## ARGUMENT

A plaintiff states a claim by alleging "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]here is no heightened pleading standards in antitrust cases." *Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 29 (2d Cir. 2017) (quotations omitted).

## I.  PLAINTIFFS PLAUSIBLY ALLEGE THE RELEVANT MARKETS

"Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Wacker*, 678 F. App'x at 30–31 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)). Market definition requires "a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).

### A.  Defendants' Argument for the Scope of the Product Markets Necessarily Fails Under the Controlling Precedent.

Contrary to Defendants' apparent interpretation (as at 24-25), the Restaurant Platform Market is not a market for restaurant meals; it is the market for enabling customers to search, view,

and order from the menus of restaurants in a particular locality. *See* AC ¶¶ 26–29. This market is distinct from the Direct Markets: "Restaurant Platforms are two-sided platforms, acting as an intermediary to connect restaurants and consumers to the benefit of both." *Id.* ¶ 36. These allegations, and Defendants' arguments against them, underscore two critical threshold points:

One, for purposes of market definition: "Only other two-sided platforms can compete with a two-sided platform for transactions." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018). Two, if (contrary to fact) restaurants and Restaurant Platforms *do* compete in the same market, as Defendants argue (at 24–26), then their NPCCs are *horizontal* agreements to fix uniform prices, which are "*per se* unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *accord In re London Silver Fixing Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 557–58 (S.D.N.Y. 2016). Defendants' arguments here are thus no basis for dismissal of Plaintiffs' claims.

### B.    Plaintiffs Plausibly Allege the Relevant Product Markets.

An alleged product market must have a "rational relation" to the "analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd*, 275 F.3d at 200 (quotations and citation omitted). Sufficient cross-elasticity of demand exists such that two products are in the same market "if consumers would respond to a slight increase in the price of one product by switching to another product." *Id.* at 201–02 (quotations omitted). In particular:

> The Court imagines that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ("SSNIP") within the proposed market. If the hypothetical monopolist can impose this SSNIP without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market.

*TSI Prods., Inc. v. Armor All/STP Prods. Co.*, 2019 WL 4600310, at *12 (D. Conn. Sept. 23, 2019) (citations, brackets, and ellipses omitted). Where cross-elasticity is low and the defendants'

products entrench their continued use, or otherwise incentivize loyalty, then a plausible market exists. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64–66 (2d Cir. 2019).

Given that "hard data on cross-elasticity of demand are rare," in particular at the pleading stage, courts also look to "practical indicia," *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 619 (S.D.N.Y. 2018), including "the product's peculiar characteristics and uses, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors," *TSI*, 2019 WL 4600310, at *12 (quotations and ellipses omitted). In addition, "[i]ndustry recognition is well established as a factor that courts consider in defining a market." *Todd*, 275 F.3d at 205.

### 1.     Restaurant Platforms Offer Services That Restaurants Do Not Offer.

With respect to restaurants that do not provide their own delivery, of course, Restaurant Platforms offer a service otherwise unavailable to the consumer. AC ¶¶ 42, 44. On these allegations alone, "defendants have not put forth an alternate theory of an economically coherent product market" in which Restaurant Platforms and restaurants compete for delivery orders. *Discovery Fin. Servs., Inc. v. Visa U.S.A., Inc.*, 2005 WL 8178488, at *3 (S.D.N.Y. Nov. 10, 2005). With respect to all restaurants, moreover, Restaurant Platforms provide services that restaurants do not offer, including by allowing customers to rate their experiences with and review restaurants, "list[ing] different restaurants that offer takeout and delivery in a particular area," and "allow[ing] the user to choose a restaurant based on her preferences, including based on [customer] reviews." AC ¶¶ 48–49. And, unlike the vast majority of restaurants, Restaurant Platforms allow consumers to place orders through mobile apps and websites, without speaking with a person. *Id.* ¶ 50. Restaurant Platforms thus offer a "specialized" product and service. *TSI*, 2019 WL 4600310, at *12.[1]

---

[1] In *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2012), plaintiffs offered "no allegations from which the Court might infer that print books and e-books are not, in consumers' minds, acceptable substitutes." *Id.* at 621 (quotations omitted). In this case, as shown, Plaintiffs

Defendants themselves tout their platforms as offering services that restaurants do not, such that restaurants have no rational economic choice but to use these platforms, which they do extensively. AC ¶¶ 79–81. Grubhub reports that it "is focused on *transforming the takeout experience*." *Id.* ¶¶ 18, 37 (emphasis added). Postmates similarly says on its website, referring to its food-delivery service, that it is "*transforming* the way goods move around cities." *Id*. ¶¶ 20, 39 (emphasis added). Uber reports that its Uber Eats service "allows consumers *to search for and discover local restaurants*, order a meal, and either pick-up at the restaurant or have the meal delivered." *Id*. ¶¶ 19, 38 (emphasis added). In addition, "commentators and politicians have identified the Restaurant Platform Market as a distinct market." *Id*. ¶ 53; *see also id*. ¶ 69 (noting the reporting that "Amazon Restaurants has struggled to gain a foothold in the restaurant delivery market," describing the Restaurant Platform Market).

Plaintiffs also allege a category of "distinct customers" for Restaurant Platforms. *TSI*, 2019 WL 4600310, at *12. In line with the relatively greater proclivity among younger professionals to harness online services and apps and for urban residents to have access to relatively more restaurants, Restaurant Platforms "are especially popular among young professionals in major cities. This is a distinct group of consumers with distinct sensitivities to price changes and distinct preferences." AC ¶ 52.

2. <u>Low Cross-Elasticity Exists Between the Markets at Issue.</u>

Contrary to Defendants' suggestion (at 25–26), the relevant question, and a fact-intensive one, is whether there is "*sufficient* cross-elasticity of demand." *Todd*, 275 F.3d at 201 (emphasis

---

have made such allegations in detail. In *Stubhub, Inc. v. Golden State Warriors, LLC*, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015), the court held that there was only one market for the commodities of tickets to Golden State Warriors home games. *Id*. at *3–4. The court did not undertake to analyze, as required in this case—in which the relevant market is not for the restaurants' meals—whether the alleged product market involves a service offering distinct qualities, uses, vendors, customers, and prices.

added); *see, e.g.*, *US Airways*, 938 F.3d at 65–66 (finding plausible market where plaintiff alleged that cross-elasticity between products at issue was low); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012) (finding alleged market plausible and explaining that extent of substitutability between products at issue is among the "fruitful areas for discovery"). There is "some cross-elasticity" between the Restaurant Platform Market and the Direct Markets. AC ¶ 148.[2] Yet such cross-elasticity is low, *id*. ¶¶ 47, 53, 190, 199, including because Restaurant Platforms are "sticky," *id*. ¶ 51. This stickiness follows in part from the different services that, as explained above, Restaurant Platforms offer consumers. *See, e.g.*, *id*. ¶¶ 87, 106.

