**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

MARIAM DAVITASHVILI, *et al.*,

        Plaintiffs,

v.

GRUBHUB INC., *et al.*,

        Defendants.

Case No. 1:20-cv-03000 (LAK)

**ECF Case**

**Electronically filed**

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' JOINT MOTION TO
<u>DISMISS PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. ii

I. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE COGNIZABLE
   ANTICOMPETITIVE EFFECTS IN THE "DIRECT" MARKETS (COUNT I). ............... 2

   A. As a Matter of Law, Alleged Harm in the "Direct" Markets Is Insufficient
      Without Harm to Competition Among Meal-Ordering Platforms. .......................... 2

   B. Plaintiffs Fail to Directly or Indirectly Allege Anticompetitive Effects in
      the "Direct" Markets. ................................................................................................ 3

II. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ANTICOMPETITIVE
    EFFECTS IN THE PURPORTED PLATFORM MARKET (COUNT II). ....................... 4

   A. Plaintiffs Fail to Allege That the Inter-Platform NDPs Cause Actual
      Anticompetitive Effects in the Purported Platform Market. .................................... 4

   B. Plaintiffs Fail to Allege Durable Market Power or Other Indirect Indicia of
      Anticompetitive Effects in the Purported Platform Market. .................................... 6

III. PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE RELEVANT MARKET
     (COUNTS I AND II). ........................................................................................................ 7

   A. Plaintiffs Fail to Allege a Plausible Product Market. .............................................. 7

   B. Plaintiffs Fail to Allege a Plausible National Platform Market. .............................. 9

IV. PLAINTIFFS' DERIVATIVE STATE LAW CLAIMS SHOULD BE
    DISMISSED (COUNTS III AND IV). ............................................................................ 10

CONCLUSION ............................................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re Aluminum Warehousing Antitrust Litigation*,
  833 F.3d 151 (2d Cir. 2016)..................................................................................2, 3

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
  985 F. Supp. 2d 612 (S.D.N.Y. 2013)........................................................................8

*Commercial Data Servers, Inc. v. International Business Machines Corp.*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003)..........................................................................7

*Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*,
  129 F.3d 240 (2d Cir. 1997).......................................................................................9

*Heerwagen v. Clear Channel Communications*,
  435 F.3d 219 (2d Cir. 2006)..................................................................................9, 10

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)........................................................................8

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)....................................................................................................4

*Mathias v. Daily News, L.P.*,
  152 F. Supp. 2d 465 (S.D.N.Y. 2001)........................................................................8

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016)........................................................................8

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................10

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018)...........................................................................................6, 9

*People v. Tempur-Pedic International, Inc.*,
  944 N.Y.S.2d 518 (1st Dep't 2012)..........................................................................10

*Prime International Trading, Ltd. v. BP PLC*,
  784 F. App'x 4 (2d Cir. 2019) ...................................................................................3

*R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*,
  462 F.3d 690 (7th Cir. 2006) .....................................................................................7

*Sentry Data Systems, Inc. v. CVS Health*,
　　379 F. Supp. 3d 1320 (S.D. Fla. 2019) ..............................................................................10

*Spinelli v. NFL*,
　　903 F.3d 185 (2d Cir. 2018) ................................................................................................3

*Tops Markets, Inc. v. Quality Markets, Inc.*,
　　142 F.3d 90 (2d Cir. 1998) ..................................................................................................7

*Toys "R" Us, Inc. v. FTC*,
　　221 F.3d 928 (7th Cir. 2000) ...............................................................................................7

*TSI Products, Inc. v. Armor All/STP Products Co.*,
　　No. 3:18-cv-1682 (MPS), 2019 WL 4600310 (D. Conn. Sept. 23, 2019) ...........................8

*United States v. Visa U.S.A., Inc.*,
　　344 F.3d 229 (2d Cir. 2003) ................................................................................................7

*WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*,
　　851 F. Supp. 2d 494 (S.D.N.Y. 2011) ...............................................................................10

*Wright v. Ernst & Young LLP*,
　　152 F.3d 169 (2d Cir. 1998) ..............................................................................................10

*In re Zinc Antitrust Litigation*,
　　155 F. Supp. 3d 337 (S.D.N.Y. 2016) .................................................................................3

