**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIAM DAVITASHVILI, ADAM BEN-
SIMON, MIA SAPIENZA, PHILIP ELI-
ADES, JONATHAN SWABY, JOHN BOISI,
NATHAN OBEY, and MALIK DREWEY,
individually and on behalf of all others simi-
larly situated,

       Plaintiffs,

v.

GRUBHUB INC., UBER TECHNOLOGIES,
INC., and POSTMATES INC.,

       Defendants.

Civ. No. 1:20-cv-03000-LAK

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTIONS TO COMPEL ARBITRATION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

I.      PLAINTIFFS' CLAIMS ......................................................................................... 3

II.     DEFENDANTS' ARBITRATION PROVISIONS ...................................................... 5

        A.      The Grubhub TOU ..................................................................................... 5

        B.      The Postmates TOU ................................................................................... 7

        C.      The Uber TOU ........................................................................................... 7

LEGAL STANDARD ..................................................................................................... 10

ARGUMENT ................................................................................................................ 12

I.      DEFENDANTS SEEK TO ENFORCE INFINITE ARBITRATION CLAUSES .......... 12

II.     THE FEDERAL ARBITRATION ACT DOES NOT APPLY HERE ........................... 14

        A.      The FAA Does Not Apply to Arbitration Clauses That Purport to Cover
                Disputes Unrelated to the Agreement Containing the Clause. ................. 14

        B.      The Grubhub Arbitration Provision Is Not Subject to the FAA. ............. 15

        C.      The Uber Arbitration Provision Is Not Subject to the FAA. .................... 17

        D.      Defendants Are Not Entitled to Relief Under Sections 3 and 4 of the FAA. .......... 19

III.    DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN TO ESTABLISH
        THAT THE PLATFORM PLAINTIFFS ASSENTED TO THE GRUBHUB TOU,
        POSTMATES TOU, OR UBER TOU .................................................................... 20

        A.      Defendants Bear the Burden of Establishing That Their Webpages Put the
                Platform Plaintiffs on Inquiry Notice Regarding Defendants' TOU. ...................... 20

        B.      Grubhub Fails to Meet Its Burden of Showing That the Platform Plaintiffs
                Assented to the Grubhub TOU. ............................................................... 21

        C.      Postmates Fails to Meet Its Burden of Showing That the Platform Plaintiffs
                Assented to the Postmates TOU. .............................................................. 23

     D.    Uber Fails to Meet Its Burden of Showing That Plaintiff Bensimon Assented to the Uber TOU. .................................................................................................... 23

IV.    DEFENDANTS' ARBITRATION CLAUSES ARE UNENFORCEABLE AND INAPPLICABLE UNDER STATE LAW .......................................................................... 25

     A.    The Grubhub Arbitration Provision Is Unenforceable and Inapplicable. ................ 25

         1.    The Question of Arbitrability Is for the Court. ................................................. 25

         2.    The Platform Plaintiffs and Grubhub Did Not Form an Agreement to Arbitrate Claims Unrelated to the Grubhub TOU. ........................................... 25

         3.    The Grubhub Arbitration Provision Is Unconscionable. .................................. 27

         4.    The Grubhub Arbitration Provision Cannot Be Interpreted to Apply to Claims Unrelated to the Grubhub TOU. .......................................................... 30

     B.    The Uber Arbitration Provision Is Unenforceable and Inapplicable. ...................... 31

         1.    The Uber Arbitration Provision Does Not Apply to the Platform Plaintiffs' Claims. ................................................................................................ 31

         2.    Postmates Cannot Enforce the Uber TOU. ...................................................... 33

V.    THE ACTION SHOULD NOT BE STAYED IN FULL ................................................. 34

CONCLUSION ......................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228, 133 S. Ct. 2304 (2013).................................................................... 17

*Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*,
885 F. Supp. 499 (S.D.N.Y. 1995) ........................................................................ 35

*Aminoff & Co. LLC v. Parcel Pro, Inc.*,
2022 WL 987665 (S.D.N.Y. Apr. 1, 2022)............................................................ 21

*Arkin v. DoorDash, Inc.*,
2020 WL 4937825 (E.D.N.Y. Aug. 24, 2020)....................................................... 32

*Bazemore v. Jefferson Capital Sys., LLC*,
827 F.3d 1325 (11th Cir. 2016) ............................................................................. 22

*Be In, Inc. v. Google Inc.*,
2013 WL 5568706 (N.D. Cal. Oct. 9, 2013).......................................................... 24

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
2017 WL 7309893 (S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted*,
2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) ........................................................... 22

*Brower v. Gateway 2000, Inc.*,
676 N.Y.S.2d 569 (App. Div. 1998)...................................................................... 27

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
361 N.E.2d 999 (N.Y. 1977).................................................................................. 26

*Calderon v. Sixt Rent a Car, LLC*,
5 F.4th 1204 (11th Cir. 2021) ........................................................................... 15, 19

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995)....................................................................................... 12

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
6 F.4th 308 (2d Cir. 2021) ................................................................................ 11, 25

*Dreni v. PrinterOn Am. Corp.*,
2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021)......................................................... 30

*Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*,
715 N.E.2d 1050 (N.Y. 1999)................................................................................ 25

*Gillman v. Chase Manhattan Bank, N.A.*,
534 N.E.2d 824 (N.Y. 1988)............................................................................ 27, 30

*Gingras v. Think Fin., Inc.,*
  922 F.3d 112 (2d Cir. 2019)................................................................................ 11, 12, 34

*Greenwich Capital Fin. Prods., Inc. v. Negrin,*
  903 N.Y.S.2d 346 (App. Div. 2010) ............................................................................ 30

*Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC,*
  808 F. Supp. 2d 552 (S.D.N.Y. 2011) ......................................................................... 35

*Hearn v. Comcast Cable Commc'ns, LLC,*
  415 F. Supp. 3d 1155 (N.D. Ga. 2019), *rev'd on other grounds,*
  992 F.3d 1209 (11th Cir. 2021) ....................................................................... 13, 16, 26

*Hidalgo v. Amateur Athletic Union of U.S., Inc.,*
  468 F. Supp. 3d 646 (S.D.N.Y. 2020) ......................................................................... 21

*Himber v. Live Nation Worldwide, Inc.,*
  2018 WL 2304770 (E.D.N.Y. May 21, 2018) ............................................................. 17

*Hines v. Overstock.com, Inc.,*
  380 F. App'x 22 (2d Cir. 2010) ............................................................................ 12, 20

*Hines v. Overstock.com, Inc.,*
  668 F. Supp. 2d 362 (E.D.N.Y. 2009) ................................................................... 20, 23

*In re A2P SMS Antitrust Litig.,*
  972 F. Supp. 2d 465 (S.D.N.Y. 2013) ......................................................................... 17

*In re Currency Conversion Fee Antitrust Litig.,*
  361 F. Supp. 2d 237 (S.D.N.Y. 2005) ................................................................... 17, 29

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.,*
  847 F. Supp. 2d 1253 (S.D. Cal. 2012) ....................................................................... 28

*In re Lyondell Chem. Co.,*
  544 B.R. 75 (Bankr. S.D.N.Y. 2016) ........................................................................... 30

*In re Stubhub Refund Litig.,*
  2021 WL 5447006 (N.D. Cal. Nov. 22, 2021) ............................................................ 24

*JLM Indus., Inc. v. Stolt-Nielsen, S.A.,*
  387 F.3d 163 (2d Cir. 2004)......................................................................................... 17

*Leasing Serv. Corp. v. Broetje,*
  545 F. Supp. 362 (S.D.N.Y. 1982) .............................................................................. 28

*Lima v. Gateway, Inc.,*
  886 F. Supp. 2d 1170 (C.D. Cal. 2012) ....................................................................... 29

*Long v. Live Nation Worldwide, Inc.*,
  2017 WL 5194978 (W.D. Wash. Nov. 9, 2017) ..................................................... 16

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
  252 F.3d 218 (2d Cir. 2001) ........................................................................ 11, 12, 31

*Mallh v. Showtime Networks, Inc.*,
  2017 WL 5157247 (S.D.N.Y. Nov. 7, 2017) ....................................................... 21

*Marcus v. Collins*,
  2016 WL 8201629 (S.D.N.Y. Dec. 30, 2016) .................................................. 12, 20

*Maree v. Deutsche Lufthansa AG*,
  2020 WL 6018806 (C.D. Cal. Oct. 7, 2020) ........................................................ 24

*McFarlane v. Altice USA, Inc.*,
  524 F. Supp. 3d 264 (S.D.N.Y. 2021) ........................................................... passim

*Metro. Life Ins. Co. v. Bucsek*,
  919 F.3d 184 (2d Cir. 2019) ................................................................................ 30

*Mey v. DIRECTV, LLC*,
  2021 WL 973454 (N.D. W. Va. Feb. 12, 2021) ............................................... 16, 28

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) .................................................................................. 22

*Mikes v. Strauss*,
  889 F. Supp. 746 (S.D.N.Y. 1995) ................................................................. 16, 35

*Moritz v. Universal City Studios LLC*,
  268 Cal. Rptr. 3d 467 (Ct. App. 2020) ................................................................ 15

*Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*,
  348 F.2d 693 (2d Cir. 1965) ................................................................................ 17

*New Prime v. Oliveira*,
  586 U.S. __, 139 S. Ct. 532 (2019) ......................................................... 10, 12, 15

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ............................................................................ 24

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ...................................................... 10, 12, 21, 22

*O'Connor v. Agilant Sols., Inc.*,
  444 F. Supp. 3d 593 (S.D.N.Y. 2020) ........................................................... 29, 33

