

**FNF** | **FREEDMAN NORMAND FRIEDLAND**

January 24, 2023

ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-27-23

**Via ECF**
The Honorable Lewis A. Kaplan
United States District Judge
500 Pearl Street
New York, NY 10007

# MEMO ENDORSED

Re: *Davitashvili et al. v. Grubhub Inc. et al.*, No. 1:20-cv-03000 (S.D.N.Y.)

Dear Judge Kaplan:

We write on behalf of Plaintiffs to request a modification of the scheduling order.[1] The modification—the first that Plaintiffs have requested—is necessary to accommodate certain non-party data productions that are critical to Plaintiffs' prospective motion for class certification.

Indeed, as explained further below, for months Plaintiffs have engaged in extensive negotiations with Defendants and numerous non-parties over complex and voluminous data productions. Those negotiations have proven fruitful (with the parties and non-parties agreeing on a sampling methodology for non-party data productions), but the non-parties are still working on producing data, and the precise timing of those productions is uncertain, including because those non-parties are attempting to balance their own pressing business needs with the parties' discovery needs. Accordingly, rather than burden those non-parties with premature motions to compel (which Plaintiffs believe would be inconsistent with the parties' obligations to cooperating non-parties), Plaintiffs respectfully request a modification of the scheduling order.

## I. Factual Background

Defendants operate online platforms that enable consumers to search for and order from participating restaurants. (Dkt. No. 28 ("AC") ¶ 27.) When a consumer orders a meal through Defendants' platforms, Defendants collect revenue from both the consumer and the restaurant, including by charging the restaurant a hefty commission, often 30%, on the total amount paid by the consumer. (*Id.* ¶¶ 3, 40-45, 109, 130.) In addition, pursuant to contractual provisions that they impose on restaurants (called no-price-competition clauses or "NPCCs"), Defendants prohibit any restaurant that sells through their platform from selling meals at a lower price directly to consumers or through competing platforms, like Doordash. (*Id.* ¶¶ 55-61.)

Plaintiffs allege that Defendants' NPCCs are anticompetitive and have caused Plaintiffs to pay supracompetitive prices at restaurants bound by those clauses. (*Id.* ¶¶ 125-35, 140-50.) Indeed, because Defendants' commission rates are so high relative to restaurants' profit margins, restaurants that sell through Defendants' platforms must increase their prices when they sell through Defendants' platforms to avoid losing money on such sales. (*Id.* ¶¶ 75, 142-44, 146.) Defendants' NPCCs, in turn, require restaurants to charge those same inflated prices to consumers

---

[1] Earlier today, Defendants indicated their opposition to a near-identical proposal discussed on January 18.

who buy directly from those restaurants and to consumers who buy through competing platforms. (*Id.* ¶¶ 147-49.) Plaintiffs accordingly seek relief on behalf of themselves and classes of consumers who purchased meals (i) directly from restaurants bound by Defendants' NPCCs and (ii) indirectly from those same restaurants through competing platforms. (*Id.* ¶¶ 173-75, 188-96, 197-205.)

On March 30, 2022, the Court denied Defendants' motions to dismiss these claims. (Dkt. No. 46.) On June 16, the Court entered a scheduling order. (Dkt. No. 65.) Pursuant to that order, the deadline for substantial completion of document production was December 20, 2022, the pre-class certification stage fact discovery cutoff is March 17, 2023, and Plaintiffs' motion for class certification is due on March 17, 2023. (*Id.* at 2-3.) On August 26, Defendants each moved to compel arbitration. (Dkt. Nos. 72, 76.) Those motions, which Plaintiffs oppose, are pending.

## II.  Legal Standard

Under Rule 16(b), "a party may obtain a modification of the scheduling order" upon "a showing of good cause." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007) (quoting Fed. R. Civ. P. 16(b)(4)). Whether "good cause" exists "depends on the diligence of the moving party." *Id.* (citations omitted). As explained below, that standard is met here.

## III.  Plaintiffs Have Diligently Pursued Discovery

Plaintiffs intend to establish injury and damages for their direct and indirect (*i.e.*, platform) purchases by comparing the prices charged by various restaurants across the nation, while also controlling for a host of other variables relevant to meal pricing. To conduct that analysis, Plaintiffs need four categories of restaurant transaction data: (i) consumers' direct purchases from restaurants bound by NPCCs, (ii) consumers' indirect purchases (via platforms) from restaurants bound by NPCCs, (iii) consumers' direct purchases from restaurants not bound by NPCCs, and (iv) consumers' indirect purchases (via platforms) from restaurants not bound by NPCCs.

