**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADAM BENSIMON, PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI, NATHAN OBEY, MALIK DREWEY, ANTWAN ROBINSON, BENJAMIN FINER, JASMINE PIERCE, ABOUBAKRY DIACKO, ANNA MARQUEZ, JARED SWOOPE, PHILIP SMITH, CHRISTOPHER CRUZ, DUSTIN ROBERTS, MISTY WILLIAMS, ROBERT CURRIE, ARLESIA BENJAMIN, MARCUS ROBINSON, LEWIE LEWIS, MAURICE RAGLAND, and EMROY CAESAR, individually and on behalf of all others similarly situated, | Civ. No. 1:20-cv-03000-LAK **JURY TRIAL DEMANDED** |
|      Plaintiffs, | |
| v. | |
| GRUBHUB INC., UBER TECHNOLOGIES, INC., and POSTMATES INC., | |
|      Defendants. | |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, Nathan Obey, Malik Drewey, Antwan Robinson, Benjamin Finer, Jasmine Pierce, Aboubakry Diacko, Anna Marquez, Jared Swoope, Philip Smith, Christopher Cruz, Dustin Roberts, Misty Williams, Robert Currie, Arlesia Benjamin, Marcus Robinson, Lewie Lewis, Maurice Ragland, and Emroy Caesar, individually and on behalf of all others similarly situated, bring this action against Grubhub Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber"), and Postmates Inc. ("Postmates") and allege as follows:

## I.    <u>INTRODUCTION</u>

1.    Defendants have violated Section 1 of the Sherman Act and its state analogues by exploiting, without procompetitive justification, their dominant position in the market for delivery and takeout through internet-based platforms that aggregate the offerings of multiple restaurants.

2.    Over the past decade, as smart phones have become ubiquitous, the popularity of these platforms has skyrocketed.  Because most restaurants face low profit margins, they require significant volume to cover their costs.  To achieve such volume, restaurants must sell through Defendants' platforms, which each have tens of millions of active users.

3.    Defendants use their market power to force any restaurant that sells goods on Defendants' platforms to pay unreasonable commissions, typically equal to 30% of every order, each time a consumer orders from that restaurant through the platform.  These commissions are so large that, when restaurants sell through Defendants' platforms, they must increase their prices just to avoid losing money on each sale.

4.    In a freely competitive market, these restaurants could offset these increased costs by increasing prices for consumers who choose the convenience of Defendants' platforms, while maintaining lower prices for consumers who order directly from the restaurants.  That is, these restaurants would offer their customers different prices depending on whether they used Defendants' platforms or placed orders directly through the restaurant.

5.    Insulating their platforms, however, each Defendant *prevents* the restaurants by contract from offering lower prices for sales *outside* its platform.  For each Defendant, these restrictions apply to direct orders from the restaurants for takeout, delivery, or dine-in meals, even if those consumers do no business with Defendants.  Grubhub and Uber apply these contractual

restrictions most broadly by also preventing restaurants from charging lower prices for orders through similar platforms, such as Doordash.

6.      Defendants do this because if the restaurants were to offer consumers lower prices for sales *outside* each Defendant's platform, then the restaurants' sales *on* the platform would decrease, and Defendants' supracompetitive profits would be threatened.

7.      The contractual restrictions that Defendants impose on restaurants thus prevent both restaurants and other platforms from competing on price with Defendants.  As a result of Defendants' conduct, any restaurant using any Defendant's platform charges *all* of its customers supracompetitive prices.

8.      These agreements thereby cause substantial anticompetitive harm that, including with respect to the millions of consumers who are not even using Defendants' platforms, lacks procompetitive justification.  Indeed, although the courts in this country have not yet had occasion to do so, European regulators have repeatedly concluded that nearly identical contractual restrictions cause anticompetitive harm.  In fact, bans on such provisions have resulted in lower prices for consumers.

9.      Accordingly, on behalf of a nationwide class of the customers of restaurants using these platforms, Plaintiffs seek to redress and enjoin Defendants' unlawful conduct, occurring from April 13, 2016, to the present (the "Class Period").

## II.    PARTIES

### a.    Plaintiffs

10.     Plaintiff Adam Bensimon is a resident and citizen of New York.  Over the relevant period, he has ordered meals for takeout, delivery, and dine-in directly from restaurants in New York City that sell their goods through Defendants' platforms.

11.     Plaintiff Phil Eliades is a resident and citizen of Rhode Island.  Over the relevant period, he has placed orders for takeout, delivery, and dine-in directly from restaurants in New York City that sell their goods through each Defendant's platform, and indirectly from such restaurants through Doordash. In addition, over the relevant period, he has placed orders for takeout and dine-in from restaurants in Boston that sell their goods through Grubhub and Uber's platforms; for takeout and dine-in from restaurants in Miami that sell their goods through Uber's platform; and for dine-in from restaurants in Washington, D.C. that sell their goods through Grubhub and Uber's platforms.

12.     Plaintiff Jonathan Swaby is a resident and citizen of New York.  Over the relevant period, he has placed orders for takeout, delivery, and dine-in directly from restaurants in New York City that sell their goods through each Defendant's platform, and indirectly from such restaurants through Doordash.

13.     Plaintiff John Boisi is a resident and citizen of New York. Over the relevant period, he has placed orders for takeout and dine-in directly from restaurants in New York City that sell their goods through Grubhub and Postmates, and indirectly from such restaurants through Caviar and Doordash. In addition, over the relevant period, he has placed orders for dine-in directly from restaurants in Chicago that sell their goods through Grubhub and Uber's platforms, and indirectly from such restaurants through Caviar.

14.     Plaintiff Nate Obey is a resident and citizen of New York. Over the relevant period, he has placed orders for takeout and dine-in directly from restaurants in New York City that sell their goods through Grubhub, and indirectly from such restaurants through Caviar.[1]

---

[1] Pursuant to the Second Circuit's order in this matter, four plaintiffs—Eliades, Swaby, Boisi, and Obey—cannot pursue their claims against Uber or Postmates in court until an arbitrator concludes

15.    Plaintiff Malik Drewey is a resident and citizen of New York.  Over the relevant period, he has placed orders for takeout and dine-in directly from restaurants in New York City that sell their goods through each Defendant's platform, but he has not used any of those platforms.

16.    Plaintiff Antwan Robinson is a resident of Chicago, Illinois, and a citizen of Illinois. Over the relevant period, he has placed orders for takeout and delivery from restaurants in Chicago that sell their goods through Defendants' platforms. He has not used Uber.

17.    Plaintiff Benjamin Finer is a resident of Los Angeles, California, and citizen of California. Over the relevant period, he has placed orders for takeout and delivery from restaurants in Chicago that sell their goods through Defendants' platforms, and from restaurants in Los Angeles that sell their goods through Uber and Postmates' platforms. In addition, over the relevant period, he has placed orders for dine-in from restaurants in Chicago and Los Angeles that sell their goods through Uber and Postmates' platforms. He is not asserting claims against Uber or Postmates in this action at this time, but reserves the right to do so if and when an arbitrator concludes that those claims are not subject to arbitration.

18.    Plaintiff Jasmine Pierce is a resident of Chicago, Illinois, and a citizen of Illinois. Over the relevant period, she has placed orders for dine-in from restaurants in Chicago that sell their goods through Defendants' platforms. She has not used Uber.

19.    Plaintiff Aboubakry Diacko is a resident of New York, New York, and a citizen of New York. Over the relevant period, he has placed orders for takeout, delivery, and dine-in from

---

that those claims are not subject to arbitration. These plaintiffs do not agree to dismiss their claims against Uber or Postmates in this action, but rather understand those claims to be stayed until an arbitrator confirms that they are not subject to arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 475–76 (2024). To ensure compliance with that stay, Eliades, Swaby, Boisi, and Obey assert claims against only Grubhub in this complaint. The other plaintiffs, unless otherwise noted, assert claims against Grubhub, Uber, and Postmates.

restaurants in New York City, Los Angeles, and Miami that sell their good through Defendants' platforms. He has not used Uber.

20.    Plaintiff Anna Marquez is a resident of Chicago, Illinois, and a citizen of Illinois. Over the relevant period, she has placed orders for takeout, delivery, and dine-in from restaurants in Chicago that sell their goods through Defendants' platforms. She has not used Uber.

21.    Plaintiff Jared Swoope is a resident of Thornton, Illinois, and a citizen of Illinois. Over the relevant period, he has placed orders for takeout, delivery, and dine-in from restaurants in Chicago that sell their goods through Defendants' platforms. In addition, over the relevant period, he has placed orders from such restaurants using non-Defendant platforms. He has not used Uber.

22.    Plaintiff Philip Smith is a resident of Los Angeles, California, and a citizen of California. Over the relevant period, he has placed orders for takeout, delivery, and dine-in from restaurants in Atlanta, San Francisco, and Los Angeles that sell their goods through Defendants' platforms. He has not used Uber.

23.    Plaintiff Christopher Cruz is a resident of Whittier, California, and a citizen of California. Over the relevant period, he has placed orders for dine-in from restaurants in Los Angeles that sell their goods through Defendants' platforms. In addition, he has placed orders from such restaurants using non-Defendant platforms, including Doordash. He has not used Uber.

24.    Plaintiff Dustin Roberts is a resident of Lakewood, California, and a citizen of California. Over the relevant period, he has placed orders for takeout, delivery, and dine-in from restaurants in Los Angeles that sell their goods through Defendants' platforms. In addition, he has placed orders from such restaurants using non-Defendant platforms, including Doordash. He has not used Uber.

25.     Plaintiff Misty Williams is a resident of Plainview, Texas, and a citizen of Texas. Over the relevant period, she has placed orders for takeout and delivery from restaurants in Dallas that sell their goods through Defendants' platforms, and for dine-in from restaurants in Dallas that sell their goods through Uber and Postmates' platforms. She has not used Uber.

26.     Plaintiff Robert Currie is a resident of Alvin, Texas, and a citizen of Texas. Over the relevant period, he has placed orders for takeout, delivery, and dine-in from restaurants in Houston that sell their goods through Defendants' platforms. In addition, he has placed orders from such restaurants using non-Defendant platforms. He has not used Uber.

27.     Plaintiff Arlesia Benjamin is a resident of Macon, Georgia, and a citizen of Georgia. Over the relevant period, she has placed orders for takeout, delivery, and dine-in from restaurants in Atlanta that sell their goods through Defendants' platforms. She has not used Uber.

28.     Plaintiff Marcus Robinson is a resident of Bronx, New York, and a citizen of New York. Over the relevant period, he has placed orders for takeout and delivery from restaurants in Philadelphia that sell their goods through Grubhub and Postmates' platforms, and from restaurants in New York City that sell their goods through Defendants' platforms. In addition, he has placed orders for dine-in from restaurants in Philadelphia and New York City that sell their goods through Defendants' platforms. He has not used Uber.

