**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ADAM BENSIMON, PHILIP ELIADES,
JONATHAN SWABY, JOHN BOISI,
NATHAN OBEY, MALIK DREWEY,
ANTWAN ROBINSON, BENJAMIN
FINER, JASMINE PIERCE, ABOUBAKRY
DIACKO, ANNA MARQUEZ, JARED
SWOOPE, PHILIP SMITH, CHRISTOPHER
CRUZ, DUSTIN ROBERTS, MISTY
WILLIAMS, ROBERT CURRIE, ARLESIA
BENJAMIN, MARCUS ROBINSON,
LEWIE LEWIS, MAURICE RAGLAND,
and EMROY CAESAR, individually and on
behalf of all others similarly situated,

      Plaintiffs,

v.

GRUBHUB INC., UBER TECHNOLOGIES,
INC., and POSTMATES INC.,

      Defendants.

Civ. No. 1:20-cv-03000-LAK

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS**
**CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................................................iii

INTRODUCTION .............................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................................. 2

I.      PLAINTIFFS' CLAIMS AND THE PROPOSED CLASSES ........................................... 2

II.     DEFENDANTS OPERATE RESTAURANT PLATFORMS............................................. 4

III.    DEFENDANTS COMPETE IN THE RESTAURANT PLATFORM MARKET ............. 4

IV.     THE RESTAURANT PLATFORM MARKET IS HIGHLY CONCENTRATED
        AND HAS HIGH BARRIERS TO ENTRY ........................................................................ 6

V.      DEFENDANTS HAVE ███████████ IN THE RESTAURANT
        PLATFORM MARKET......................................................................................................... 7

VI.     DEFENDANTS DICTATE TERMS TO RESTAURANTS ............................................... 7

VII.    RESTAURANTS COMPETE LOCALLY IN DIRECT MARKETS................................ 9

VIII.   DEFENDANTS' COMMISSIONS ENCOURAGE RESTAURANTS TO
        INCREASE ON-PLATFORM PRICES RELATIVE TO DIRECT PRICES ................... 10

IX.     DEFENDANTS IMPOSED NPCCS ON RESTAURANTS ............................................. 11

        A.      Grubhub's NPCCs....................................................................................................... 11

        B.      Uber's NPCCs............................................................................................................. 13

        C.      Postmates' NPCCs ...................................................................................................... 16

X.      DEFENDANTS' NPCCS WERE EFFECTIVE ................................................................ 16

XI.     DEFENDANTS' NPCCS HARMED THE CLASSES ...................................................... 17

        A.      Defendants' NPCCs drive commissions and prices upward................................. 17

        B.      Defendants' NPCCs caused ██████ harm......................................... 18

        C.      Virtually all class members were harmed ............................................................. 20

LEGAL STANDARD ...................................................................................................................... 20

ARGUMENT .................................................................................................................................... 21

I.      PLAINTIFFS AND EACH CLASS SATISFY RULE 23(A)...........................................21

        A.      Class members are numerous....................................................................21

        B.      The classes' claims raise common questions .........................................21

        C.      The class representatives' claims are typical .........................................22

        D.      The class representatives and counsel will provide adequate representation .......22

II.     PLAINTIFFS AND THE DIRECT CLASSES SATISFY RULE 23(B)(3)......................23

        A.      Plaintiffs satisfy the predominance requirement....................................23

                1.      Violation of antitrust law ...........................................................25

                        i.      Combination or some form of concerted action .................25

                        ii.     Relevant markets...............................................................26

                        iii.    Unreasonable restraint of trade .........................................29

                2.      Injury and causation...................................................................31

                        i.      Injury-in-fact.....................................................................31

                        ii.     Type of injury....................................................................33

                3.      Damages......................................................................................33

        B.      Plaintiffs satisfy the superiority requirement........................................34

III.    PLAINTIFFS AND THE RESTAURANT PLATFORM CLASS SATISFY RULE
        23(B)(2)....................................................................................................................34

CONCLUSION.........................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455, 133 S. Ct. 1184 (2013)...........................................................................21, 23, 24

*Bell v. PNC Bank, Nat'l Ass'n*,
    800 F.3d 360 (7th Cir. 2015)............................................................................................ 28

*Blessing v. Sirius XM Radio Inc.*,
    2011 WL 1194707 (S.D.N.Y. Mar. 29, 2011) .................................................................. 28

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013)............................................................................................ 34

*Concord Assocs., LP v. Entm't Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016) .........................................................................................26, 28

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) ............................................................................................... 21

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ........................................................................................ passim

*DDMB, Inc. v. Visa, Inc.*,
    2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) ................................................................. 35

*De Coster v. Amazon.com, Inc.*,
    350 F.R.D. 293 (W.D. Wash. 2025) .......................................................................... passim

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ................................................................... 22, 25, 32, 33

*Elisa W. v. City of N.Y.*,
    82 F.4th 115 (2d Cir. 2023) ..................................................................................20, 21, 22

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009) .............................................................................. 27

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023)............................................................................................. 30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804, 131 S. Ct. 2179 (2011)............................................................................... 24

*FTC v. Kroger Co.*,
    2024 WL 5053016 (D. Or. Dec. 10, 2024)........................................................................ 28

*FTC v. Whole Foods Mkt., Inc.*,
   502 F. Supp. 2d 1 (D.D.C. 2007), *rev'd on other grounds*, 548 F.3d 1028 (D.C. Cir. 2008).... 28

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ....................................................................................... 25

*Henrietta D. v. Giuliani*,
   119 F. Supp. 2d 181 (E.D.N.Y. 2000) ....................................................................... 34

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) .......................................................... 25

*In re Aphria, Inc. Sec. Litig.*,
   342 F.R.D. 199 (S.D.N.Y. 2022) ............................................................................... 21

*In re Auction Houses Antitrust Litig.*,
   193 F.R.D. 162 (S.D.N.Y. 2000) .......................................................................... 22, 34

*In re Credit Suisse Sec. Fraud Class Actions*,
   350 F.R.D. 425 (S.D.N.Y. 2025) ............................................................................... 23

*In re Elec. Books Antitrust Litig.*,
   2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ................................................. 24, 32, 33

*In re EpiPen Mktg., Sales Practices & Antitrust Litig.*,
   2020 WL 1180550 (D. Kan. Mar. 10, 2020) ............................................................. 33

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) .......................................................................... 25, 31

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................................. 26

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   714 F. Supp. 3d 65 (E.D.N.Y. 2024) .................................................................... 30, 31

*In re Platinum & Palladium Commodities Litig.*,
   2014 WL 3500655 (S.D.N.Y. July 15, 2014) ............................................................. 25

*In re Restasis Antitrust Litig.*,
   335 F.R.D. 1 (E.D.N.Y. 2020) .............................................................................. 32, 34

*In re Valve Antitrust Litig.*,
   780 F. Supp. 3d 1110 (W.D. Wash. 2024) ............................................. 1, 24, 27, 33

*Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024) ............................................................. 32

*Kurtz v. Costco Wholesale Corp.*,
818 F. App'x 57 (2d Cir. 2020) ................................................................................. 34

*Nat'l ATM Council, Inc. v. Visa Inc.*,
2023 WL 4743013 (D.C. Cir. July 25, 2023) ............................................................. 1

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85, 104 S. Ct. 2948 (1984) ......................................................................... 29

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020) ...................................................................... 28

*Ohio v. Am. Express Co.*,
585 U.S. 529, 138 S. Ct. 2274 (2018) ............................................................ 25, 27, 29

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ..................................................................................... 32

*Oliver v. Am. Express Co.*,
2024 WL 100848 (E.D.N.Y. Jan. 9, 2024) ...................................................... 1, 24, 33

*Regeneron Pharm., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) .................................................................................. 26, 27

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) .................................................................................. 32, 33

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
659 F.3d 234 (2d Cir. 2011) ...................................................................................... 21

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) .................................................................................... 24, 35

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ...................................................................................... 29

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
283 F.R.D. 199 (S.D.N.Y. 2012) ........................................................................... 22, 23

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442, 136 S. Ct. 1036 (2016) ............................................................ 23, 24, 30

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016) .................................................................................. 29, 30

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003) .................................................................................. 29, 30

v

*United States v. Visa, Inc.*,
   788 F. Supp. 3d 585 (S.D.N.Y. 2025) ...................................................................... 31

*US Airways, Inc. v. Sabre Holdings Corp.*,
   105 F. Supp. 3d 265 (S.D.N.Y. 2015) ............................................................... 30, 31