Defendants' arguments here (at 25–26) reduce to the proposition that because Restaurant Platforms have taken substantial delivery business *from* restaurants, there must not be a Restaurant Platform Market. This logic is wrong. To take recent and analogous examples, plausible markets exist for single-serve coffee brewers (which are taking substantial business from traditional drip-coffee machines), *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 226–27 (S.D.N.Y. 2019); and for mobile app-generated ride-share services, like Uber (which are taking substantial business from taxis and car services), *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 827–28 (S.D.N.Y. 2016); *accord SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 792 (N.D. Cal. 2020). The "cannibalization" that Plaintiffs cite, and that Defendants (at 25) mischaracterize as reflecting inconsistent allegations, merely describes how Restaurant

---

[2] Defendants (at 26) accuse Plaintiffs of "plain economic and legal gamesmanship" without, as discussed further below, disputing the plausibility of such low cross-elasticity or trying to account for the *Cellophane* fallacy. Defendants' frivolous accusation underscores the impropriety of disputing the economics underlying Plaintiffs' allegations on a motion to dismiss, *see, e.g.*, *Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *4–5 (D. Vt. Dec. 31, 2013) (citing *Eastman Kodak* and allowing expert testimony on market definition), and disregards the courts' longstanding acknowledgement that "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 199–200 (S.D.N.Y. 2020) (quotations omitted) (collecting authority).

Platforms operate. That is, Defendants entice customers to use their platforms to buy the meals that restaurants prepare. What restaurants originally thought would add to their business, given what Defendants told them, has instead taken from it. AC ¶ 89.

            3.    Plaintiffs Account for the *Cellophane* Fallacy in Making Their Allega-
tions, Which Defendants Fail to Do in Their Motion.

In arguing (at 25–26 & n.9) that cross-elasticity between the Restaurant Platform Market and Direct Markets demonstrates that those markets are not separate, Defendants fail to apprehend that where producers have profitably raised prices because not enough customers have switched to other products, the producers' products are sold in a distinct market. *See Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Defendants *have* profitably raised prices. *See, e.g.*, AC ¶¶ 2, 112–13, 115, 118. For example, the net fees that Grubhub charges restaurants and consumers increased by 156% between 2014 and 2019, while Grubhub's revenue nearly tripled between 2016 to 2019. *Id*. ¶¶ 114, 118. Those fees, like the fees charged by other Restaurant Platforms, have reached supracompetitive levels. *Id.* ¶¶ 108–18.

The *Cellophane* fallacy teaches that if a defendant is *already* charging supracompetitive prices, then its inability to increase prices *further* without causing switching to substitutes is not evidence that such substitutes are part of the market. *See In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016). Defendants thus overlook (at 26 n.9) that cross-elasticity of demand may reflect that "at a high enough price, even poor substitutes look good to the consumer." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995) (quotations and citation omitted). In this case, if there were not already supracompetitive prices in the Restaurant Platform Market, the cross-elasticity of demand between Restaurant Platforms and the Direct Markets would be even lower. *See* AC ¶¶ 54, 154.

13

C.     Plaintiffs Plausibly Allege the Relevant Geographic Markets.

"The relevant geographic markets need not be defined with scientific precision, as 'an el-ement of fuzziness would seem inherent' in any attempted definition." *Deutsche Telekom*, 439 F. Supp. 3d at 203 (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)). Where the seller "markets its products or services on a local, regional, and national basis, the Court has acknowledged the existence of more than one relevant geographic market." *United States v. Ma-rine Bancorporation, Inc.*, 418 U.S. 602, 621 (1974).

In *Deutsche Telekom*, for example, following a bench trial, the court found a national mar-ket for retail mobile wireless telecommunications services, in which providers (or "carriers") such as Verizon, AT&T, T-Mobile, and Sprint compete. 439 F. Supp. 3d at 186–96, 203–05. The court cited "the national scope of carriers' decision-making processes" and that carriers "price nation-ally," such that "prices do not vary locally." *Id*. at 203–05; *see also Grinnell*, 384 U.S. at 575–76 (similar criteria for a national geographic market). At the same time, the court found that "there are additional local markets" because "consumers likely rely primarily on local services in the area in which they live and/or work," and because some carriers "engage in a significant degree of local marketing." *Deutsche Telekom*, 439 F. Supp. 3d at 203–04; *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006) (reading *Grinnell* "to stand for the proposition that in some cases involving services that tend to be provided locally, the market for purposes of the antitrust laws still could be national"). The court thus concluded, in analyzing T-Mobile's proposed acquisition of Sprint, that the relevant geographic markets were both the national market and local markets. *Deutsche Telekom*, 439 F. Supp. 3d at 205; *see also, e.g.*, *Sentry Data Health Sys., Inc. v. CVS Health*, 379 F. Supp. 3d 1320, 1328–29 (S.D. Fla. 2019) (rejecting defendants' argument and holding, with respect to CVS's provision of "contract pharmacy services," that plaintiff

adequately alleged that CVS provides such services in both a national market and the local markets in which "CVS has a 30% or greater share of contract pharmacy locations").

Plaintiffs here similarly and plausibly allege that, with respect to the Restaurant Platform Market, a national market coexists with local markets, because Restaurant Platforms:

- "compete in the Restaurant Platform Market throughout the United States." AC ¶¶ 94–95; *see Grinnell*, 384 U.S. at 575–76 (geographic market involved multistate competitors); *Deutsche Telekom*, 439 F. Supp. 3d at 203–04 (national competition); *Sentry*, 379 F. Supp. 3d at 1328 (CVS "competes with other national pharmacy chains").

- "advertise their services nationwide." AC ¶ 96; *see Deutsche Telekom*, 439 F. Supp. 3d at 203–04; *cf. Heerwagen*, 435 F.3d at 230–31 (no national market where no such national advertising).

- "operate nationwide," including in that they "provide the same exact services nationwide through the same exact websites and mobile apps." AC ¶ 96; *see Grinnell*, 384 U.S. at 575–76; *Deutsche Telekom*, 439 F. Supp. 3d at 203–04; *Sentry*, 379 F. Supp. 3d at 1328 ("CVS operates nationally").