## OTHER AUTHORITIES

Rani Molla, *Grubhub sale rumors highlight the state of the struggling food-delivery industry*, Vox (Jan. 9, 2020),
　　https://www.vox.com/recode/2020/1/9/21058674/grubhub-sale-food-delivery-struggling-industry ..............................................................................................................6

Plaintiffs' opposition brief does not salvage their claims. Plaintiffs fail to overcome that they are challenging contractual provisions that *prevent* restaurants from charging *higher* menu prices to *consumers* on Defendants' platforms. Plaintiffs also ignore their factual allegations suggesting Defendants compete in a *growing* and *competitive* marketplace for food delivery services where neither consumers nor restaurants are forced to use any Defendant's platform. And Plaintiffs provide no answer to the obvious flaw in their theory of harm: DoorDash, the largest platform, does not use the challenged provisions, and restaurants and consumers are free to switch to that platform.

As the opposition confirms, Counts I and III allege that the restrictions on restaurants charging higher menu prices on Defendants' platforms than they do for items sold directly cause anticompetitive effects in the direct channels, where Defendants do not compete. Plaintiffs' own precedent shows, however, that they must allege harm to a market in which Defendants do compete, and Plaintiffs do not—and cannot—allege that these restrictions reduce competition in the purportedly separate platform market. Plaintiffs' arguments reveal their Catch-22 problem: the restrictions on higher restaurant pricing in the direct channels could harm competition only if meal-ordering platforms and restaurants' direct channels were part of the same product market. But Plaintiffs have not pled such a market because Defendants would have a minuscule market share and their restrictions could not conceivably cause market-wide harm.

Opposing dismissal of Counts II and IV, Plaintiffs repeat only conclusory allegations of anticompetitive effects in the platform channel from inter-platform NDPs that are allegedly in Uber Eats and Grubhub's contracts. They do not address the disconnect between their assertion that Uber Eats and Grubhub force restaurants to accept inter-platform NDPs and their factual allegations suggesting that customers use multiple platforms interchangeably and that Uber Eats

and Grubhub compete with Postmates, DoorDash, and other platforms that do not use inter-platform NDPs.

Plaintiffs' claims should be dismissed with prejudice.

I.   **PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE COGNIZABLE ANTICOMPETITIVE EFFECTS IN THE "DIRECT" MARKETS (COUNT I).**

   A.   **As a Matter of Law, Alleged Harm in the "Direct" Markets Is Insufficient Without Harm to Competition Among Meal-Ordering Platforms.**

Plaintiffs do not allege that Defendants compete in the "direct" markets. *See* Mem. 10-11. Nevertheless, in Count I, Plaintiffs allege that the contractual restrictions on restaurants charging higher menu prices on Defendants' platforms than in the direct channels are unlawful because they harm competition in the direct channels. *See* Compl. ¶ 192. Count I should be dismissed because Plaintiffs do not—and cannot—plausibly allege that these restrictions reduce competition among meal-ordering platforms in the purported platform market. *See* Mem. 10-11. Plaintiffs cannot fix this fatal deficiency through their inapposite argument that they have antitrust standing because their alleged injury in the direct markets "was inextricably intertwined with the injury the conspirators sought to inflict." Opp. 16-18.[1]

The "inextricably intertwined" exception to the general rule that an antitrust plaintiff must be a "participant[] in the defendants' market" addresses only "[t]he universe of potential plaintiffs." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). It does not address the substantive element of competitive harm, and thus does not absolve Plaintiffs of their obligation to plausibly allege that the NDPs reduce competition among meal-ordering platforms. Plaintiffs fail to cite a single case that survived a motion to dismiss where

---

[1] Count I—against all Defendants—does not challenge the inter-platform NDPs that are allegedly used only by Grubhub and Uber Eats, and not by Postmates.

the challenged agreement did not allegedly reduce competition among competitors in the defendants' market, and they fail to distinguish the controlling caselaw (discussed in the moving brief) that Section 1 requires such harm. *See* Opp. 18 n.3.[2] Rather, the cases Plaintiffs cite are consistent with this requirement because the conduct at issue in those cases was the "necessary" and "essential" "'means' to inflict injury on participants *in the defendants' market*." *Aluminum*, 833 F.3d at 161-63 (emphasis added) (citation omitted); *see id.* at 159-63 (distinguishing *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), where the psychiatrists "accomplished their purported goal of harming the psychologists [competitors in the psychotherapy market] by inflicting direct harm on health insurance subscribers").