*O'Connor v. Uber Techs., Inc.*,
   2013 WL 6407583 (N.D. Cal. Dec. 6, 2013) ...................................................... 33

*Pincaro v. Glassdoor, Inc.*,
   2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017) .................................................. 23

*Plazza v. Airbnb, Inc.*,
   289 F. Supp. 3d 537 (S.D.N.Y. 2018) ........................................................ 21, 23

*Revitch v. DIRECTV, LLC*,
   977 F.3d 713 (9th Cir. 2020) ..................................................................... 14, 15

*Rittmann v. Amazon.com, Inc.*,
   971 F.3d 904 (9th Cir. 2020) ............................................................................ 19

*Rodman v. Safeway Inc.*,
   2015 WL 604985 (N.D. Cal. Feb. 12, 2015) .................................................. 25

*Rui Chen v. Premier Fin. All., Inc.*,
   2019 WL 280944 (N.D. Cal. Jan. 22, 2019) .................................................. 24

*Sarchi v. Uber Techs., Inc.*,
   268 A.3d 258 (Maine 2022) .......................................................................... 23

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) .......................................................................... 10

*Sierra Rutile Ltd. v. Katz*,
   937 F.2d 743 (2d Cir. 1991) .......................................................................... 34

*Smith v. Steinkamp*,
   318 F.3d 775 (7th Cir. 2003) ................................................................... 26, 28

*Snow v. Eventbrite, Inc.*,
   2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ............................................. 22

*Sollinger v. SmileDirectClub, LLC*,
   2020 WL 774135 (S.D.N.Y. Feb. 18, 2020) ............................................... 21

*Spinelli v. Nat'l Football League*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) ............................................................. 17

*Starke v. SquareTrade, Inc.*,
   913 F.3d 279 (2d Cir. 2019) ............................................................. 20, 23, 25

*Thomas v. Cricket Wireless, LLC*,
   506 F. Supp. 3d 891 (N.D. Cal. 2020) ............................................ 14, 28, 34

*Wexler v. AT&T Corp.*,
  211 F. Supp. 3d 500 (E.D.N.Y. 2016) ......................................................... 14, 26, 28

*Whitt v. Prosper Funding, LLC*,
  2015 WL 4254062 (S.D.N.Y. July 14, 2015) ........................................................ 21

*Wilson v. Redbox Automated Retail, LLC*,
  448 F. Supp. 3d 873 (N.D. Ill. 2020) .................................................................. 23

*Wuest v. Comcast Corp.*,
  2017 WL 6520754 (N.D. Cal. Oct. 5, 2017)..................................................... 26, 31

*Zachman v. Hudson Valley Fed. Credit Union*,
  2021 WL 1092508 (S.D.N.Y. Mar. 22, 2021) ...................................................... 21

**Other Authorities**

9 U.S.C. § 2................................................................................................... 1, 13

*Infinite Arbitration Clauses*,
  168 U. Pa. L. Rev. 633 (2020) ........................................................................ 15

Plaintiffs, Mariam Davitashvili, Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, Nathan Obey, and Malik Drewey, individually and on behalf of all others similarly situated, respectfully submit this Memorandum of Law in opposition to Defendants' motions to compel arbitration.

## **INTRODUCTION**

Defendants, Grubhub Inc., Uber Technologies, Inc., and Postmates LLC, have each moved to compel Plaintiffs Mariam Davitashvili, Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, and Nathan Obey (the "Platform Plaintiffs") to arbitrate their claims, based on arbitration provisions in Defendants' adhesion contracts. Under the controlling law, these provisions do not apply to these Plaintiffs. Accordingly, the Court should deny the motions.

Under the Federal Arbitration Act ("FAA"), a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of such contract or transaction*, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy *arising out of such a contract, transaction, or refusal*, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." 9 U.S.C. § 2 (emphasis added). Consistent with this statutory language, the paradigmatic "broad" arbitration clause subjects to arbitration "any claim or controversy *arising out of or relating to the agreement*" containing that clause. The Second Circuit interprets these "broad" clauses as extending to claims that implicate "the parties' rights and obligations" *under the agreement* containing the clause—but no further.

Defendants, which are major technology firms that operate billion-dollar meal-delivery platforms, impose on their customers form contracts with arbitration clauses that disregard these limits. These clauses, if enforced, would preclude those customers from *ever* asserting claims

against Defendants in court. Indeed, under Defendants' arbitration clauses, it does not matter if the customer seeks to assert a claim wholly unrelated to his or her use of Defendants' platform. It does not matter if the customer seeks to assert a claim that arose long before, or long after, he or she first or last used Defendants' platform. The result, if these clauses are enforced, is the same: the customer *must* submit his or her claim to individual arbitration.

These are, in short, not the "broad" arbitration clauses that the Second Circuit has frequently addressed. They are, instead, an entirely different species: a novel form that courts and commentators have recently dubbed "infinite arbitration clauses." Infinite arbitration clauses are not limited to disputes that relate to the parties' underlying agreement, but rather purport to apply to any conceivable dispute between the parties, regardless of the subject matter.

In recognizing the "absurd" and "outrageous" results of enforcing infinite arbitration clauses, courts throughout the country have refused to enforce them. Some courts have rejected them on contract-formation grounds, reasoning that no reasonable person would believe that he or she had agreed to arbitrate claims unrelated to the subject matter of his or her contract. Other courts have found that they are unconscionable because they eviscerate consumers' reasonable expectations. And others have relied on the absurdity canon of contract interpretation to limit the scope of infinite arbitration clauses to disputes relating to the parties' contract. All the while, judges and commentators have warned that infinite arbitration clauses flout the limits imposed by Section 2 of the FAA because they are not limited to controversies "arising out of" the agreement containing the arbitration clause.

Consistent with all of this reasoning, Defendants' infinite arbitration clauses are unenforceable here. The clauses are contained in Defendants' standard adhesion contracts, which concern consumers' "use" of Defendants' platforms. But the Platform Plaintiffs' claims are wholly

unrelated to their respective "use" of Defendants' platforms: in the operative complaint, the Platform Plaintiffs do not even allege that they have ever used Defendants' platforms. Instead, the Platform Plaintiffs' claims are based on their purchases from restaurants and from non-defendant meal-delivery platforms (*e.g.*, Doordash), and these claims *specifically exclude* any purchases made through Defendants' platforms. The fact that the Platform Plaintiffs also happen to have used Defendants' platforms is pure coincidence.

If Defendants' infinite arbitration clauses are enforced as Defendants propose, the Platform Plaintiffs would be required to submit these claims, as well as any other conceivable dispute that could arise with Defendants, to individual arbitration. The same would be true for any of the other tens of millions of consumers who have, at one point in their life, used Defendants' ubiquitous platforms. Neither the FAA, nor common-law principles of contract law, permit that result. The Court should deny Defendants' motions.

## FACTUAL BACKGROUND

### I.   PLAINTIFFS' CLAIMS

Defendants operate online platforms that enable consumers to search for and order from participating restaurants. (Dkt. No. 28 ("AC") ¶ 27.) These platforms are used by tens of millions of consumers and generate billions of dollars in revenue for Defendants. (*Id.* ¶¶ 18-20, 104.) When a consumer orders a meal through one of Defendants' platforms, Defendants collect revenue from both the consumer and the restaurant, including by charging the restaurant a hefty commission on the total amount paid by the consumer. (*Id.* ¶¶ 40-45.) That commission is typically equal to approximately 30% of the total amount paid by the consumer. (*Id.* ¶¶ 3, 41, 109, 130.)

In many cities, the vast majority of restaurants sell at least some meals through Defendants' platforms and are thus bound by certain terms that Defendants impose. (*Id.* ¶¶ 80-83.) Grubhub and Uber both impose on restaurants "wide" no-price-competition clauses ("NPCCs"), under

which any restaurant that sells through their platform is prohibited from selling meals at a lower price through any other sales channel. (*Id.* ¶¶ 55-56, 59-61.) Pursuant to these clauses, a restaurant that sells through Grubhub or Uber cannot sell its meals at a lower price directly to consumers or through a competing platform, like Doordash. (*Id.*) Postmates imposes "narrow" NPPCs, which only prohibit restaurants that sell through Postmates from selling meals directly to consumers at a lower price. (*Id.* ¶¶ 57-58.)

Plaintiffs allege that Defendants' NPCCs are anticompetitive and have caused Plaintiffs to pay supracompetitive prices at restaurants bound by those clauses. (*Id.* ¶¶ 125-35, 140-50.) Because Defendants' commissions are so high relative to restaurants' profit margins, restaurants that sell through Defendants' platforms increase their prices when they sell through Defendants' platforms. (*Id.* ¶¶ 75, 142-44, 146.) Defendants' NPCCs, in turn, require restaurants to charge those same inflated prices to consumers who buy directly from those restaurants or who buy through competing platforms. (*Id.* ¶¶ 147-49.) Put differently, Defendants' NPCCs force consumers who purchase through a restaurant's lower-cost sales channels (*i.e.*, directly from restaurants or through non-defendant platforms) to subsidize consumers who purchase through Defendants' platforms, where restaurants face higher marginal costs. (*Id.* ¶¶ 4-7.)

Plaintiffs seek damages for only (i) their direct purchases from restaurants bound by Defendants' NPCCs and (ii) their purchases from such restaurants through non-defendant platforms. (*Id.* ¶¶ 173-75.) Plaintiffs do not seek damages for purchases made through Defendants' platforms (*id.* ¶ 175), nor do they even allege that they have ever used Defendants' platforms (*id.* ¶¶ 10-17). Indeed, Plaintiffs allege that Defendants' conduct has harmed "millions of consumers who are not even using" those platforms. (*Id.* ¶¶ 5, 8.)