After the Court denied Defendants' motions to dismiss, Plaintiffs identified restaurant point-of-sale providers (*i.e.*, companies that process payments at restaurants) as potential sources of data for consumers' direct purchases from restaurants.[2] Accordingly, on June 3, before the scheduling order was entered, Plaintiffs issued subpoenas to four of the largest restaurant point-of-sale providers in the United States—Lightspeed, Clover, Toast, and Block (collectively, the "POS Providers"). Those subpoenas sought, among other things, detailed restaurant transaction data that Plaintiffs could not obtain from Defendants. By June 8, Plaintiffs had served Clover, Toast, and Block; Lightspeed's affiliate, Upserve, was served on July 21.[3]

Shortly after the subpoenas were served, Plaintiffs engaged in initial meet-and-confers with each POS Provider. The POS Providers indicated that they would investigate the extent to which they possessed responsive data and the feasibility of producing that data. At the same time, they

---

[2] With respect to data for consumers' indirect purchases through competing platforms, Plaintiffs subpoenaed several of Defendants' competitors, some of which have already produced data. Plaintiffs are still engaged in negotiations with other platforms regarding the scope of their data productions, including Doordash, who Plaintiffs have been in discussions with since June. Plaintiffs expect those discussions to conclude this month.

[3] Both parties had difficulty serving Lightspeed; indeed, on July 25, Defendants requested Plaintiffs' assistance in identifying an address for service (which Plaintiffs promptly provided).

expressed a number of concerns relating to client confidentiality and the burden of compiling and producing the requested data, which would contain millions (or billions) of transactions from thousands of restaurants across the country. The POS Providers' formal responses and objections, served in July and early August, further reflected those concerns.

On June 29, Defendants indicated that they intended to subpoena the POS Providers. On July 6, to minimize the burden on those entities, Plaintiffs agreed to coordinate their discovery efforts with Defendants' efforts. In late July, Defendants issued subpoenas to each of those entities and requested much of the same data that Plaintiffs requested.

Pursuant to the parties' informal agreement, the parties exchanged communications regarding discovery from the POS Providers on July 26 and 27; August 1, 3, 4, 9, 10, 11, 15, and 16; and September 9, 10, 11, 12, and 23. The parties likewise engaged in joint communications with the POS Providers on July 26 and 27, August 11, 12, 15, 16, 24, and 31; and September 11, 12, 13, 15, and 22. In these communications, the POS Providers confirmed that they possess the data, but reiterated their concerns about the volume of data requested. In August and September, Toast and Upserve nevertheless indicated that they would be willing to discuss a more limited data production, while Clover continued to investigate the technical feasibility of producing data at all.

Around the same time, the parties were engaged in extensive negotiations regarding Defendants' production of transactional data, which Plaintiffs also needed to calculate damages. The parties exchanged letters and emails on that subject on August 5, 17, 19, 26, and 29; September 1, 2, 7, 9, 16, 22, and 26; and October 6, 11, 13, 14, 20, 25, and 27, and held telephonic meet and confers on July 15, July 22, August 3, September 8, and September 30.

Defendants' position, made clear by late August, was that they would produce only a *sample* of transaction data. Accordingly, on September 9, based on input from their experts, Plaintiffs proposed a sampling procedure. On October 6, after a series of counterproposals, the parties (in consultation with their experts) agreed on a sampling methodology and further agreed to propose that same methodology to the POS Providers. Specifically, among other things, Defendants would produce (and the parties would propose that the POS Providers produce) all transactional data for a randomly selected set of the greater of 35% or 1,000 restaurants located in twelve cities, for seven randomly selected days per month, from 2016 to 2021. Shortly thereafter, the parties shared this proposal with Toast, Upserve, and Clover. Following further discussions, as described below, Toast, Upserve, and Clover each accepted it.[4]

*First*, in mid-November, Upserve agreed to produce the requested data sample and indicated that it would follow up with the parties regarding the timing of its production. When the parties requested an update in December, they learned that the attorney from Upserve with whom they had been dealing had left. Nevertheless, on December 20, Upserve's new counsel affirmed Upserve's prior position. On January 5, Upserve stated that it was "currently working on gathering the data" and was "looking at EOM as the target date"—a timeline it confirmed on January 20.

*Second*, on November 16, Clover indicated that it was still investigating the "feasibility and burden" of the parties' proposed sampling methodology, and requested that the parties provide

---

[4] In addition, the parties have continued to engage in discussions with Block, which stated on January 13 that it was "working internally to try to reach a feasible compromise" on the scope of its data production.

3

Freedman Normand Friedland LLP

a list of zip codes and merchant category codes that they wanted to be covered by Clover's production. Following negotiations, the parties provided agreed-upon lists to Clover on December 2, and, on December 22, Clover stated that it would produce the requested data within approximately six weeks, pending resolution of a cost-related issue.[5]

*Third*, in late November, Plaintiffs and Toast met and conferred regarding Toast's data production. On December 23, Toast's outside counsel indicated that Toast would produce the requested data, but that the "production of data will likely require two engineers working full time for approximately two weeks" and that Toast could not "undertake the work immediately" due to "other pressing business needs." Toast committed to "identify a two week window in the near future" and explained that it would be able to provide "an exact date range" in January. The parties requested an update from Toast earlier this month and are awaiting a response.