29.     Plaintiff Lewie Lewis is a resident of Tempe, Arizona, and a citizen of Arizona. Over the relevant period, he has placed orders for dine-in from restaurants in Phoenix that sell their goods through Defendants' platforms. In addition, he has placed orders from such restaurants using non-Defendant platforms, including Doordash. He has not used Uber.

30.     Plaintiff Maurice Ragland is a resident of Taunton, Massachusetts, and a citizen of Massachusetts. Over the relevant period, he has placed orders for takeout, delivery, and dine-in

from restaurants in Boston that sell their goods through Defendants' platforms. He is not asserting claims against Uber or Postmates in this action at this time, but reserves the right to do so if and when an arbitrator concludes that those claims are not subject to arbitration.

31.     Plaintiff Emroy Caesar is a resident of Brooklyn, New York, and a citizen of New York. Over the relevant period, he has placed orders for takeout, delivery, and dine-in from restaurants in New York City that sell their goods through Defendants' platforms. He has not used Uber.

**b.    Defendants**

32.     Defendant Grubhub is a Delaware corporation with its principal place of business in Chicago, Illinois.  Grubhub says it "connects more than 300,000 restaurants with hungry diners in thousands of cities across the United States and is focused on transforming the takeout experience."  Grubhub's 2019 revenues were $1.31 billion.

33.     Defendant Uber is a Delaware corporation with a principal place of business in San Francisco, California.  Uber says its Uber Eats service "allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered."  Uber's 2019 revenues from this service were $2.5 billion.

34.     Defendant Postmates is a Delaware corporation with a principal place of business in San Francisco, California.  Postmates says it is "transforming the way goods move around cities through [its] revolutionary Urban Logistics platform that connects customers with local couriers who can deliver anything from your favorite restaurant or retailer within minutes."  Postmates is not a public company; its reported valuation is approximately $2.4 billion.

35.     On July 6, 2020, Uber announced an agreement to acquire Postmates in a $2.65 billion all-stock takeover.

III.    **JURISDICTION AND VENUE**

36.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

37.    Venue lies within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

38.    This Court has personal jurisdiction over Defendants because this action arises out of Defendants' conduct in this District.

IV.    **FACTUAL ALLEGATIONS**

    a.    **The Relevant Product Markets**

39.    Coupled with the already increasing frequency with which restaurants had come to offer takeout and delivery service, the advent of the internet even further changed the food industry. Instead of calling a restaurant to place an order for takeout or delivery, customers could order on a restaurant's website menu.

40.    Defendant Grubhub was one of the first companies to build and operate an online platform through which restaurant menus in a particular region are aggregated to allow consumers to view available pickup or delivery options all at once.

41.    These "Restaurant Platforms" enable consumers to search for participating restaurants in a particular locality and order food for takeout or delivery from those restaurants.

Restaurant Platforms also deliver food for participating restaurants that do not want to provide delivery themselves.

42.     In aggregating the offerings of multiple restaurants in a single place, Restaurant Platforms provide a service distinct from a restaurant's website or app (*e.g.*, a Domino's pizza app), which simply allow a consumer to place an order from a single restaurant.

43.     Restaurant Platforms thus compete with each other in the product market for takeout and delivery orders from Restaurant Platforms (the "Restaurant Platform Market").

44.     For purposes of this action, two additional product markets are also relevant. First, in addition to offering meals for takeout and delivery through Restaurant Platforms, restaurants also sell meals directly to consumers for takeout and delivery (the "Direct Takeout and Delivery Market"). In the Direct Takeout and Delivery Market, a consumer may order directly from a restaurant for takeout or delivery by, for example, calling the restaurant's phone number or by visiting the restaurant's website. Second, consumers may also order meals to be eaten at a restaurant directly from that restaurant (the "Dine-In Market"). In the Dine-In Market, a consumer may order a meal from a restaurant and eat the meal at that restaurant, as opposed to taking that meal to eat elsewhere. These markets, in addition to the Restaurant Platform Market, are described in more detail below.

b.     **The Restaurant Platform Market**

45.     Although a number of firms participate in the Restaurant Platform Market, the market is dominated by just four firms: Doordash, Grubhub, Uber, and Postmates.

46.    According to data compiled by Vox, these firms control a remarkable 98% of the Restaurant Platform Market in the United States.[2]

47.    Vox found that as of November 2019, Doordash's national share of the market was 37%, Grubhub's share was 31%, Uber's share was 20%, and Postmates' share was 10%. This data underestimates Uber's market share, because beginning in May 2019, some Uber Eats transactions became indistinguishable from Uber Rides transactions.

48.    These market shares vary across metropolitan areas. As *The Atlantic* has observed, Restaurant Platforms have "split their dominance regionally, like cable companies." Grubhub, for example, controls 67% of the market in all of New York City, 4.5 times as much as its closest competitor in that market. Vox has summarized estimated shares in other markets:

| Local Market | Grubhub Share | Uber Share | Postmates Share |
|---|---|---|---|
| New York City | 67% | 14% | 4% |
| SF Bay Area | 16% | 13% | 8% |
| Miami | 11% | 55% | 19% |
| Houston | 9% | 29% | 4% |
| Phoenix | 15% | 23% | 23% |
| Dallas-Fort Worth | 12% | 32% | 4% |
| Washington, D.C. | 22% | 28% | 7% |
| Boston | 41% | 26% | 4% |
| Los Angeles | 19% | 15% | 37% |
| Chicago | 37% | 24% | 6% |

---

[2] Unless otherwise noted, statistics included in this complaint are as of August 2020. Plaintiffs will as necessary update these figures through discovery.

| | | | |
|---|---|---|---|
| Philadelphia | 42% | 16% | 3% |
| Atlanta | 12% | 40% | 10% |

49.     This result is the natural consequence not only of so-called indirect network effects, as explained below, but also of Defendants' anticompetitive conduct.

**c.     The Business of Restaurant Platforms**

50.     Restaurant Platforms are two-sided platforms, acting as an intermediary to connect restaurants and consumers to the benefit of both.

51.     In its most recent 10-K, Grubhub describes its business as follows: "The Company connects more than 300,000 restaurants with hungry diners in thousands of cities across the United States and is focused on transforming the takeout experience."

52.     In its most recent 10-K, Uber similarly describes its business as follows: "Our Eats offering allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered."

53.     Postmates, on its website, likewise describes itself as follows: "Postmates is transforming the way goods move around cities through [its] revolutionary Urban Logistics platform that connects customers with local couriers who can deliver nearly anything from your favorite restaurant or retailer in minutes."

54.     Grubhub, Uber, and Postmates, like other Restaurant Platforms, not only connect restaurants and consumers, but also derive revenue from both restaurants and consumers.

55.     <u>Restaurant Commission</u>.  When a consumer orders from a restaurant through a Restaurant Platform, the platform typically charges the restaurant a commission (the "Restaurant

Commission"). The Restaurant Commission is typically equal to a rate (the "Restaurant Commission Rate") multiplied by the total price of the order.

56. If the restaurant does not provide its own delivery, the total price is the listed price of the goods ordered (*e.g.*, the total price of two burgers, one order of fries, and a soda). Those prices, which are typically chosen by the restaurant, are referred to as the Restaurant List Prices. If the restaurant provides its own delivery, the total price is the sum of the Restaurant List Prices for the goods ordered, plus the delivery fees the restaurant charges. Defendants typically charge a 30% Restaurant Commission Rate to restaurants that do not provide their own delivery, and a lower Restaurant Commission Rate for restaurants that do provide their own delivery.

57. <u>Consumer Commission</u>. A Restaurant Platform also charges consumers a service fee (the "Consumer Commission"). The Consumer Commission is typically equal to a commission rate (the "Consumer Commission Rate") multiplied by the total listed price of the order. The Consumer Commission Rate is typically between 5% and 10%. In some cases, Restaurant Platforms charge no Consumer Commission Rates for orders from restaurants that provide their own deliveries and for takeout orders.

58. <u>Consumer Delivery Fee</u>. Restaurant Platforms also typically charge the consumer a delivery fee for orders from restaurants that do not provide their own delivery (the "Consumer Delivery Fee"). The Consumer Delivery Fee is typically about 5%.

59. The following is an example of the fees that Restaurant Platforms charge:

|  | Scenario A: Restaurant Platform provides delivery | Scenario B: Restaurant provides delivery | Scenario C: Takeout orders |
|---|---|---|---|
| Restaurant List Price | $50.00 | $50.00 | $50.00 |
| Restaurant's delivery price | n/a | $2.00 | n/a |

| | | | |
|---|---|---|---|
| Restaurant Commission Rate | 30% | 20% | 15% |
| Restaurant Commission | $15.00 | $10.40 | $7.50 |
| Consumer Commission Rate | 5% | 0% | 0% |
| Consumer Commission | $2.50 | $0.00 | $0.00 |
| Consumer Delivery Fee | $2.50 | $0.00 | $0.00 |
| Total Charged to Consumer | $55.00 | $52.00 | $50.00 |
| Total Revenue for Restaurant Platform | $20.00 | $10.40 | $7.50 |

60.     The Restaurant Platform Market is a separate product market from both the Direct Takeout and Delivery Market and the Dine-In Market.  This is because a hypothetical Restaurant Platform monopolist could profitably increase prices, as measured by the fees charged to both restaurants and consumers, above competitive levels.

61.     Although consumers may order meals for takeout or delivery in the Restaurant Platform Market or the Direct Takeout and Delivery Market, direct orders from restaurants (*i.e.*, orders in the Direct Takeout and Delivery Market) are not reasonably interchangeable with orders from Restaurant Platforms.  This is the case for several reasons.

62.     *First*, Restaurant Platforms offer services that restaurants do not offer.  Restaurant Platforms list different restaurants that offer takeout and delivery in a particular area and thus allow the user to choose a restaurant based on her preferences, including based on reviews provided by other users of the Restaurant Platform.  In allowing consumers to rate and review restaurants that they have ordered from, Restaurant Platforms allow consumers to share their experiences.  In contrast, restaurants in the Direct Takeout and Delivery Market simply offer consumers the ability to place an order after the consumer has already decided to order from that restaurant.

14

63.    For example, Grubhub has a five-star rating system that allows its users to rate an individual restaurant, leave a review, and inform others what they ordered from the restaurant:



64.    *Second*, Restaurant Platforms allow consumers to place orders through mobile apps and websites, without speaking with a person.  Once a consumer has provided a Restaurant Platform with her payment information, then she can place future orders without providing that information again.  Restaurants do not necessarily offer the same services; indeed, the vast majority of restaurants do not offer their own mobile apps and many do not offer online ordering.

65.    *Third*, as discussed in more detail below, Restaurant Platforms are "sticky," meaning that consumers who become familiar with platforms are unlikely to switch to any other service, whether that other service is a competing Restaurant Platform or a restaurant website or mobile app.  This means that a hypothetical Restaurant Platform monopolist could raise prices to a degree that it otherwise could not without seeing decreased profits.