**Other Authorities**

6 Newberg & Rubenstein on Class Actions § 20:38 (6th ed. 2025) ............................................... 1

6 Newberg & Rubenstein on Class Actions § 20:40 (6th ed. 2025) ........................................... 22

6 Newberg & Rubenstein on Class Actions § 20:42 (6th ed. 2025) ........................................... 22

6 Newberg & Rubenstein on Class Actions § 20:54 (6th ed. 2025) ........................................... 34

Andre Boik and Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105 (2016) .................................................................. 17

**INTRODUCTION**

In this proposed class action, Plaintiffs allege that Defendants Grubhub Inc., Uber Technologies, Inc., and Postmates Inc. violated federal and state antitrust law by imposing "no-price-competition clauses" ("NPCCs") on restaurants, which prohibited them from charging lower prices for sales made through competing platforms or directly to consumers. The economics are straightforward. When restaurants sell through Defendants' platforms, Defendants charge them a substantial commission, often 30%. As a result, it is more expensive for restaurants to sell through Defendants' platforms than other channels. Absent Defendants' NPCCs, restaurants would offset those heightened costs by charging higher prices on Defendants' platforms compared to other, lower-cost sales channels. But as a result of the NPCCs, restaurants spread the exorbitant cost of selling through Defendants' platforms across all sales channels, and thus force consumers like Plaintiffs who purchase through those other channels to pay inflated prices.

To remedy this, Plaintiffs seek to certify three classes: two damages classes comprised of persons who purchased directly from restaurants subject to Defendants' NPCCs, and an injunctive relief class comprised of persons who purchased from such restaurants through competing platforms, like Doordash. "Courts have long noted that antitrust claims are particularly suited for class treatment." 6 Newberg & Rubenstein on Class Actions § 20:38 (6th ed. 2025). In fact, within the past three years alone, courts have certified proposed classes in at least four other antitrust cases challenging analogous restraints. *See De Coster v. Amazon.com, Inc.*, 350 F.R.D. 293 (W.D. Wash. 2025) (Amazon's NPCCs); *In re Valve Antitrust Litig.*, 780 F. Supp. 3d 1110 (W.D. Wash. 2024) (Steam's NPCCs); *Oliver v. Am. Express Co.*, 2024 WL 100848 (E.D.N.Y. Jan. 9, 2024) (American Express's anti-steering rules); *Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 WL 4743013 (D.C. Cir. July 25, 2023) (Visa's NPCCs).

The same result is appropriate here. For each damages class, every class member asserts that they were harmed the same way by the same conduct: Defendants' NPCCs caused them to pay higher prices for meals purchased through other sales channels. And for each class, every class member intends to make that showing with the same evidence—namely, Defendants' own documents and testimony, economic analysis of the relevant markets, and sophisticated econometric analysis demonstrating that, as one would expect, restaurant prices increased marketwide as a critical mass of restaurants became ensnared in Defendants' NPCCs. Plaintiffs' common evidence will show that, to prop up their businesses, Defendants ███████████████████ ████████████████████████████████████████████████. This is precisely the type of situation class actions are intended to address. Plaintiffs' motion should be granted.

## FACTUAL BACKGROUND

### I.    PLAINTIFFS' CLAIMS AND THE PROPOSED CLASSES

Plaintiffs are individuals who purchased meals in one or more of twelve cities in the United States (the "Local Markets"),[1] from restaurants subject to Defendants' NPCCs. Dkt. No. 147 ("SAC") ¶¶ 10–16, 26, 29. Each made purchases directly from such restaurants for dine-in, takeout, and delivery, while Boisi, Currie, Swaby, Obey, and Eliades also purchased indirectly through non-Defendant platforms. Declaration of Edward Normand ("Normand Decl."), Exs. 1–10.[2]

Plaintiffs assert four claims. In Count I, they allege that Defendants' NPCCs violate Section 1 of the Sherman Act by producing substantial anticompetitive effects in the "Direct Dine-In

---

[1] The cities are New York, Chicago, Los Angeles, San Francisco, Miami, Phoenix, Dallas, Washington, D.C., Boston, Philadelphia, Houston, and Atlanta. For purposes of this motion, the term "Plaintiffs" excludes those covered by the Stipulation of Partial Voluntary Dismissal dated February 26, 2026, Dkt. No. 172, as well as Emroy Caesar, Dustin Roberts, Arlesia Benjamin, and Marcus Robinson.

[2] Exhibits to the Normand Decl. are referenced as "Ex. __" throughout. For case citations, unless otherwise noted, alterations, quotations, and internal citations are omitted, and emphases are in original. Internal references (*e.g.*, *supra*) are to material in this "Factual Background" section, unless otherwise noted.

2

Market" (*i.e.*, the market for dining in at restaurants) and the "Direct Takeout and Delivery Market" (*i.e.*, the market for ordering directly from restaurants for takeout or delivery). *Id.* ¶¶ 202–10. In Count II, they assert the same claim with respect to the "Restaurant Platform Market" (*i.e.*, the market for platform transactions). *Id.* ¶¶ 211–19. Counts III and IV assert the same claims as Counts I and II under state antitrust law. *Id.* ¶¶ 220–30.

Plaintiffs seek to certify two damages classes: (1) the "Direct Dine-In Class" consists of all persons or entities in the United States who have purchased goods, for dining in the restaurant, from a restaurant subject to any Defendant's NPCC in a Local Market, and (2) the "Direct Takeout and Delivery Class" consists of all persons or entities in the United States who have purchased goods, for takeout or delivery by the restaurant, directly from a restaurant subject to any Defendant's NPCC in a Local Market. *Id.* ¶¶ 187–88. Plaintiffs also seek to certify an injunctive-relief class, the "Restaurant Platform Class," comprised of all persons or entities in the United States who have purchased goods, through a non-Defendant Restaurant Platform, from a restaurant subject to Grubhub's or Uber's NPCCs in a Local Market. *Id.* ¶ 189.[3] The proposed class representatives for the Direct Dine-In and Direct Takeout and Delivery Classes (the "Direct Classes") are Plaintiffs, and the proposed class representatives for the Restaurant Platform Class are Boisi, Currie, Swaby, Obey, Eliades, and Lewis.

In support of this motion, Plaintiffs submit the Expert Report of J. Douglas Zona ("Zona Decl."), Ex. 102, an experienced economist whose testimony has been accepted by courts

---

[3] The relevant period for the two damages classes is April 13, 2016, to December 31, 2021 (the "Damages Period"), while the relevant period for the Restaurant Platform Class extends to the present. The proposed classes exclude (i) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person. *Id.* ¶ 190.

throughout the country. Dr. Zona opines, among other things, that Defendants' NPCCs produced anticompetitive effects and harmed all or virtually all class members. *Id.* ¶¶ 12, 354.

## II.    DEFENDANTS OPERATE RESTAURANT PLATFORMS

Defendants operate platforms that connect consumers and restaurants to facilitate takeout and delivery orders from those restaurants ("Restaurant Platforms"). *Id.* ¶ 4. The platforms are ubiquitous: in June 2020, Grubhub's platform had nearly ███████ restaurants and ███████ active users, and Uber's platform had nearly ██████ restaurants and ███████ active users. *Id.* ¶¶ 61, 64. Restaurants that use platforms may either deliver the food themselves or, for an additional fee, utilize the platform's delivery fleet. *Id.* ¶¶ 84–85.

Restaurant Platforms generate revenue by charging commissions and fees to the restaurants and consumers that they connect. *Id.* ¶ 4. In general, platforms charge restaurants a commission that is calculated as a percentage of the order subtotal. *Id.* ¶ 85. For much of the Damages Period, Grubhub and Uber each charged restaurants a standard rate of ████ for platform-delivered orders. *See* Ex. 11 at -322 (describing standard fee); Ex. 12 at -458–59 ██████████████████████ ███████████████████████████████████). At the same time, platforms typically also charge consumers delivery and other fees. Zona Decl. ¶ 74.

## III.    DEFENDANTS COMPETE IN THE RESTAURANT PLATFORM MARKET

Defendants compete in a market comprised of Restaurant Platforms, *i.e.*, the Restaurant Platform Market. *Id.* ¶¶ 137–39. In that market, Restaurant Platforms compete for transactions and seek to grow the size of their networks, both on the consumer and restaurant side. *Id.* ¶ 58.