- "charge restaurants the same Restaurant Commission Rates" and "the same Consumer Commission Rates" nationwide. AC ¶ 96; *see Grinnell*, 384 U.S. at 575–76; *Deutsche Telekom*, 439 F. Supp. 3d at 203–04; *Sentry*, 379 F. Supp. 3d at 1329 (citing "CVS's contracts for provision of pharmacy services across state lines with generally applicable price and service terms").

- "impose the same contractual restrictions—including, with respect to Defendants, the same NPCCs—on restaurants and consumers nationwide." AC ¶ 96; *see Grinnell*, 384 U.S. at 575–76; *Deutsche Telekom*, 439 F. Supp. 3d at 203–04; *cf. Heerwagen*, 435 F.3d at 230–31 (no national market where no such national contracts).

In addition, where Restaurant Platforms impose this national pricing and a hypothetical Restaurant Platform monopolist could profitably increase it to 5% above competitive levels, AC ¶ 53, Plaintiffs have alleged a further and well-established basis for the relevant geographic market, *see Deutsche Telekom*, 439 F. Supp. 3d at 204.

Plaintiffs also allege that "Restaurant Platforms compete for important partnerships with national restaurant chains, such as McDonald's, Starbucks, and Chick-Fil-A." AC ¶ 97. These are

"multistate businesses" with whom Restaurant Platforms enter into "nationwide contracts." *Grinnell*, 384 U.S. at 575; *Sentry*, 379 F. Supp. 3d at 1328 (CVS "contracts with national and regional health insurers"). Restaurant Platforms thus can "attract that chain's consumers throughout the country and therefore increase [their] revenues." AC ¶ 97. That is, Restaurant Platforms compete with each other nationally to attract such restaurant chains to increase the number of restaurants they can offer to consumers, and vice versa, *id.* ¶ 98, thereby underscoring the plausible coexistence of national and local geographic markets, *see, e.g.*, *Sentry*, 379 F. Supp. 3d at 1328–29 (accepting plaintiffs' allegations that covered entities "cannot turn to contract pharmacies located outside the relevant local markets," and concluding that "the allegations of a national market are not incongruous with allegations regarding local markets").

## II.    PLAINTIFFS PLAUSIBLY ALLEGE AND MAY SEEK REDRESS FOR THEIR INJURY IN THE DIRECT MARKETS

### A.    The Direct Classes Have Suffered Injury Inextricably Intertwined with the Injury That Defendants Sought to Inflict in the Restaurant Platform Market.

The Direct Takeout and Delivery and Dine-In Classes (or "Direct Classes") have suffered antitrust injury from the supracompetitive prices they have paid for menu items as a result of Defendants' NPCCs. Defendants argue (at 10–11) that these Classes cannot recover for this injury because Defendants do not compete in the Direct Markets and, they say, Section 1 requires that "a challenged restraint must harm competition in a market in which defendants compete." This incomplete description of the law overlooks the well-established bases for Plaintiffs' claims.

The "antitrust laws do not require a plaintiff to fit neatly into a box of competitor or consumer, so long as 'the injury [they] suffered was inextricably intertwined with the injury the conspirators sought to inflict.'" *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 361 (S.D.N.Y. 2016) (quoting *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982)). Under the "inextricably intertwined" standard, "courts ask whether the plaintiff was 'manipulated or utilized by

[defendant] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets.'" *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) (quotations omitted). This standard thus speaks to "the *reason* defendants would bother to corrupt some market in which they do not participate." *Id.* (emphasis in original).

In short, although the "relevant market" within which a plaintiff alleges anticompetitive harm is *usually* the market in which the defendant competes, "sometimes the defendant will corrupt a separate market in order to achieve its illegal ends." *Id.* In that scenario, the separate market is a "relevant market" because it qualifies as "the market that is directly restrained by Defendants' alleged anticompetitive activity." *Prime Int'l Trading, Ltd. v. BP PLC*, 784 F. App'x 4, 7 (2d Cir. 2019) (quotations omitted). Plaintiffs here allege that Defendants (i) have "corrupted" the Direct Markets by contractually fixing prices between those markets and the Restaurant Platform Market; and (ii) have done so to protect their supracompetitive pricing in the Restaurant Platform Market. AC ¶¶ 6–7, 56–61, 153–54. Plaintiffs' allegations therefore meet the foregoing standards.

Defendants' argument regarding Plaintiffs' supposed failure adequately to allege harm in the Restaurant Platform Market is unavailing for two independent reasons.

*First*, if there were any such requirement (there is not), Plaintiffs more than plausibly allege that each Defendant's misconduct has harmed competition in the Restaurant Platform Market. *See* Part III, below (analyzing the issue in greater detail with respect to Grubhub and Uber). Each Defendant's NPCCs cause anticompetitive effects in the Restaurant Platform Market by artificially increasing prices and restaurant commission rates and reducing competition on technology and service. *See* AC ¶¶ 64, 135–39, 142–43, 148, 153–54. Grubhub's and Uber's NPCCs even further cause such effects by *expressly precluding* Restaurant Platforms from competing on price in the Restaurant Platform Market. *Id*. ¶¶ 81–84, 125, 127–30, 135–36. Defendants' NPCCs cause these

injuries in the Restaurant Platform Market by preventing restaurants in the Direct Markets from undercutting Defendants' prices in the Restaurant Platform Market. *Id.* ¶¶ 151–54. The injuries in the Direct Markets and Restaurant Platform Market are thus inextricably intertwined because Defendants utilize the supracompetitive prices charged to the Direct Classes as a fulcrum to cause injury in the Restaurant Platform Market.