Plaintiffs' allegation that the restrictions on menu pricing in the direct channels inhibit competition between each Defendant and its in-network restaurants, *see* Mem. 11; Opp. 16, could thus support a Section 1 claim only if restaurants and platforms competed in the same market, which Plaintiffs insist is not the case. Count I should be dismissed for this reason alone.

### B. Plaintiffs Fail to Directly or Indirectly Allege Anticompetitive Effects in the "Direct" Markets.

Even if Plaintiffs could base Count I on harm to the direct channels, Plaintiffs do not point to any factual allegations of actual (direct) anticompetitive effects in the form of market-wide supracompetitive pricing in those channels. Repetition of narrow allegations about a study of New York restaurants that use GrubHub, *see* Opp. 22, does not suffice. *See* Mem. 12-13.

---

[2] Plaintiffs ignore that in *Spinelli*, the Second Circuit held that allegations of competitive harm in the market for "stock photography" were irrelevant because they "say nothing" about the market for "commercial licenses" in which defendants competed. *See Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 365-77 (S.D.N.Y. 2016) (dismissing Section 1 claim for lack of plausible allegations of "anticompetitive agreement" in markets in which defendants competed). Plaintiffs also do not address the Ninth Circuit's *Qualcomm* decision, *see* Mem. 11, and in the case Plaintiffs cite involving multiple "relevant markets," the defendants allegedly competed in each of those markets. *See Prime Int'l Trading, Ltd. v. BP PLC*, 784 F. App'x 4, 7 (2d Cir. 2019) (defendants competed in both "relevant markets" for physical commodity and linked derivatives).

Plaintiffs also cannot plead anticompetitive effects indirectly because Defendants do not set any restaurant's prices, have no market share, and have no market power in the direct channels. *See* Mem. 14-16. Plaintiffs do not argue to the contrary. *See* Opp. 16-24.

Plaintiffs' reliance on *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) to support their claims of anticompetitive effects, *see* Opp. 20-23, is misplaced. *First*, the NDPs are not resale price maintenance agreements; Defendants are platforms, not retailers, and the restaurants' direct sales to consumers have no intermediary. *Second*, unlike the resale price maintenance agreements in *Leegin*, *see id.* at 21-22, the Complaint makes clear that NDPs set *maximum* prices, not minimum prices. *Third*, Plaintiffs' allegations do not invoke either concern about retailer-led price restraints noted in *Leegin*—Plaintiffs do not allege a retailer cartel, and they do not allege that any Defendant is "dominant" (nor could they, given DoorDash's position and all the new entrants to the marketplace). *See* 551 U.S. at 893, 897-98.

Finally, even under Plaintiffs' strained reading of *Leegin*, this case does not present the circumstances the Court identified in which vertical agreements might cause concern. Plaintiffs have not alleged facts sufficient to show that: (i) NDPs drive restaurants to charge uniform prices, *see* Mem. 12-14, 17-18; (ii) restaurants cannot forgo contracting with any individual Defendant, *see id.* at 14-16, 21-23; (iii) NDPs force the restaurants to charge supracompetitive prices to consumers, *see id.* at 12-14, 17-18; or (iv) that any Defendant possesses power in any market on the correct, transaction-share basis, *see id.* at 21; *infra* pp. 6-7.

## II. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE ANTICOMPETITIVE EFFECTS IN THE PURPORTED PLATFORM MARKET (COUNT II).

### A. Plaintiffs Fail to Allege That the Inter-Platform NDPs Cause Actual Anticompetitive Effects in the Purported Platform Market.

In Count II, Plaintiffs challenge Grubhub and Uber's inter-platform NDPs. They argue that without these restrictions, "restaurants could—*and would*—offer lower Restaurant List

4

Prices through Restaurant Platforms that offered lower Restaurant Commission Rates." Opp. 25. They do not, however, make *factual* allegations that restaurants would switch to other platforms, or that menu prices would decrease, but for the inter-platform NDPs. *See* Mem. 17-18.