In March 2022, the Court denied Defendants' motion to dismiss these claims. (*See* Dkt. No. 46.) Approximately two months later, Defendants served interrogatories on Plaintiffs, requesting that they "identify the Meal Order Platforms through which" they ordered "at any point during the Class Period." (Hochstadt Decl. Ex. B at 4-5.) In response, the Platform Plaintiffs disclosed that they had used at least some Defendants' platforms, while Plaintiff Drewey disclosed that he had never used those platforms. Based on that information—and not allegations in the operative complaint—Defendants have moved to compel arbitration against the Platform Plaintiffs.

## II.   DEFENDANTS' ARBITRATION PROVISIONS

### A.      The Grubhub TOU

Grubhub merged with Seamless North America LLC ("Seamless") in August 2013. (Koreis Decl. ¶ 4.) Grubhub asserts that, prior to April 2020, each Platform Plaintiff opened an account with either Grubhub or Seamless (*id.* ¶¶ 5-7), and that Grubhub's "Terms of Use" were published on its website "[b]efore this case was filed and during the pendency of the litigation" (*id.* ¶ 8). Grubhub does not submit evidence demonstrating how those terms appeared or could be accessed.

Grubhub states that it requires customers "to agree to its Terms of Use each time the customer places a pick-up or delivery order." (*Id.* ¶ 10.) According to Grubhub, the Platform Plaintiffs have each "placed orders on Grubhub" since December 14, 2021, when Grubhub updated its Terms of Use. (*Id.* ¶ 13.) Although Grubhub has submitted "[s]creenshots depicting the Grubhub checkout page" on both its "mobile application" and "website" (*id.* ¶ 10), it does not claim that these screenshots accurately reflect what the Platform Plaintiffs were shown when they placed orders through Grubhub or that those screenshots were accurate as of the date that the Platform Plaintiffs placed their orders. Grubhub does not, moreover, specify whether the Platform Plaintiffs placed their order through Grubhub's website or mobile application.

The screenshots depict Grubhub checkout pages that state "[b]y placing your order, you agree to Grubhub's term of use." (*Id.* ¶ 10.) According to Grubhub, "the phrase 'terms of use' has been hyperlinked to the full text of the Terms of Use," and customers who click that link are brought to a page that "has a pop-up alerting" them that the Terms of Use were updated in December 2021. (*Id.* ¶¶ 10-12.) Grubhub states that it also "emailed customers, inculding each plaintiff, to inform them of the updated Terms of Use." (*Id.* ¶ 12.)

In its motion, Grubhub argues (at 8-10) that the Platform Plaintiffs are bound by those updated terms (the "Grubhub TOU"), which govern consumers' "use" of Grubhub's platform:

> Grubhub Holdings Inc. and its subsidiaries and affiliates ("Grubhub," "we," "our," or "us") own and operate certain websites, including related subdomains; our mobile, tablet and other smart device applications; application program interfaces; in-store kiosks or other online services; other tools, technology and programs (collectively, the "Platform") and all associated services (collectively, the "Services"); in each case, that reference and incorporate this Agreement. . . . This Agreement constitutes a contract between you and us that *governs your access and use of the Platform and Services*.

(Koreis Decl. Ex. D at 2 (emphasis added).)

The Grubhub TOU contains a provision titled "Mutual Arbitration Provision" (the "Grubhub Arbitration Provision"). The Grubhub Arbitration Provision purports to require consumers to submit "any" dispute with Grubhub to arbitration:

> You and Grubhub agree that all claims, disputes, or disagreements that may arise out of the interpretation or performance of this Agreement or payments by or to Grubhub, or that in any way relate to your use of the Platform, the Materials, the Services, and/or other content on the Platform, your relationship with Grubhub, *or any other dispute with Grubhub*, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) (each, a "Dispute") shall be submitted exclusively to binding arbitration. Dispute shall have the broadest possible meaning. This includes claims that arose, were asserted, or involve facts occurring before the existence of this or any prior Agreement as well as claims that may arise after the

>        termination of this Agreement. This Mutual Arbitration Agreement
>        is intended to be broadly interpreted.

(*Id.* at 21 (emphasis added).) The Grubhub Arbitration Provision clarifies that the Court, not the

arbitrator, decides issues relating to arbitrability: "Notwithstanding the foregoing, issues related to

the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide." (*Id.*)

### B.    The Postmates TOU

Uber asserts that "to place orders through the Postmates online marketplace, users must

first create a Postmates account and agree to Postmates' Terms in effect at that time." (Sullivan

Decl. ¶ 7.) According to Uber, between 2015 and 2018, Plaintiffs Boisi, Davitashvili, Obey, and

Swaby "created user accounts with Postmates." (*Id.* ¶ 9.) Uber does not explain, however, whether

or how those individuals accepted Postmates' terms (the "Postmates TOU") at that time, and does

not contend that Plaintiffs Bensimon or Eliades ever signed up for Postmates.

On December 1, 2020, Uber acquired Postmates. (*Id.* ¶ 17.) Uber asserts that, between

March 17, 2021, and mid-April 2021, Postmates emailed users informing them that "the Postmates

App had been updated, and that their accounts would be linked with Uber." (*Id.* ¶ 21.) Although

Uber states that the email "contained a blue hyperlink to 'Terms of Use'" (*id.*), it does not claim

that the email was sent to any of the Platform Plaintiffs or explain whether the hyperlinked "Terms

of Use" were Uber's terms or Postmates' terms.

### C.    The Uber TOU

Uber asserts that "to request and pay for services through the Uber or Uber Eats online

marketplaces, users must first create an Uber account and agree to Uber's Terms in effect at that

time." (*Id.* ¶ 7.) According to Uber, the Platform Plaintiffs each "created user accounts with Uber

to access the Uber Apps" between early 2014 and mid-2018. (*Id.* ¶ 25.) Uber does not explain

whether or how those individuals accepted its terms at that time.

Uber updated its terms on December 16, 2021. (*Id.* ¶ 35.) In connection with that update, Uber claims that it "notified users" through "an in-app blocking pop-up screen that appeared when the user opened an Uber App." (*Id.* ¶ 39.) Uber asserts that, "[t]o proceed past the pop-up screen, the user was required to affirmatively check a box labeled 'By checking the box, I have reviewed and agreed to the Terms of Use and acknowledged the Privacy Notice' and click 'Confirm.'" (*Id.*) According to Uber, each of the Platform Plaintiffs except for Plaintiff Bensimon provided "checkbox consent" (*id.* ¶ 40), and are thus bound by Uber's December 2021 Terms of Use.

With respect to Plaintiff Bensimon, Uber asserts that he used his "Uber account as recently as November 18, 2021." (Sullivan Decl. ¶ 41.) In support of that assertion, Uber provides a history of Plaintiff Bensimon's use of Uber, which indicates that he has never used Uber Eats (the meal-delivery platform at issue here), but has periodically used Uber's popular ridesharing service. (Sullivan Decl. Ex. H.) Uber asserts (at 10) that, by using its ridesharing service in November 2021, Plaintiff Bensimon became bound by Uber's July 2021 terms.

For purposes of its motion, Uber treats its July 2021 and December 2021 terms (the "Uber TOU") as substantially identical, and the Platform Plaintiffs do so here as well. The Uber TOU, like the Grubhub TOU, governs consumers' use of Uber's platform:

> Uber provides a personalized multipurpose digital marketplace platform ("Uber Marketplace Platform") that enables you to conveniently find, request, or receive transportation, logistics and/or delivery services from third-party providers that meet your needs and interests. *These Terms of Use ("Terms") govern your access or use*, from within the United States and its territories and possessions, *of the Uber Marketplace Platform and any related content or services* (collectively, the "Services," as more fully defined below in Section 3) made available in the United States and its territories and possessions by Uber Technologies, Inc. and its subsidiaries, representatives, affiliates, officers and directors (collectively, "Uber").

(Sullivan Decl. Ex. F at 55.)

In addition, like the Grubhub TOU, the Uber TOU contains an arbitration agreement (the "Uber Arbitration Provision"). Section 2(a)(1), titled "Covered Disputes," provides:

> Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to the Terms and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law. This Arbitration Agreement survives after your relationship with Uber ends.

(*Id.* at 56-57.) Section 2(a)(4), titled "Delegation Clause," provides:

> Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. *However, only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and Mass Action Waiver, including but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable . . . .*

(*Id.* at 59-60 (emphasis added).)

Section 2(a)(2), titled "Class Action Waiver," expands on Uber's purported arbitration rights and provides: "You acknowledge and agree that *any and all* disputes, claims, or

9

controversies between the parties shall be resolved only in individual arbitration." (*Id.* at 57 (emphasis added).) That section further provides:

> If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (i) any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction; (ii) the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration; (iii) the unenforceable or unlawful portion(s) shall be severed from this Arbitration Agreement; and (iv) severance of the unenforceable or unlawful portion(s) shall have no impact whatsoever on the enforceability, applicability, or validity of the Arbitration Agreement or the arbitrability of any remaining claims asserted by you or Uber.

(*Id.* (emphasis added).)