## IV. The Proposed Extension Is Reasonably Necessary

The proposed modification, attached as Exhibit A, is reasonably necessary. As explained above, the data from the POS Providers is critical to Plaintiffs' motion for class certification. Indeed, both sides promptly issued subpoenas for this data and have spent considerable time and resources pursuing it. Plaintiffs and the proposed Classes would, accordingly, be prejudiced if they could not rely on this data in their motion for class certification—either because it had not yet been produced or because their experts did not have enough time to analyze it before that deadline.

That is what Plaintiffs believe would happen absent a modification of the current schedule. Plaintiffs reasonably expect that, given the complexity of the data requested, the POS Providers' productions will not be complete to the parties' satisfaction until the end of March.[6] After receiving that data, which will cover *tens of millions* of transactions, Plaintiffs and their experts will need to understand it, resolve any unexpected issues with it, analyze it, incorporate that analysis into expert reports, and incorporate those reports into their class certification motion. These are time-consuming, challenging tasks that Plaintiffs and their experts believe will take months, not weeks. That is especially true given the scope of this case, which concerns tens of millions of consumers' purchases from hundreds of thousands of restaurants over a seven-year period.

We respectfully submit, for all of the foregoing reasons, that the requested modification to the scheduling order is reasonably necessary and in the best interests of the proposed Classes.

Respectfully,
/s/ *Edward Normand*
Edward Normand

cc: Counsel of Record (via ECF)

---

[5] Plaintiffs have since reached out to Clover twice to resolve that issue, but, as of the most recent attempt, Clover's attorney was out of the office due to a family emergency.

[6] At best, Plaintiffs *could* receive data from Upserve later this month, and from Toast, Clover, and Block next month, and that data *could*—in contrast to data Plaintiffs have received from non-party platforms—have no unexpected issues that would require Plaintiffs to go back to the producing entities. But even in that best-case scenario, Plaintiffs would be in the untenable position of completing the challenging tasks outlined above in a one-month period. On top of that, because Defendants waited until the substantial production deadline to make any significant document or data productions, Plaintiffs and their experts would need to review and analyze hundreds of thousands of documents and millions of rows of transactional data produced by Defendants over that same period.

# EXHIBIT A

Case 1:20-cv-03000-LAK-JW Document 100 Filed 01/27/23 Page 5 of 8

## PLAINTIFFS' PROPOSED MODIFIED SCHEDULE

| EVENT | CURRENT DEADLINE | PROPOSED DEADLINE |
|---|---|---|
| **Class Certification Stage** | | |
| Pre-class certification stage fact discovery cutoff | March 17, 2023 | July 31, 2023 |
| Plaintiffs' motion for class certification | March 17, 2023 | July 31, 2023 |
| Discovery cutoff regarding Plaintiffs' class certification expert report(s) | May 23, 2023 | September 11, 2023 |
| Defendants' opposition to Plaintiffs' motion for class certification | June 6, 2023 | September 25, 2023 |
| Discovery cutoff regarding Defendants' class certification expert report(s) | July 20, 2023 | November 6, 2023 |
| Plaintiffs' reply in support of their motion for class certification | August 3, 2023 | November 20, 2023 |
| Class certification hearing | August 29, 2023, or on an alternative convenient date to be determined by the Court | December 11, 2023, or on an alternative convenient date to be determined by the Court |
| **Post-Class Certification Stage** | | |
| Defendants' motions for summary judgment | October 5, 2023 | January 15, 2024 |
| Discovery cutoff regarding Defendants' merit expert report(s) | November 1, 2023 | February 5, 2024 |
| Plaintiffs' opposition to Defendants' motions for summary judgment | November 15, 2023 | February 19, 2024 |

| Discovery cutoff regarding Plaintiffs' merit expert report(s) | December 6, 2023 | March 11, 2024 |
| --- | --- | --- |
| Defendants' reply in support of their motions for summary judgment | December 15, 2023 | March 20, 2024 |

2

Memorandum Endorsement                    Davitashvili v. Grubhub Inc., 20-cv-3000 (LAK)

        While the Court appreciates some of defendants' points, the overall situation strongly favors plaintiffs' application. I find good cause for the requested modification of the scheduling order. The prior scheduling order is amended to conform to that attached as Exhibit A to Dkt 98.

        SO ORDERED.

Dated:      January 27, 2023

                                                        Lewis A. Kaplan
                                              United States District Judge