66.     *Fourth*, although different consumers use Restaurant Platforms, they are especially popular among young professionals in major cities.  This is a distinct group of consumers with distinct sensitivities to price changes and distinct preferences.

67.     These distinctions demonstrate that, if a hypothetical Restaurant Platform monopolist increased prices to 5% above competitive levels, not enough consumers would switch away from that platform to make that price increase unprofitable.  As further support for this analysis, commentators and politicians have identified the Restaurant Platform Market as a distinct market, characterizing it as an oligopoly and calling for antitrust scrutiny of potential mergers in that market.

68.     Although (for purposes of antitrust law) the Restaurant Platform Market is distinct from the Direct Takeout and Delivery Market and the Dine-In Market, there is some cross-elasticity between the Restaurant Platform Market and those markets.  If a hypothetical Restaurant Platform monopolist increased prices, some consumers would switch to ordering in the Direct Takeout and Delivery Market or the Dine-In Market.  For example, it would not necessarily be profitable for a hypothetical Restaurant Platform monopolist to increase prices to more than 5% above competitive levels.  Put differently, a hypothetical Restaurant Platform monopolist that is already charging supracompetitive prices to restaurants and consumers may be unable, absent some other restrictive mechanism, to profitably increase those prices further.

### d.     Defendants Contractually Restrict Restaurant Prices

69.     Defendants have leveraged their position in the relevant markets to force restaurants to enter into agreements that include clauses requiring uniform prices for restaurants' menu items (the "No Price Competition Clause" or "NPCC").

70.     In general, the NPCCs prohibit a supplier that sells through that platform from charging lower prices when that supplier sells through other channels.  NPCCs may be broadly categorized as "narrow" or "wide."  In a "narrow NPCC," the platform prohibits the supplier from selling its goods at a lower price when the supplier sells to consumers directly, as opposed to through the platform or some other non-direct channel.  In a "wide NPCC," the platform prohibits the supplier from selling its goods at a lower price when the supplier sells through *any* channel other than through the platform.

71.     Postmates imposes narrow NPCCs on restaurants that sell through Postmates. Postmates's NPCC states:  "Pricing shall be consistent with Merchant's in-store pricing."  That is, "Postmates insists on price parity between in-store and online menus."

72.     As a result, any restaurant that sells goods through Postmates is contractually prohibited from selling those goods at a lower price to consumers who purchase directly from that restaurant, regardless of whether the meal is for takeout, delivery, or dine-in, and regardless of whether that meal was ordered online, by phone, or in person.  The restaurant may, however, charge a lower price when it sells its goods through a competing platform, such as Doordash.

73.     Grubhub and Uber both impose wide NPCCs.  Like Postmates's NPCC, these provisions prohibit restaurants from selling at lower prices directly to consumers (regardless of whether the meal is for takeout, delivery, or dine-in, and regardless of whether that meal is ordered online, on the phone, or in person).  But unlike Postmates's NPCC, Grubhub's and Uber's wide NPCCs also prohibit restaurants from selling at lower prices to consumers through any competing Restaurant Platform.  For a restaurant that sells through Grubhub or Uber, the restaurant's Restaurant List Price on those platforms is the *lowest price* the restaurant is permitted to charge in selling its goods.

74.    Grubhub's NPCC states:  "The item pricing must be at least as favorable to the consumer as that which is available for Restaurant's standard menu or offered to any 3rd party service."  Consistent with this provision, Grubhub boasts (in its 2019 10-K) that it offers "menu price parity with any other online ordering option."

75.    Uber's NPCC states:  "Merchant may not make any Item available to Customers through the Eats App at a price that is higher than the price that Merchant charges in-store for similar Items.  Merchant agrees that you will not make an Item available under this Agreement at a price higher than the amount Merchant is charging for similar Items through any comparable platform for food delivery services."

76.    The Restaurant Platform industry as a whole demonstrates that Defendants' NPCCs are not a necessary element of their business.  Doordash, for example, does not impose these restrictions on restaurants that sell through its platform.  Public reporting on Doordash highlights this distinction:

> For a very long time GrubHub forced stores to sell at the exact same menu price that they offered in store – exactly what you're mentioning.  But then DoorDash came out and said, "Hey restaurant, you do whatever you want for your pricing, if you want to sell it on DoorDash at 10%, 15% higher, so forth."  So, lot[s] of restaurant clients really liked DoorDash as they could increase their prices to recover commission costs.

Another publication characterized this fact as a key "differentiator" for Doordash, explaining that Doordash's lack of NPCC was "a big win for restaurants" because it allows them to "increase prices on that platform to offset the delivery app's commission fees, without increasing the in-house restaurant list price."

77.    A 2016 *Bloomberg* article similarly reported:  "An explanation for DoorDash's price discrepancies can be found in a support document within the help section of the company's

website. It says partner restaurants may choose to charge customers more to make up for commissions paid to the delivery company."

78.    Defendants' NPCCs have forced consumers who purchase from restaurants directly or from other Restaurant Platforms to pay supracompetitive prices; have enabled Defendants to continue offering subpar technology and service; and have caused Restaurant Commission Rates to increase to such a degree that restaurants have been forced out of business. Defendants' NPCCs are anticompetitive and do not have any procompetitive justification.

**e.    Competition in the Restaurant Platform Market**

79.    Restaurant Platforms compete with each other for both delivery and takeout orders. For an order to occur, a Restaurant Platform needs to match a consumer and a restaurant. As a result, in competing for orders, Restaurant Platforms compete with each other for both consumers and restaurants.

80.    Restaurant Platforms exhibit indirect network effects, in that the value that they offer to one side of the platform is a function of the extent of the use of the other side of the platform. A Restaurant Platform that more consumers use is more valuable to restaurants, because the platform connects those restaurants with more consumers. Conversely, a Restaurant Platform that more restaurants use is more valuable to consumers, because that platform connects those consumers to more restaurants.

81.    These indirect network effects thus create a positive feedback loop for a market-leading Restaurant Platform. A Restaurant Platform that is popular with consumers is more attractive to restaurants and will therefore succeed in attracting more restaurants to the platform. Once more restaurants agree to use the platform, the platform becomes even more attractive to new consumers, who will also use that platform.

82.     In producing significant benefits to a market-leading Restaurant Platform, however, this positive feedback loop imposes significant barriers for smaller firms and new entrants. A small or new entrant cannot reasonably compete with larger Restaurant Platforms unless it can offer consumers a sufficient number of restaurants from which to choose. Conversely, the small or new entrant cannot realistically attract restaurants unless it can provide those restaurants with access to a sufficient number of consumers. Indirect network effects thus simultaneously make it easier for a market-leading firm to maintain its dominance and more difficult for a new entrant or smaller firm to establish a foothold.

83.     Even Amazon, for example, was unable successfully to break into the Restaurant Platform Market. As the *New York Times* explained: "Since it started in Seattle in 2015, Amazon Restaurants has struggled to gain a foothold in the restaurant delivery market," where "nearly 80 percent" of the market is controlled by "UberEats, Grubhub and DoorDash." Accordingly, in June 2019, Amazon Restaurants shut down.

84.     Indirect network effects alone, however, do not necessarily preclude new entrants or smaller firms from taking market share away from a market-leading firm. For example, one journalist explained that Doordash was able to take market share away from Grubhub by expanding the services that it offered.

> Grubhub's original model was a marketplace for consumers to order food from independent restaurants that already had their own delivery fleets. Though this was a game-changer for consumers, it constrained supply to only listing restaurants that could perform their own deliveries. This was a mistake.
>
> Postmates and DoorDash were the first to realize that if they could provide the broader group of restaurants that did *not* do delivery with the ability to do deliveries, they could dramatically increase the number of restaurants that could exist in the marketplace, thereby leapfrogging Grubhub's selection (and liquidity).

> Once they realized this Achilles heel, Postmates and DoorDash raced to exploit the vulnerability with a growth-at-all costs mentality. Grubhub was caught backfooted. Grubhub thought that they had saturated the market, but they had only saturated a subsection of the market—independent restaurants that made their own deliveries. Meanwhile, DoorDash, Postmates, Uber Eats, and all other food delivery startups were racing to capitalize on the newer, bigger definition of the category.

85.     In addition to increasing the size of the market, Restaurant Platforms have also sought to gain and protect their market shares in a number of other ways.

86.     On the restaurant side, for example, Restaurant Platforms have sought to prevent competitors from signing up additional restaurants by entering into exclusive agreements with those restaurants. For example, Grubhub has an exclusive deal with Yum Brands (KFC and Taco Bell), Doordash has an exclusive deal with Chili's and the Cheesecake Factory, and Uber used to have an exclusive deal with McDonald's.

87.     On the consumer side, Restaurant Platforms have sought to discourage consumers from using more than one Restaurant Platform, or "multihoming," by offering packages waiving the monthly service fee that have the economic effect of volume discounts.

88.     Restaurant Platforms could also compete by offering consumers and restaurants better technology or better service, by offering restaurants lower Restaurant Commission Rates, and by offering consumers lower Consumer Commission Rates. Defendants' conduct, however, including their NPCCs, has limited such forms of competition.

**f.      Competition in the Direct Takeout and Delivery Market**

89.     The restaurant industry is notoriously challenging. In 2018, there were approximately 650,000 restaurants in the United States, with about 60,000 opening and 50,000 closing every year. As this turnover indicates, the profit margins of restaurants are typically thin. According to Upserve, a company that provides restaurant-management software, restaurant profit

margins generally range from 0% to 15%. Because of these thin profit margins, restaurants generally need a significant number of sales to cover their fixed costs.

90.    In addition to sales through Restaurant Platforms, restaurants generate revenue by selling through both the Direct Takeout and Delivery Market and the Dine-In Market. These markets are distinct from each other because, for a consumer who wants to eat at home, a meal at a restaurant is not reasonably interchangeable with a takeout or delivery order. Likewise, for a consumer who wants to eat at a restaurant, a meal at home is not reasonably interchangeable with a meal at a restaurant. Consistent with this intuition, industry publications recognize a separate "off-premise market."

91.    Over the past several years, an increasing number of restaurants' takeout and delivery sales have been placed through Restaurant Platforms, such that the Restaurant Platform market is cannibalizing the Direct Takeout and Delivery Market. Analysis from Cowen indicates that the share of delivery orders placed online increased from approximately 26% in 2012 to 46% in 2017, with the prediction that they would rise to 73% by 2022. Morgan Stanley's research indicates that much of this growth occurred, and will continue to occur, on Restaurant Platforms: the proportion of online delivery orders through Restaurant Platforms increased from 41% in 2015 to 68% in 2018. Morgan Stanley projects that this number will increase to 87% by 2025.