The ████████████████████████████████████. *Id.* ¶ 104; *see* Ex. 13 at -883 (analyst report); Ex. 14 at -869 (same); Ex. 15 at -089 (opinion article in Boston Globe); Ex. 16 at -083–084 (letter from Sen. Klobuchar). Defendants and their employees ███████ ████. *See* Ex. 17 at 288:22–289:4 (Uber "████████████████████████████"), 290:18–25

4



(Uber did not regard ███████████████), 291:2–5 (Uber did not regard ████████ ████████), 291:10–24 (Uber regarded ███████████████████████ ██████████████████████████████████████); Ex. 18 at 206:3–12 (Grubhub regarded ████████████████████████████████████), 206:13–207:21 (Grubhub ██████████████████████).[4]

Indeed, Restaurant Platforms offer unique services, both to restaurants and consumers. For restaurants, Restaurant Platforms offer delivery services, infrastructure, and logistics, and access to tens of millions of consumers. Zona Decl. ¶ 104; Ex. 17 at 343:5–344:8. For consumers, Restaurant Platforms offer access to a marketplace that enables them to identify and order from hundreds of thousands of restaurants, all without speaking to a person. Zona Decl. ¶ 104; Ex. 17 at 344:9–18; Ex. 18 at 200:14–201:8. Uber has thus analogized purchasing through Restaurant Platforms to ███████████████████████████████████.” Ex. 17 at 344:19–345:3.

Restaurant Platforms cater to a particular set of consumers—namely, those who are "time-constrained" and are "willing to pay a premium for convenience." Zona Decl. ¶ 104. These consumers tend to be ████████████████████████████████████. Ex. 23 at -747. Accounting for commissions and fees, they pay substantially higher prices to order through Restaurant Platforms than they would pay to get the same items in-store. Zona Decl. ¶ 104; Ex. 24 at -022 (███████████████████████████).

Dr. Zona's econometric analysis confirms that ███████████████████████ ██████████████████████████. Using transactional data obtained in discovery, ████████████████████████████████████████

---

[4] *See also* Ex. 19 at 165:9–11; Ex. 20 at 168:24–169:9; Ex. 21 at 32:1–17; Ex. 22 at 123:20–124:16.



. Zona Decl. ¶¶ 106–18. In other words, ▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 137.

Restaurant Platforms compete in the Local Markets. *Id.* ¶ 147. Dr. Zona's empirical analysis and ▮▮▮▮▮▮▮▮▮ demonstrate that food is delivered locally. *Id.* ¶¶ 141–42. Underscoring that point, Defendants not only ▮▮▮▮▮▮▮▮, but also ▮▮ ▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶¶ 143–45; Ex. 25 at -517 (▮▮▮▮▮▮); Ex. 26 at -218–220 (noting that Uber ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮), -223–24 (▮▮▮▮▮▮); Ex. 27 at 114:8–19 ▮▮▮▮▮▮); Ex. 28, Slide 9 (▮▮▮▮▮▮).

## IV.    THE RESTAURANT PLATFORM MARKET IS HIGHLY CONCENTRATED AND HAS HIGH BARRIERS TO ENTRY

The Restaurant Platform Market is highly concentrated and characterized by high barriers to entry. Zona Decl. ¶¶ 175, 180, 197–202. During the Damages Period, four Restaurant Platforms accounted for more than ▮▮ of all sales. *Id.* ¶ 175. That number decreased to three platforms when Uber acquired Postmates for $2.65 billion in 2020. *Id.* ¶ 63. Commentators have thus described the market as an "oligopoly." Ex. 15 at -089.

Market entry is difficult because, among other reasons, Restaurant Platforms exhibit strong network effects. Zona Decl. ¶ 198; *see* Ex. 29 at -687 (Uber ▮▮▮▮▮▮ ▮▮▮▮▮▮). New entrants face a chicken-and-egg problem that is difficult and expensive to overcome, including because they cannot attract consumers without restaurants and cannot attract restaurants without consumers. Zona Dec. ¶ 198. Indeed, no new significant

competitors entered the market during the Damages Period. *Id.* ¶ 201; Ex. 30 at 59:11–23 ███████

████████████████████████████████████████████████ ).

## V. DEFENDANTS HAVE ████████████████████ IN THE RESTAURANT PLATFORM MARKET

Defendants have ████████████ of the Restaurant Platform Market. For example, in February 2019, roughly the midpoint of the Damages Period, Grubhub's ████████████ in New York, Uber's ████████ in Miami, and Postmates' ████████ in Los Angeles. Zona Decl. ¶ 181. These ████ indicate that Defendants' platforms each ████████████████████ ████████ and were thus important prospective partners for restaurants. *Id.* ¶ 177. Indeed, each Defendant had ████████ of users who ████████████████████████████ ████████████████ through their platforms. *Id.* ¶¶ 18, 61, 64.

## VI. DEFENDANTS DICTATE TERMS TO RESTAURANTS

The popularity of Defendants' platforms, coupled with other market factors, enable Defendants to effectively dictate terms to restaurants. *Id.* ¶¶ 184–88, 211.

First, as a general matter, because so much commerce flows through Restaurant Platforms, many restaurants feel compelled to sell through the platform channel to maintain relevance. *Id.* ¶ 79; *see* Ex. 31 at -413 ████████████████████████████████ ████████████████████████████████████████ "). For example, during the Damages Period, restaurants expressed that Defendants' platforms " ████████████████████ ████████████," Ex. 32 at -599, and that restaurants were ████████████████████ ████████, Ex. 33 at -263. As one Grubhub employee put it, restaurants ████████████ ████████████████████████████ Ex. 34 at -359. Accordingly, in many Local Markets, ████ ████████ of all restaurants were on one or more of Defendants' platforms. Zona Decl. ¶ 351.

Second, the market dynamics are such that ███████████████████ is not sufficient for restaurants. *See* Ex. 18 at 244:6–18 (███████████████████); Ex. 35 at 25:22–26:13 ████████████████████████████); Ex. 26 at -418 ████████████████████ ███████████████████████████). As Grubhub explained with logic that applies equally to Uber and Postmates, ████████████████████ ████████████████████████████████████.” Ex. 28, Slide 16. Indeed, “███████████████████████████████████████████ ██████,” Ex. 37 at -678, with each providing restaurants with █████████████,” Ex. 18 at 245:12–19; Ex. 17 at 348:21–349:6; *see* Ex. 38 at -967 (head of Uber Eats stating that █████ ████████████████████████████████████████). This creates a "competitive bottleneck," which permits platforms with sufficiently large user bases—like Defendants—to impose unfavorable terms. Zona Decl. ¶¶ 170, 211.

Consistent with that, during the Damages Period, Defendants imposed commissions on restaurants that were ████████████████████. One consultant, for example, noted that Defendants' commissions █████████████████████████████████████ ███████████████████” Ex. 39 at -606; *see* Ex. 40 at -841 (similar). Restaurants raised similar ██████, Ex. 41, Slide 46, with one Uber employee noting that, ███████████ ██████████████████████████████████████████████ ██████████████████████,” Ex. 42 at -373, and a third-party survey finding that ████████████████████████████████████” Ex. 43 at -720. Even Defendants' ████████████████. *See* Ex. 44 at -938 (███████████ █████████████████████████████).

8



This feedback is unsurprising. Uber sought to "▮▮▮▮▮▮▮▮▮" on the restaurant side of the platform, Ex. 45 at -572, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Ex. 11 at -322–23. Grubhub, for its part, proclaimed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Ex. 34 at -359, and proceeded to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ between 2016 and 2019, often on ▮▮▮▮▮▮▮▮▮▮, Ex. 27 at 122:4–25. Realized rates ▮▮▮▮▮▮: Dr. Zona found that Grubhub's net fees ▮▮▮▮▮▮▮ between 2016 and 2019. Zona Decl. ¶ 307.

Defendants imposed other ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, including, as particularly relevant here, NPCCs. *Id.* ¶ 185. For example, internal Grubhub documents indicated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. These provisions were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 47 at 72:19–74:23 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

## VII.    RESTAURANTS COMPETE LOCALLY IN DIRECT MARKETS

In addition to selling through Restaurant Platforms, restaurants compete with each other in the Direct Dine-In Market and Direct Takeout and Delivery Market (the "Direct Markets"). Zona Decl. ¶¶ 149–62. These markets are distinct from each other: survey and other empirical evidence indicates that consumers do not view dine-in and takeout or delivery orders as substitutes, including because dine-in consumption is driven by factors like atmosphere and social interaction, whereas delivery and takeout are primarily chosen for convenience. *Id.* ¶¶ 153, 155. Restaurants competing in these markets set their prices with reference to, among other things, the prices charged by nearby restaurants. *Id.* ¶¶ 35, 339.