*Second*, Plaintiffs need not establish that Defendants *succeeded* in causing anticompetitive effects in the Restaurant Platform Market. The Supreme Court decided *not* to impose any such requirement in *McCready*, holding that it is enough for the plaintiff to allege injury inextricably intertwined with the injury the defendant "sought to inflict" in the market in which it competes. *McCready*, 457 U.S. at 484; *Zinc*, 155 F. Supp. 3d at 361; *see also McCready*, 457 U.S. at 489 (Rehnquist, J., dissenting) ("[The plaintiff] does not allege that her injury was caused by any reduction in competition between psychologists and psychiatrists, nor that it was the result of any *success* Blue Shield achieved in its 'boycott' of psychologists."); *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 176 (3d Cir. 2015) (holding that, like the plaintiff in *McCready*, "Hanover Realty does not allege a classic antitrust harm, but it nonetheless sufficiently alleges antitrust injury because its harm was the very means by which Defendants *sought* to keep Wegmans out of the market") (emphasis added); *see also Aluminum*, 833 F.3d at 161 (discussing in detail and endorsing *Hanover*). Accordingly, it is enough that Defendants *sought* to use the NPCCs to insulate themselves from price competition by both restaurants in the Direct Markets and other Restaurant Platforms in the Restaurant Platform Market. AC ¶¶ 125–68.[3]

---

[3] Defendants' cases do not suggest, let alone establish, that the "relevant market" for purposes of an antitrust claim must be a market in which the defendant participates; those cases do not even address that issue. *See Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018); *United States v. Visa USA, Inc.*, 344 F.3d 229, 238 (2d Cir. 2003). Cases that do address that issue make clear that Section 1 "allows for the flexibility to allege a *result* (e.g. higher prices) derived from conspiratorial behavior between two or more actors, who need not be within the same market, to achieve that end." *Zinc*, 155 F. Supp. 3d at 363 (emphasis in original).

B.     Plaintiffs Allege Anticompetitive Effects in the Direct Markets Because the
       NPCCs Cause Supracompetitive Pricing in Those Markets.

Defendants' NPCCs have the purpose and effect of fixing minimum and uniform prices, and are thus price-fixing agreements. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 171 n.212 (S.D.N.Y. 2018) (citing the longstanding explanation, set out in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940), that agreements "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" are price-fixing agreements). As vertical price-fixing agreements (between entities at different levels of distribution), Defendants' NPCCs are analyzed under the rule of reason, *see Leegin*, 551 U.S. at 907, a "fact-intensive" inquiry that involves "the weighing of procompetitive and anticompetitive effects" of the challenged restraint, *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 202 (S.D.N.Y. 2019), typically on the discovery record, *see, e.g.*, *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 221 (S.D.N.Y. 2014); *see also FTC v. AbbVie Inc.*, 976 F.3d 327, 356 (3d Cir. 2020) (the court must "allow the plaintiff to take discovery" if she has plausibly alleged that anticompetitive effects outweigh any procompetitive benefits).

Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *US Airways*, 938 F.3d at 55. The plaintiff may meet this burden directly, by alleging increased price, decreased consumer choice, or decreased quality, *id.* at 62; *Laumann v. NHL*, 907 F. Supp. 2d 465,

490 (S.D.N.Y. 2012); or indirectly, with "proof of market power plus some evidence that the challenged restraint harms competition." *Amex*, 138 S. Ct. at 2284.[4]

Defendants do not contend that Plaintiffs have failed to allege increased prices in the Direct Markets. Instead, they assert (at 12) that Plaintiffs' allegations are not plausible. This argument not only disregards Plaintiffs' detailed factual allegations, but also overlooks controlling Supreme Court precedent, which makes clear that Defendants' NPCCs are the precise type of vertical restraints most likely to produce anticompetitive effects. Against the background of the Supreme Court's historical concern with vertical price-fixing agreements, *Leegin* holds that vertical price restraints are likely to have anticompetitive effects if (i) they are imposed by a retailer on manufacturers (as opposed to the other way around), (ii) the retailer's position in the market is such that manufacturers cannot avoid that retailer by "sell[ing] their goods through rival retailers," (iii) the restraints prevent "[r]etailers with better distribution systems and lower cost structures" from "charging lower prices," and (iv) a large share of manufacturers are bound by the agreements. *See* 551 U.S. at 892–94, 897–99. Plaintiffs allege facts showing each of these elements.

*First*, retailers (Defendants' platforms) have driven manufacturers (the restaurants) to enforce uniform and, in effect, minimum prices. *See id.* at 897–98 ("If there is evidence retailers were the impetus for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer.").[5] Defendants were the impetus of the

---

[4] Defendants cite (at 8) the rule of reason, but do not assert any procompetitive justifications for their NPCCs. In addition to the hurdles in evaluating any supposed procompetitive justification on the pleadings, Defendants cannot properly raise that issue for the first time in reply.

[5] Consistent with such concerns, the facts may come to show a "hub-and-spoke" price-fixing conspiracy whereby each Defendant (the "hub") has entered into a series of vertical agreements with the restaurants (the "spokes"), who compete with each other in Local Markets, and "the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing." *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (quotations and brackets omitted). The "per se" rule would apply to such a conspiracy. *See id.* at 321–25. Where factual information necessary

20

NPCCs in order to support their market position in the inextricably intertwined Restaurant Platform Market. *See, e.g.*, AC ¶¶ 3–7, 55–64, 96, 123.

*Second*, restaurants cannot economically forego contracting with Defendants. *See Leegin*, 551 U.S. at 898 (restraints "may not be a serious concern unless the relevant entity has market power" such that manufacturers cannot "sell their goods through rival retailers"). With low profit margins, restaurants need substantial sales to cover their costs, and the only way to get those sales is through Defendants—each of which provides access to tens of millions of consumers, including many who use only a single platform. *See* AC ¶¶ 75–80, 85–86; *cf. US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 274 (S.D.N.Y. 2015) (citing expert who explained that platforms were "able to insist that airlines use their services, and accept their contractual terms," because a large share of travel agencies used only a single platform). Defendants ignore these allegations in arguing (at 12) that "[if] the [NPCCs] were disfavored by restaurants, restaurants could shift their business to other platforms."

*Third*, Defendants' NPCCs prevent restaurants from charging lower prices through lower-cost distribution channels. *See Leegin*, 551 U.S. at 893 (identifying "legitimate concern" where "[r]etailers with better distribution systems and lower cost structures [are] prevented from charging lower prices by [an] agreement"). When restaurants sell their meals through Defendants' platforms, restaurants are required to pay Restaurant Commission Rates approaching (and sometimes exceeding) 30%. *See* AC ¶¶ 42, 109, 142–43. Restaurants do not pay these fees when they sell directly to consumers in the Direct Markets, and therefore face lower costs in that distribution

---

to this theory of recovery is exclusively in the hands of the Defendants and restaurants subject to the NPCCs, Plaintiffs have not asserted a Section 1 claim on this basis, but await fact discovery.

channel. Defendants' NPCCs nevertheless "prohibit restaurants from selling menu items at a lower price" to consumers in the Direct Markets. *Id.* ¶¶ 140–41.