Instead, Plaintiffs point to conclusory assertions and allegations that are insufficient to suggest market-wide anticompetitive effects. *See* Opp. 25 (citing Compl. ¶¶ 125-33). Plaintiffs treat their allegations regarding commissions and fees charged to customers as a proxy for elevated menu prices, *see id.* at 26 & n.7, but fees charged by platforms to *consumers* do not suggest that inter-platform NDPs in *restaurant* contracts caused *restaurants* to charge higher menu prices, *see* Compl. ¶¶ 43-45, 117. Tellingly, Plaintiffs fail to confront that in their main example of alleged higher menu prices, less than a quarter of New York restaurants raised prices at all. *See* Mem. 13. And even if Grubhub's net prices allegedly increased over time and Uber and Grubhub have allegedly high profit margins, *see* Opp. 26, that does not suggest that *restaurant menu prices* have increased.

The Complaint also does not support Plaintiffs' argument that inter-platform NDPs cause market-wide anticompetitive effects because "a significant share of restaurants are bound" by those provisions. *Id*. at 26. As an initial matter, Plaintiffs have not plausibly pled the existence of supracompetitive prices. Further, Plaintiffs' factual allegation about consumers multi-homing, *see* Mem. 22-23, belies their claim that restaurants must contract with Grubhub and Uber Eats (as opposed to DoorDash) to reach consumers. And even if Plaintiffs' allegations about consumer use of platforms is correct, Compl. ¶ 86, that confirms only that at least a majority— and possibly up to 80%—of users on each platform do *not* use that platform exclusively.

Plaintiffs' assertion that inter-platform NDPs have "caused supracompetitive pricing in the form of inflated Restaurant Commission Rates," Opp. 27-28, likewise fails. These

commissions are charged to *restaurants*, rather than to Plaintiff consumers. To the extent Plaintiffs assert that restaurants pass these higher rates on to consumers, the alleged restrictions on restaurants charging higher prices on Defendants' platforms would *prevent* such pass-through.

Finally, Plaintiffs' attempt to assert anticompetitive effects in the form of reduced choice and quality, *see id*. at 24, is also insufficient. Their passing references to choice and quality, *see* Compl. ¶¶ 135-39, cobble together dated news stories, internet surveys, and anecdotes, and do not approach plausibly alleging that the inter-platform NDPs have caused a market-wide reduction in choice or quality. These assertions are also inconsistent with the factual allegations regarding the popularity and growth of meal-ordering platforms. *See id*. at ¶¶ 2, 52, 79.

**B.     Plaintiffs Fail to Allege Durable Market Power or Other Indirect Indicia of Anticompetitive Effects in the Purported Platform Market.**

Plaintiffs do not allege facts suggesting that Grubhub and Uber Eats each possess durable market power in the platform market. *See* Mem. 19-23. Plaintiffs contend they have alleged such market power based on the number of restaurants that contract with each platform. *See* Opp. 29-30. But volume of transactions, not number of users, is the appropriate market share metric for two-sided transaction platforms. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 & n.8 (2018) (because two-sided transaction platforms "cannot make a sale unless both sides of the platform simultaneously agree to use their services," they "are best understood as supplying only one product—transactions").

Plaintiffs likewise cannot show *durable* market power based on a survey reporting market shares from a *single month* ranging from 20% to 31%. *See* Opp. 30. *First*, Plaintiffs ignore the

6

premise of the article from which they derive these shares,³ which is that Grubhub faces "tough competition" from many firms and a declining market share.  *Second*, virtually all of the market shares pled are below the threshold typically required to state a Section 1 claim.  *See Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power." (citation omitted)).  *Third*, Plaintiffs conspicuously omit that they have alleged a growing market and lots of entry, *see* Compl. ¶¶ 2, 15, 31, 110, belying their conclusory assertion of high barriers to entry.  Plaintiffs' cases, *see* Opp. 30, are not to the contrary because they involved higher market shares, horizontal conspiracies in addition to vertical agreements, and/or independent evidence of market power.⁴

Finally, Plaintiffs' assertion that they have pled "other evidence of Grubhub's and Uber's market power," *id*. at 32-33, is largely duplicative of their arguments that they have pled direct evidence of anticompetitive effects, and they fail for the same reasons, *see supra* pp. 4-6.