## LEGAL STANDARD

"While a court's authority under the Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *New Prime v. Oliveira*, 586 U.S. __, 139 S. Ct. 532, 537 (2019). "Instead, antecedent statutory provisions"—namely, Sections 1 and 2 of the FAA—"limit the scope of the court's powers under §§ 3 and 4." *Id.* Where an agreement is beyond the purview of these provisions, a court cannot "invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration." *Id.*

Where the FAA applies, it merely "places arbitration agreements 'upon the same footing as other contracts.'" *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511, 94 S. Ct. 2449 (1974)). It therefore "does not require parties to arbitrate when they have not agreed to do so." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Schnabel*, 697 F.3d at 118). "Nor does it require arbitration when, under generally applicable principles of state law, the agreement would be unenforceable." *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 274 (S.D.N.Y. 2021); *see, e.g.*, *Gingras v.*

*Think Fin., Inc.*, 922 F.3d 112, 126-27 (2d Cir. 2019) (declining to enforce arbitration provision on grounds that it was unconscionable under state law).

If an arbitration agreement falls within the ambit of the FAA and is enforceable under state law, courts in the Second Circuit typically "undertake a three-part inquiry" to "determine whether a particular dispute falls within the scope" of that agreement. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224-25 (2d Cir. 2001). First, the court categorizes the clause as "broad" or "narrow": a clause is "broad" if it "evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause," and "narrow" if "arbitration was designed to play a more limited role in any future dispute." *Id.* at 225. Second, the court "determines whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Id.* at 224. Third, the court applies these finding to determine whether the dispute is covered: if the clause is "narrow, a collateral matter will generally be ruled beyond its purview," but "[w]here the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" *Id.* (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995)).

"[I]n the absence of an arbitration agreement that clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator, the question of whether the particular dispute is subject to an arbitration agreement 'is typically an issue for judicial determination.'" *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (quoting *Metro Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019)). If the arbitration agreement "clearly and unmistakably" delegates the issue of arbitrability to the arbitrator, the court still must

11

first determine whether the agreement is subject to the FAA at all. *See New Prime*, 586 U.S. at __, 139 S. Ct. at 538 ("[A] court may use §§ 3 and 4 to enforce a delegation clause only if the clause appears in a 'written provision in . . . a contract evidencing a transaction involving commerce' consistent with § 2."). And "[i]f a party challenges the validity" of the delegation clause itself, "the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Gingras*, 922 F.3d at 126 (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71, 130 S. Ct. 2772 (2019)).

"In deciding a motion to compel, courts apply a 'standard similar to that applicable for a motion for summary judgment'" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia*, 834 F.3d at 229 (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). The movant "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). "If the moving party demonstrates the existence of an arbitration agreement 'by a showing of evidentiary facts,' the burden shifts to the party 'seeking to avoid arbitration' to 'show the agreement to be inapplicable or invalid.'" *Marcus v. Collins*, 2016 WL 8201629, at *7 (S.D.N.Y. Dec. 30, 2016) (cleaned up).

## **ARGUMENT**

### I.   **DEFENDANTS SEEK TO ENFORCE INFINITE ARBITRATION CLAUSES**

The Grubhub Arbitration Provision and the Uber Arbitration Provision are unusually broad in scope and precisely the type of provisions that courts have found unenforceable. In this Circuit, as noted, courts typically classify arbitration clauses as "broad" or "narrow." The "paradigm of a broad clause" is one that purports to submit "to arbitration 'any claim or controversy arising out of or relating to the agreement.'" *Collins & Aikman*, 58 F.3d at 20 (alterations omitted). These "broad" clauses are interpreted to extend to any claim alleged that "implicates issues of contract construction or the parties' rights and obligations under it." *Louis Dreyfus*, 252 F.3d at 224

(quoting *Collins & Aikman*, 58 F.3d at 23). This interpretation "tracks the language" of Section 2 of the FAA, *Hearn v. Comcast Cable Commc'ns, LLC*, 415 F. Supp. 3d 1155, 1161 (N.D. Ga. 2019), *rev'd on other grounds*, 992 F.3d 1209 (11th Cir. 2021), under which contracts "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of* such contract" are deemed "valid, irrevocable, and enforceable," 9 U.S.C. § 2 (emphasis added).

The Uber Arbitration Provision and Grubhub Arbitration Provision stray far from that language. The Uber Arbitration Provision, for example, applies not just to disputes "arising out of or relating to" the Uber TOU, but also to "all" disputes "in any way arising out of or relating to" the consumer's "relationship with Uber." (Sullivan Decl. Ex. F at 56-57.) In addition, this provision purports to require that "any and all disputes, claims, or controversies between the parties" be "resolved only in individual arbitration." (*Id.*) The Grubhub Arbitration Provision similarly purports to apply to "any" dispute with Grubhub. (Koreis Decl. Ex. D at 21.)

These are not the "broad" arbitration clauses the Second Circuit has frequently addressed. Instead, they are what courts and commentators have recently dubbed "infinite" arbitration clauses. *McFarlane*, 524 F. Supp. 3d at 275 (citations omitted). Such clauses are "*significantly* broader even than the paradigmatic broad arbitration clause identified by the Second Circuit," and, as written, purport to "mandate arbitration of any claim between the parties, including those without any nexus whatsoever to the agreement containing the clause." *Id.* (emphasis in original).

"Underscoring the relative novelty of 'infinite arbitration clauses,' there is relatively little case law addressing them." *Id.* But the case law that does exist, as explained below, demonstrates that they are unenforceable. *See, e.g.*, *id.* (explaining that "[m]ost" courts have "taken a jaundiced view of the argument that" infinite arbitration clauses "should be enforced according to their terms," and collecting cases). Indeed, courts have struggled to find any authority that supports

enforcing such broad clauses. *See, e.g.*, *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 723 (9th Cir. 2020) (O'Scannlain, J., concurring) ("I have been unable to locate any case in which the Supreme Court enforced an arbitration clause when the underlying claim was wholly unrelated to the contract in which the clause was contained."); *Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 904 (N.D. Cal. 2020) ("While courts in this district regularly enforce arbitration clauses with respect to claims that arise directly out of or are somehow connected to the service agreement containing the arbitration clauses, Cricket has not cited to and this order is not aware of any controlling authorities allowing for arbitration of claims, like here, that are wholly divorced from the underlying service contract." (internal citations omitted)).

## II.   THE FEDERAL ARBITRATION ACT DOES NOT APPLY HERE

Grubhub seeks to compel arbitration "as required by the Federal Arbitration Act" and to "stay further proceedings" pursuant to Section 3 of the FAA. (Dkt. No. 73 at 1, 13.) Uber's motion is likewise brought "pursuant to the Federal Arbitration Act." (Dkt. No. 76.) The premise of these motions—that the FAA applies to Defendants' arbitration clauses—does not hold.

### A.   The FAA Does Not Apply to Arbitration Clauses That Purport to Cover Disputes Unrelated to the Agreement Containing the Clause.

The FAA "applies only to '[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of such a contract or transaction*.'" *McFarlane*, 524 F. Supp. 3d at 278-79 (quoting 9 U.S.C. § 2) (emphasis and alterations in original); *see also Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 505 (E.D.N.Y. 2016) ("Indeed, the FAA explicitly limits itself to agreements 'to settle by arbitration a controversy thereafter *arising out of such contract or transaction, or the refusal to perform the whole or any part thereof*.'" (quoting 9 U.S.C. § 2) (emphasis in original)). Section 2 "confines the FAA's application to the arbitration of controversies with a sufficiently close 'relationship' to the underlying

14

contract." *Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1213-14 (11th Cir. 2021); *see also* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 678-79 (2020) (explaining that Section 2 "does not apply" to claims that do not "flow" from the contract containing the arbitration clause). Accordingly, "when the dispute is wholly unrelated to the contract" containing the arbitration clause, "federal courts have no power to compel arbitration" under the Act. *Revitch*, 977 F.3d at 721-22 (O'Scannlain, J., concurring); *see also New Prime*, 586 U.S. at __, 139 S. Ct. at 538 ("'[Sections] 1 and 2 define the field in which Congress was legislating,' and §§ 3 and 4 apply only to contracts covered by those provisions." (quoting *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 201-02, 76 S. Ct. 273 (1956))); *Moritz v. Universal City Studios LLC*, 268 Cal. Rptr. 3d 467, 475-76 (Ct. App. 2020) ("The FAA requires no enforcement of an arbitration provision with respect to disputes unrelated to the contract in which the provision appears.").

### B.   The Grubhub Arbitration Provision Is Not Subject to the FAA.

The Grubhub Arbitration Provision purports to cover claims unrelated to the Grubhub TOU, like the Platform Plaintiffs' claims here, and is therefore not subject to the FAA. Grubhub itself asserts (at 11) that the provision applies to "'*all claims, disputes, or disagreements*' with Grubhub." (emphasis in original).

Grubhub is correct: the provision states that it applies not only to disputes "that may arise out of the interpretation or performance" of the Grubhub TOU, but also to "*any other dispute* with Grubhub, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory)." (Koreis Decl. Ex. D at 21 (emphasis added).) The provision thus sweeps far beyond the scope of Section 2 to include disputes "wholly unrelated" to the Grubhub TOU. *Revitch*, 977 F.3d at 721-22 (O'Scannlain, J., concurring); *see also Calderon*, 5 F.4th at 1212-14 (finding that FAA did not apply, where claims were not "an immediate, foreseeable result of the performance" of agreement containing arbitration clause); *Mey v. DIRECTV, LLC*, 2021 WL 973454, at *11 (N.D.

W. Va. Feb. 12, 2021) (holding that infinite arbitration clause "far exceeds anything contemplated by Congress in enacting the FAA"); *Hearn*, 415 F. Supp. 3d at 1165 (narrowing arbitration clause because, among other reasons, it deviated "from the statutory language of the Federal Arbitration Act, which by its terms covers written provisions 'to settle by arbitration a controversy thereafter *arising out of*' a contract or transaction involving interstate commerce") (emphasis in original).