92.    These market conditions mean that restaurants must work with Defendants, which each have a significant share of the fast-growing Restaurant Platform Market, to generate sufficient sales to turn a profit. As one restaurant owner has explained: "These delivery companies were never something I wanted to work with, but we have to. . . . We are a fast-casual restaurant. We are dependent upon volume to make any money." Another restaurant owner explained to *Forbes*: "These platforms are growing exponentially and have developed a primary relationship with

customers.  They are not providing a service; they are growing a network.  If you 'own' the customer, you can charge whatever you want, which is what they are doing."

93.    These are not mere anecdotes.  The *New York Times* has explained that Restaurant Platforms are so popular with consumers that "few restaurants can afford to opt out."  *Buzzfeed News* has explained that restaurants "have no choice to use them if they want to retain customers." *Food & Wine* has concluded:  "Most restaurant owners don't feel like they have a choice but to work with these platforms to survive."

94.    Accordingly, the vast majority of restaurants that offer takeout and delivery in the United States sell through Restaurant Platforms.  A survey from *Restaurant Owner* indicates that nearly 80% of independent restaurants that offer delivery do so through a third-party delivery service.

95.    The same survey indicates that nearly 60% of independent restaurants in the United States offer delivery.   Applying that percentage to all restaurants in the United States, approximately 390,000 restaurants in the United States (60% of 650,000 restaurants) offer delivery.  Approximately 300,000 of those 390,000 restaurants are on Grubhub; approximately 100,000 of those 390,000 restaurants are on Uber; and approximately 115,000 of those restaurants sell through Postmates.  In other words, approximately 77% of all restaurants in the United States that offer delivery do so through Grubhub, and more than a quarter of all restaurants in the United States that offer delivery do so through Uber and Postmates.

96.    In some markets, Restaurant Platforms have an especially strong stranglehold on restaurants.  In fact, even when *all* restaurants are considered (as opposed to just those that offer takeout and delivery), more than half of the restaurants in each Local Market (defined below) are

on Grubhub.  Similarly, more than half of all restaurants in San Francisco, Miami, Dallas, and

Atlanta are on Uber.[3]

| Local Market | Total Restaurants | Restaurants on Grubhub | Restaurants on Uber |
|---|---|---|---|
| New York | 24,000 | 15,000 *(63%)* | 6,900 *(29%)* |
| Chicago | 8,700 | 7,300 *(84%)* | 2,300 *(26%)* |
| Los Angeles | 11,600 | 11,000 *(95%)* | 2,200 *(19%)* |
| San Francisco | 4,400 | 4,000 *(91%)* | 4,100 *(93%)* |
| Miami | 6,000 | 4,300 *(72%)* | 5,100 *(85%)* |
| Phoenix | 5,000 | 4,100 *(82%)* | n/a |
| Dallas | 6,000 | 5,700 *(95%)* | 4,000 *(67%)* |
| Washington, DC | 3,000 | 1,500 *(50%)* | n/a |
| Boston | 3,000 | 2,500 *(83%)* | n/a |
| Philadelphia | 6,000 | 3,900 *(65%)* | n/a |
| Houston | 10,000 | 7,200 *(72%)* | n/a |
| Atlanta | 3,500 | 3,400 *(97%)* | 3,000 *(86%)* |

---

[3] Although these numbers are as of 2020, information produced in discovery indicates that Defendants' penetration rates have increased since then.

Although data for Uber is more limited, it is reasonable to infer that more restaurants use Uber in markets where Uber's sales exceed Grubhub's, such as Houston, Washington, D.C., and Phoenix. As a result, it is likely that more than 72% of all restaurants in Houston, 50% of all restaurants in Washington, D.C., and 82% of all restaurants in Phoenix are on Uber.

97.     Data for Postmates is not publicly available, but information that is available indicates that, throughout the United States, roughly as many restaurants are on Postmates as Uber. Moreover, it is reasonable to infer that in Los Angeles, a market where Postmates outsells Grubhub two-to-one, more restaurants use Postmates than Grubhub. The same is true with respect to Miami and Phoenix, where Postmates's sales also exceed Grubhub's. As a result, it is likely that more than 95% of all restaurants in Los Angeles, more than 72% of all restaurants in Miami, and more than 82% of all restaurants in Phoenix use Postmates.

98.     Defendants have even added restaurants to Defendants' platforms without their consent, forcing the restaurants to deal with them. One restaurant owner described her experience with Grubhub as follows:

> "If we don't sign up for this 'partnership' you pirate our menus off our website and take orders from customers anyway," continues Wade in the letter. "The pre-charged payment cards sometimes don't work and everything we made languishes, unpaid for. We field angry calls from customers who think it's our fault they didn't get the food they ordered. When my manager called customer service to tell you how unfair it is that we are paying for your mistakes, he was told 'Well, none of this would happen if you would just sign up with us.' Which sounds a lot like what the mob boss says after they burn down your house."

99.     Not only are restaurants forced to sell through a Restaurant Platform, they are typically compelled to sell through multiple Restaurant Platforms. This is because, in order to

reach enough consumers to cover their costs, restaurants need to access consumers that use different Restaurant Platforms.

100.    For example, Grubhub has over 22 million active users, Uber has at least 15 million, and Postmates has at least 10 million.  Although users of each platform are not mutually exclusive, there are many individuals who use only a single platform.  For example, nearly half of Grubhub users use only Grubhub.  The only way that a restaurant can access those consumers is to sell through Grubhub.  Likewise, 40% of Uber users use only Uber, and approximately 20% of Postmates users use only Postmates.

101.    The fact that many consumers are loyal to a single Restaurant Platform is not surprising and has little to do with platform quality.  One study from McKinsey concluded that Restaurant Platforms are "sticky," meaning that many consumers who sign up "never or rarely leave for another platform."  Various commentators have attributed this "stickiness" to high switching costs associated with online platforms.  *Yale Law Journal* has noted:  "Although competition for online services may seem to be 'just one click away,' research drawing on behavioral tendencies shows that the 'switching cost' of changing web services can, in fact, be quite high."  *Wired* has explained:  "As tech platforms amass more and more data to personally tailor their experience to a consumer, 'there is a pretty decent cost to switching.'"  *Vanderbilt Law Review* has highlighted platform "users' aversion to the cognitive costs of switching."

102.    Due to this "stickiness," Restaurant Platforms grow their networks of consumers primarily by buying up other Restaurant Platforms—not by winning new consumers over with a superior product.  For example, over the past ten years, Grubhub has acquired Dotmenu, Seamless, DiningIn, Restaurants on the Run, Delivered Dish, Eat24, Foodler, LevelUp, Tapingo, and OrderUp.  Likewise, Uber recently acquired Postmates.

103.    In addition to having to work with multiple Restaurant Platforms, restaurants are also forced to watch the growing Restaurant Platform Market cannibalize their sales in the Direct Takeout and Delivery Market.  For example, a New York City Hospitality Alliance survey indicates that, for 2 out of 3 restaurants, customers who previously ordered directly now order through Grubhub.  As *The New Yorker* has explained:

> Companies like GrubHub maintain that the revenue they bring restaurants is "incremental"—the cherry on top, so to speak, of whatever sales the place would have done on its own.  They also argue that delivery orders are a form of marketing, exposing potential new customers who might convert to lucrative in-restaurant patrons.  The problem is that as consumers use services like Uber Eats and Seamless for a greater share of their meals, delivery orders are beginning to replace some restaurants' core business instead of complementing it. . . .  And, as delivery orders replace profitable takeout or sit-down sales with less profitable ones—ostensibly giving restaurants business but effectively taking it away—the "incremental" argument no longer holds.  "It's total bullshit, and you can quote me on that," Justin Rosenberg, the C.E.O. of the Philadelphia-based fast-causal chain Honeygrow, told me.  "I've spoken to C.F.O.s of bigger fast-casuals, and they've said the same thing."

In other words, Restaurant Platforms have cannibalized restaurants' existing business by redirecting orders that used to flow to restaurants directly to instead flow through Restaurant Platforms.  As a result, Restaurant Platforms have increased restaurant costs without adding revenue, placing further pressure on restaurants to increase menu prices.

### g.    Competition in the Dine-In Market

104.    In addition to competing for orders in the Direct Takeout and Delivery Market, restaurants also compete for sales in the Dine-In Market.  Based on data from *Restaurant Owner*, approximately 60% of restaurants offer delivery (either themselves or through a Restaurant Platform) and thus compete in both markets.

105.    Sales in the Dine-In Market are more profitable to restaurants than sales in the Direct Takeout and Delivery Market.  As Thanx, a company specializing in customer engagement, has concisely explained, "Delivery profit margins aren't as high as dine-in margins."  This is because "[c]ustomers usually skip drinks when ordering in, which automatically cuts profits.  Plus, labor, packaging, and delivery fees are all higher, which eats into the profits."  *CNN* has likewise explained that consumers are "less likely to ask for menu items that carry higher margins— including soda and alcoholic drinks—when they order in, cutting deeper into profit from delivery." And the *Wall Street Journal* has noted:  "Delivery and packaging fees take a big cut of restaurant profits, and deliveries often don't include beverages, which provide high margins."

106.    Sales in the Dine-In Market are thus essential for a restaurant's survival, but Restaurant Platforms have jeopardized those sales.  Restaurant Platforms do not compete in the Dine-In Market, but they have nevertheless cannibalized sales in that market.  Research from Morgan Stanley indicates that, in 2017, "43% of consumers who ordered food for delivery say it replaced a meal at a restaurant."  According to the NPD Group, since 2014, "total visits to restaurants have declined more than 700 million visits."  And data from TDN2K Black Box Research shows that in-store traffic has steadily fallen at restaurants.

107.    Restaurant owners tell a similar story.  The *New York Times* provides an example:

> The major delivery companies have long argued that apps expose restaurants to new customers, allowing small businesses to tap into a network of tens of millions of online users and to benefit from the advertising muscle of multibillion-dollar companies.  Katie Norris, a Grubhub spokeswoman, said the service drove "incremental sales"—bringing in customers who would otherwise stay home and cook.

> "The incremental sales and traffic with higher average checks more than offset commission rates," she said.

> But that has not been the experience of Anil Bathwal, who runs the Kati Roll Company, a New York-based chain specializing in Indian street food.
>
> Mr. Bathwal did not have a large-scale delivery operation when his chain signed up with Seamless, and he said the service had initially brought him new business.  But over the years, third-party delivery has grown to account for as much as 30 percent of his sales, as existing customers—*those who used to eat at the restaurant*—have started using Seamless instead.
>
> "As time goes by, more and more of my existing customers are being cannibalized," said Mr. Bathwal, who estimates the delivery service has reduced his overall profits by 2 to 5 percent.

Based on this contrast between (i) Restaurant Platforms' promises to restaurants of more orders and (ii) the reality that the platforms cannibalize restaurants' dine-in business, one New York City councilman has characterized Restaurant Platforms as a "trojan horse" for restaurants.