Indeed, in the Direct Markets, restaurants compete locally. *Id.* ¶ 163. For example, in New York, 90% of delivery orders are placed by consumers located within a ▮▮-minute drive of the

9

restaurant, while in Chicago, the analogous distance is ▮▮▮ minutes. *Id.* ¶ 165. Accordingly, the relevant geographic market for each zip code consists of restaurants located in zip codes within the applicable 90% catchment area for the city in which that restaurant is located. *Id.* ¶ 302.

## VIII.    DEFENDANTS' COMMISSIONS ENCOURAGE RESTAURANTS TO INCREASE ON-PLATFORM PRICES RELATIVE TO DIRECT PRICES

When restaurants sell through Restaurant Platforms, they face additional costs that they do not face in other sales channels, including substantial commissions. *Id.* ¶¶ 40, 215. Accordingly, it is more expensive for a restaurant to sell through a Restaurant Platform than other channels. *Id.* Or, as one firm put it, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 39 at -606. The impact of that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮" is exacerbated by the fact that restaurant profit margins are typically only 5%. Zona Decl. ¶ 33.[5]

Economic theory dictates that, absent restriction, restaurants would respond to higher costs in the Restaurant Platform channel by increasing their prices on that channel relative to lower-cost channels. *Id.* ¶ 215. Indeed, all else equal, a restaurant (like any other business) would increase its profits by doing so. *Id.* ¶¶ 40, 51, 215. Defendants' NPCCs, described below, preclude that.

---

[5] Defendants acknowledge that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As one Grubhub executive explained: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 48, Slide 5. In other words, where the Restaurant Platform "▮▮▮" is "▮▮▮▮▮," "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.*, Slide 4. A manager at Uber, Victor Verdeja, similarly explained that as platform orders comprise "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 44 at -938; *see also* Ex. 49 at 47:23–48:9 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

## IX.    DEFENDANTS IMPOSED NPCCS ON RESTAURANTS

### A.    Grubhub's NPCCs

Prior to August 2022, Grubhub's "standard restaurant contract included a provision that required menu prices on Grubhub's platform to be at least as favorable to diners as prices available on the restaurant's standard menu." Dkt. No. 156 ¶ 5. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ " Ex. 50, No. 83.

Witness testimony ██████████. Grubhub's former senior director of restaurant fulfillment, Morgan Funke, testified that "█████████████████████████

██████████████████████████," Ex. 21 at 16:4–9; that Grubhub "██████████████████████████████," *id.* at 17:6–18; that Grubhub's ████████████████████████, *id.* at 18:17–21, 21:13–17; and that █████████████████████," *id.* at 21:18–22. The manager who internally announced ███████████████████████, Liz Schaff, explained that ██████ ███████████████████████████████████████

██████████," Ex. 22 at 26:22–27:9, and that the prices on Grubhub █████████ ██████████████████████████," *id.* at 47:13–48:3; *see also id.* at 41:14–42:3 (similar), 44:16–19 (similar). A former senior operations manager, Christopher Guzek, confirmed that the ████████████████████████████████

████████████████████," including to consumers "██████████████████ ████." Ex. 30 at 44:24–46:5; *see also id.* at 186:22–187:3 (similar), 213:2–14 (similar).

The documentary evidence underscores these points. In contemporaneous emails and communications, Grubhub employees emphasized that ██████████████████," Ex. 51

at -631, that applied to "███████████████" on the platform, Ex. 52 at -196, and had only ██

██████████████████, Ex. 53 at -518. Indeed, employees noted that Grubhub's ████████

██████████████████████████," Ex. 54 at -688, and that █████████

██████████████████, Ex. 55 at -564, had ███████████████████,"

Ex. 56 at -992, was part of Grubhub's ████████████," Ex. 57 at -774, and was among the

"██████████████████, Ex. 58 at -378. Grubhub likewise told restaurants

that it does "███████████████████████████████████

████." Ex. 59 at -347; *see* Ex. 60 at -464 (similar); Ex. 61 at -687 (similar).

     Until October 2019, Grubhub ███████████████████ in three primary ways.

First, ████████████████████████████████████

████████████████████████████████████████

█████." Ex. 21 at 44:20–45:2.[6] Second, ███████████████████████

████████████████████████████████████████

████████." Ex. 62 at 34:3–7.[7] And third, Grubhub would █████████████

████████████████████████████████████. Ex. 30 at 170:3–11;

Ex. 69 at -045 (similar).



---

[6] *See also id.* at 64:10–24, 66:10–67:1, 70:12–71:1, 127:17–128:2; Ex. 62 at 33:5–12, 65:14–66:6, 139:24–140:8, 185:20–186:2, 191:8–15; Ex. 63 at -610; Ex. 64 at -709; Ex. 65 at -840.

[7] *See also id.* at 61:2–18, 65:14–66:6, 196:25–198:17, 203:2–204:8; Ex. 21 at 55:13–56:10, 107:16–108:16; Ex. 27 at 44:17–24; Ex. 30 at 51:22–52:7, 80:2–25, 84:23–85:9, 91:16–94:7, 94:15–95:23, 177:10–20, 178:14–179:14; Ex. 66 at -003; Ex. 67 at -546. During the Damages Period, Grubhub ██████████████ ██████████. Ex. 30 at 96:12–97:4. Grubhub would ████████████████████████ ████████. *Id.* at 101:14–102:12 (describing procedure), 107:5–108:4 (similar), 109:15–111:3 (similar); Ex. 21 at 109:11–18 (similar); Ex. 68 at -916 (similar).

In October 2019, in what Ms. Schaff described as a "███████████████," Ex. 70 at -678–79, and "███████████████████████," Ex. 22 at 114:4–11, Grubhub announced internally that it would ███████████████████, Ex. 62 at 186:3–12. But Grubhub did not ███████ ████████████████████████, *id.* at 146:7–147:5, continued to ███████████████████ ████████████████████████, *id.* at 142:11–143:13, 147:11–25, 149:14–150:5, and ████████ ████████████████████████████████, *id.* at 43:2–17, 98:21–100:10. As it had since at least 2016, moreover, Grubhub continued to ████████████████████████████████████. *Id.* at 152:8–154:4 (discussing requirements); Ex. 50, Nos. 85–88 (similar); Ex. 30 at 274:15–275:12 (similar); Ex. 71 at -724 (similar); Ex. 72 at -630 (similar).

**B.    Uber's NPCCs**

When Uber first launched, it did not ████████████████████████████ Ex. 17 at 18:18–22. Instead, Uber █████████████████████████████████████████████████████ ████████████████████████████." Ex. 73 at -060. By mid-2016, however, Uber abandoned that approach and █████████████████████████████████████████████████. *See* Ex. 74 at -920 ("██████████████████████████████████████████████████ ████████████████████████"); Ex. 75 at -971 (██████████████████████).

In October 2016, Uber modified its █████████████████████████████████████████ █████████████████████. *See* Ex. 76 at -112 (summarizing timeline), -116 (summarizing contract language); Ex. 77 at -309 (contract language); Ex. 17 at 33:14–34:5 (testifying about standard language), 62:4–16 (similar); Ex. 49 at 33:22–34:2 (similar), 41:25–43:2 (similar); Ex. 78 at -025 ("██████████████████████████████████████████████████████ ████████████████████████████████████████████████████."). Uber continued to ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████." Ex. 79 at -247. From



████████████████████████, Uber regarded ████████████████████████████████,"
such that allowing restaurants to ████████████████████████████████████
████████████████████████." Ex. 17 at 78:4–80:7, 140:7–20, 157:24–158:5, 165:11–
166:12. In other words, during this period, it was Uber's "████████████████████████
████████." Ex. 80 at -174.

Consistent with that, throughout 2018, Uber employees estimated that between ████████
████████████████████████████████████████████████. *See* Ex. 81 at
-273 ("████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████"); Ex. 82 at -161 ("████████████████████████████████████████

████████████████████████████████████████████████████")[8] Even among so-
called enterprise restaurants—large chains that presumably had more bargaining power than
smaller restaurants—████████████████. *See* Ex. 83 at -237 ("████████████████

████████████████████████████████████████████████████████████

████████████████████████████████"); Ex. 84 at -201 ("████████████████████

████████████████████████████████████████████████.").