The predictable consequence is that consumers in the Direct Markets pay higher prices than they would absent the NPCCs. *See id.* ¶¶ 140–49; *see also Babyage.com, Inc. v. Toys R Us, Inc.*, 558 F. Supp. 2d 575, 583–84 (E.D. Pa. 2008) (denying motion to dismiss where plaintiff alleged that retailer imposed contractual provisions on manufacturers that prevented those manufacturers from selling their goods at lower prices through competing retail channels, and that such provisions "caused prices for the manufacturers' goods to increase beyond competitive levels"). Defendants' Restaurant Commission Rates are so high, often exceeding restaurants' profit margins, that restaurants frequently need to increase their prices when they sell through Defendants' platforms. *See* AC ¶¶ 142–46; *Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 250 (S.D.N.Y. 2016) (finding similar dynamic plausible in airline industry). Plaintiffs cite both empirical and anecdotal evidence, including survey data demonstrating that 64.1% of restaurants in New York increased or considering increasing their prices in response to Grubhub's fees in 2019 alone. AC ¶ 144; *cf. United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 674 (E.D. Mich. 2011) (plaintiff adequately alleged anticompetitive effects of MFN provisions with "various examples"). Defendants' NPCCs force those restaurants to charge those same inflated and supracompetitive prices in all distribution channels, including in the Direct Markets. AC ¶ 147.

Defendants insist (at 12) that "restaurants are just as free to *lower* their [prices] on Defendants' platforms to match a lower dine-in or delivery price offered by competing restaurants as they are to raise dine-in and delivery prices to match a higher [price] on Defendants' platforms." But this is not true. The NPCCs have the purpose and effect of discouraging restaurants from reducing their prices in the Direct Markets because "if the restaurant reduces its prices to consumers in those

markets, then the restaurant would have to also reduce its prices on Defendants' platforms." AC ¶ 159. Reducing prices on Defendants' platforms is not an economically tenable option for restaurants, which have profit margins that are typically smaller than Defendants' Restaurant Commission Rates. *See id.* ¶¶ 142–46; *cf. id.* ¶ 160 (quoting DOJ report explaining how, from a seller's perspective, NPCCs transform a discount into "an occasion for across-the-board revenue losses").

Accordingly, regardless of whether Defendants' NPCCs force restaurants to increase their prices in the Direct Markets or prevent restaurants from reducing their prices in those markets, Plaintiffs' allegations make the following clear: prices *would be lower* in the Direct Markets if any Defendant had not imposed its NPCCs. *See Visa*, 344 F.3d at 238 (explaining that "substantial adverse effects on competition" include "increases in price"); *In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 12 n.6 (E.D.N.Y. 2020) ("In an antitrust case alleging overcharges, the typical measure of damage is the difference between the price that was actually charged and the price that a consumer would have been charged in the but-for world.").

*Fourth*, Defendants' NPCCs bind a large share of restaurants in the Direct Markets. *See Leegin*, 551 U.S. at 898 (identifying as a relevant factor in the rule-of-reason analysis whether only a limited number of manufacturers or retailers, depending on who is driving the price-fixing, have agreed to the minimum pricing). Plaintiffs allege facts showing that Grubhub's NPCCs bind most (50% or more) of the restaurants in each Local Market; that Uber's NPCCs bind most restaurants in San Francisco, Miami, Dallas, and Atlanta; that the reasonable inference is that Uber's NPCCs also bind most restaurants in Houston, Washington, D.C, and Phoenix; and that Postmates's NPCCs bind most restaurants in Los Angeles, Miami, and Phoenix. *See* AC ¶¶ 82–83.

Accordingly, in the Local Markets, one or more Defendant's NPCCs restrain more than half of the Direct Markets. This level of foreclosure is more than sufficient, for pleading purposes,

to establish "the requisite harmful effect upon competition." *Mazda v. Carfax, Inc.*, 2016 WL 7231941, at \*4 (S.D.N.Y. Dec. 9, 2016) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001)). Where 30-40% of the market is restrained, adverse marketwide effects are plausible. *See id.* (30-40% is sufficient in exclusive-dealing context); *Toys R Us, Inc. v. FTC*, 221 F.3d 928, 936–37 (7th Cir. 2000) (evidence of anticompetitive effects sufficient where 40% of manufacturers were subject to restraint imposed by retailer designed to reduce output that manufacturers provided to competing retailers); *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1304 (M.D. Fla. 2016) (denying motion to dismiss where vertical price restraints "reach[ed] at least 40%" of the relevant market); *TSI*, 2019 WL 4600310, at \*13–14 (same, where exclusive-dealing arrangements covered "at least three of the six retailers that comprise 80% of the market").[6] Plaintiffs further allege that a sufficiently large portion of the Direct Markets is restrained that "price competition *between* restaurants" in the Direct Markets is impaired. AC ¶ 162. Each Defendant's NPCC has produced "a substantial anticompetitive effect that harms consumers" in the Direct Markets. *US Airways*, 938 F.3d at 55.

## III. PLAINTIFFS PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS IN THE RESTAURANT PLATFORM MARKET

### A. Plaintiffs Plausibly Allege Anticompetitive Effects Directly.

Plaintiffs allege that Uber's and Grubhub's NPCCs have caused increased price, decreased consumer choice, and decreased quality. *See* AC ¶¶ 135 (low-quality technology), 136–38 (low-

---

[6] Defendants' reliance *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270 (S.D.N.Y. 2007), is misplaced. The plaintiff, which sold supplements and vitamins, alleged that a competitor caused publishers to cancel or reject plaintiff's advertisements, foreclosing plaintiff (and plaintiff alone) from advertising to 70% of the market. *Id.* at 281. The court held that the plaintiff failed adequately to allege that this "refusal to deal" violated the antitrust laws, because the plaintiff did not allege that the challenged conduct "adversely effected price, output or quality of services." *Id.* at 293. In this case, in contrast, Plaintiffs describe price-fixing agreements between Defendants and restaurants that enforce uniform and, in effect, minimum prices, and explain how those agreements cause supracompetitive effects in the relevant markets.

quality service), 139 (reduced choice of menu items). Defendants do not challenge these allegations of decreased choice or quality, and their arguments regarding increased prices are meritless.

### 1.    Plaintiffs Plausibly Allege Increased Consumer Prices.

The Restaurant List Prices are "a key (and, in some cases, the only) component of the end-price paid by consumers for goods ordered through Restaurant Platforms." *Id*. ¶ 125. Plaintiffs plausibly allege that Grubhub and Uber's NPCCs produce supracompetitive Restaurant List Prices, including with respect to sales made through competing Restaurant Platforms.