### III. PLAINTIFFS FAIL TO ALLEGE A PLAUSIBLE RELEVANT MARKET (COUNTS I AND II).

#### A. Plaintiffs Fail to Allege a Plausible Product Market.

Plaintiffs agree that the test for pleading a plausible product market turns on the "interchangeability of use or the cross-elasticity of demand."  Mem. 23-24; Opp. 9.  And

---

³ Rani Molla, *Grubhub sale rumors highlight the state of the struggling food-delivery industry*, Vox (Jan. 9, 2020), https://www.vox.com/recode/2020/1/9/21058674/grubhub-sale-food-delivery-struggling-industry.

⁴ *See R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 694-95 (7th Cir. 2006) (direct evidence of market power; 25% market share "irrelevant"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003) (combined 73% market share; direct evidence of market power); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934, 937 (7th Cir. 2000) (concerted action; direct evidence of market power). Although Plaintiffs correctly note that *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90 (2d Cir. 1998) concerned monopoly power, their cases do not endorse their proposed durable market share test.

Plaintiffs concede that ordering a meal from a restaurant can be a substitute for ordering the same meal over a meal-ordering platform. *See* Opp. 12. But Plaintiffs dispute that their factual allegations suggest that restaurants and meal-ordering platforms compete in the same market to sell takeout and delivery meals because: (i) meal-ordering platforms offer functionality that some restaurants choose not to offer, *see id.* at 10-11; (ii) there is "some," but not enough cross-elasticity of demand between direct channels and meal-ordering platforms, *id.* at 11-13; and (iii) meal-ordering platforms "have profitably raised prices because not enough customers have switched to other products," *id.* at 13. Each of these arguments is incorrect.

*First*, that meal-ordering platforms offer some functionality that some restaurants choose not to offer does not justify separate markets, as "[r]easonable interchangeability fully acknowledges differences in product characteristics." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001). Like features that differentiate meal-ordering platforms from each other—e.g., consumer packages waiving monthly service fees, *see* Compl. ¶¶ 72-73—these differences suggest only that certain restaurants and meal-ordering platforms have chosen to compete for consumers' orders by offering different services. This same rationale explains why, in *Bookhouse*, the court held that e-readers and physical books are part of the same product market even though unlike a physical book, an e-reader allows a consumer to instantly purchase, receive, and read a book electronically. *See Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 621 (S.D.N.Y. 2013).[5]

---

[5] The cases Plaintiffs cite are not to the contrary. In *TSI Products, Inc. v. Armor All/STP Products Co.*, the value-added kits had significant "uses separate from other products." No. 3:18-cv-1682 (MPS), 2019 WL 4600310, at *12-13 (D. Conn. Sept. 23, 2019). And in both *Keurig* and *Meyer*, the complaint at issue—unlike Plaintiffs' claims here—provided factual allegations to support a narrowly-defined market. *See* 383 F. Supp. 3d 187, 226-27 (S.D.N.Y. 2019); *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 827-28 (S.D.N.Y. 2016).

8

*Second*, Plaintiffs fail to identify any *factual* allegation that contradicts the substantial alleged competition between the direct and platform channels, *see* Mem. 25, and that supports their assertion that cross-elasticity between the direct channels and platforms is "low." Opp. 12.

*Third*, as Plaintiffs acknowledge, an increase in meal-ordering platforms' fees without substantial switching to direct channels does not suggest separate markets unless those fees were already supracompetitive and Defendants had substantial market power. *See id*. at 13. Plaintiffs have failed to plausibly allege either prerequisite. *See supra* pp. 4-7.

*Finally*, Plaintiffs misinterpret the Supreme Court's statement in *American Express* that "[o]nly other two-sided platforms can compete with a two-sided platform." 138 S. Ct. at 2287. That might arguably be true with respect to the full complement of transactional services offered by a two-sided platform, but it does not change the fact that *consumers* seeking a meal choose interchangeably between options provided through the platforms and the options provided by the restaurants themselves. And Plaintiffs are incorrect that NDPs would be *per se* unlawful if meal-ordering platforms and direct channels comprise the same market, *see* Opp. 9, as the rule of reason applies to restraints in analogous dual-distribution arrangements. *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc*., 129 F.3d 240, 243 (2d Cir. 1997).