This dispute, moreover, is "wholly unrelated" to the Grubhub TOU, which concerns the Platform Plaintiffs' "access and use of [Grubhub's] Platform and Services." (Koreis Decl. Ex. D at 2.) The Platform Plaintiffs do not allege that they ever used or accessed Grubhub's platform. (*See* AC ¶¶ 10-17; Hochstadt Ex. B (interrogatories seeking that information).) Instead, their claims are based on their purchases of meals directly from restaurants and from Grubhub's competitors, like Doordash, and these claims exclude any transactions made through any Defendant's platform. (AC ¶¶ 173-75.)

The Platform Plaintiffs' claims against Grubhub thus exist *independently* of the Grubhub TOU—the Platform Plaintiffs could have brought those claims even if they had *never* used Grubhub's platform or services. *See Mikes v. Strauss*, 889 F. Supp. 746, 754-55 (S.D.N.Y. 1995) (declining to compel arbitration of *qui tam* claims under employment agreement, where plaintiff "would still be able to bring a suit" even if she "had never been employed by defendants"). Plaintiff Drewey is proof: he asserts the same claims as the Platform Plaintiffs, but he has never used Grubhub. (Hochstadt Decl. Ex. B at 4-5.) The Platform Plaintiffs' claims, in short, have nothing to do with their "use" of Grubhub and therefore cannot be characterized as "arising out of" the Grubhub TOU. *See, e.g.*, *Long v. Live Nation Worldwide, Inc.*, 2017 WL 5194978, at *3 (W.D. Wash. Nov. 9, 2017) (defendant could not compel arbitration with respect to claims arising out use of one of its sites, where plaintiff only agreed to arbitrate claims arising out of use of another of defendant's

site); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (recognizing that even the fact that claims "would not have arisen" if agreement "had never existed" was "not sufficient" to demonstrate that claims "ar[o]se out of" agreement).[1]

Grubhub's argument to the contrary is unpersuasive. Although Grubhub claims (at 12) that the Platform Plaintiffs' claims relate to their "use of the Platform" because the Platform Plaintiffs (i) "have used Grubhub's platform" and (ii) claim that Grubhub's NPCCs with restaurants on its platform "led to increased prices in those restaurants," Grubhub offers no explanation *why* those two pieces of disparate information are connected.[2] They are not. Indeed, if there were a connection, the Platform Plaintiffs would have alleged their use of Grubhub in the Amended Complaint. They did not—and their claims are well-plead. (Dkt. No. 46.)

### C.     The Uber Arbitration Provision Is Not Subject to the FAA.

Just like the Grubhub Arbitration Provision, the Uber Arbitration Provision purports to cover disputes unrelated to the Uber TOU, including the Platform Plaintiffs' claims, and is

---

[1] Grubhub asserts (at 12) that courts "routinely find that antitrust claims fall within the scope of a broad arbitration agreement," but its cited cases concern claims that, unlike the claims here, do relate to the agreement containing the arbitration clause. *See, e.g., JLM Indus., Inc. v. Stolt-Nielsen, S.A.*, 387 F.3d 163, 175 (2d Cir. 2004) (plaintiff "could not have suffered" alleged damages if it had not entered into contracts containing arbitration clauses); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 243-44 (S.D.N.Y. 2005) (plaintiffs sought to recover for overcharges paid pursuant to contracts containing arbitration clauses); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 231-32, 133 S. Ct. 2304 (2013) (same); *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 470-72 (S.D.N.Y. 2013) (same); *see also Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 105 (S.D.N.Y. 2015) (plaintiffs claimed "that the damages they purportedly suffered as a result of the alleged conspiracy among the NFL Defendants and Getty flowed from the Getty Contributor Agreements," which contained the arbitration clauses).

[2] Grubhub incorrectly suggests that the relationship between its TOU and the Platform Plaintiffs' claims is somehow analogous to the relationship between the plaintiff's claims in *Himber v. Live Nation Worldwide, Inc.*, 2018 WL 2304770 (E.D.N.Y. May 21, 2018), and the agreement at issue there. In *Himber*, the applicable terms covered the plaintiff's "use" of the defendant's website, and the plaintiff's claims were based on information that he viewed on that very website. *Id.* at *6. Here, in contrast, Plaintiffs' claims are not based on anything they saw, or did not see, on Grubhub's website, or on *any* interaction they had with Grubhub's platform or services.

therefore not subject to the FAA. The Uber Arbitration Provision, as noted above, applies not only to disputes "arising out of or relating to" the Uber TOU, but also to "any and all disputes" between the parties. (Sullivan Decl. Ex. F at 55-60.) It is, in other words, not limited to disputes "arising out of or relating to" the agreement that contains it.

In addition, for the same reasons that the Platform Plaintiffs' claims are wholly unrelated to the Grubhub TOU, those claims are wholly unrelated to the Uber TOU. The Uber TOU concerns consumers' "access or use" of "the Uber Marketplace Platform and any related content or service" (Sullivan Decl. Ex. F at 55); the Platform Plaintiffs do not allege that they have ever used Uber (AC ¶¶ 10-17); the Platform Plaintiffs' claims are based on their purchases of meals directly from restaurants and from Uber's competitors and exclude any transactions made through Uber (*id.* ¶¶ 173-75); and those claims survived Uber's motion to dismiss (Dkt. No. 46). The Platform Plaintiffs' claims, moreover, are independent of the Platform Plaintiffs' "access" and "use" of Uber because they could have brought those claims regardless of whether they had ever used Uber, as Plaintiff Drewey did. (Hochstadt Decl. Ex. B at 4-5.)

Uber's contrary arguments, like Grubhub's, are unpersuasive. Uber claims (at 16), for example, that "[t]his litigation relates to Uber's Terms because, according to plaintiffs' allegations, Uber's desire to encourage consumers' use of its delivery services led to the adoption of allegedly anticompetitive contractual provisions that purportedly caused users to pay higher prices." But "Uber's Terms" are *specific* agreements between each Platform Plaintiff and Uber. (Sullivan Decl. Ex. F at 55 ("These Terms of Use ('Terms') govern *your* access or use . . . of the Uber Marketplace Platform and any related content or services . . . ." (emphasis added)).) Uber does not—and cannot—argue that the Platform Plaintiffs' claims have any connection with *those specific*

18

agreements. *See* 9 U.S.C. § 2 (applying to a "controversy thereafter arising out of *such* contract or transaction") (emphasis added).

Similarly unpersuasive is Uber's assertion (at 16) that the Platform Plaintiffs' claims "relate" to their "use" of Uber because the Platform Plaintiffs "contend that the price of items purchased through the Uber and Postmates platforms are higher as a result of [Uber and Postmates'] restaurant commission rates." Although some of the Platform Plaintiffs may have "used" Uber and were thus "subject to these allegedly higher prices," the Platform Plaintiffs do not allege, let alone assert claims in connection with, that "use." (AC ¶¶ 10-17, 173-75.) Uber cannot rewrite the complaint to fit the Platform Plaintiffs' claims within the scope of Section 2 of the FAA.

### D. Defendants Are Not Entitled to Relief Under Sections 3 and 4 of the FAA.

The fact that Plaintiffs' claims are "wholly unrelated" to both the Grubhub TOU and the Uber TOU means that Section 2 of the FAA does not apply.[3] Accordingly, Defendants' requests for relief pursuant to Sections 3 and 4 of the FAA must fail. And Defendants do not seek relief under any other body of law. Accordingly, the Court should deny their motions in full.[4]

---

[3] If Defendants mean to claim that the FAA nevertheless applies because they have inserted an FAA choice-of-law clause in their adhesion contracts, that argument is meritless. *See, e.g.*, *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020) (rejecting argument that parties may "contract around" limits of the FAA).

[4] At minimum, Defendants' motions should be analyzed without the benefit of "*Moses H. Cone*'s pro-arbitration canon of construction," which they both invoke. *Calderon*, 5 F.4th at 1213-14 (finding "canon" inapplicable where claims did not "aris[e] out of" agreement containing arbitration clause "within the meaning of § 2").

## III.  DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN TO ESTABLISH THAT THE PLATFORM PLAINTIFFS ASSENTED TO THE GRUBHUB TOU, POSTMATES TOU, OR UBER TOU

### A.  Defendants Bear the Burden of Establishing That Their Webpages Put the Platform Plaintiffs on Inquiry Notice Regarding Defendants' TOU.

Where the FAA applies, "[t]he party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines*, 380 F. App'x at 24. "If the moving party fails to make an adequate initial showing, based on competent evidence, the motion to compel arbitration must be denied." *Marcus*, 2016 WL 8201629, at *7.

"On the internet, the primary means of forming a contract are the so-called 'clickwrap' (or 'click-through') agreements, in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use, and the 'browsewrap' agreements, where website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen." *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009), *aff'd*, 380 F. App'x 22 (2d Cir. 2010). "Unlike a clickwrap agreement, a browsewrap agreement 'does not require the user to manifest assent to the terms and conditions expressly.'" *Id.* "In determining the validity of browsewrap agreements, courts often consider whether a website user has actual or constructive notice of the conditions," an inquiry that "depends heavily on whether the design and content of that website rendered the existence of terms reasonably conspicuous." *Nicosia*, 834 F.3d at 233; *see also Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) ("[W]e look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms.").