### h.    Geographic Markets

108.    The relevant geographic markets regarding Defendants' conduct are the nationwide market (the "National Market") and the local markets described below, because Restaurant Platforms compete in the Restaurant Platform Market throughout the United States, at both the national and local level.

109.    Restaurant Platforms compete in the National Market because they compete nationwide to build a national network of consumers to offer restaurants, and a national network of restaurants to offer consumers.  Grubhub asserted in its most recent 10-K, for example, that its acquisition of Eat24 "expanded the breadth and depth of [its] national network of restaurant partners and active diners."

110.    Indeed, Restaurant Platforms (i) advertise their services nationwide; (ii) operate nationwide; (iii) charge restaurants the same Restaurant Commission Rates nationwide; (iv) charge the same Consumer Commission Rates nationwide; (v) provide the same exact services nationwide

through the same exact websites and mobile apps; and (vi) impose the same contractual restrictions—including, with respect to Defendants, the same NPCCs—on restaurants and consumers nationwide. Put simply, a consumer can use the same Restaurant Platform app regardless of whether he or she is in New York or San Francisco that day, and that app will operate, and affect the consumer and restaurant, in the exact same way.

111. In addition, Restaurant Platforms compete for important partnerships with national restaurant chains, such as McDonald's, Starbucks, and Chick-Fil-A, which they attempt to leverage to attract consumers who order from those restaurants to their platforms. A Restaurant Platform that successfully obtains an agreement with a popular chain may, for example, be able to attract that chain's consumers throughout the country and therefore increase its revenues.

112. Restaurant Platforms also compete locally in the Restaurant Platform Market. In particular, Restaurant Platforms compete with each other for both (i) listings from restaurants and (ii) delivery and takeout orders from consumers. Such competition is local because a consumer in one metropolitan area is highly unlikely to order food through a Restaurant Platform from a restaurant in a far-away metropolitan area, and because both Restaurant Platforms' and restaurants' delivery ranges are limited. To take an obvious example, for a consumer located in New York City, a takeout order from a restaurant in San Francisco is not a reasonable substitute for a takeout order from a restaurant in New York City. For the same reason, the relevant geographic market for the Direct Takeout and Delivery Market and the Dine-In Market is local. Indeed, restaurants generally compete with other restaurants in the same city, not with restaurants in far-away cities.

113. The local markets in which Restaurant Platforms compete in the Restaurant Platform Market, and the local markets in which restaurants compete in the Direct Takeout and Delivery Market and the Dine-In Market (the "Local Markets"), include New York City, Los

Angeles, Chicago, Dallas-Fort Worth, Houston, Washington, Miami, Philadelphia, Atlanta, Boston, Phoenix, and the San Francisco Bay Area.

       **i.**     **Defendants' Market Power**

     114.   <u>Defendants' High Market Shares</u>.  Defendants' high market shares evidence their market power in the Restaurant Platform Market.  Grubhub's market share is 31% nationwide and 67% in New York City.  Uber's market share is at least 20% nationwide and much higher in some local markets, such as Miami, where its market share is at least 55%.  Postmates' market share in Los Angeles, the second-largest city in the United States, is 37%.

     115.   <u>Defendants' Network of Restaurants</u>.  Defendants' market power is also demonstrated by the sheer number of restaurants that have no choice but to sell through Defendants' platforms.  Nearly half of all restaurants in the United States sell through Grubhub, and a much larger share of restaurants that offer delivery do so through Grubhub.  Similarly, more than 15% of all restaurants in the United States, and over a quarter of restaurants that offer delivery, sell through Uber and Postmates.

     116.   The numbers are even more striking in certain large Local Markets, such as New York City (nearly 65% of all restaurants sell through Grubhub), Chicago (approximately 85% of all restaurants sell through Grubhub), Dallas (approximately 95% of all restaurants sell through Grubhub), Philadelphia (approximately 65% of all restaurants sell through Grubhub), Boston (approximately 83% of all restaurants sell through Grubhub), Atlanta (approximately 97% of all restaurants sell through Grubhub), San Francisco (approximately 93% of all restaurants sell through Uber), Miami (approximately 85% of all restaurants sell through Uber), Houston (more than 72% of all restaurants sell through Uber), Washington, D.C. (more than 50% of all restaurants

sell through Uber), Phoenix (more than 82% of all restaurants sell through Uber and Postmates), and Los Angeles (more than 95% of all restaurants sell through Postmates).

117.    In addition to demonstrating that restaurants have no choice but to sell through Defendants' platforms, the size of each Defendant's network of restaurants also gives each Defendant the ability to impose supracompetitive pricing and substandard service on consumers.

118.    <u>Defendants' Network of Consumers</u>.    Defendants' market power is further demonstrated by the number of consumers that use Defendants' platforms.  More than 22 million people use Grubhub, more than 15 million use Uber, and approximately 10 million use Postmates. As explained above, to access these consumers, restaurants have no choice but to sell through Defendants' platforms.

119.    <u>Network effects</u>.  Indirect network effects further increase Defendants' market power.   In particular, Defendants' massive networks of restaurants and consumers create significant indirect network effects that inhibit smaller platforms from gaining market share.  For example, in a market where Grubhub is the market-leading platform, smaller platforms in that market cannot readily attract additional restaurants and consumers because, even if Grubhub increased its prices on both sides of the platform, consumers may be unwilling to switch to a platform with fewer restaurants, and restaurants may be unwilling to switch to a platform with fewer consumers.  Thus, a smaller platform's ability to constrain the behavior of a market-leading platform through competition is limited.

120.    <u>Platform stickiness</u>. Defendants' market power is compounded by the "stickiness" of their platforms.  As explained above, once a consumer becomes familiar with a Restaurant Platform, he or she is very unlikely to leave that platform for a competing service.  This enables

Defendants to charge higher prices and offer lower quality service to those consumers without losing their business.

121.    Because Defendants' platforms are "sticky," consumers remain loyal to a particular Defendant's platform.  As a result, restaurants must sell through multiple platforms in order to access consumers who use those platforms.  This dynamic enables even a platform that does not have the largest market share to impose supracompetitive pricing on restaurants and consumers.

122.    <u>Defendants' Supracompetitive Pricing for Restaurants</u>.  Defendants' ability to charge supracompetitive prices to restaurants without losing them as customers and without losing out on profit further demonstrates their market power in the relevant markets.

123.    Defendants charge a Restaurant Commission Rate between 15% and 30%, depending on the service being offered (*e.g.*, takeout, delivery orders that the restaurant delivers, or delivery orders that the platform delivers).  When Defendants provide delivery, they typically charge 30% Restaurant Commission Rates.  Uber charges restaurants 15% Restaurant Commission Rates even for customers who order only for pickup.  Similarly, Grubhub's own advertising material indicates that restaurants that rely on Grubhub for delivery can expect to pay more than 33% Restaurant Commission Rates.  And even in the face of legislation that prohibits Restaurant Platforms from charging Restaurant Commission Rates exceeding 15% during the COVID-19 pandemic, Postmates has reportedly "continue[d] to charge restaurants between 20 and 33 percent of each order."

124.    Lesser-known Restaurant Platforms that provide the same service as Defendants— allowing consumers to search for and order from restaurants in their area—charge significantly less.  For example, Foodetective provides the same exact service but, instead of charging sky-high commissions, charges only a "modest monthly subscription fee."  Similarly, Slice charges only a

small flat fee per order ($1.95), while Fare does not charge restaurants at all. And smaller Restaurant Platforms—*i.e.*, those other than Doordash and Defendants—that have adopted Defendants' commission model still charge more modest Restaurant Commission Rates than Defendants: Waitr charges between 15% and 25%, and Delivery.com charges 15%.

125.    Defendants have not always charged the high Restaurant Commission Rates that they charge today. Instead, as Defendants have become more essential to restaurants' very survival, and as their share of the restaurants' revenue has increased, Defendants have leveraged their market power over restaurants to substantially increase their Restaurant Commission Rates.

126.    Restaurant Platforms initially charged Restaurant Commission Rates between 10% and 12%. When it started in 2004, for example, Grubhub charged a 10% Restaurant Commission Rate. By 2015, Restaurant Platforms were "reportedly" charging Restaurant Commission Rates "as large as 18%." By that point, as noted, over 40% of online delivery orders were being placed through Restaurant Platforms. The following year, 2016, Grubhub charged between 12% and 24%, still significantly less than the current rate, but also much more than its initial 10% rate.

127.    With 80% of online delivery orders now placed through Restaurant Platforms, however, Defendants' Restaurant Commission Rates today are approximately 30%, or triple what they were initially. Basic principles of economics suggest that a firm that triples its price should *lose* revenue as restaurants and consumers flock to lower-price competitors. But Defendants' price increases have *not* resulted in Defendants losing market share or losing profit.

128.    Over the period from 2016 to 2019, Grubhub's revenue increased from approximately $500 million to over $1.3 billion. Uber's revenue from its Uber Eats brand more than quadrupled between 2017 and 2019. And Uber agreed to purchase Postmates for $2.65 billion in July 2020.

129.    Defendants have been able to substantially raise prices on restaurants without losing those restaurants or profit because, as explained above, market conditions compel restaurants to work with them.  For example, over 90% of restaurants surveyed that sell through Grubhub believe that Grubhub's fees are "unreasonable."  Defendants Uber and Postmates charge these same "unreasonable" fees.

130.    <u>Defendants' Supracompetitive Pricing for Consumers</u>.  Defendants' ability to charge supracompetitive prices to consumers further demonstrates their market power.  The *New York Times* has found, for example, that the markup for delivery orders through Defendants' Restaurant Platforms (*i.e.*, the difference between (i) the total price to the consumer when ordering through a platform, including fees imposed by Defendants, and (ii) the total price to the consumer when ordering directly from the restaurant) ranged from between 25% to 91%.  The author aptly characterized these prices as "downright egregious."  In particular, the *Times* found that the markup was 25% to 37% on Grubhub, 45% to 63% on Postmates, and 49% to 91% on Uber.

131.    Similarly, *Tech Crunch* found that, based on data from thirty restaurants in Los Angeles, New York, and San Francisco, consumers who ordered delivery from Postmates pay over 40% more than if they were to just order directly from the restaurant for takeout.  The markup was nearly 30% for Uber, and nearly 20% for Grubhub's Seamless brand.

132.    Moreover, although publicly available information regarding trends in fees imposed by Defendants on consumers is hard to come by, available data suggests that those fees, just like Defendants' Restaurant Commission Rates, have risen over time.  For example, data included in Grubhub's SEC filings indicates that, from 2014 through 2019, the *total commission rate* that Grubhub imposed on restaurants and consumers for using its platform increased by a staggering 156%.