Uber ████████████████████████████████. *See* Ex. 85 at -932 (indicating
"████████████████████████████████████"). First, ████████████████████

████████████████████████████████████████████████████████████"
Ex. 86 at -914; *see also* Ex. 87 at -658 ("████████████████████████████████.").

---

[8] These numbers are consistent with Plaintiffs' review of ████████████████████████████
produced by Uber in discovery. To the extent it would assist the Court, Plaintiffs can submit a declaration
to this end.

Second, prior to July 2018, ███████████████████████████████████████████

███████████████████████████████████████████" Ex. 76 at -081.[9]

This second ████████████████████████████████████████████████████████

████████████████████████████████████████████████. *See* Ex. 82 at -

161 ("████████████████████████████████████████"); Ex. 91 at 279:6–

280:22 (describing issues); Ex. 49 at 158:22–159:9 (similar). Accordingly, in August 2018, Uber

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████" Ex. 92 at -071. For ███████████████████████

████████████████████████████████████████████████████████████████

██████████████" *Id.* at -072; *see also* Ex. 49 at 53:4–54:16 (describing approach); Ex. 93 at

158:14–161:18 (similar), 288:23–289:19 (similar); Ex. 94 at -623–24 (sample communications).

Uber thus sought to ███████████████████████████████████████████████████

████████████████████████. Ex. 86 at -914; *see also* Ex. 82 at -161 (similar).

Uber continued to use this ████████ approach until around ████████. *See* Ex. 95 at -318

("████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████"); Ex.

93 at 160:8–161:18 (████████████████████████████████████). By that time, Uber had

concluded that the ███████████████████████████████████████████. As one internal

---

[9] *See* Ex. 88 at -137 (summarizing "████████████████████████████████████████");
Ex. 89 at -823 ████████████████████████████████████████████████████████
████████████████████████████████████████"); Ex. 90 at -011 ("████████████████
████████████████████████████████").

document stated: "█████████████████████████████████████████████

████████████████████████████████████████████████████████."

Ex. 95 at -319. Uber continued to ███████████████████████████. *See* Ex. 96 at -751

(███████████████).

### C.   Postmates' NPCCs

Until at least ████████████████████████████   *See* Ex. 97 at -863 (██████

██████████████████████████████████████████████████████████

██████████████████████████); Ex. 98 at -92–93 (████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████). Indeed, Postmates' standard agreements stated: "███████████████

████████████████████." Ex. 99 at -250; *see* Ex. 103 at 2 (███████████████████

████████████████████████████████████). By ███████████, Postmates had only

"████████████████████████████████████████████████." Ex. 100 at -365.

### X.   DEFENDANTS' NPCCS WERE EFFECTIVE

Defendants' NPCCs were ███████████████████████████████

██████████████████████e. Zona Decl. ¶¶ 261–63. For example, compared to restaurants that

were ████████████—and   were   therefore   ████████████████████████████████—

restaurants on Grubhub were ████████████████████████████████. *Id.* ¶¶ 264–76. The

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. *Id.*[10]

---

[10] Although data limitations precluded Dr. Zona from conducting the same comparative analysis for Uber and Postmates, there is no reason to believe the results would be different, *id.* ¶ 277, especially with respect

## XI.    DEFENDANTS' NPCCS HARMED THE CLASSES

### A.    Defendants' NPCCs drive commissions and prices upward

Platform most-favored nation clauses, like Defendants' NPCCs, cause substantial economic harm. Zona Decl. ¶¶ 212–20. These harms are well understood among economists and are described in a seminal paper by two economists, Andre Boik and Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & Econ. 105 (2016), that has been cited in multiple antitrust investigations, *id.* ¶¶ 221–23; *see De Coster*, 350 F.R.D. at 317–18 (expert's model was based on paper). These harms have, moreover, been corroborated by empirical research, which demonstrates that when, for example, online travel agencies in Europe removed in-store parity requirements, prices fell. Zona Decl. ¶¶ 224–26.

First, NPCCs cause consumers who purchase through channels other than Defendants' platforms, including in the Direct Markets, to pay more than they otherwise would. *Id.* ¶¶ 216, 241. Absent the NPCCs, restaurants could (and would) charge higher prices on higher-cost channels, like Defendants' platforms, than in the Direct Markets, where they do not face 30% commissions. *Id.* With the NPCCs, restaurants are prohibited from doing so and must instead apply any price increase they make on Defendants' platforms to all other sales channels. *Id.*

Second, NPCCs lead to higher commission rates because they render commission increases more profitable for Defendants. *Id.* ¶¶ 217–18, 240. Absent the NPCCs, in response to a commission increase, restaurants would simply increase their prices on Defendants' platforms, which would cause consumers to buy meals elsewhere and would thus reduce sales on Defendants'

---

to Uber. First, ████████████████████████████████████████████████████ .
*See supra* §§ IX.A–B. Second, although Uber ████████████████████████ , Grubhub restaurants continued to ████████████████████
████████████████████ , Zona Decl. ¶¶ 272–76, a result that is unsurprising given the evidence indicating that ████████████████████████████████████ " Ex. 95 at -319; *see* Ex. 47 at 53:1–13 (" ████████████████████████████ .").

platforms. *Id.* With the NPCCs, restaurants are forced to spread increased costs across all sales channels, which means they increase prices (i) by less than they otherwise would on Defendants' platforms and (ii) by more than they otherwise would on other sales channels. *Id.* Accordingly, fewer consumers switch away from Defendants' platforms to other sales channels in response to a commission increase, making that increase more profitable. *Id.*

Third, NPCCs reduce competition among Restaurant Platforms. *Id.* ¶¶ 222–23, 241. Absent the NPCCs, a competing Restaurant Platform could gain market share by offering lower commissions to restaurants, which would induce those restaurants to charge lower prices through the competitor. *Id.* With the NPCCs, the competitor's commission decrease would be ineffective because restaurants are prohibited from charging lower prices through the competitor. *Id.* This discourages the competitor from reducing commissions, while also deterring new, lower-cost Restaurant Platforms from entering the market. *Id.*

To confirm that these dynamics applied here, Dr. Zona developed a mathematical model that assessed the extent to which NPCCs altered optimal in-store pricing and optimal platform commissions. *Id.* ¶¶ 244–48. Using data for restaurants that ███████████████████████ ████████████████████ as a benchmark, Dr. Zona found that, for a restaurant with 10% of its sales through a platform, the NPCCs led to optimal in-store prices ████████████ and optimal platform ██████████████████ percentage points. *Id.* ¶¶ 249–51.

### B.   Defendants' NPCCs caused ██████████████ harm

In addition to quantifying how the NPCCs altered pricing incentives, Dr. Zona quantified the extent to which ███████████████████████████████ ████████████████████. *Id.* ¶¶ 315–36. Specifically, he constructed a linear regression model that analyzed the relationship between (i) ███████████████████████ and (ii) ███████████████████████



███████████████████████████████████████████. *Id.* ¶¶ 329–30. To isolate the ████████████████████████, he controlled for other variables that may impact restaurant pricing, including food, labor, and rent costs in the relevant area. *Id.*

Using data from millions of transactions, Dr. Zona found that ███████████████ ████████████████████████████████. *Id.* ¶ 332. In particular, the model indicates that for each ████████████████████████████████████████████ ████████████████████████████████ *Id.* This relationship is not only statistically significant, but also ████████████████████████████████████████ ████████████████████████. *Id.* ¶ 334. The model thus demonstrates that ██████████ ████████████████████████████████ during the Damages Period. *Id.*

Because the NPCC Penetration Rate varied by zip code and month, ████████████████ ████████████████████████. *Id.* ¶¶ 332–33. For example, from late 2016 to mid-2020, the weighted average ████████████████████ in New York ranged from approximately █████████ while during the same period, the ██████████████████ in Philadelphia ranged from approximately ████████ *Id.* These differences over time and geographic area are explained by differences in the NPCC Penetration Rate. *Id.*

Dr. Zona used ████████████████████████████████████████████████████ to calculate damages, both for certain Plaintiffs as an illustration, and for the Direct Classes in aggregate. *Id.* ¶¶ 336–37. Specifically, he calculated damages for individual Plaintiffs based on the date, location, and amount of their purchases, and aggregate damages based on the amount that consumers spent in each zip code and month at restaurants subject to Defendants' NPCCs. *Id.* In total, he found that the Direct Classes ██████████████████████████████████. *Id.* ¶ 336.