Grubhub and Uber's NPCCs are the type of vertical price restraints that antitrust law condemns: they are imposed by retailers (Grubhub and Uber) on manufacturers (restaurants) that cannot economically avoid selling through those retailers. *See Leegin*, 551 U.S. at 897–98. And the NPCCs prevent those manufacturers from charging lower prices (Restaurant List Prices) through less expensive distribution channels (competing Restaurant Platforms). *See* AC ¶¶ 59–61. Absent the NPCCs, restaurants could—*and would*—offer lower Restaurant List Prices through Restaurant Platforms that offered lower Restaurant Commission Rates, like Slice, and consumers would pay lower prices through those platforms. *See id.* ¶¶ 110, 125–34; Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 Yale L.J. 2176, 2181–82 (2018) (explaining this causal chain). As in the Direct Markets, the impact of Grubhub and Uber's NPCCs is predictable: higher Restaurant List Prices for consumers. *See* AC ¶¶ 125–34; *see also F&M Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 819 (2d Cir. 1979) (elimination of price competition causes higher prices); *Laumann*, 907 F. Supp. 2d at 489–91 (plaintiff adequately alleged anticompetitive effects where challenged agreement "restrict[ed] each company's ability to compete for the other's business"); *Babyage.com*, 558 F. Supp. 2d at 583–84 (similar provisions "caused prices for the manufacturers' goods to increase beyond competitive levels").

Just as in the Direct Markets, moreover, a significant share of restaurants are bound by each of Grubhub and Uber's NPCCs in the Restaurant Platform Market. *Most* restaurants (not just those that sell through Restaurant Platforms) in many of the Local Markets are bound by Grubhub's and Uber's NPCCs. *See* AC ¶¶ 80–82. This percentage is considerably higher when the set of restaurants is restricted to those that sell through Restaurant Platforms. Accordingly, Plaintiffs plausibly allege that Grubhub's and Uber's NPCCs each produce anticompetitive effects *marketwide*. *See Toys R Us*, 221 F.3d at 937 (restraint affected 40% of market).

Defendants ignore these allegations regarding Restaurant List Prices and argue (at 17) that the separate *commissions and fees* that Grubhub and Uber charge consumers may reflect value that consumers receive from those platforms. This argument first disregards that Restaurant List Prices are *the* critical component of consumer prices. AC ¶ 125. In addition, Plaintiffs allege facts demonstrating that such commissions and fees *are* supracompetitive, including that (i) Grubhub and Uber's profit margins are extremely high (up to 80%), (ii) companies such as Google, Yelp, and TripAdvisor provide the same service to consumers for free, and (iii) Grubhub's net prices, which incorporate commissions and fees charged to consumers, increased by 156% from 2014 to 2019. *See id.* ¶¶ 120–22; *US Airways*, 938 F.3d at 61–62 (denying post-trial motion for judgment as a matter of law where plaintiff submitted evidence of defendant's high profits).[7]

Defendants also suggest (at 17–18) that Grubhub's and Uber's NPCCs could not have *caused* supracompetitive Restaurant List Prices because Doordash, the largest Restaurant Platform, does not use NPCCs. But, as noted, *most* restaurants in the Restaurant Platform Market sell

---

[7] High profit margins are evidence of supracompetitive pricing. *See, e.g.*, *In re Nexium Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (plaintiff alleged that defendant "sold Nexium at prices well in excess of marginal costs"); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, 2006 WL 1766434, at *28 (D. Mass. June 28, 2016) (plaintiff alleged that "when STK discounted its prices by seventy percent, it was still able to maintain a nearly twenty percent profit margin").

through Grubhub and Uber, including restaurants that also sell through Doordash. The NPCCs bind these restaurants. Defendants' argument (at 18) that any increase in Restaurant List Prices is driven by a shift in consumer demand (from higher margin dine-in meals to lower-margin delivery) is mere speculation and overlooks that restaurants' margins on delivery and takeout orders are driven lower by Grubhub's and Uber's supracompetitive Restaurant Commission Rates. In addition, it is fundamental that the Court "may not pick and choose among plausible explanations" at the pleading stage. *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 669–72 (S.D.N.Y. 2016) (discussing causation allegations).

### 2.  Plaintiffs Plausibly Allege Increased Restaurant Prices.

Plaintiffs also plausibly allege that the NPCCs have caused supracompetitive pricing in the form of inflated Restaurant Commission Rates. *See* AC ¶¶ 125–34, 150.

*First*, the NPCCs discourage competing Restaurant Platforms from reducing their Restaurant Commission Rates, because those provisions prevent restaurants from offering discounted Restaurant List Prices, which would attract more consumers to the platforms, in response. *See id.* ¶¶ 126–30. Accordingly, most large Restaurant Platforms charge near-identical, supracompetitive Restaurant Commission Rates. *See id.* ¶ 130. Defendants argue that this fact somehow means that Grubhub's and Uber's Restaurant Commission Rates are not supracompetitive, but that is backwards: the NPCCs are as harmful to competition as they are *precisely because* they produce supracompetitive Restaurant Commission Rates *marketwide*. *Cf. In re London Silver Fixing, Ltd. Antitrust Litig.*, 332 F. Supp. 3d 885, 905 (S.D.N.Y. 2018) (explaining that "price-fixing enables non-conspiring market participants to charge supra-competitive prices").

*Second*, the NPCCs *encourage* further increases in Restaurant Commission Rates. *See* AC ¶ 131. Absent the NPCCs, if Grubhub or Uber increased Restaurant Commission Rates, restaurants would increase their Restaurant List Prices on those platforms, consumers would switch to less

expensive Restaurant Platforms, and Grubhub's and Uber's sales would decrease. *See id.* ¶¶ 5–7. But the NPCCs force restaurants to charge the same (or higher) prices through competing Restaurant Platforms and thus enable Grubhub and Uber to increase Restaurant Commission Rates without suffering the consequences of reduced sales. This is not merely Plaintiffs' perspective. *See* Andre Boik & Kenneth Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J. L. & Econ. 105, 106–07 (2016) (platform NPCCs "create an incentive for the platform to raise fees"). Accordingly, Grubhub's Restaurant Commission Rates have increased from 10% to 30% over the past fifteen years. *See* AC ¶¶ 111–15.