### B.  Plaintiffs Fail to Allege a Plausible National Platform Market.

Plaintiffs argue that their proposed nationwide market is plausible because platforms allegedly have a few nationwide agreements with restaurant chains, and operate, advertise, provide similar user experiences, and charge the same fees nationwide. *See* Opp. 15. However, Plaintiffs fail to acknowledge that a relevant geographic market must consider "both the 'area in which the seller operates, *and* to which the purchaser can practically turn for supplies.'" *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006) (citation omitted). *Heerwagen* rejected a substantively identical argument as the one Plaintiffs offer, and is

controlling. *See id.* at 230 (even though the defendant purportedly "conduct[ed] business and set[] prices at a national level," the market for concert tickets was local, not national, because "only those people in a particular region are likely to buy tickets to concerts in that region").[6]

## IV. PLAINTIFFS' DERIVATIVE STATE LAW CLAIMS SHOULD BE DISMISSED (COUNTS III AND IV).

Plaintiffs do not dispute that, if the Complaint fails to state a plausible Section 1 claim, then it also fails to state parallel claims under New York (or any state's) antitrust law. *See* Opp. 33-34. Rather, Plaintiffs contend that the NDPs are "minimum vertical price-fixing" agreements that "remain[] *per se* unlawful" under certain state laws. *Id.* But Counts III and IV do not even purport to allege *per se* claims—the phrase *per se* appears nowhere in the Complaint—and Plaintiffs cannot use their brief to amend the Complaint. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). In any event, this argument fails to salvage the state law claims because the NDPs do not set minimum resale prices. *See supra* p. 4. It also fails because the sole state in which Plaintiffs assert they have individual standing to bring a claim, New York, does not condemn such agreements as *per se* unlawful. *See WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 501-02 (S.D.N.Y. 2011); *People v. Tempur-Pedic Int'l, Inc.*, 944 N.Y.S.2d 518, 519 (1st Dep't 2012). Lacking plausible individual claims, Plaintiffs cannot assert claims based on other states' laws. *See* Mem. 28-29.

## CONCLUSION

For the foregoing reasons, each of Plaintiffs' claims should be dismissed with prejudice.

---

[6] Each case Plaintiffs cite where courts found a nationwide market over the defendants' objections involved contracts with *consumers* for sales on a nationwide basis. *See, e.g.*, *Heerwagen*, 435 F.3d at 230 (stating *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) involved "nationwide contracts with customers"); *Sentry Data Sys., Inc. v. CVS Health*, 379 F. Supp. 3d 1320, 1328 (S.D. Fla. 2019) (CVS "contracts with covered entities for provision of 340B contract pharmacy services nationally"); *see also New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 203 (S.D.N.Y. 2020) (no dispute over nationwide geographic market).

| | |
|---|---|
| Dated: Washington, DC<br>January 19, 2021 | Respectfully submitted, |
| /s/ *Steven C. Sunshine*<br>Steven C. Sunshine<br>SKADDEN, ARPS, SLATE,<br>  MEAGHER, & FLOM, LLP<br>1400 New York Avenue N.W.<br>Washington, D.C. 20005<br>steve.sunshine@skadden.com<br><br>Karen M. Lent<br>Evan Kreiner<br>SKADDEN, ARPS, SLATE,<br>  MEAGHER, & FLOM, LLP<br>One Manhattan West<br>New York, NY 10001<br>karen.lent@skadden.com<br>evan.kreiner@skadden.com<br><br>*Counsel for Defendant Postmates Inc.* | /s/ *Derek Ludwin* (*with permission*)<br>Derek Ludwin<br>Stacey K. Grigsby<br>COVINGTON & BURLING LLP<br>One CityCenter<br>850 Tenth Street, N.W.<br>Washington, D.C. 20001<br>dludwin@cov.com<br>sgrigsby@cov.com<br><br>Andrew A. Ruffino<br>COVINGTON & BURLING LLP<br>620 Eighth Avenue<br>New York, NY 10018<br>aruffino@cov.com<br><br>*Counsel for Defendant Uber Technologies, Inc.*<br><br><br>/s/ *David J. Lender (with permission)*<br>David J. Lender<br>Eric S. Hochstadt<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>david.lender@weil.com<br>eric.hochstadt@weil.com<br><br>*Counsel for Defendant Grubhub Inc.* |