Defendants, as shown below, have failed to meet their burden to establish that the Platform Plaintiffs accepted—either as "clickwrap," "browsewrap," or anything in between—the Grubhub

TOU or Postmates TOU. Defendants have likewise failed to meet their burden to establish that Plaintiff Bensimon accepted the Uber TOU.

>    **B.    Grubhub Fails to Meet Its Burden of Showing That the Platform Plaintiffs Assented to the Grubhub TOU.**

Grubhub has failed to show that any Platform Plaintiff accepted the Grubhub TOU. As an initial matter, contrary to Grubhub's suggestion (at 8-10), the Grubhub TOU was not presented as a "clickwrap" agreement. Grubhub's checkout page—where the Platform Plaintiffs supposedly manifested their assent—does not require users to check a box indicating that they have assented to, or even read, the Grubhub TOU. (Koreis Decl. ¶ 10); *see Nicosia*, 834 F.3d at 236 ("Notably, unlike typical 'clickwrap' agreements, clicking 'Place your order' does not specifically manifest assent to the additional terms, for the purchaser is not specifically asked whether she agrees or to say 'I agree.'"). Instead, users purportedly assent by placing their order on a page that states, in fine print, "[b]y placing your order you agree to Grubhub's terms of use." (Koreis Decl. ¶ 10.)[5]

Grubhub also fails to provide sufficient evidence regarding the design and content of its checkout interface as it appeared to the Platform Plaintiffs. Grubhub submitted "[s]creenshots depicting the Grubhub checkout page" for both its "mobile application" and "website" (*id.*), but it does not say whether the Platform Plaintiffs placed orders through the "mobile application" or "website." *See Zachman v. Hudson Valley Fed. Credit Union*, 2021 WL 1092508, at *6-7 (S.D.N.Y. Mar. 22, 2021) (denying motion to compel, where court was "unable to assess whether the relevant language and hyperlink are clear and conspicuous or obscured by advertisements,

---

[5] Grubhub's case law addressing "clickwrap" agreements is thus inapposite. *See, e.g.*, *Aminoff & Co. LLC v. Parcel Pro, Inc.*, 2022 WL 987665, at *3-5 (S.D.N.Y. Apr. 1, 2022); *Sollinger v. SmileDirectClub, LLC*, 2020 WL 774135, at *2 (S.D.N.Y. Feb. 18, 2020); *Hidalgo v. Amateur Athletic Union of U.S., Inc.*, 468 F. Supp. 3d 646, 657-58 (S.D.N.Y. 2020); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 548-51 (S.D.N.Y. 2018); *Whitt v. Prosper Funding, LLC*, 2015 WL 4254062, at *4-5 (S.D.N.Y. July 14, 2015); *Mallh v. Showtime Networks, Inc.*, 2017 WL 5157247, at *4-5 (S.D.N.Y. Nov. 7, 2017).

colors, links, or other information"); *accord Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330-31 (11th Cir. 2016) (Kaplan, J.) (denying motion to compel where there was "no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card"). Nor does Grubhub shed any light as to whether those screenshots are accurate depictions as of the dates on which the Platform Plaintiffs placed their orders. *See Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *4-6 (N.D. Cal. Oct. 19, 2020) ("Eventbrite would only be able to carry its burden if it could show what the agreements looked like during the period when the plaintiffs would have actually seen them.").

In addition, if Grubhub *could* establish that the screenshots it submitted are accurate depictions of the page through which the Platform Plaintiffs placed their orders, Grubhub still would have failed to meet its burden—at least to the extent that those orders were placed through Grubhub's webpage, as opposed to through its mobile application. Grubhub's checkout webpage is nearly identical to the Amazon checkout page at issue *Nicosia*, where the Second Circuit denied a motion to compel arbitration on the grounds that Amazon "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law." 834 F.3d at 238 (applying Washington law); *compare id.* at 241 (Amazon checkout), *with* Koreis Decl. Ex. C (Grubhub checkout webpage). As in *Nicosia*, the link to the Grubhub TOU "is not bold, capitalized, or conspicuous in light of the whole webpage." *Id.* at 237. There are, moreover, "numerous other links on the webpage," in addition to "multiple buttons" and "sufficiently distracting" customer- and order-specific information. *Id.*[6] In short, it cannot accurately be said that the Grubhub TOU "were

---

[6] Grubhub's webpage is thus markedly different from the "uncluttered" webpages addressed in Defendants' cases. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017); *Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 7309893, at *13 (S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (Kaplan, J.).

presented" to the Platform Plaintiffs "in a way that would put" them "on inquiry notice of such terms." *Starke*, 913 F.3d at 389.

This leaves, as Grubhub's only evidence, the email that it purportedly sent to the Platform Plaintiffs on an unidentified date "to inform them of the updated terms." (Koreis Decl. ¶ 12.) But in contrast to cases that have found notice by email to be sufficient, Grubhub provides no evidence that, at the time the Platform Plaintiffs received the emails, they had assented to a previous iteration of the Gruhbub TOU. *See, e.g.*, *Plazza*, 289 F. Supp. 3d at 548-51 (clickwrap agreements preceded emails). This distinction, courts have recognized, is critical. *See Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 886 n.3 (N.D. Ill. 2020) (distinguishing *Pincaro v. Glassdoor, Inc.*, 2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017), cited by Grubhub, and denying motion to compel); *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 273 n.15 (Maine 2022) (same).

### C.    Postmates Fails to Meet Its Burden of Showing That the Platform Plaintiffs Assented to the Postmates TOU.

If Defendants are arguing that the Platform Plaintiffs are bound by the Postmates TOU, that argument fails. Platform Plaintiffs Bensimon and Eliades have never used Postmates (Sullivan Decl. ¶¶ 9-10), and Defendants offer no explanation as to *how* any Platform Plaintiff assented to the Postmates TOU. *See Hines*, 668 F. Supp. 2d at 367 (denying motion to compel, where movant "crucially" failed to "explain how a site-user such as Plaintiff is made aware of the Terms and Conditions"). Defendants have thus failed to meet their burden.

### D.    Uber Fails to Meet Its Burden of Showing That Plaintiff Bensimon Assented to the Uber TOU.

Uber has failed to establish that Plaintiff Bensimon accepted the Uber TOU. Uber does not claim that Bensimon ever affirmatively assented to the Uber TOU, either by "clicking" a box or through other means. Nor does Uber claim that Bensimon ever affirmatively assented to any prior version of the Uber TOU. In fact, the declaration submitted by Uber in support of its motion

indicates that Bensimon *did not* consent to the version of the Uber TOU that was operative when

he first signed up for Uber's ridesharing service in October 2014. (Sullivan Decl. ¶ 26 & Ex. E.)

 In addition, Uber has not submitted any evidence to suggest, let alone demonstrate, that its

website or app would have put a reasonable person in Bensimon's position on notice of the exist-

ence of the terms of the Uber TOU or any previous version thereof. *See Nguyen v. Barnes & Noble*

*Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (explaining that "the validity of the browsewrap agree-

ment turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of

the contract," which "depends on the design and content of the website and the agreement's

webpage"). Uber provides *no information* about what its webpage looked like when Bensimon

initially signed up back in 2014 or at any other relevant point in time. That failure is fatal. *See Rui*

*Chen v. Premier Fin. All., Inc.*, 2019 WL 280944, at *3 (N.D. Cal. Jan. 22, 2019) (denying motion

to compel, where defendants did not offer "evidence explaining the design and content of the

webpage or how the AMA appeared on the PFA website"); *In re Stubhub Refund Litig.*, 2021 WL

5447006, at *7-8 (N.D. Cal. Nov. 22, 2021) ("Because the Court does not know what the sign-up

screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether

they received constructive notice of the User Agreement when they signed up with Stubhub."); 

*Maree v. Deutsche Lufthansa AG*, 2020 WL 6018806, at *3 (C.D. Cal. Oct. 7, 2020) ("The Court

agrees with Plaintiff that it would be improper to rule on the existence of an arbitration agreement

without first determining, as a factual matter, what the website looked like on the relevant date.").

 Uber nevertheless asserts (at 10) that Plaintiff Bensimon assented to the Uber TOU by

using his Uber account. But without any *evidence* that Plaintiff Bensimon had reasonable notice

of those terms, Uber's argument fails. *See Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *8-9

(N.D. Cal. Oct. 9, 2013) (explaining that "mere use of the website can only serve as a manifestation

of assent where" party "had, or should have had, reason to know that mere use would be so inter-preted"); *Rodman v. Safeway Inc.*, 2015 WL 604985, at *10-11 (N.D. Cal. Feb. 12, 2015) ("There-fore, assent to the revised Special Terms cannot be inferred from Class Members' continued use of Safeway.com following November 15, 2011.").

## IV.   DEFENDANTS' ARBITRATION CLAUSES ARE UNENFORCEABLE AND IN-APPLICABLE UNDER STATE LAW

If the FAA did apply (it does not), and if Defendants had met their burden to establish that the Platform Plaintiffs assented to Defendants' respective TOUs (they have not), Defendants' ar-bitration clauses are nevertheless unenforceable under applicable state law.

### A.   The Grubhub Arbitration Provision Is Unenforceable and Inapplicable.

#### 1.   The Question of Arbitrability Is for the Court.

Arbitrability "is typically an issue for judicial determination." *DDK Hotels*, 6 F.4th at 317. That is plainly true with respect to the Grubhub Arbitration Provision, which states that "issues related to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide." (Koreis Decl. Ex. D at 21.) Grubhub does not—and cannot—argue otherwise.

#### 2.   The Platform Plaintiffs and Grubhub Did Not Form an Agreement to Arbi-trate Claims Unrelated to the Grubhub TOU.