133.    This does not even take into account the fact that restaurants that sell on Defendants' platforms typically need to increase their Restaurant List Prices—*i.e.*, the prices that they charge consumers for their food.  As explained below, Defendants' Restaurant Commission Rates are so high that restaurants typically must increase the prices that they charge on those platforms just to avoid losing money on every transaction.  These are costs that all restaurant consumers bear.

134.    Defendants' Profit Margins.  Consistent with the supracompetitive pricing that Defendants impose on both restaurants and consumers, Defendants see profit margins that restaurants could never attain.  For example, in a recent letter to shareholders, Grubhub indicated that its margins are nearly 40% when it provides delivery on behalf of independent restaurants. Previous filings from Grubhub show that its margins approach 80% when the restaurants provide their own delivery.  The same would be true when consumers order for takeout through Grubhub.

135.    Although the same information is not available for Uber and Postmates, the only reason that their margins would be lower than Grubhub's would be if they were less efficient.

136.    The fact that Defendants' margins are unreasonably high is confirmed by the fact that, as explained above, smaller platforms charge considerably lower fees.  Moreover, websites such as Google, Yelp, and Tripadvisor—which also enable consumers to search for and review restaurants—are free to both consumers and restaurants.

137.    Defendants' NPCCs.  Defendants' ability to impose their NPCCs on restaurants also demonstrates their market power.  These provisions, as explained just below, harm restaurants by limiting their ability to compete with Defendants.

138.    Defendants' Ability to Control Prices.  Combined with the significant number of restaurants that are forced to accept Defendants' NPCCs and the supracompetitive Restaurant

Commission Rates that Defendants charge, these NPCCs enable Defendants to control, or at minimum substantially affect, the prices charged by restaurants in the Direct Takeout and Delivery Market and the Dine-In Market.

      **j.**     **Anticompetitive Purpose and Effects of Defendants' NPCCs**

      *i.*     *Grubhub and Uber's NPCCs Prevent Restaurant Platforms from Competing on Price and Insulate Them from Competition*

139.    Grubhub and Uber's NPCCs limit price competition in the Restaurant Platform Market by fixing a key (and, in some cases, the only) component of the end-price paid by consumers for goods ordered through Restaurant Platforms, and by removing a powerful incentive for Restaurant Platforms to reduce Restaurant Commission Rates.

140.    Grubhub and Uber's NPCCs, as explained above, prohibit restaurants from listing their menu items on competing platforms for a lower price. This restriction is significant, "especially since many restaurants feel the need to list on more than one app." Grubhub thus recently touted that it offers "menu price parity with any other online ordering option."

141.    Given that Restaurant Platforms exhibit indirect network effects, as also explained above, Restaurant Platforms must attract a sufficient number of consumers and restaurants in order to survive. Ordinarily, like any platform, a Restaurant Platform could attract consumers by offering them lower prices—that is, lower Restaurant List Prices. Likewise, ordinarily, a Restaurant Platform could attract restaurants by offering them lower prices—that is, lower Restaurant Commission Rates.

142.    Absent Grubhub and Uber's NPCCs, given the limits of stickiness, a competing Restaurant Platform could thus attract consumers by offering restaurants lower Restaurant Commission Rates to induce those restaurants to provide lower Restaurant List Prices. For example, a restaurant may be willing to offer a lower Restaurant List Price to a Restaurant Platform

that charges a 15% Restaurant Commission Rate, instead of a 30% Restaurant Commission Rate (like Defendants).

143.    If successful, this pricing strategy would make the competing platform more attractive to consumers because it would provide them with lower Restaurant List Prices, which are a key component of the end-price that they pay for delivery and takeout orders.  In fact, for orders for which Restaurant Platforms do not charge delivery fees or commissions to consumers, Restaurant List Prices *are* the end-prices that consumers pay.  Accordingly, reducing that price would draw more consumers to the platform.  This pricing strategy would make the platform more attractive to restaurants as well, because it would provide them with lower Restaurant Commission Rates.  All else equal, a restaurant would prefer to sell on a Restaurant Platform that charges a 15% Restaurant Commission Rate as opposed to a Restaurant Platform that (like Defendants) charges a 30% Restaurant Commission Rate.

144.    Grubhub and Uber's NPCCs, however, eliminate even the possibility of a competing platform engaging in this strategy.  Because these NPCCs prohibit restaurants from providing competing platforms with lower Restaurant List Prices, competing platforms have no incentive to offer restaurants lower Restaurant Commission Rates to induce those restaurants to lower their Restaurant List Prices.  Grubhub and Uber's NPCCs thus discourage competing platforms from reducing their Restaurant Commission Rates.  For this reason, Restaurant Commission Rates are essentially uniform (30%) among the largest Restaurant Platforms.

145.    At the same time, Grubhub and Uber's NPCCs create an incentive for Grubhub and Uber to continually increase their Restaurant Commission Rates, as they have over the past fifteen years.  By increasing their Restaurant Commission Rates, Grubhub and Uber can increase their

revenue without any concern that consumers will flee to a competing platform with lower Restaurant List Prices.

146.    The most fundamental and anticompetitive feature of Grubhub and Uber's NPCCs is that they prevent a restaurant from choosing—for *any reason*—to charge a lower Restaurant List Price on a competing platform.  As a result, Grubhub and Uber's NPCCs flatly eliminate competition among Restaurant Platforms on Restaurant List Prices, thereby preventing competing platforms from offering lower Restaurant List Prices to consumers.  For many consumers, as noted, Restaurant List Prices are the end-prices consumers pay.  Grubhub and Uber's NPCCs thus effectively fix the end-price that consumers pay when they order through Restaurant Platforms.

147.    Grubhub and Uber's NPCCs serve to insulate them from competition on *both* sides of the market, by fixing the Restaurant List Price, which is a key component of the price paid by consumers, and by discouraging competing Restaurant Platforms from offering lower Restaurant Commission Rates.  This insulation has enabled Grubhub and Uber to hike up Restaurant Commission Rates, forcing consumers and restaurants alike to pay higher prices, without fear of being undercut by competing Restaurant Platforms.  Without the ability to offer lower Restaurant List Prices, competing platforms are blocked from creating the positive feedback loop needed to survive in the Restaurant Platform Market because they lose the primary (and to many consumers, only) means of attracting consumers to their platform and as a result are unable to attract more restaurants.  Anyone with an understanding of the market is unlikely to even attempt to enter.

148.    This is an intended and predictable consequence of Grubhub and Uber's NPCCs.  As the *Yale Law Journal* has reported:  "The leading theoretical analysis by economists Andre Boik and Kenneth Corts finds that platform [NPCCs] lead to higher platform fees, drive up retail prices, and discourage entry by firms with lower cost business models."

149.    In addition to enabling Grubhub and Uber to increase Restaurant Commission Rates, this insulation resulting from Grubhub's and Uber's NPCCs has also stalled technological development in the Restaurant Platform Market. *Tech Crunch* has reported, for example, that "the primary differentiation between delivery apps today is not based on innovations that meaningfully impact user experience." The *Tribeca Citizen*, in an article titled "Why Restaurants Hate GrubHub Seamless," characterized the state of technology in the Restaurant Platform Market as follows: "The technology stinks." By 2016, Grubhub "still [hadn't] found a way to integrate their current technology into restaurant point-of-sale systems—or even a single tablet."

150.    Similarly, Grubhub and Uber offer very poor service to restaurants. As the *Washington Post* recently explained: "Virtually every restaurant person has a nightmare story about the apps botching their menus and hours of operations." One survey indicated that less than 10% of responding restaurants had "a positive experience with Grubhub/Seamless."

151.    Grubhub and Uber perform no better for consumers. According to SiteJabber, a website that allows consumers to rate businesses, Grubhub "ranks 95th among Food Delivery sites," with an average "rating of 1.18 stars from 2,666 reviews." Uber is only slightly better—it "ranks 73rd among Food Delivery sites," with an average rating of 1.76 stars. These overwhelmingly negative reviews are hardly shocking in light of recent survey results that show that *more than 25%* of delivery drivers for Restaurant Platforms have sampled customers' food before delivering it.

152.    A recent study by Zion & Zion identified a litany of other issues that consumers experience with Restaurant Platforms. Nearly 30% of the time, the food arrives at the wrong temperature; 28% of the time the food is unacceptably late; and another 21% of the time,

consumers receive the wrong dish.  According to the study, more than half of consumers that receive the wrong dish or receive their food late are "very frustrated."

153.    Moreover, the high Restaurant Commission Rates—which flow directly from Defendants' NPCCs—reduce consumer choice.  Because the Restaurant Commission Rates are so high, restaurants are unable to offer lower-margin items through Defendants' platforms.  As one industry expert explained:  "Restaurants, in response, will continue to rethink delivery in 2019 by creating separate menus with higher margin food items—items that are inexpensive to make, like French fries, but cost the customer more."  This is precisely what has happened, as many restaurants now offer a limited menu for delivery.

> ### ii.    Defendants' NPCCs Preclude Restaurants from Competing on Price with Defendants in the Direct Takeout and Delivery Market and the Dine-In Market

154.    While only Grubhub and Uber restrict price competition across Restaurant Platforms, all of Defendants' NPCCs have both the purpose and effect of precluding restaurants from competing directly on price with Defendants in the Direct Takeout and Delivery Market and the Dine-In Market.

155.    Defendants' NPCCs prohibit restaurants from selling menu items at a lower price to consumers who order directly from restaurants, regardless of whether those orders are for takeout, delivery, or dine-in, and regardless of whether those orders are made online, in person, or over the phone.  Under these NPCCs, for example, a restaurant that lists an item on Defendants' platform for $10 is contractually prohibited from selling that item for $9 to a consumer who calls the restaurant to order that item for takeout.

156.    It is easy to see why a restaurant would want to offer lower prices to consumers who order directly from the restaurant than to consumers who order through Defendants' platforms.  Whenever a restaurant sells through Defendants' platforms, the restaurant must pay a

hefty Restaurant Commission Rate.  In fact, Defendants' Restaurant Commission Rates often *exceed* restaurants' profit margins.  As a result, restaurants cannot make any money selling through Defendants' platforms unless restaurants increase the prices of their menu items.  As one Colorado restaurant owner explained, the "[c]ommissions are too high to maintain a profit," so restaurants are "forced to either raise prices to maintain a profit or lose money on delivery orders."

157.    With respect to Uber and its 30% Restaurant Commission Rate, for instance, *Forbes* has explained as follows:

> The problem here is that the average profit margin for a restaurant is under 30%.  Fast food such as McDonalds reported profit margins about 22% in 2017.  Casual dining or family style restaurants have a profit margin between 5% to 10%.  Lastly, full-service restaurants such as fine-dining have average profit margins of about 6.1%.
>
> Based on the average profit margins above, every restaurant that engages Uber Eats will lose money on every order they take.  The more orders coming from Uber Eats, the more money a restaurant would lose.