19

Approximately ███████████████████████████████████████████

████████████████████████████████████████. *Id.*

### C.    Virtually all class members were harmed

Because consumers generally visit restaurants several times a year, and because the impact

of Defendants' NPCCs ████████████████████████, the likelihood that a class

member would be unaffected by Defendants' conduct is miniscule. *Id.* ¶¶ 339–52. Indeed, based

on ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████, Dr. Zona found that ████████ of class members could be

expected to have escaped harm over the five-year Damages Period. *Id.* ¶ 352.

### LEGAL STANDARD

"Class actions are governed by Federal Rule of Civil Procedure 23." *Elisa W. v. City of

N.Y.*, 82 F.4th 115, 122 (2d Cir. 2023). "To maintain a class action, plaintiffs must demonstrate that

'(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions

of law or fact common to the class; (3) the claims or defenses of the representative parties are

typical of the claims or defenses of the class; and (4) the representative parties will fairly and

adequately protect the interests of the class.'" *Id.* (quoting Fed. R. Civ. P. 23(a)). "These

requirements are known as numerosity, commonality, typicality, and adequate representation." *Id.*

"In addition to satisfying these requirements, plaintiffs must also show that one of the three

conditions of Rule 23(b) is met." *Id.* Where, as here, plaintiffs seek "certification of a class action

for money damages under Rule 23(b)(3)," they must "establish that 'the questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently adjudicating

20

the controversy." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460, 133 S. Ct. 1184 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).

## ARGUMENT

The Direct Dine-In, Direct Takeout and Delivery, and Restaurant Platform Classes should each be certified. First, each class and its respective representatives satisfy Rule 23(a)'s threshold requirements. Second, the Direct Classes both satisfy Rule 23(b)(3)'s predominance and superiority requirements and should be certified as damages classes under that rule. And third, the Restaurant Platform Class satisfies Rule 23(b)(2)'s requirements and should be certified as an injunctive relief class under that rule.

### I.    PLAINTIFFS AND EACH CLASS SATISFY RULE 23(A)

#### A.    Class members are numerous

"[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, each proposed class contains thousands, if not millions. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) ("little difficulty in agreeing with the court that the numerosity requirement is satisfied," where "class includes approximately 275 people").

#### B.    The classes' claims raise common questions

Commonality is a "low hurdle," *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 204 (S.D.N.Y. 2022), that is met so long as "there are questions of law or fact common to the class," *Elisa W.*, 82 F.4th at 122–23. "[E]ven a single common question will do." *Id.* at 127 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359, 131 S. Ct. 2541 (2011)). Where, as here, a plaintiff moves "for certification of a class pursuant to Rule 23(b)(3), Rule 23(a)(2)'s commonality requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement of

21

predominance." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015). As shown below, both requirements are met here.

### C.    The class representatives' claims are typical

The typicality requirement is "not demanding." *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012). "Putative antitrust classes are particularly likely to satisfy the typicality requirement," 6 Newberg & Rubenstein on Class Actions § 20:40 (6th ed. 2025), which is met where "each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," *Elisa W.*, 82 F.4th at 128. Here, each class and its respective representatives allege that they were harmed in the same way by the same conduct—namely, they were overcharged as a result of Defendants' NPCCs. *See Dial*, 314 F.R.D. at 114–15 (satisfied where "all class representatives made some ISP purchases during the damages period").

### D.    The class representatives and counsel will provide adequate representation

Rule 23(a)(4) requires Plaintiffs to "demonstrate that 1) their interests are not antagonistic to the interest of other members of the class and 2) their attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103 (2d Cir. 2007). Both prongs are met.

First, each class representative's interests are aligned with the class he seeks to represent. "In antitrust suits alleging a conspiracy in restraint of trade, courts generally find the claims of a class representative to be sufficiently consistent with those of the absent class members so as to satisfy the adequacy requirements given that each individual plaintiff has an interest in establishing the existence and effect of the alleged conspiracy." *Newberg*, *supra*, § 20:42. That is the case where, as here, class representatives and members allege that they suffered the same harm from the same conduct. *See In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000)

(adequacy satisfied, where plaintiffs and class members "allegedly have been impacted by the artificial inflation" of commissions caused by conspiracy).

Second, Plaintiffs' counsel is qualified, experienced, and able to conduct the litigation. Plaintiffs' counsel has spent thousands of hours pursuing this action on behalf of the classes; that has included successfully opposing Defendants' motions to dismiss and compel arbitration, successfully defending on appeal the order denying Grubhub's motion to compel arbitration, obtaining from third parties data covering millions of transactions, and pursuing deposition and document discovery. FNF has been appointed and is serving as lead counsel or co-lead counsel in several class actions across the country, including *Henry v. Brown University*, No. 1:22-cv-00125 (N.D. Ill.), an antitrust case where plaintiffs have recovered $319 million to date. Ex. 101. Frank LLP has similarly achieved successful results, both in the context of antitrust class actions, *see Hartig Drug Co. v. Senju Pharm. Co.*, No. 1:14-cv-00719 (D. Del.), and in other complex litigation, *see United States ex rel. Valisure LLC v. GlaxoSmithKline*, No. 19-cv-4239 (E.D. Pa.) ($67.5 million settlement). Ex. 104. This combined wealth of experience is sufficient. *See Tsereteli*, 283 F.R.D. at 209–10 (requirement met).

## II.    PLAINTIFFS AND THE DIRECT CLASSES SATISFY RULE 23(B)(3)

### A.    Plaintiffs satisfy the predominance requirement

Predominance is "a comparative test," *In re Credit Suisse Sec. Fraud Class Actions*, 350 F.R.D. 425, 453 (S.D.N.Y. 2025), that "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class," *Amgen*, 568 U.S. at 459, 132 S. Ct. 1184. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or more important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S. Ct. 1036 (2016). For purposes of this inquiry, "[a]n individual question is one

where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id.*

"When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." *Id.* Predominance "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," *Amgen*, 568 U.S. at 469, 133 S. Ct. 1184, and "[t]he mere existence of individual issues will not be sufficient to defeat certification." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 87 (2d Cir. 2015). "Rather, the balance must tip such that these individual issues predominate." *Id.*

Predominance is "a test readily met in certain cases alleging violations of the antitrust laws." *Cordes*, 502 F.3d at 108. "For where plaintiffs were allegedly aggrieved by a single policy of the defendant, and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *13 (S.D.N.Y. Mar. 28, 2014). As in recent cases addressing NPCCs imposed by platforms,[11] that is the case here.

The predominance analysis "begins" with "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809, 131 S. Ct. 2179 (2011). "The three

---

[11] *See Oliver*, 2024 WL 100848, at *28 (debit card holders who purchased from merchants that accepted American Express cards challenging American Express's anti-steering provisions on grounds that they inflated fees charged to merchants); *De Coster*, 350 F.R.D. at 323 (consumers who purchased from third-party sellers through Amazon challenging Amazon's NPCCs on grounds they inflated Amazon fees); *Valve*, 780 F. Supp. 3d at 1126–28 (developers who sold through Valve challenging Valve's NPCCs on grounds they inflated Valve's fees).

required elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages." *Cordes*, 502 F.3d at 105. Plaintiffs will use common evidence to prove each.

### 1.     Violation of antitrust law

Plaintiffs will use common evidence to prove that Defendants violated federal and state antitrust law. "[C]ommon evidence generally predominates over individualized evidence with regard to" the antitrust-violation element because "it is primarily a determination that focuses on the defendants' conduct." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 551 (S.D.N.Y. 2021); *see Dial*, 314 F.R.D. at 114 (violation element "can be proven through class-wide, common evidence" because it "focus[es] on New Corp.'s conduct, not on the actions of putative class member"). "To prove a § 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004). As part of the latter requirement, plaintiffs typically must also "define the relevant market," *i.e.*, "the area of effective competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542–43, 138 S. Ct. 2274 (2018). "Generally, the plaintiffs' successful showing of common evidence of a violation is a compelling reason to find that predominance is satisfied overall." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at \*40 (E.D.N.Y. Oct. 15, 2014).