Defendants argue (at 19) that this evidence of increasing Restaurant Commission Rates is insufficient to establish supracompetitive pricing because Grubhub's and Uber's sales increased over the same period. But the Second Circuit has rejected the argument that "evidence of higher prices unconnected to reduced output" is insufficient to establish "harm to competition." *US Airways*, 938 F.3d at 63. Defendants' argument also fails because Plaintiffs allege far more than just increasing prices over time. In addition to explaining how Grubhub's and Uber's NPCCs inflate Restaurant Commission Rates (and providing evidence to support those explanations, including evidence of converging and increasing Restaurant Commission Rates), Plaintiffs allege that (i) the vast majority of restaurants believe that Grubhub's rates (the same as Uber's rates) are "unreasonable," (ii) Grubhub's and Uber's profit margins are high (up to 80%), and (iii) other companies (like Slice and Waitr) provide the same services to restaurants as Grubhub and Uber at a fraction of the price. *See* AC ¶¶ 108–15, 120–22, 130. Contrary to Defendants' further argument (at 18), the fact that Grubhub and Uber provide services that are of some value to restaurants is immaterial; Plaintiffs need only allege that rates are higher than they would be in a competitive market, not that rates in a competitive market would be $0.

B.     Plaintiffs Plausibly Allege Anticompetitive Effects Indirectly.

Plaintiffs plausibly plead anticompetitive effects indirectly by alleging that Grubhub and Uber have market power in the Restaurant Platform Market. *See* AC ¶ 198; *Amex*, 138 S. Ct. at 2284. "Dismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010). This is not one of those rare cases.

1.     Plaintiffs Allege that Grubhub and Uber Have the Ability to Adversely Affect Competition in the Restaurant Platform Market.

On a Section 1 claim, a defendant has market power if it has the ability "to cause an adverse effect on competition." *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (explaining that "the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition"). Vertical restraints that affect 30% or more of the relevant market may adversely affect competition. *See* Part II.B, above.

Plaintiffs plausibly allege market power by alleging that *nearly all* restaurants in the United States that sell through Restaurant Platforms sell through Grubhub; that *one-third* of such restaurants sell through Uber; that *most* restaurants in each Local Market sell through Grubhub; and that *most* restaurants in *most* Local Markets sell through Uber. AC ¶¶ 80–83. Because Grubhub and Uber contract with such a large percentage of restaurants that sell through Restaurant Platforms, Grubhub and Uber can—and do—adversely affect competition in the Restaurant Platform Market by imposing restraints on those restaurants. *See Mazda*, 2016 WL 7231941, at *4 (explaining that exclusive-dealing arrangements that foreclose more than 30% of the market may "have the requisite harmful effect upon competition"). This inference is only strengthened by the fact that

29

restaurants are economically forced to work with Grubhub and Uber and therefore must accede to contractual demands those platforms impose. AC ¶¶ 78–88.

> 2.   Plaintiffs Allege Grubhub's and Uber's Market Shares.

Market power "may be presumed if the defendant controls a large enough share of the relevant market." *Visa*, 344 F.3d at 239. The Second Circuit has not established "any strict threshold of market share sufficient to establish a § 1 violation," *Amex*, 838 F.3d at 200 n.47, but has found that 26% is sufficient where the relevant market is "highly concentrated." *Visa*, 344 F.3d at 240 (four firms with 99% of market share). That is the case here: in terms of sales, just four firms control 98% of the Restaurant Platform Market. *See* AC ¶ 32.

In the context of vertical price restraints, moreover, a 20% market share may be sufficient, even in markets that are not concentrated. In *Leegin*, for example, the Court cited *Toys R Us*, 221 F.3d at 937–38, for the proposition that "[a] dominant retailer . . . might request resale price maintenance to forestall innovation in distribution that decreases costs." 551 U.S. at 893–94. Toys R Us, the "dominant retailer," had a 20% market share. *See* 221 F.3d at 937.

Plaintiffs thus plausibly allege market power by alleging that Grubhub's share of the National Market is 31%; Uber's share of the National Market exceeds 20%; Grubhub's share exceeds 20% in five of twelve Local Markets; and Uber's share exceeds 20% in eight of twelve Local Markets. *See id.* ¶¶ 32–34; *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 694–95 (7th Cir. 2006) (Easterbrook, J.) (criticizing district court's decision that 25% share of concentrated market was "too small to create market power").

In noting (at 19–21) that "Plaintiffs do not allege that either Grubhub or [Uber] has more than a 50% share of sales in 11 of the 13 purported geographic markets," Defendants rely on the wrong law. The supposed 50% rule concerns *monopoly power* under Section 2, not *market power* under Section 1. *See Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 99 (2d Cir. 1998); *see*

*also DSM Desotech Inc. v. 3D Sys. Corp.*, 2009 WL 174989, at *7 (N.D. Ill. Jan. 26, 2009) ("Although 3DS cites [precedent] for the proposition that '[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share,' 3DS has conflated the terms *monopoly* power and *market* power."). "Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak*, 504 U.S. at 480. This is because, unlike Section 1, Section 2 requires conduct that "threatens actual monopolization"—*i.e.*, the improper acquisition or maintenance of monopoly status. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–69 (1984). Defendants' Section 1 cases are distinguishable because they involve market shares of 10% or less. *See Bookhouse*, 985 F. Supp. 2d at 622 (10%); *Commercial Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 74–75 (S.D.N.Y. 2003) (8%). (Even under Section 2, a market share below 30% is not fatal. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008).)

Defendants similarly rely on inapposite precedent in arguing (at 20) that Plaintiffs did "not allege that market shares are consistent over time." The only case Defendants cite here held that a defendant with a market share that fluctuated between 6.79% and 56.7% lacked *monopoly* power, under Section 2. *See Apotex Corp. v. Hospira Healthcare India Private Ltd.*, 2020 WL 58247, at *6–7 (S.D.N.Y. Jan. 6, 2020). In addition, the evidence that Defendants cite (and that is of course outside the pleadings) would satisfy any application of the durable-market-share rule that Defendants invoke:  going back to late 2017, Grubhub's market share never dipped below 30%, and Uber's market share dipped below 20% only briefly (but the data source acknowledged that Uber's share was "likely higher"). Plaintiffs show below, moreover, that Grubhub's and Uber's market shares are "durable."