The Platform Plaintiffs and Grubhub did not form a binding agreement to arbitrate claims unrelated to the Grubhub TOU. "It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke*, 913 F.3d at 288-89 (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)). "In determining whether the parties entered into a contractual agreement and what were its terms," courts look "to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam*

*Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977). The goal of this inquiry is "that there be a 'realization of [the parties'] reasonable expectations.'" *Id.* (quoting 1 Corbin, *Contracts* § 1).

Applying these principles to infinite arbitration clauses, courts have concluded that agreements containing such clauses do not reflect a meeting of the minds because "no reasonable person would think" agreeing to a service provider's terms and conditions "would obligate them to arbitrate literally every possible dispute he or she might have" with that provider. *McFarlane*, 524 F. Supp. 3d at 277; *see also Hearn*, 415 F. Supp. 3d at 1164-65 (finding no mutual assent to infinite arbitration clause on grounds that "no reasonable customer would have understood himself to be signing over his right to pursue any claim against the Defendant in perpetuity simply by signing a work order acknowledging receipt of the 2016 Service Agreement"); *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016) (concluding that "an arbitration clause that is unlimited in scope presents a question of contract *formation*") (emphasis in original).

Such a broad agreement, if enforced, would produce "absurd results." *Smith v. Steinkamp*, 318 F.3d 775, 777-78 (7th Cir. 2003) (posing hypotheticals); *McFarlane*, 524 F. Supp. 3d at 277-78 (same); *Wexler*, 211 F. Supp. 3d at 503 (same); *see also Hearn*, 415 F. Supp. 3d at 1164 ("The Court agrees with its district court colleagues that absurd results would inevitably ensue if federal courts began compelling arbitration of claims that are substantively and temporally unmoored from the agreements containing the arbitration provision."); *Wuest v. Comcast Corp.*, 2017 WL 6520754, at *3 (N.D. Cal. Oct. 5, 2017) (concluding that "if there is no limiting clause in the arbitration provision absurd results would ensue") (citations, quotations, and alterations omitted). That is the antithesis of what a "reasonable person" would expect.

In this case, no reasonable person in the Platform Plaintiffs' position would think that he or she had agreed to arbitrate "'*all claims, disputes, or disagreements*' with Grubhub." Such an

agreement would force the Platform Plaintiffs, and every other Grubhub user, to arbitrate a limit-less set of disputes with Grubhub—an absurd consequence. For example, if Plaintiff Davitashvili happened to get rear-ended by a Grubhub driver: arbitration. If Plaintiff Bensimon happened to buy Grubhub stock and Grubhub engaged in some form of corporate malfeasance that caused the price of that stock to drop: arbitration. If a Grubhub delivery-person unintentionally pushed Plaintiff Eliades down a flight of stairs while delivering food to one of his neighbors: arbitration. It would make no difference whether these claims arose today, tomorrow, or twenty years from now—the Platform Plaintiffs would be forced to arbitrate them with Grubhub, all because they allegedly ordered a meal on a webpage that contained a hyperlink to an adhesion contract that, on its own terms, concerned their "use" of Grubhub's platform and services.

### 3.    The Grubhub Arbitration Provision Is Unconscionable.

The Grubhub Arbitration Provision, if an agreement at all, is unconscionable and unenforceable. "An unconscionable contract has been defined as one which 'is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be [unenforceable] according to its literal terms.'" *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (quoting *Mandel v. Liebman*, 100 N.E.2d 149, 154 (N.Y. 1951)). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—*i.e.*, some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Id.* (quoting *State v. Avco Fin. Serv. of N.Y. Inc.*, 406 N.E.2d 1075, 1078 (N.Y. 1980)). The doctrine is nevertheless "a flexible one," *id.*, and procedural unconscionability is not necessarily required, *see Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569, 574 (App. Div. 1998) ("While it is true that, under New York law, unconscionability is generally predicated on the presence of both the procedural and substantive elements, the substantive elements alone may

be sufficient to render the terms of the provision at issue unenforceable."). At bottom, the "purpose of the doctrine" is "to prevent oppression and unfair surprise." *Leasing Serv. Corp. v. Broetje*, 545 F. Supp. 362, 366-67 (S.D.N.Y. 1982).

Such "unfair surprise" exists with respect to infinite arbitration clauses. Indeed, as explained above, "no reasonable person" would expect an arbitration clause to apply to "literally every possible dispute he or she might have" with his or her counterparty. *Wexler*, 211 F. Supp. 3d at 504. And enforcing such a provision in accordance with its language would produce "absurd results." *Smith*, 318 F.3d at 777-78. Courts have, for these reasons, repeatedly found that infinite arbitration clauses are unconscionable. *See McFarlane*, 524 F. Supp. 3d at 277-78 (concluding, based on "the outrageous results that would follow," that "it would be unconscionable to enforce" arbitration provision "with respect to claims untethered" to the agreement containing that provision); *Mey*, 2021 WL 973454, at *11 (finding that infinite arbitration clause was "overbroad, absurd, and unconscionable"); *Thomas*, 506 F. Supp. 3d at 903-04 (finding that infinite arbitration clauses were "so overly broad that they are unconscionable"); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012) (observing that an arbitration clause that encompassed "'any and all disputes' between the parties" would "clearly be unconscionable").

That same result is appropriate here. No reasonable person in the Platform Plaintiffs' position, as explained above, would believe that he or she had agreed to arbitrate any and all possible disputes with Grubhub. Not only would such an agreement produce "absurd results," it would also sweep "*significantly*" beyond the standard "broad" arbitration clauses under which parties agree to arbitrate disputes relating to the agreement containing the arbitration clause. *McFarlane*, 524 F. Supp. 3d at 275-77 (explaining that, "at most," a reasonable person would understand that he or she had agreed to "arbitrate disputes connected in some way" to the agreement containing the

arbitration clause). The Grubhub Arbitration Provision unfairly surprises consumers and eviscerates their reasonable expectations. *See Lima v. Gateway, Inc.*, 886 F. Supp. 2d 1170, 1183 (C.D. Cal. 2012) ("Because the sweeping scope of the Limited Warranty's arbitration provision exceeds a consumer's reasonable expectations, it is substantively unconscionable.").

Underscoring the unconscionability of the Grubhub Arbitration Provision, Grubhub imposed it during the pendency of this litigation, without notice to Plaintiffs' counsel, and without disclosing to the Platform Plaintiffs how it may affect their claims in this action. *See O'Connor v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 602-03 (S.D.N.Y. 2020) (explaining that a "party acts unconscionably when it omits material information from a contract regarding the consumers' forfeiture of important protections"). Under the version of the Grubhub TOU in place when this action was commenced, disputes were "governed by the version of Agreement in effect at the time of the first event which gave rise to the dispute." (Koreis Decl. Ex. A at 18.) The Grubhub TOU, in contrast, omits that language. (Koreis Decl. Ex. D at 19-20.) This change is significant because the "event" giving "rise to the dispute"—Grubhub's imposition of the NPCCs—occurred more than a decade ago, at which point Grubhub's terms *did not* contain an arbitration clause or class-action waiver. (Normand Aff. ¶¶ 3-4 & Exs. A-B.)

In other words, prior to Grubhub's imposition of the Grubhub TOU in the midst of this litigation, Grubhub did not have *any* basis for even *claiming* that the Platform Plaintiffs' claims were subject to arbitration. Grubhub's failure to disclose this material change further demonstrates that it would be unconscionable to enforce the Grubhub Arbitration Provision against the Platform Plaintiffs. *See In re Currency Conversion Antitrust Litig.*, 361 F. Supp. 2d at 251-52 (finding that "it would be unconscionable to allow Chase and Citibank to nullify cardholders' rights," where

29

"those banks possessed information regarding this litigation which they withheld from their card-holders when they added the [arbitration] clause to their contracts").[7]

### 4. The Grubhub Arbitration Provision Cannot Be Interpreted to Apply to Claims Unrelated to the Grubhub TOU.

If the Grubhub Arbitration Provision were enforceable (it is not), it cannot be interpreted to apply to the Platform Plaintiffs' claims here, because such an interpretation would be absurd.

"A court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" *Dreni v. PrinterOn Am. Corp.*, 2021 WL 4066635, at *7 (S.D.N.Y. Sept. 3, 2021) (quoting *Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009)); *see also Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (App. Div. 2010) (same). "Where some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part,' courts 'may as a matter of interpretation carry out the intention of the contract by transposing, rejecting, or supplying words to make the meaning of the contract more clear.'" *McFarlane*, 524 F. Supp. 3d at 277 (quoting *Jade Realty LLC v. Citigroup Commercial Mortg. Tr.*, 908 N.E.2d 945, 947 (N.Y. 2012)) (alterations omitted). These fundamental principles of contract interpretation apply with equal force to arbitration clauses. *See, e.g.*, *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 192 (2d Cir. 2019) (refusing to adopt interpretation of arbitration clause that "would produce absurd results" that "could not have been intended" by "the contracting parties").

---

[7] As additional evidence of procedural unconscionability, the Grubhub TOU is an adhesion contract imposed on consumers, who, practically speaking, had little choice but to accept the Grubhub Arbitration Provision or something substantially similar. *See Gillman*, 534 N.E.2 at 828 ("The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice."). Although the Platform Plaintiffs could have theoretically dealt with another meal-delivery platform, Grubhub's primary competitors in New York—Uber and Postmates—impose near-identical provisions. (*See* AC ¶ 34 (Defendants control approximately 85% of the New York market, where the Platform Plaintiffs reside); *cf. In re Lyondell Chem. Co.*, 544 B.R. 75, 85 (Bankr. S.D.N.Y. 2016) (citing the existence of a "monopoly" as a factor relevant to evaluation of "negotiation process").