158.    The natural and predictable result of Defendants' NPCCs is that restaurants must increase their prices when they sell on Defendants' platforms.  For example, in 2019 the New York City Hospitality Alliance found that 64.1% of restaurants either raised menu prices or considered raising menu prices to offset fees from Grubhub.

159.    This data is supported by countless anecdotes.  In Milwaukee, "Alexa Afaro of the Filipino restaurant and food truck Meat on the Street said they've had to raise prices to help off set some of the additional costs of delivery commissions."  In San Francisco, as reported by the SFist in 2015, another restaurant owner explained that he would be forced to raise prices in response to high commissions.  *Restaurant Business* provides another example:

> When the Habit Burger Grill began offering delivery to its customers last year, the company did something a bit different.

It upcharged delivery orders by 25%.

"At the end of the day, with the commission structures the way they are, someone has to pay for that convenience," CEO Russ Bendel said on an upcoming episode of *Restaurant Business'* podcast, "A Deeper Dive."

It's an increasingly common strategy. Chains, eager to jump on board to an increasingly popular service but worried about the impact such fees can have on their business, have started charging delivery customers higher prices.

*Tech Crunch* interviews with restaurant owners likewise indicate that many restaurants "increase on-app list prices when selling through delivery apps as a way of offsetting the up to 30% fee the delivery apps charge."

160.    This strategy of increasing "on-app list prices when selling through delivery apps" is unavoidable for any restaurant with profit margins below Defendants' Restaurant Commission Rates. For example, a restaurant with a 10% profit margin can ordinarily make $2 whenever it sells $20 in food. But if the restaurant is also forced to pay a 30% Restaurant Commission Rate on top of its existing costs, then the restaurant would *lose* $4 whenever it sold the same items for $20. Just to break even, the restaurant would need to increase its prices from $20 to $26. To make the same $2, the restaurant would have to increase its prices from $20 to $29.

161.    Defendants' Restaurant Commission Rates thus force restaurants to increase the prices of items listed on Defendants' platforms. Compounding the anticompetitive effect, Defendants' NPCCs force restaurants to charge consumers who buy directly from restaurants, or through a competing Restaurant Platform, *those same inflated prices*.

162.    If restaurants do not raise their prices in response to Defendants' commissions, moreover, Defendants' NPCCs still result in higher prices for consumers who buy from those restaurants in the Direct Takeout and Delivery Market and the Dine-In Market. Absent

Defendants' NPCCs, restaurants would be motivated to encourage consumers to buy directly from them (where restaurants' profit margins are higher), as opposed to ordering through Defendants' platforms (where restaurants are required to pay substantial commissions). Restaurants could achieve this goal by charging lower prices in the Direct Takeout and Delivery Market and the Dine-In Market than through Defendants' platforms. Because there is *some* cross-elasticity between these markets, this strategy would likely be successful. For example, Thanx—a company specializing in consumer engagement—has characterized this strategy as a "powerful" way for restaurants to increase their profitability. Yet this strategy is foreclosed by Defendants' NPCCs.

163. In sum, coupled with their exorbitant Restaurant Commission Rates, Defendants' NPCCs prevent restaurants from charging consumers who buy directly from restaurants (or through competing Restaurant Platforms) lower prices, *even though* restaurants *would* charge lower prices to consumers who buy directly from restaurants (or through competing Restaurant Platforms) but for Defendants' NPCCs. In short, the NPCCs force consumers to pay higher prices.

164. The impact of Defendants' NPCCs in the Direct Takeout and Delivery Market and Dine-In Market is not limited to increased prices for consumers. These NPCCs have insulated Defendants from competition and enabled them to increase their Restaurant Commission Rates with impunity. These rates are so high that they are driving many restaurants out of business, thereby reducing consumer choice. As the *New York Times* has reported:

> For Paul Geffner, the growing popularity of food-delivery apps has hurt. He has run Escape from New York Pizza, a small restaurant chain in the Bay Area, for three decades, relying on delivery orders as a major source of revenue.
>
> After he offered delivery through the apps in 2016, his business teetered. Two of his five pizzerias, which together had generated annual profits of $50,000 to $100,000, lost as much as $40,000 a year as customers who had ordered directly from Escape From New

> York switched to the apps. That forced Mr. Geffner to pay the commissions.
>
> "We saw a direct correlation between the delivery services and the reduction of our income," Mr. Geffner said. "It was like death by a thousand cuts."

*NPR* provides a similar example: "With already thin profit margins further diluted by the app fees, Bathwal could not justify keeping his six locations open. He temporarily shuttered all of his restaurants with hopes of reopening, when he can, on a pared-down menu emphasizing items that are the most affordable to make."

### iii.    Defendants Use Their NPCCs to Control Prices in the Direct Takeout and Delivery Market and Dine-In Market

165.    Although Defendants do not directly participate in the Direct Takeout and Delivery Market or the Dine-In Market, they use their NPCCs to directly restrain and manipulate prices in those markets.

166.    Each Defendant's NPCC forces restaurants that operate in those markets to charge the same price as they charge when they sell meals in the Restaurant Platform Market through Defendants' platforms. As explained above, these provisions prevent restaurants from competing on price with Defendants. Thus, once consumers move from the Direct Takeout and Delivery Market and Dine-In Market to Defendants' platforms, restaurants cannot pull those consumers back to the former markets by offering those consumers lower prices. It is therefore no surprise that the Restaurant Platform Market has, for years, cannibalized sales from both the Direct Takeout and Delivery Market and the Dine-In Market.

167.    Of course, this is precisely the intent of Defendants' NPCCs—to increase the size of the Restaurant Platform Market, and to guard against consumers leaving that market, even if it comes at the cost of harming the Direct Takeout and Delivery Market and the Dine-In Market.

168.    The fact that the Restaurant Platform Market is, for antitrust purposes, a separate market from the Direct Takeout and Delivery Market and the Dine-In Market is not inconsistent with that intent.  There is some cross-elasticity between these markets and the Restaurant Platform Market, and that cross-elasticity is higher (*i.e.*, there is more switching between markets) when, as is the case now, Restaurant Platforms are already charging supracompetitive prices.  Indeed, Defendants' NPCCs are at their most useful to Defendants when they are charging supracompetitive prices to consumers and restaurants.  Under such circumstances, consumers would be, absent the NPCCs, especially willing to switch back to the Direct Takeout and Delivery Market and the Dine-In Market.

169.    In addition to directly restraining prices in the Direct Takeout and Delivery Market and the Dine-In Market, Defendants drive the prices charged by restaurants in those markets.  In particular, the *amount* that restaurants increase prices in those markets is driven by Defendants, who set the Restaurant Commission Rates.

170.    Accordingly, in tandem with the Restaurant Commission Rates, Defendants' NPCCs both drive and substantially affect the prices in the Direct Takeout and Delivery Market and the Dine-In Market.  The fact that Defendants are able to achieve such results demonstrates that Defendants possess the ability to control prices in both the Direct Takeout and Delivery Market and the Dine-In Market.

### iv.    Defendants' NPCCs Restrict Interbrand Competition in the Direct Takeout and Delivery Market and the Dine-In Market

171.    Defendants' NPCCs are so pervasive that they do far more than inhibit intrabrand competition (*i.e.*, competition for sales of goods from a particular restaurant).  Those NPCCs inhibit *interbrand* competition in the Direct Takeout and Delivery Market and the Dine-In Market.  As explained above, a significant portion of *all* restaurants in the United States are bound by

Defendants' NPCCs.  An even higher percentage of restaurants that offer delivery in the United States are bound by Defendants' NPCCs.

172.    Defendants' NPCCs make it more difficult for restaurants bound by those provisions to compete on price in the Direct Takeout and Delivery Market and the Dine-In Market. As explained above, restaurants bound by Defendants' NPCCs typically need to increase their prices in the Direct Takeout and Delivery Market and the Dine-In Market in order to avoid losing money on each transaction in the Restaurant Platform Market.  But that is not the only way in which Defendants' NPCCs inhibit restaurant pricing in the Direct Takeout and Delivery Market and the Dine-In Market.

173.    Importantly, even if restaurants *do not* raise their prices in response to Defendants' Restaurant Commission Rates, Defendants' NPCCs *still* result in higher prices for consumers who buy from those restaurants.  This is because, absent the NPCCs, restaurants would compete freely with each other on price in the Direct Takeout and Delivery Market and Dine-In Market, including by offering discounted menu item prices to attract additional consumers.  Defendants' NPCCs discourage those restaurants from offering any discounts in those markets because, if the restaurant reduces its prices to consumers in those markets, then the restaurant would have to also reduce its prices on Defendants' platforms.  For a restaurant that has not already raised its prices in response to Defendants' commissions, this would only compound that restaurant's losses for its sales on Defendants' platforms.

174.    This result—less discounting in the Direct Takeout and Delivery Market and Dine-In Market—is entirely predictable.  As the Department of Justice explained nearly five years ago, "Under an [NPCC] the low price offered on a particular contract becomes not just a one-time opportunity for the firm offering the discount to gain some incremental sales volume, but rather

an occasion for across-the-board revenue losses as many of the firm's contract prices are reset."
In other words, NPCCs make discounting more expensive, and therefore less attractive, for would-
be discounters.

175.    Defendants' NPCCs thus force restaurants to increase their prices in the Direct
Takeout and Delivery Market and the Dine-In Market, while also discouraging restaurants from
offering discounted menu items in those markets.

176.    Because such a large percentage of restaurants in the Direct Takeout and Delivery
Market and the Dine-In Market are bound by Defendants' NPCCs, and therefore encouraged to
increase their prices and discouraged from offering discounted menu items, Defendants' NPCCs
reduce price competition *between* restaurants in both the Direct Takeout and Delivery Market and
the Dine-In Market.  For example, in New York, almost 65% of *all* restaurants are on Grubhub.
These restaurants are forced to increase their prices in the Takeout and Deliver Market and the
Dine-In Market or are, in effect, precluded from offering discounts to consumers in those markets.

> ### *v.    The Substantial Anticompetitive Costs of Defendants' NPCCs Outweigh Any Procompetitive Benefits*

177.    The anticompetitive costs of Defendants' conduct, as shown, are substantial.  As a
direct result of Defendants' conduct, consumers are forced to pay supracompetitive prices for
goods from any restaurant that must use Defendants' platforms; consumers and restaurants must
use Restaurant Platforms that offer inferior technology and service; and consumers are left with
fewer restaurants from which to choose.

178.    Consistent with empirical research from economists regarding NPCCs generally,
Defendants' NPCCs harm consumers and competition.  Consumer prices fell, as just one example,
when European countries banned online travel agencies from using NPCCs.