### i.   Combination or some form of concerted action

Plaintiffs will use common evidence to prove concerted action. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at \*9 (S.D.N.Y. July 15, 2014); *accord Newberg*, *supra*, § 20:38 (similar). Here, each class member will rely on the same testimony and documents to establish that Defendants imposed and enforced

NPCCs as a matter of policy during the Damages Period, and that such efforts broadly impacted restaurant pricing across sales channels. *See supra* §§ IX–X; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 52 (E.D.N.Y. 2019) (common issue where plaintiffs "point[ed] to specific policies and rules" that caused harm).

### ii.  **Relevant markets**

Plaintiffs will use common evidence to define the relevant markets. "For antitrust purposes, the concept of a market has two components: a product market and a geographic market." *Concord Assocs., LP v. Entm't Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016).

Product market. The product markets here are the Restaurant Platform Market, the Direct Dine-In Market, and the Direct Takeout and Delivery Market.[12] In antitrust law, the product market is comprised of "all products reasonably interchangeable by consumers for the same purposes." *Regeneron Pharm., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024). "Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." *Id.* at 339. The Second Circuit has "evaluated interchangeability" by "imagining that a hypothetical monopolist has imposed a small but significant non-transitory increase in price ('SSNIP') within the proposed market." *Id.* "If the hypothetical monopolist can impose a SSNIP without losing so many sales to other products as to render the SSNIP unprofitable, then the proposed market is the relevant market." *Id.*

---

[12] Although the Direct Takeout and Delivery Market may contain submarkets for takeout and delivery, that does not alter the analysis of whether common issues predominate: the scope of the relevant markets would likewise be defined with reference to common evidence, and Dr. Zona's model is capable of estimating anticompetitive effects, injury, and damages in either market for the reasons provided below.

"Hard data concerning cross-elasticity is not the only means of proving a relevant market." *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 355 (S.D.N.Y. 2009). Indeed, "[c]ourts also often look to 'practical indicia' of market boundaries to identify whether two products are economic substitutes and compete within the same antitrust market." *Regeneron*, 96 F.4th at 339. "These indicia," sometimes referred to as the *Brown Shoe* factors, "can include industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

As relevant here, the Supreme Court has stated that "[o]nly other two-sided platforms can compete with a two-sided platform for transactions." *Amex*, 585 U.S. at 546, 138 S. Ct. 2274. Consistent with that, courts have recently found that, for purposes of class certification, platforms do not compete with non-platforms from which the same goods may be purchased. *See De Coster*, 350 F.R.D. at 320–23 ("Online Retail Marketplace Market" excluded online and brick-and-mortar retailers where consumers could purchase the same goods); *Valve*, 780 F. Supp. 3d at 1124 ("PC video game digital distribution market" excluded "other distribution methods"). For this reason alone, the Restaurant Platform Market and Direct Markets are properly defined separately.

This distinction is further supported by evidence that applies with equal force to each class member. For example, the *Brown Shoe* factors demonstrate that ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████████, while Dr. Zona's econometric analysis demonstrates that ██████████████████ ████████████████████████████ *See supra* § III. Plaintiffs similarly intend to

27

rely on common evidence regarding consumer preferences to prove that the Direct Dine-In and Direct Takeout and Delivery Markets are distinct. *See supra* § VII. In short, Plaintiffs' evidence regarding market definition concerns Defendants' products and general consumer preferences—not the actions, decisions, or circumstances of individual class members—and is thus common to the class. *See Blessing v. Sirius XM Radio Inc.*, 2011 WL 1194707, at \*7 (S.D.N.Y. Mar. 29, 2011) (evidence relating to "product characteristics" and "ability to sustain profits through price increases" was common to class).

Geographic market. The other component of an antitrust market, the geographic market, consists of "the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Concord Assocs.*, 817 F.3d at 53. "The relevant geographic markets need not be defined with scientific precision, as an element of fuzziness would seem inherent in any attempted definition." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 203 (S.D.N.Y. 2020). In cases involving grocery stores, courts have found that the relevant geographic market consists of stores within a certain distance, whether measured in miles or drive time. *See, e.g.*, *FTC v. Kroger Co.*, 2024 WL 5053016, at \*12 (D. Or. Dec. 10, 2024) (ten-mile radius); *FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1, 36–38 (D.D.C. 2007) (16-minute drive), *rev'd on other grounds*, 548 F.3d 1028 (D.C. Cir. 2008).

Here, for the Direct Markets, Plaintiffs will use common evidence to prove that the relevant geographic markets are similarly determined by drive time. *See supra* § VII. Indeed, although the specific geographic market in which class members made qualifying purchases will vary, the methodology for determining the scope of those markets will not. *See Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 379 (7th Cir. 2015) ("Rule 23(b) requires only common evidence and common methodology, not common results."). Specifically, for each class member, the relevant

28

geographic market for a given purchase will be the appropriate 90% catchment area around the zip code in which the purchase was made. *See supra* § VII. As to the Restaurant Platform Market, Plaintiffs will also rely on common proof—████████████████████████████ ██████—to prove that the Local Markets are the relevant geographic markets. *See supra* § III.

### iii.    Unreasonable restraint of trade

Plaintiffs will use common evidence to prove that Defendants' unreasonably restrained trade. Under the rule of reason, a restraint is "unreasonable" if it "has a substantial anticompetitive effect that harms consumers in the relevant market." *Amex*, 585 U.S. at 541, 138 S. Ct. 2274. Plaintiffs may prove such effects either "directly or indirectly." *Id.* at 542. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* "Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

Courts have described market power as "the ability to raise prices above those that would be charged in a competitive market," *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38, 104 S. Ct. 2948 (1984), or "the power to force a purchaser to do something that he would not do in a competitive market," *United States v. Am. Express Co.*, 838 F.3d 179, 200 (2d Cir. 2016). Regardless of the specific formulation, the purpose of the inquiry is the same: to determine whether the defendant has the ability "to cause an adverse effect on competition." *Id.* at 194.

Market power "may be proven through evidence of specific conduct undertaken by the defendant that indicates he has the power to affect price or exclude competition." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003). For example, "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001). "Alternatively, market

29

power may be presumed if the defendant controls a large enough share of the relevant market." *Visa*, 344 F.3d at 239. There is no "strict threshold," *Amex*, 838 F.3d at 200 n.47, but courts have found market shares between 20% and 30% may be sufficient where the relevant market is "concentrated" and has "high barriers to entry," *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 96–100 (E.D.N.Y. 2024) (denying summary judgment); *see Visa*, 344 F.3d at 240 (26% share of "highly concentrated market").

Where a defendant has market power, a plaintiff may rely on "anecdotal or theoretical evidence" to establish anticompetitive effects. *Payment Card*, 714 F. Supp. 3d at 96. "This inquiry need not always be extensive or highly technical." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023). "It is sufficient that the plaintiff prove the defendant's conduct, as a matter of economic theory, harms competition." *Id.* at 983–84.

Here, Plaintiffs will prove anticompetitive effects directly with common evidence— namely, ███████████████████. As explained above, that ██████████████████ ████████████████████████████████████████ ██████████. *See supra* § XI.B; *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 281–82 (S.D.N.Y. 2015) (adverse effect "may be shown by evidence of increased prices"). Accordingly, it may be relied upon by each class member, regardless of where and when they made their purchases. *See Tyson Foods*, 577 U.S. at 455, 136 S. Ct. 1036 ("statistical evidence" is "permissible method of proving class wide liability" if "each class member could have relied on that sample to establish liability if he or she had brought an individual action").

Common evidence can also be used to indirectly establish anticompetitive effects. First, Dr. Zona's opinion and anticipated testimony that (i) ███████████████████████ ███████████████████████████, (ii) ███████████████████████████,

30



(iii) ████████████████████████████████████████, (iv) ██████████

████████████████████████████, and (v) ████████████

████████████████, constitutes strong evidence for each class member of Defendants' market

power and ability to influence prices in each relevant market, *see supra* §§ IV–VI, XI.B; *Payment*

*Card*, 714 F. Supp. 3d at 96–97 (market shares, concentration, and barriers relevant); *US Airways*,

105 F. Supp. 3d at 274, 281 (ability to insist on contractual terms is evidence of market power);

*United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 611–12 (S.D.N.Y. 2025) (foreclosure of 45% of

market "sufficient to violate the Sherman Act").[13] Second, each class member could likewise rely

on Dr. Zona's theoretical analysis of the impact of NPCCs to meet his or her burden to provide

"some evidence" that those clauses harmed competition here. *See supra* § XI.A.