3.     Plaintiffs Allege Other Evidence of Grubhub's and Uber's Market Power.

Contrary to Defendants' further misapprehension of the controlling law (at 21), proxies such as market share are "not the only way to demonstrate" market power. *Todd*, 275 F.3d at 206 (explaining that "a threshold showing of market share is not a prerequisite for bringing a § 1 claim"). "Such power may be proven through evidence of specific conduct undertaken by the defendant that indicates he has the power to affect price or exclude competition." *Visa*, 344 F.3d at 239. A plaintiff may allege market power by alleging that "the structure of the market as a whole prevents a customer's ability to purchase lower-priced alternatives to the defendant's product," *Payment Card*, 562 F. Supp. 2d at 402, such as where that market has high barriers to entry or inelastic demand, *see Tops Mkts.*, 142 F.3d at 98.

Plaintiffs allege that Grubhub and Uber have forced restaurants to accept NPCCs, which produce supracompetitive prices in the Restaurant Platform Market. *See* AC ¶ 123; Part III.A, above. Plaintiffs further allege that Grubhub's and Uber's supracompetitive prices exceed those charged by smaller competitors, like Waitr and Slice. *See* AC ¶ 110; Part III.A, above; *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984) ("Market power is the ability to raise prices above those that would be charged in a competitive market."). These allegations plausibly show that Defendants have the ability to cause, and have caused, an adverse effect on competition.

Plaintiffs further allege that the Restaurant Platform Market's structure provides Grubhub and Uber with market power. Because Restaurant Platforms exhibit indirect network effects, the Restaurant Platform Market has significant barriers to entry, and smaller firms cannot adequately constrain larger competitors by expanding output. *See* AC ¶¶ 68, 105; *Amex*, 838 F.3d at 190 (explaining "chicken and egg problem" faced by "potential new entrants" to market with network effects); *SC Innovations, Inc. v. Uber Tech., Inc.*, 2020 WL 2097611, at *8 (N.D. Cal. May 1,

2020) (explaining that network effects can "serve as a barrier to entry," and also prevent smaller competitors from increasing output). Even Amazon was unable "to gain a foothold" in the market. AC ¶ 69. Defendants are wrong in arguing (at 22–23) that the existence of *some* competition disproves the existence of these barriers, let alone as a matter of law. *See Aggrenox*, 199 F. Supp. 3d at 666 (explaining that seller that "face[s] some competition" may "still have a meaningful degree of market power").

On the consumer side, moreover, Grubhub's and Uber's platforms are "sticky," meaning that consumer demand is relatively inelastic, such that price increases are more profitable than they would be otherwise. *See* AC ¶¶ 87–88, 106–07; *see also Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (characterizing "entrenched buyer preferences for established brands" as one of the "main sources of entry barriers"); *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 732 (W.D.N.C. 2017) (consumer loyalty may confer market power). And on the restaurant side, because restaurants have low profit margins (and therefore need a high volume of sales to cover their costs), and because many consumers use only a single Restaurant Platform, restaurants must engage with Grubhub and Uber, even though restaurants believe that those platforms impose unreasonable fees, and even though NPCCs harm restaurants. *See* AC ¶¶ 78–86, 107, 115, 123; *see also Amex*, 838 F.3d at 200 ("Market power is the power to force a purchaser to do something that he would not do in a competitive market."); *cf. US Airways*, 105 F. Supp. 3d at 274 (expert offered similar reasoning to show market power).

## IV.   PLAINTIFFS ADEQUATELY ALLEGE THEIR CLAIMS UNDER STATE LAW

Defendants' argument to dismiss the state claims (at 27–28) first fails because, as shown, Plaintiffs have properly plead their federal claims. Nor do Defendants address that, in many states,

a vertical price-fixing agreement remains *per se* unlawful.[8] In arguing (at 28) that Plaintiffs do not allege where they made their purchases, moreover, Defendants pretend that the Amended Complaint somehow leaves vague whether these New York residents bought food from New York restaurants. Plaintiffs allege that they reside in New York, that they purchased meals for delivery from restaurants bound by Defendants' NPCCs, and that consumers typically purchase meals in the city in which they live. AC ¶¶ 10–17, 98–99. The reasonable—and correct—inference from these allegations is that Plaintiffs purchased meals in at least New York and thus may invoke New York's antitrust laws.

Finally, Plaintiffs also have standing to assert claims under the laws of other states on behalf of class members who made purchases in those states. *See Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018) ("Accordingly, we conclude that whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III."). Defendants' suggestion (at 29) that applying the laws of other states would somehow violate their due process rights is unavailing; in contrast to the case Defendants cite, Defendants' anticompetitive conduct occurred in all of the relevant jurisdictions. *Compare* Consol. Class Action Compl. ¶¶ 8, 21–35, *Contant v. Bank of Am. Corp.*, No. 17-cv-3139 (S.D.N.Y. June 30, 2017) (alleging activity in New York) *with* AC ¶¶ 34, 82, 94–96 (alleging market shares in all relevant cities and nationwide operations).

---

[8] *See, e.g.*, *Darush v. Revision LP*, 2013 WL 1749539, at *6 (C.D. Cal. Apr. 10, 2013) ("Under current California Supreme Court precedent, vertical price restraints are per se unlawful under the Cartwright Act. There is no indication that precedent is changing." (internal citations omitted)); *O'Brien v. Leegin Creative Leather Prods., Inc.*, 277 P.3d 1062, 1078–83 (Kan. 2012) (vertical price-fixing is *per se* unlawful by statute); 4E *Commercial Litigation in N.Y. State Courts* § 124:22 (5th ed. Oct. 2020 update) (noting that the New York Attorney General's office has "argued that § 369-a indicates a legislative preference that minimum vertical price-fixing remain per se unlawful under New York State law").

## **CONCLUSION**

Plaintiffs respectfully request, for the foregoing reasons, that the Court deny Defendants' motion to dismiss.

Dated:  December 18, 2020

By: */s/ Gregory A. Frank*                        */s/ Kyle W. Roche*
Gregory A. Frank (GF0531)          Kyle W. Roche
Marvin L. Frank (MF1436)           Edward Normand
Asher Hawkins (AH2333)             Stephen Lagos
FRANK LLP                                    ROCHE CYRULNIK FREEDMAN LLP
370 Lexington Avenue, Suite 1706   99 Park Avenue, 19th Floor
New York, New York 10017            New York, NY 10016
Tel: (212) 682-1853                     kyle@rcfllp.com
Fax: (212) 682-1892                     tnormand@rcfllp.com
info@frankllp.com                         slagos@rcfllp.com

*Attorneys for Plaintiffs*