If interpreted literally, as shown above, infinite arbitration clauses like the Grubhub Arbitration Provision would produce absurd results that would contravene a reasonable person's expectations. *See McFarlane*, 524 F. Supp. 3d at 277 (noting that "it takes little imagination to come up with hypotheticals that make plain the outrageous results that would follow"). Accordingly, to the extent that infinite arbitration clauses are enforceable at all, courts have limited their application to disputes relating to the agreement containing the clause. *See, e.g.*, *id.* at 279 (holding that arbitration provision did not apply to claims "to the extent" that claims "lack any nexus" to the agreement containing that provision); *Wuest*, 2017 WL 6520754, at *3 (agreeing with precedent that "arbitration clause must extend only to claims that 'arise out of or relate to' the contract the Plaintiff signed").

The Court should likewise refuse to apply the Grubhub Arbitration Provision to disputes wholly unrelated to the Grubhub TOU. This narrower interpretation would be consistent with how the Second Circuit has traditionally interpreted "broad" arbitration provisions. *See Louis Dreyfus*, 252 F.3d at 224 ("broad" clause may extend to any claim alleged that "implicates issues of contract construction or the parties' rights and obligations under it") (quoting *Collins & Aikman*, 58 F.3d at 23). It would, moreover, avoid the "absurd results" that other courts have recognized would flow from a literal interpretation.

**B.    The Uber Arbitration Provision Is Unenforceable and Inapplicable.**

        1.   <u>The Uber Arbitration Provision Does Not Apply to the Platform Plaintiffs' Claims.</u>

On its own terms, the Uber Arbitration Provision dictates that Uber's motion should be denied. Under that agreement, "only a court of competent jurisdiction, not an arbitrator, shall have exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver." (Sullivan Decl. Ex. F at 59-60.) That agreement further provides that "[i]f there is a final

judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason," "any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful provision(s) shall proceed in a court of competent juris-diction." (*Id.* at 57.) The Platform Plaintiffs' claims, as explained below, are subject to an "unen-forceable" and "unlawful" portion of Uber's "Class Action Waiver." Accordingly, by the plain language of the Uber Arbitration Provision, those claims must "proceed" in court.

In particular, the Uber Class Action Waiver contains an infinite arbitration clause *combined* with an infinite class action waiver. That provision states: "You acknowledge and agree that *any and all* disputes, claims, or controversies between the parties shall be resolved only in *individual arbitration*." (*Id.* (emphases added).) With respect to arbitration, this clause is not simply redun-dant of what is included in the "Covered Disputes" section of the Uber Arbitration Provision. Instead, it expands the scope of claims purportedly subject to arbitration from (i) those relating to a consumer's "relationship with Uber" to (ii) "any and all disputes, claims, or controversies be-tween the parties." (*Id.* at 55-57.)[8]

Uber's infinite arbitration clause is unenforceable for the same reasons that Grubhub's in-finite arbitration clause is unenforceable. The Platform Plaintiffs never formed an agreement with Uber to arbitrate any and all possible disputes with Uber, because no reasonable person would have thought accepting the Uber TOU would come with such consequences; Uber's infinite arbi-tration clause is just as broad and unconscionable as Grubhub's; and even if the Court concluded that Uber's infinite arbitration clause were enforceable to some degree, it would not be enforceable

---

[8] If Uber did not want to use the Class Action Waiver to purportedly expand the scope of disputes subject to arbitration, it could have used the language that Doordash uses in its arbitration clause. *See, e.g.*, *Arkin v. DoorDash, Inc.*, 2020 WL 4937825, at *2 (E.D.N.Y. Aug. 24, 2020) (providing that "[a]ll claims and disputes *within the scope* of this arbitration agreement must be arbitrated on an individual basis and not on a class basis") (emphasis added).

to the extent it purports to cover claims unrelated to the Uber TOU, like the claims that the Platform Plaintiffs assert here. Because the Class Action Waiver is unenforceable as to the Platform Plaintiffs' claims, those claims "shall proceed in a court of competent jurisdiction"—*i.e.*, this Court.

2.    <u>Postmates Cannot Enforce the Uber TOU.</u>

Postmates cannot compel arbitration against the Platform Plaintiffs based on the Uber TOU. "When consumers are not advised of the rights they are forfeiting, enforceability of arbitration clauses may be restricted." *O'Conner*, 444 F. Supp. 3d at 602 (quoting *In re Currency Conversion*, 361 F. Supp. 2d at 250). Indeed, a "party acts unconscionably when it omits material information from a contract regarding the consumers' forfeiture of important protections." *Id.* at 602-03 (quoting *In re Currency Conversion*, 361 F. Supp. 2d at 250). That is what happened here.

Uber and Postmates imposed the Uber TOU on the Platform Plaintiffs during the pendency of this litigation, without providing any notice to Plaintiffs' counsel. Uber, moreover, failed to inform the Platform Plaintiffs that, by accepting those terms, they would (purportedly) be agreeing to arbitrate the claims that they had *already* asserted in this action against *Postmates*, notwithstanding that those claims arose years before Postmates had any relationship with Uber. *See id.* at 603 (arbitration agreement unenforceable, where it did not disclose that, by signing it, "putative plaintiffs would lose their right to participate in this lawsuit"); *cf. O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013) ("Uber drivers must be given clear notice of the arbitration provision, the effect of assenting to arbitration on their participation in this lawsuit, and reasonable means of opting out of the arbitration provision within 30 days of the notice."). Uber did not even make clear to the Platform Plaintiffs—some of whom have never even used Postmates—that they would be entering an agreement with Postmates; indeed, the Uber TOU does not mention Postmates by name.

The unfairness of allowing Postmates to invoke the Uber TOU against the Platform Plaintiffs is underscored by the fact that there is *no evidence* that any Platform Plaintiff had previously agreed to arbitrate with Postmates. In other words, by imposing the Uber TOU in the midst of this litigation, Uber and Postmates have purported to give Postmates the right to force the Platform Plaintiffs to arbitrate their claims against Postmates, where no such right previously existed. Under the circumstances, it would be unconscionable to permit Postmates to enforce the Uber TOU, or any component thereof,[9] against Plaintiffs. *See Thomas*, 506 F. Supp. 3d at 904 (finding unconscionability, where Cricket was "trying to compel arbitration of Waters' claim against it for the alleged false advertising of its wireless services between 2012 and 2014—before it became an affiliate of AT&T Mobility—based on an entirely separate wireless service agreement that Waters signed with a different wireless service provider—AT&T Mobility—years after she purchased a phone from Cricket.").

## V.   THE ACTION SHOULD NOT BE STAYED IN FULL

In an argument that Grubhub tellingly declines to make, Uber argues (at 17) that the Court should exercise its discretion to "stay the entire action," including with respect to Plaintiff Drewey's claims, even though Plaintiff Drewey has never used any Defendant's platform and is indisputably not bound by any Defendant's arbitration clause. Where, as here, a defendant seeks stay an action pending resolution of arbitration, that party "bears a heavy burden of showing necessity for the stay." *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991); *see also Hard*

---

[9] For the avoidance of doubt, the Platform Plaintiffs challenge the validity of the Delegation Clause itself, on the grounds that it would be unconscionable to permit Postmates to enforce that clause. *See Gingras*, 922 F.3d at 126 (allegation that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent" was "sufficient to make the issue of arbitrability one for a federal court").

*Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 564 (S.D.N.Y. 2011) (same). Uber has failed to meet its burden.

Uber asserts that staying Plaintiff Drewey's claims would "conserve judicial resources" and "avoid potential inconsistent outcomes," but Uber disregards that its motion seeks to force the other six named plaintiffs to arbitrate their claims separately—circumstances that *invite* the inconsistent outcomes that Uber supposedly wants to avoid. Uber, moreover, fails to make any showing that any of those six arbitrations would have a preclusive effect as to Plaintiff Drewey's claims, and thus fails to demonstrate that a stay would in fact "conserve judicial resources." *See Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995) (denying motion to compel, where it was "not at all clear that the arbitration will finally decide even those issues common to both the arbitration and the court proceedings"). Uber similarly fails to establish that the six arbitrations "will conclude within a reasonable time." *Id.*[10]

### CONCLUSION

Plaintiffs respectfully request, for the foregoing reasons, that the Court deny Defendants' motions to compel arbitration.

---

[10] In addition, to the extent that Uber is arguing that claims against some defendants should be stayed if claims against other defendants are sent to arbitration, that argument should be rejected. Resolution of Plaintiffs' claims against one defendant would not resolve Plaintiffs' claims against any other defendant. *See Mikes*, 889 F. Supp. at 757 ("Since plaintiff's § 3730(h) and § 191 claims are distinct from and do not affect the merits of her *qui tam* claims, we see no reason to stay the *qui tam* action pending arbitration of plaintiff's other claims.").

Dated:  September 16, 2022

*/s/ Edward Normand*
Velvel (Devin) Freedman
Edward Normand
Stephen Lagos
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, NY 10016
vel@rochefreedman.com
tnormand@rochefreedman.com
slagos@rochefreedman.com

Gregory A. Frank
Marvin L. Frank
Asher Hawkins
**FRANK LLP**
305 Broadway, Suite 700
New York, New York 10007
Tel: (212) 682-1853
Fax: (212) 682-1892
gfrank@frankllp.com

*Counsel for Plaintiffs*