179.    These substantial anticompetitive costs outweigh any procompetitive justification. Defendants' NPCCs, for example, do not protect Defendants from free-riding.  With very few exceptions, consumers who use Defendants' platforms do so because the platforms are convenient, not to discover new restaurants and then order directly from those restaurants.  The notion that such consumers would be willing to spend more time than necessary to place an order for takeout or delivery is unreasonable and unsupported.  Doordash's ability to compete with Defendants without such NPCCs is proof that such restrictions are not necessary for Restaurant Platforms to offer consumers the benefits of their platform.

180.    In prohibiting restaurants from charging lower prices to consumers who purchase directly from restaurants in the Direct Takeout and Delivery Market and Dine-In Market, moreover, Defendants' NPCCs directly restrain prices in markets in which Defendants do not even participate.  There can be no procompetitive justification for this type of restraint.

181.    In addition, no rationale concerning free-riding can explain why Grubhub and Uber's NPCCs prohibit restaurants from offering lower Restaurant List Prices on competing Restaurant Platforms.

182.    As the *Yale Law Journal* has reported, in scrutinizing provisions that are nearly identical to those imposed by Defendants here, European regulators have repeatedly concluded that the provisions are anticompetitive and have banned them—resulting in lower prices for consumers.  Restaurant consumers in the United States deserve the same result.

## V.    CLASS INJURY AND STANDING

183.    Plaintiffs and each class have suffered injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' act unlawful.

184.    Plaintiffs and each class allege that Defendants' anticompetitive conduct has caused them to pay supracompetitive prices.  Such an injury is plainly of the type the antitrust laws were intended to prevent.

185.    Defendants' misconduct has directly caused this injury to Plaintiffs and each class. Plaintiffs and each class are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in paying reasonable rather than supracompetitive prices.

## VI.    CLASS ALLEGATIONS

186.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of three classes, which may comprise subclasses, to be defined based on discovery.

187.    The first class comprises all persons or entities in the United States who have purchased goods, for takeout from or delivery by the restaurant, directly from a restaurant subject to any Defendant's NPCC (the "Direct Takeout and Delivery Class").

188.    The second class comprises all persons or entities in the United States who have purchased goods, for dining in the restaurant, from a restaurant subject to any Defendant's NPCC (the "Dine-In Class").

189.    The third class comprises all persons or entities in the United States who have purchased goods, through a non-Defendant Restaurant Platform, from a restaurant subject to Grubhub's or Uber's NPCCs (the "Restaurant Platform Class").

190.    These classes exclude (i) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

191.    Plaintiffs reserve the right to amend any of these class definitions if further investigation, discovery, or both indicate that such definitions should be narrowed, expanded, or otherwise modified.

192.    The members of each class are so numerous that joinder of all members is impracticable.  The precise number of members of each class is unknown to Plaintiffs at this time, but it is believed to be in the millions.

193.    Defendants have acted on grounds that apply generally to the members of each class, so that final injunctive relief is appropriate respecting each class as a whole.

194.    Common questions of law and fact exist as to all members of each class and predominate over any questions solely affecting individual members of each class.  Such common issues include:

(a) Whether each Defendant has market power in the Restaurant Platform Market;

(b) Whether each Defendant's NPCC produces substantial anticompetitive effects, without procompetitive justification, in the Restaurant Platform Market, the Direct Takeout and Delivery Market, and the Dine-In Market;

(c) Whether any procompetitive efficiencies from each Defendant's NPCC could be achieved through less anticompetitive means; and

(d) Whether, and to what extent, each Defendant's NPCC caused Plaintiffs to suffer antitrust injury.

195.    Plaintiffs' claims are typical of the claims of the other members of each class they seek to represent.  Defendants' practices have targeted and affected all members of each class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' practices.

196.    Plaintiffs will continue to fully and adequately protect the interests of the members of each class.  Plaintiffs have retained counsel competent and experienced in antitrust class actions. Plaintiffs have no interests in conflict with those of any class.

197.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

198.    The prosecution of separate actions by individual members of each class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the classes.

199.    A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

200.    The interests of the members of each class in individually controlling the prosecution of separate actions are theoretical rather than practical.  The classes each have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  As the damages suffered by some of the individual class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of each class to individually redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

201.    WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Class Representatives, that Freedman Normand Friedland LLP and Frank LLP be named Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to each class.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 1 of the Sherman Act
### With Respect to the Direct Takeout and Delivery Market and the Dine-In Market
### (by the Direct Takeout and Delivery Class and the Dine-In Class)
### (Against Defendants)

202.    Plaintiffs incorporate the allegations above.

203.    At all times throughout the Class Period, Defendants possessed (i) market power in the Restaurant Platform Market in the National Market and the Local Markets, and (ii) market power in the Direct Takeout and Delivery Market and Dine-In Market in the Local Markets.

204.    This market power is demonstrated by Defendants' ability to profitably impose supracompetitive pricing on both restaurants and consumers in these markets.

205.    Under section 1 of the Sherman Act, Defendants' NPCCs constitute vertical agreements with restaurants in restraint of trade or commerce among the several States.

206.    Defendants' NPCCs constitute unreasonable restraints of trade because they have produced substantial anticompetitive effects in the Direct Takeout and Delivery Market and the Dine-In Market in the Local Markets without procompetitive justification.

207.    Defendants' NPCCs have reduced price competition in these markets by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants and, in the case of Grubhub and Uber, prohibiting restaurants from offering lower prices through competing Restaurant Platforms.

208.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

209.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

210.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

## COUNT II
### Violations of Section 1 of the Sherman Act
### With Respect to the Restaurant Platform Market
### (by the Restaurant Platform Class)
### (Against Grubhub and Uber)

211.    Plaintiffs incorporate the allegations above.

212.    At all times throughout the Class Period, Grubhub and Uber possessed market power in the Restaurant Platform Market in both the National Market and the Local Markets.

213.    This market power is demonstrated by Grubhub and Uber's share of the Restaurant Platform Market in these geographic markets, as well as, among other things, their ability to profitably impose supracompetitive pricing on both restaurants and consumers in those markets.

214.    Under section 1 of the Sherman Act, Grubhub and Uber's NPCCs constitute vertical agreements with restaurants in restraint of trade or commerce among the several States.

215.    Grubhub and Uber's NPCCs constitute unreasonable restraints of trade because they have produced substantial anticompetitive effects in the Restaurant Platform Market in both the National Market and Local Markets without procompetitive justification.

216.    Grubhub and Uber's NPCCs have reduced price competition in these markets by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants and by prohibiting restaurants from offering lower prices through competing Restaurant Platforms.

217.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

218.     Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

219.     Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

## COUNT III
### Violations of State Antitrust Laws – Agreement in Restraint of Trade
### With Respect to the Direct Takeout and Delivery Market and the Dine-In Market
### (by the Direct Takeout and Delivery Class and Dine-In Class)
### (Against Defendants)

220.     Plaintiffs incorporate the allegations above.

221.     At all times throughout the Class Period, Defendants possessed (i) market power in the Restaurant Platform Market in the National Market and the Local Markets, and (ii) market power in the Direct Takeout and Delivery Market and Dine-In Market in the Local Markets.

222.     Defendants' NPCCs constitute vertical agreements with restaurants in restraint of trade.  These agreements unreasonably restrain trade by producing substantial anticompetitive effects in the Direct Takeout and Delivery Market and Dine-In Market in the Local Markets without procompetitive justification.

223.     Such conduct violates the following state antitrust laws:

a.   Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona;

b.   Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

c.   D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

d.   Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

e.   740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

    f.  Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; and

    g.  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York;

224.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

225.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

<u>**COUNT IV**</u>
**Violations of State Antitrust Laws – Agreement in Restraint of Trade**
**With Respect to the Restaurant Platform Market**
**(by the Restaurant Platform Class)**
**(Against Grubhub and Uber)**

226.    Plaintiffs incorporate the allegations above.

227.    At all times throughout the Class Period, Grubhub and Uber possessed market power in the Restaurant Platform Market in the National Market and Local Markets; their NPCCs are anticompetitive agreements that unreasonably restrain trade in those markets; and their anticompetitive conduct has proximately harmed Plaintiffs.

228.    Such conduct violates the following state antitrust laws:

    a.  Ala. Code § 6-5-60 *et seq.*, which respect to purchases in Alabama;

    b.  Alaska Stat. §§ 45.50.562, 45.50.576(a), (b), with respect to purchases in Alaska;

    c.  Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona;

    d.  Ark. Code Ann. § 4-75-212(b), *et seq.*, with respect to purchases in Arkansas;

    e.  Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

    f.  D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

    g.  Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

h.  Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii;

i.  740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

j.  Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa;

k.  Kansas Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas;

l.  Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts;

m.  Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine;

n.  Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan;

o.  Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota;

p.  Miss. Code Ann. § 75-21-1, *et seq.*, with respect to purchases in Mississippi;

q.  Missouri Stat. § 416.011, *et seq.*, with respect to purchases in Missouri;

r.  Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska;

s.  Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada;

t.  N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire;

u.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico;

v.  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York;

w.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina;

x.  N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota;

y.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon;

z.  P.R. Laws Ann. Tit. 10, § 257, *et seq.*, with respect to purchases in Puerto Rico;

aa. R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases in Rhode Island;

bb. S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*, with respect to purchases in South Dakota;

cc. Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee;

dd. Utah Code § 76-10-3101, *et seq.*, with respect to purchases in Utah;

ee. Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont;

ff. W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia; and

gg. Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases in Wisconsin.

229. As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

230. Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

## DEMAND FOR JURY TRIAL

231. Plaintiffs respectfully demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the classes;

(b) Require Defendants to pay for sending notice to the certified classes;

(c) Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(d) Issue an injunction to enjoin Defendants from continuing to engage in the anticompetitive conduct alleged in this Complaint;

(e) Award compensatory damages to Plaintiffs and the proposed classes in an amount to be established at trial;

(f) Award treble damages as permitted by law;

(g) Award pre- and post-judgment interest;

(h) Award reasonable attorneys' fees and costs; and

(i) Award any other and further relief as may be just and proper.

Dated:  September 30, 2025                    Respectfully submitted,
   New York, NY


             */s/ Edward Normand*
             Edward Normand
             Kyle W. Roche
             Stephen Lagos
             **FREEDMAND NORMAND FRIEDLAND LLP**
             155 E. 44th Street, Suite 915
             New York, NY 10017
             Tel: (646) 494-2900
             tnormand@fnf.law
             kroche@fnf.law
             slagos@fnf.law

             Richard Cipolla
             John Super
             **FREEDMAND NORMAND FRIEDLAND LLP**
             225 Franklin Street, 26th Floor
             Boston, MA 02110
             Tel: (617) 374-3700
             rcipolla@fnf.law
             jsuper@fnf.law

             Gregory A. Frank
             Marvin L. Frank
             Asher Hawkins
             **FRANK LLP**
             305 Broadway, Suite 700
             New York, NY 10007
             Tel: (212) 682-1853
             gfrank@frankllp.com
             mfrank@frankllp.com
             ahawkins@frankllp.com

             *Counsel for Plaintiffs*