## 2. Injury and causation

Plaintiffs will use common evidence to prove injury and causation. The antitrust-injury

inquiry "poses two distinct questions": first, "the familiar factual question whether the plaintiff has

indeed suffered harm, or 'injury-in-fact,'" and second, "the legal question whether any such injury

is injury of the type the antitrust laws were intended to prevent and that flows from that which

makes defendants' acts unlawful." *Cordes*, 502 F.3d at 106.

### i. Injury-in-fact

"Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase

suffices to show" injury in fact. *Namenda*, 338 F.R.D. at 557. On a motion for class certification,

"the Court only evaluates whether the method by which plaintiffs propose to prove class-wide

---

[13] Although Defendants' market shares and the percentage of restaurants subject to Defendants' NPCCs
█████████████████████, the shares and percentages from every Local Market are relevant to each class
member's claim because they support the broader points that the Restaurant Platform Market, by its nature,
is █████████████████████████████, and that ████████
████████████████████████████ Zona Decl. ¶¶ 174–79, 182, 184,
200–01.

impact *could* prove such impact, not whether plaintiffs in fact can prove class-wide impact." *Iowa Pub. Emps. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2024 WL 5004632, at *12 (S.D.N.Y. Dec. 6, 2024). That is, plaintiffs need only "advance a workable methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *Dial*, 314 F.R.D. at 115.

In antitrust cases, there is "a commonly accepted two-step method to prove classwide injury-in-fact." *In re Restasis Antitrust Litig.*, 335 F.R.D. 1, 15 (E.D.N.Y. 2020). "This approach shows, first, that class members paid artificially inflated prices and, second, that this price inflation occurred to substantially all class members." *Id.*[14] For example, in *Olean*, the plaintiffs' expert first used a regression model to calculate an aggregate 10.28% overcharge attributable to the alleged conspiracy, and then "confirm[ed]" that his model was "an appropriate tool" to "show common impact" by, among other things, modifying it to "evaluate the overcharge specific to certain products with different characteristics." 31 F.4th at 671–73.

Here, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████. *See supra* § XI.B. This model is sufficient for purposes of class certification because it "takes account of the significant variables affecting price" such as restaurants' costs, *Dial*, 314 F.R.D. at 116, and purports to measure "damages that result from the class's asserted theory of injury," *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).

---

[14] A regression model may make both showings in one swoop. *See Elec. Books*, 2014 WL 1282293, at *14–23 (regression that estimated average overcharge attributable to alleged antitrust violation for each category of e-book constituted "classic method" that was sufficient to establish predominance); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022) (en banc) ("In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members.").

Second, to further assess common impact, ███████████████████████

████████████████████████████████████. *See supra* § XI.B. He then used data on

the ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ could expect to avoid being overcharged a single time during the five-year Damages

Period. *See supra* § XI.C; *In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 2020 WL

1180550, at *32–34 (D. Kan. Mar. 10, 2020) (accepting similar analysis). Dr. Zona's methodology

is thus capable of proving that Defendants' NPCCs harmed substantially all class members—

████████████████████████████████████████████████████████████████

███████████. *See Elec. Books*, 2014 WL 1282293, at *14–23 (overcharge calculated by book

category); *De Coster*, 350 F.R.D. at 315–17 (overcharge calculated by product category); *Oliver*,

2024 WL 100848, at *9–10 (uniform overcharge); *Valve*, 780 F. Supp. 3d at 1123 (same).

### ii.  Type of injury

Plaintiffs will use common evidence to prove that, as a legal matter, their injury is "of the

type the antitrust laws were intended to prevent and that flows from that which makes defendants'

acts unlawful." *Cordes*, 502 F.3d at 107. To the extent that issue has not already been resolved, *see*

Dkt. No. 46, at 29–30, it can be resolved on a classwide basis because "[t]here is only one type of

injury alleged," an overcharge from Defendants' conduct, *Cordes*, 502 F.3d at 107.

### 3.  Damages

Setting aside that "individual damages determinations do not defeat class certification,"

*Dial*, 314 F.R.D. at 120, Plaintiffs will use common evidence—██████████████████

██████—to prove damages. Where a plaintiff relies on a statistical model to determine damages,

that model must purport to "measure damages that result from the class's asserted theory of injury."

*Roach*, 778 F.3d at 407. Nevertheless, "given the inherent difficulty of identifying a 'but-for

world,'" any such model need not measure damages with "precision" or "certainty." *Restasis*, 335

F.R.D. at 32. Here,

. *See supra* XI.B. Whatever qualms Defendants may have with it, the model

"still serves as common evidence of plaintiffs' theory of injury," and is therefore sufficient. *Kurtz*

*v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020).

### B.    Plaintiffs satisfy the superiority requirement

Plaintiffs satisfy the superiority requirement, which is "easily met in most antitrust cases."

*Newberg*, *supra*, § 20:54. Indeed, where, as here, a case involves "large numbers" of consumers

who "were overcharged pursuant to a common scheme and mechanism and who have relatively

small stakes," "[t]he superiority of the class action device" is "clear." *Auction Houses*, 193 F.R.D.

at 168. Under such circumstances, the "alternative" is not some other proceeding; it is no

proceeding at all and impunity for Defendants. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801

(7th Cir. 2013).

## III.    PLAINTIFFS AND THE RESTAURANT PLATFORM CLASS SATISFY RULE 23(B)(2)

Although  Defendants ,

Grubhub and Uber continued to                              , *see supra* § IX, which lead

to inflated commissions on non-Defendant platforms and otherwise suppress competition in the

Restaurant Platform Market, Zona Decl. ¶ 314.[15] Plaintiffs thus seek certification of the Restaurant

Platform Class pursuant to Rule 23(b)(2).

---

[15] This action was commenced in April 2020. The bulk of document and data discovery was completed before the case was stayed in 2023 and was thus limited to the period ending in December 2021. Although Plaintiffs therefore have less precise information available about the impact of Defendants' conduct after 2021, they have no reason to believe that Defendants' platform parity requirements would suddenly cease causing harm. *See id.*; *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 204–05 (E.D.N.Y. 2000) (rejecting

Under that rule, a class may be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole." *Sykes*, 780 F.3d at 80. Here, Grubhub and Uber have "acted on grounds generally applicable to the class," *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *44 (E.D.N.Y. Sept. 27, 2021), by imposing ██████████████████████ that increase prices and fees for consumers who make purchases from those restaurants through competing platforms, *see supra* §§ IX. XI.A. In addition, the requested relief—an order enjoining Grubhub and Uber from imposing ███████████████ on restaurants—"would apply to and benefit the class as a whole," *DDMB*, 2021 WL 6221326, at *44, by removing those harms going forward.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the Direct Dine-In Class and Direct Takeout and Delivery Class pursuant to Rule 23(b)(3), certify the Restaurant Platform Class pursuant to Rule 23(b)(2), appoint Plaintiffs as representatives of the Direct Dine-In and Direct Takeout and Delivery Classes, appoint Plaintiffs Boisi, Currie, Swaby, Obey, Eliades, and Lewis as representatives of the Restaurant Platform Class, and appoint Freedman Normand Friedland LLP and Frank LLP as counsel for each class.

Dated:  March 2, 2026                    Respectfully submitted
       New York, NY

                                  */s/ Edward Normand*
                                  Edward Normand
                                  Velvel (Devin) Freedman
                                  Kyle W. Roche
                                  Stephen Lagos
                                  **FREEDMAND NORMAND FRIEDLAND LLP**

---

argument that permanent injunction should not be entered because plaintiffs allegedly relied upon outdated evidence at trial). To the extent that Defendants contend that this evidence is stale, Plaintiffs would propose further, targeted discovery to address that assertion.

155 E. 44th Street, Suite 915
New York, NY 10017
Tel: (646) 494-2900
tnormand@fnf.law
vel@fnf.law
kroche@fnf.law
slagos@fnf.law

Richard Cipolla
John Super
**FREEDMAND NORMAND FRIEDLAND LLP**
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel: (617) 374-3700
rcipolla@fnf.law
jsuper@fnf.law

Gregory A. Frank
Marvin L. Frank
Asher Hawkins
**FRANK LLP**
305 Broadway, Suite 700
New York, NY 10007
Tel: (212) 682-1853
gfrank@frankllp.com
mfrank@frankllp.com
ahawkins@frankllp.com

*Counsel for Plaintiffs*

36